UNITED STATES of America

v.

ATLANTIC STATES CAST IRON PIPE COMPANY, John Prisque, Scott Faubert, Jeffrey Maury, and Craig Davidson, Defendants.

Criminal No. 03–852 (MLC).

United States District Court, D. New Jersey.

April 30, 2009.

John J. O'Reilly, Day Pitney LLP, Morristown, NJ, Thomas J. Kelly, Jr., Venable LLP, Washington, DC, Lawrence S. Lustberg, Gibbons PC, Newark, NJ, for Atlantic State's Cast Iron Pipeline Co.

Michael D. Ctirchley, Critchley & K, LLC, Roseland, NJ, for John Prisque.

Michael D'Alessio, Jr., Walder Hayden & Brogan, PA, Roseland, NJ, Michael J. Sullivan, Timothy Ignatius Duffy, Mark K. Silver, Coughlin Duffy LLP, Morristown, NJ, for Scott Faubert.

Michael N. Pedicini, Morristown, NJ, for Jeffrey Maury.

Vincent Joseph Nuzzi, Nuzzi & Mason, LLC, Dover, NJ, for Craig Davidson.

Maurice A. Griffin, Office of the Attorney General, Trenton, NJ, Phillip Leahy, Office of the NJ Attorney General, Division of Criminal Justice, Trenton, NJ, for New Jersey Department of Law & Public Safety.

Andrew D. Goldsmith, U.S. Attorney General's Office, Environmental Crimes Section, Washington, DC, Norville P. McAndrew, James Thomas Kitchen, Office of the U.S. Attorney, Trenton, NJ, for Plaintiff United States of America.

## MEMORANDUM OPINION

MARY L. COOPER, District Judge.

### INDEX TO MEMORANDUM OPINION

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .192

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .195

I. APPLICABLE GUIDELINE EDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .195

II. CHAPTER TWO CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .197
 A. OSHA–RELATED OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .197
 1. Application of Section 2J1.2 to these offenses . . . . . . . . . . . . . . . . . . . . . . . . .197
 2. USSG § 2J1.2(a)—Base offense level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .198
 3. USSG § 2J1.2(b)(2)—Substantial interference with the administration
 of justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .198
 B. CWA–RELATED OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .208
 1. Review of convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .208
 2. USSG § 2Q1.3—Mishandling of environmental pollutants . . . . . . . . . . . . . . .209
 3. USSG § 2Q1.3(a)—Base offense level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .211
 4. USSG § 2Q1.3(b)(1)(A) or (B)—Discharge, release, or emission of
 pollutant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .212
 5. USSG § 2Q1.3(b)(4)—Discharge without or in violation of permit . . . . . . . .221
 6. USSG § 2Q1.3, Notes 4 and 7—Departure of up to two levels either
 direction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .222
 7. USSG § 2Q1.3, Note 3—Departure involving negligent conduct . . . . . . . . . .229

 8. USSG § 2F1.1(a)—Base offense level ...............................231
 C. CAA–RELATED OFFENSES .........................................231
 1. Review of convictions ...........................................231
 2. USSG § 2Q1.3—Mishandling of environmental pollutants ...............232
 3. USSG § 2Q1.3(a)—Base offense level ..............................233
 4. USSG § 2Q1.3(b)(1)(A) or (B)—Discharge, release, or emission of
 pollutant .....................................................233
 5. USSG § 2Q1.3(b)(4)—Discharge without or in violation of permit .........236
 6. USSG § 2Q1.3, Notes 4 and 7—Departure of up to two levels ...........236

III. CHAPTER THREE, PART B (ROLE IN OFFENSE) .........................239
 A. Guidelines Introductory Commentary .................................239
 B. USSG § 3B1.1—Aggravating Role ....................................240
 C. USSG § 3B1.2—Mitigating Role .....................................257
 D. USSG § 3B1.3—Abuse of Position of Trust ............................260
 1. This enhancement has been applied most commonly in the contractual
 setting. The contracts can be in the public or the private sector......262
 2. The enhancement has also been applied to public employees
 occupying positions of trust. ....................................266
 3. The enhancement has been applied to certain persons holding
 government-issued professional or occupational licenses................267
 4. The enhancement has been applied to a manager for abuse of trust by
 forcing mine workers to falsify safety training certifications. ...........268
 5. There is sharp disagreement whether the enhancement applies to
 environmental offenses by private persons. .........................269

IV. CHAPTER THREE, PART C (OBSTRUCTION OF JUSTICE) .................275
 A. USSG § 3C1.1—Obstructing or Impeding the Administration of Justice—
 Perjury .........................................................275
 1. John Prisque ..................................................281
 2. Scott Faubert ..................................................295
 3. Jeffrey Maury .................................................312
 4. Craig Davidson ................................................344
 B. USSG § 3C1.1—Obstructing or Impeding the Administration of Justice—
 Unlawfully Influencing or Attempting to Influence a Witness ..............366

V. CHAPTER THREE, PART D (MULTIPLE COUNTS) .........................375
 A. USSG § 3D1.1—Procedure for Determining Offense Level on Multiple
 Counts .........................................................375
 B. USSG § 3D1.2—Groups of Closely Related Counts .........................376
 C. USSG § 3D1.4—Determining the Combined Offense Level ...................380
 1. John Prisque ..................................................380
 2. Scott Faubert ..................................................382
 3. Jeffrey Maury .................................................382
 4. Craig Davidson ................................................383

SUMMARY ...............................................................383

## PRELIMINARY STATEMENT

This memorandum opinion pertains to the sentencing of all defendants convicted in this case: ATLANTIC STATES CAST IRON PIPE CO., JOHN PRISQUE, SCOTT FAUBERT, JEFFREY MAURY, and CRAIG DAVIDSON. A summary of the counts of conviction as to each defendant may be found on the docket. (*See* dkt. 721 at 1–3, 112–13, 133–34.)[1] The

1. Most references to the trial record in this memorandum are by citation to the Memorandum Opinion filed herein on 8–2–07 (dkt. 721), containing rulings on post-trial motions.

parties were given notice of the contents of this memorandum on December 31, 2008, in the form of tentative rulings. Sentencing was completed on April 20–24, 2009. These tentative rulings were made final at the sentencing hearings, after the parties had been afforded full opportunity to respond.

The Court must sentence each defendant individually. However, the convictions in this multi-count, multi-defendant prosecution raise some common sentencing issues, as well as some separate issues. In addition, the post-*Booker* sentencing process for each defendant must include three steps, in which the Court must: (1) determine the guideline range; (2) rule on departure motions under the guidelines; and (3) determine the sentence pursuant to 18 U.S.C. § 3553(a), including ruling on any requests for variance from the guideline rulings. *See United States v. Levinson,* 543 F.3d 190, 194–95 (3d Cir.2008). An indispensable part of arriving at a reasonable sentence is a correct calculation of the advisory guidelines range. *See United States v. Cooper,* 437 F.3d 324, 330 (3d Cir.2006).

A ruling at Step 1 pertaining to a particular defendant here may be dispositive of an issue common to one or more other defendants. Therefore, the parties were given the opportunity to brief their arguments at Step 1 simultaneously, pursuant to scheduling orders entered for that purpose. (Dkt. 728, 729.) In doing so, the parties raised arguments on potential departures mentioned in the application notes for the Clean Water Act ("CWA") and Clean Air Act ("CAA") offenses. This memorandum contains a preliminary discussion of those issues, which were to be decided along with any other departure issues at Step 2.

This memorandum sets forth our guideline rulings at Step 1, concentrating primarily upon the calculations for each individual defendant. Some of these points also pertain to the corporate defendant, but the primary focus here is on guideline calculations for the individual defendants.

The purpose of this memorandum, when circulated to the parties on December 31, 2008, was to notify all parties of these Step 1 rulings, by reference to the trial record and pertinent authorities. It is now being filed on the Docket as a sentencing opinion, without substantial modification. The topic headings emerge from the issues identified by the parties.[2]

The following discussion provides the Court's rulings on guideline issues identified by the parties and/or the U.S. Probation Office ("Probation") in preparation of drafts of the Presentence Investigation Reports ("PSRs") pertaining to the named defendants. The contents of PSRs are not public, nor are the sentencing memoranda submitted by the parties. (Dkt. 639.)[3] The Court has considered the extensive

---

Terms and abbreviations used there are incorporated by reference here.

**2.** The defendants did not have a joint defense agreement, and each defendant argues separately on those sentencing issues pertinent to that defendant. We will refer to them as "defendants" only where their positions coincide; otherwise we will refer to them separately.

**3.** We entered an order on 8–18–06 directing: "[U]nless prior leave of Court is requested

and granted, (1) sentencing briefs and memoranda, and all related materials, shall be submitted to chambers and not filed on the docket; [and] (2) the parties are not to disclose, by any means, the contents of those materials or the contents of any presentence report." (Dkt. 639.) This is consistent with Standing Order re: Guideline Sentencing, July 7, 2000, and practice in this District. *See* Lite, *N.J. Federal Practice Rules,* Comment 3 to L.Crim.R. 32.1 (Gann 2008 ed.).

briefing materials and oral arguments on those topics.[4] The guideline rulings in this memorandum are based on the public trial record and legal authorities as cited herein, rather than on the contents of any PSR drafts.

The trial record in this case is extremely lengthy, totaling approximately 20,000 pages of transcript and many exhibits over the course of the trial. (*See* dkt. 721 at 3, n. 5.) The parties argue many aspects of the evidence in their sentencing memoranda submitted to date.[5]

The findings set forth in this memorandum are based on the summary of the record contained in our Memorandum Opinion on the Rule 29 and Rule 33 motions (dkt. 721), except where otherwise noted. In making each ruling we will cite to the relevant portion of our summary of the evidence contained in that Memorandum Opinion, and thus incorporate that portion of the record without repeating it here.

This memorandum makes only those factual findings necessary to a ruling on each disputed guideline point, applying the standard of preponderance of the evidence. *United States v. Grier,* 475 F.3d 556 (3d Cir.2007). There is certainly more evidence that the parties can argue, and have argued, supports their respective positions. However, we decline to elaborate on the factual support for these findings beyond what is necessary to rule on each disputed guideline issue.

\* \* \*

Here we present a very brief overview of the structure of the sentencing guidelines, as pertinent to the guideline calculation issues raised by the parties. The discussion in this memorandum follows that structure, with reference to each individual defendant in those portions relevant to that defendant.

Chapter Two of the guidelines pertains to offense conduct, and is organized by offense statute. "Each offense has a corresponding base offense level and may have one or more specific offense characteristics that adjust the offense level upward or downward." USSG Ch. 2, intro. cmt.[6] For each type of substantive offense

4. The sentencing memoranda submitted to Probation and to Chambers as of December 31, 2008, consisted of the following, which we will cite as indicated: Atlantic States Responses and Objections to Draft PSR, 10–12–07 ("Atlantic States I"); Prisque Responses and Objections, 10–12–07 ("Prisque I"); Faubert ltr. mem., 10–12–07 ("Faubert I"); Faubert supp. ltr. mem., 11–13–07 ("Faubert II"); Maury Responses and Objections, 10–12–07 ("Maury I"); Davidson Responses and Objections, 10–19–07 ("Davidson I"); United States Consolidated Opposition and Argument for Upward Enhancement, 11–30–07 ("Gov. I"); Atlantic States Response, 12–21–07 ("Atlantic States II"); Prisque Reply, 12–21–07 ("Prisque II"); Faubert ltr. reply mem., 12–21–07 ("Faubert III"); Maury Response, 12–21–07 ("Maury II"); Davidson Reply, 12–21–07 ("Davidson II"); United States supp. ltr. mem., 2–13–08 ("Gov. II"); Prisque Further Reply, 2–21–08 ("Prisque III"); Maury Further Reply, 2–21–08 ("Maury III"); Faubert Further Reply, 2–21–08 ("Faubert IV"). Oral argument was conducted on 2–6–08, primarily addressing Step 1 for the individual defendants. (Tr. 738.)

5. This case has been characterized by voluminous briefing materials and numerous disputed issues at every stage, and the sentencing phase is no exception. For example, the briefing materials filed by the parties on the Rule 29 and Rule 33 motions for acquittal and new trial totaled approximately 595 pages, exclusive of appendices and exhibits. (*See* briefs listed in dkt. 721 at 130.) The sentencing memoranda submitted to date total 650 pages (many single-spaced), exclusive of exhibits. This memorandum contains citing references to those sentencing memoranda, issue by issue.

6. All cites to the federal sentencing guidelines will (1) be designated as "USSG", and (2) refer to the 1998 version, unless otherwise indicated.

in this case, a part of Chapter Two will apply. *See generally* USSG § 1B1.6 (structure of the guidelines).

Where there are also convictions on a multi-object conspiracy count, the guidelines provide: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." USSG § 1B1.2(d).[7]

Parts A, B, and C of Chapter Three set forth some factors that may be relevant to the offense that are not covered in Chapter Two, including role in the offense and similar factors. USSG Ch. 2, intro. cmt.

Chapter Three, Part D, is a separate part that "provides rules for determining a single offense level that encompasses all the counts of which the defendant is convicted." These are the so-called grouping rules. USSG Ch. 3, Pt. D, intro. cmt.

There are sentencing issues in this case under Chapter Two pertaining to the three main types of substantive convictions in this case. We will address those Chapter Two issues by type of substantive offense

statute, and by individual defendant, as follows:

(1) OSHA-related offenses [PRISQUE, FAUBERT, MAURY];

(2) CWA-related offenses [PRISQUE, MAURY, DAVIDSON]; and

(3) CAA-related offenses [PRISQUE].[8]

The substantive false statement convictions related to categories (1) and (2) are addressed under those categories and later in the discussion of the grouping rules.

There are also Chapter Three issues as to each defendant under Part B (role in the offense), and Part C (obstruction of justice).

The grouping calculations are disputed under Chapter Three, Part D, by those whose guideline calculations may be enhanced by those provisions [PRISQUE, MAURY].

## DISCUSSION

### I. APPLICABLE GUIDELINE EDITION

The Court will use the November 1, 1998, edition of the Guidelines Manual, based on *United States v. Bertoli*, 40 F.3d 1384 (3d Cir.1994). The government's objection is noted.[9] *Bertoli* held, based on ex

---

**7.** The cross-reference for the Count 1 conspiracy offense charged in this case, 18 U.S.C. § 371, directs the court to use the "base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." USSG § 2X1.1(a) & cmt., stat. prov. Therefore, the discussion in this memorandum concentrates mainly on the substantive counts until we reach the topic of grouping the multiple counts, *infra*, Sec. V.

**8.** Each of these defendants also was convicted of the Count 1 conspiracy offense, but the jury findings as to participation in the five charged objectives varied by defendant. (Dkt. 721 at 112–113 and n. 64.) Those findings are noted *infra*, where they are relevant to the verdicts on the substantive counts.

**9.** We observe that all defendants [except Davidson, who states no position on this issue] argue that the 1998 edition is appropriate. (*See* Atlantic States I at 72–73; Prisque I at 102–104 & n. 7; Faubert I at 6; Maury I at 52–53; Atlantic States II at 2–4; Prisque II at 29–32; Faubert II at 2–3; Faubert III at 2; Maury II at 24–26.) The government urges the Court to apply USSG § 1B1.11(b)(3) as it has consistently read since that subsection was introduced in the revisions effective 11–1–93. *See* USSG App. C, amend. 474. That would result in use of the guidelines manual in effect at the time the last offense of conviction was completed (by each defendant) or the current edition, whichever is more defendant-favorable. (*See* Gov. I at 24–26, 41.) Here, for example, that could arguably require use of the guidelines manual in effect when the

post facto concerns, that the date of the earliest completed offense should dictate the edition to be used, and grouping cannot be used to determine date of offense for the purpose of choosing the applicable guideline edition. *Id.* at 1402–04. This is contrary to USSG § (hereinafter in text, "Section") 1B1.11(b)(3), effective 11–1–93, which was in effect when *Bertoli* was decided but was not mentioned in the decision.

*Bertoli* relied on *United States v. Seligsohn,* 981 F.2d 1418 (3d Cir.1992), which has since been recognized as ineffective as against Section 1B1.11(b)(2) (one book rule). *See United States v. Corrado,* 53 F.3d 620, 623–24 (3d Cir.1995). *Bertoli* remains undisturbed as to its ex post facto

holding, however, and the Third Circuit has not addressed Section 1B1.11(b)(3). *See generally United States v. Sullivan,* 255 F.3d 1256, 1260–62 (10th Cir.2001) (describing circuit split and collecting cases). Thus, we will use the manual for the earliest completed substantive crime, as to each defendant, notwithstanding the fact that the conspiracy allegation runs the whole period of the substantive counts (to August, 2003).

The earliest count of conviction as to ATLANTIC STATES is Count 12, a CWA violation in December, 1998. (Dkt. 721 at 3, n. 4, & 189.) The counts of conviction as to each individual defendant (citing dkt. 721) are:

| | | | |
|---|---|---|---|
| PRISQUE | Ct. 1 | (all five objects) | c. 10–31–95–Aug., 2003 |
| | Ct. 8 | (Owens OSHA obstruction, p. 159) | July, 1999 |
| | Ct. 9 | (Coxe OSHA obstruction, p. 163) | 3–24/25–00 |
| | Ct. 11 | (Velarde OSHA obstruction, p. 176) | Dec., 2002 |
| | Ct. 27 | (CWA neg. only, p. 215) | 12–4/5–99 |
| | Ct. 34 | (CAA, p. 243) | Feb.–Aug.2003 |
| | | | |
| FAUBERT | Ct. 1 | (objects C, D, E [all OSHA-related] ) | |
| | Ct. 7 | (false statement re: Marchan injury, p. 149) | 5–11–00 |
| | Ct. 9 | (Coxe OSHA obstruction, p. 163) | 3–24/25–00 |
| | Ct. 10 | (OSHA obstruction re: Marchan injury, p. 157) | 7–24–00 |
| | | | |
| MAURY | Ct. 1 | (objects A, C, D, E [all except CAA] ) | |
| | Ct. 3 | (false statement re: 12–4/5–99 CWA discharge, p. 136) | 2–24–00 |
| | Ct. 9 | (Coxe OSHA obstruction, p. 163) | 3–24/25–00 |
| | Ct. 27 | (CWA neg. only, p. 215) | 12–4/5–99 |
| | Cts. 28–32 [10] | (CWA discharges from # 4 pit, p. 231) | May–Oct.1999 |
| | | | |
| DAVIDSON | Ct. 1 | (objects A, D [both CWA-related] ) | |

Count 1 offense (on which all defendants were convicted) was completed, in approximately August, 2003. That could produce a higher base offense level relating to the OSHA obstruction offenses and conspiracy objectives, because USSG § 2J1.2(a) was revised upward from base offense level of 12 to level 14 as of 1–25–03. *See* USSG App. C, amend. 647.

We presume that Davidson's silence on this issue is due to the fact that he is not convicted on any OSHA obstruction offenses or conspiracy objectives. We might then be comparing

the 1998 edition and the current guidelines edition (11–1–08) to determine which guidelines edition to use for Davidson's sentencing. The Court will perform that further analysis as to Davidson, if necessary, but for purposes of this memorandum opinion we are assuming that the 1998 edition should be applied to him as well as the other defendants.

**10.** The Court granted judgment of acquittal of ATLANTIC STATES and MAURY on Count 33. (Dkt. 721 at 267.)

Ct. 4 (false statement re: 12–4/5–99 CWA
 discharge, p. 141) 2–24–00
Cts. 12–20,[11] 22–26 (CWA neg. only, p. 189) Dec. 1998 to Feb. 2000
Ct. 27 (CWA neg. only, p. 215) 12–4/5–99.

The completion date of the earliest count of conviction for PRISQUE is July, 1999 (Ct. 8); for FAUBERT is March 25, 2000 (Ct. 9); for MAURY is May, 1999 (Ct. 28); and for DAVIDSON is December, 1998 (Ct. 12). (Dkt. 721 at 3, n. 4 & 159, 163–164, 189, 231.)

Each of those convictions falls within the guidelines edition effective November 1, 1998, except FAUBERT's on Count 9, which technically falls within the November, 1999 edition. But the November, 1999 edition was identical to the November, 1998 edition. Therefore, we will refer to the November, 1998 edition for all defendants. *See supra* n. 9. All of the other arguments of the parties are addressed within that framework.

## II. CHAPTER TWO CALCULATIONS

### A. OSHA–RELATED OFFENSES

#### 1. Application of Section 2J1.2 to these offenses

Defendants PRISQUE, FAUBERT, and MAURY were convicted of conspiracy and substantive offenses for obstruction of OSHA in relation to worker injuries.[12] Those substantive counts of conviction are:

11. The Court granted judgment of acquittal of ATLANTIC STATES and DAVIDSON on Count 21. (Dkt. 721 at 267.)

12. PRISQUE, FAUBERT, and MAURY also were convicted of each alleged objective of the Count 1 conspiracy that refers to OSHA, Objectives C, D, and E. (Dkt. 711 at 11–12; dkt. 721 at 112–113, n. 64.) Specifically, Objective E (obstruction of OSHA) refers solely to the OSHA agency, whereas Objectives C (defraud the United States) and D (make false

PRISQUE Ct. 8 (Owens OSHA obstruction, pp. 159–163)
 Ct. 9 (Coxe OSHA obstruction, pp. 163–176)
 Ct. 11 (Velarde OSHA obstruction, pp. 176–188)

FAUBERT Ct. 7 (false statement re: Marchan injury, pp. 149–159)
 Ct. 9 (Coxe OSHA obstruction, pp. 163–176)
 Ct. 10 (OSHA obstruction re: Marchan injury, pp. 149–159)

MAURY Ct. 9 (Coxe OSHA obstruction, pp. 163–176).

Counts 8, 9 and 10 are felony OSHA obstruction offenses under 18 U.S.C. § 1505. (Dkt. 721 at 133.) The basic guideline section for that statute is Section 2J1.2, "Obstruction of Justice." *See* USSG § 2J1.2, cmt., stat. prov.

Count 11 is a felony OSHA obstruction offense under 18 U.S.C. § 1519 (altering object with intent to obstruct OSHA). (Dkt. 721 at 133.) We will also apply Section 2J1.2 to that count. *See* USSG § 2X5.1 (apply most analogous guideline for felony offense for which no guideline expressly has been promulgated).

Counts 5 and 7 are false statement offenses under 18 U.S.C. § 1001. The offense conduct for Counts 5 and 7 is related to, and similar to, the offense conduct underlying Counts 9 and 10 (obstruction of OSHA investigation of Coxe fatality), as we explain in the margin.[13] Therefore,

statements) refer to OSHA and other federal agencies including the EPA. (Dkt. 711 at 12.)

13. Counts 5, 7, 9, and 10 all relate to obstruction of the OSHA investigation of the Coxe forklift fatality. An earlier forklift injury of employee Marchan was investigated as part of the Coxe investigation. (Dkt. 721 at 147–159, 163–176.) Counts 5 and 7 are charged under 18 U.S.C. § 1001 (false statements). Counts 9 and 10 are charged under 18 U.S.C. § 1505 (obstruction of OSHA). (*Id.* at 133.) MAURY was acquitted on Count 5, but ATLANTIC

Counts 5 and 7 are analyzed under Section 2J1.2, rather than under the general fraud guidelines. *See* USSG § 2F1.1, cmt. n. 14 (where the indictment setting forth the count of conviction establishes an offense more aptly covered by another guideline, apply that guideline rather than Section 2F1.1).[14]

The following discussion addresses each of the OSHA-related counts as a separate count. Grouping of counts, where applicable, is addressed *infra*, Sec. V.

### 2. USSG § 2J1.2(a)-Base offense level

Section 2J1.2 covers "Obstruction of Justice" offenses, as we have described above. The background commentary to this section states: "Numerous offenses of varying seriousness may constitute obstruction of justice: ... obstructing a civil or administrative proceeding." USSG § 2J1.2, cmt. Thus, obstruction of a civil or an administrative proceeding is expressly covered by this section.

The government advised during this prosecution, and we can confirm, that the OSHA statute itself contains very limited criminal enforcement provisions. *See* 29 U.S.C. § 666. In other words, a violation of the OSHA workplace safety law and its rules and regulations can give rise to criminal liability, but those provisions are narrowly drawn.[15] It appears that interference with civil OSHA investigations is therefore commonly prosecuted, as in this case, under federal conspiracy, false statement, and obstruction laws.

The base offense level under Section 2J1.2 is 12. USSG § 2J1.2(a). We will apply this base offense level to each of the OSHA-related offenses.

### 3. USSG § 2J1.2(b)(2)—Substantial interference with the administration of justice

Subsection 2J1.2(b)(2) provides as a specific offense characteristic: "If the offense resulted in substantial interference with the administration of justice, increase by 3 levels." USSG § 2J1.2(b)(2). Application note 1 states: " 'Substantial interference with the administration of justice' includes ... *the unnecessary expenditure of substantial governmental or court resources.*" *Id.*, cmt. n. 1 (emphasis added). The commentary adds that the "specific offense

STATES was convicted on that count (false written statement re: condition of Coxe forklift). FAUBERT was convicted on Count 7 (false statement re: Marchan injury). PRISQUE, FAUBERT, and MAURY were convicted on Count 9 (Coxe OSHA obstruction). PRISQUE was acquitted on Count 10, but FAUBERT was convicted on Count 10 (OSHA obstruction re: Marchan injury). (*Id.* at 3, n. 4.)

14. Guidelines Chapter 2, Part F was consolidated into Chapter 2, Part B (Basic Economic Offenses) in the 2001 revisions, beyond the time frame of the 1998 edition we are applying in this case. *See* USSG App. C, amendment 617 (2001). The revised Section 2B1.1 retains the cross-reference where a false statement offense is more aptly covered by another guideline in Chapter Two. *See, e.g.,* USSG § 2B1.1(c)(3) & cmt. n. 15 (2008). As set forth in the text above, we have determined that the Counts 5 and 7 false statement convictions among the OSHA-related offenses are properly calculated under Chapter Two, Part J, along with the other OSHA obstruction offenses analyzed under Section 2J1.2.

15. Our review of the OSHA statute reveals only three criminal provisions. All other enforcement provisions are civil. The criminal violations are: (1) willful OSHA violation causing death to employee; (2) giving advance notice of OSHA inspection; and (3) knowingly making false statements in required documentation. 29 U.S.C. § 666(e)-(g). Those provisions carry only misdemeanor level penalties, and none of those criminal offenses were charged here.

characteristics reflect the more serious forms of obstruction." *Id.*, cmt.

The government argues in favor of this enhancement for all three individual defendants who sustained the OSHA-related convictions, PRISQUE, MAURY, AND FAUBERT. (Gov. I at 26–29, 41–44; Gov. II at 1.) Those defendants object, contending that the OSHA incident investigations at Atlantic States during the relevant time frame were normal investigative measures and that OSHA was generally complete and thorough, so OSHA was not substantially interfered with in performing its functions. They also argue that the evidence does not quantify the amount of governmental resources unnecessarily expended, and that the conduct for the enhancement would be the same conduct producing the base offense level, thus creating unwarranted double-counting if we apply this enhancement. (Prisque I at 104; Maury I at 54; Prisque II at 32; Faubert II at 3; Maury II at 26; Faubert III at 2–5; Prisque III at 1–2; Maury III at 1–4; Faubert IV at 1–2.)

Any discussion of the legal principles governing this potential guideline enhancement must begin with the recognition that this 3–level adjustment for a specific offense characteristic is found in Chapter 2, Part J of the guidelines. That is the Part covering "Offenses Involving the Administration of Justice," which contains sections covering obstruction-type offenses such as contempt (§ 2J1.1), obstruction of justice (§ 2J1.2), perjury, suborning perjury, or bribery of a witness (§ 2J1.3), impersonation of a federal agent (§ 2J1.4), failure to appear by a material witness (§ 2J1.5), failure to appear by defendant (§ 2J1.6), commission of an offense while on release (§ 2J1.7), and payment to a witness (§ 2J1.9). *See* USSG Ch. 2, Part J. We have determined that all of the OSHA-related offenses in this case fall within Chapter 2, Part J, and specifically Section 2J1.2. *See supra* Sec. II.A.1.

Sections 2J1.2(b)(2) and 2J1.3(b)(2) are *in pari materia,* insofar as each provides a 3–level enhancement to a base offense level of 12, where the particular obstruction-type offenses covered by those sections resulted in "substantial interference with the administration of justice." Each contains an identical application note including the ground of "unnecessary expenditure of substantial governmental or court resources." *Compare* USSG § 2J1.2, cmt. n. 1 *with* USSG § 2J1.3, cmt. n. 1. Case law addressing Section 2J1.2(b)(2) or Section 2J1.3(b)(2) is therefore relevant to interpretation of those parallel subsections. *See United States v. Tackett,* 193 F.3d 880, 886 & n. 2 (6th Cir.1999). However, case law addressing the 2–level adjustment for obstruction of justice found in Chapter 3, Part C, Section 3C1.1 is not applicable to Sections 2J1.2(b)(2) and 2J1.3(b)(3), as we explain in the margin.[16]

The Third Circuit Court of Appeals addressed a 3–level adjustment under Section 2J1.3(b)(2) for unnecessary expenditure of substantial governmental resources

---

**16.** There are critical differences between (1) the 3–level specific offense characteristic enhancement in Section 2J1.2(b)(2) for "substantial interference with the administration of justice," which is provided in the Chapter Two, Part J calculation only for obstruction-type offenses, and (2) the 2–level adjustment in Chapter Three, Part C, Section 3C1.1, for "obstructing or impeding the administration of justice." *Compare* USSG § 2J1.2(b)(2) *with* USSG § 3C1.1. Section 3C1.1 can be applied to any offense, not just obstruction-type offenses, but only as specified in Section 3C1.1. There are instructions in the commentary for both Section 2J1.2 and Section 3C1.1 that discuss those distinctions. The circumstances wherein an adjustment under Section 3C1.1 must be considered, insofar as relevant to this case, are discussed *infra.*

in *United States v. Serafini*, 233 F.3d 758 (3d Cir.2000). There, the defendant was a state legislator convicted of having committed perjury while testifying under immunity before a grand jury that was investigating possible violations of federal election laws involving campaign contributions. The district court imposed the 3–level enhancement under Section 2J1.3(b)(2), finding that if defendant had testified truthfully to the grand jury the government would not have been put to significant additional effort that it described. The Court of Appeals affirmed, observing that the district court made explicit factual findings that defendant's perjury was a "but-for cause" of substantial additional expenditures of the government's time and effort in conducting the underlying investigation of the election law issues. *Id.* at 771 & n. 19. It rejected, as did the district court, defendant's argument that the government's investigation expenditures would have been undertaken even in the absence of his perjury, agreeing with the district court's findings that certain investigative steps were necessitated by defendant's obstructive conduct. *Id.* at 771 & n. 19.

■ A 3–level enhancement under Section 2J1.2(b)(2) or its analogue, Section 2J1.3(b)(2), where the offense resulted in the unnecessary expenditure of substantial governmental or court resources, does not require that defendant's obstructive conduct have occurred during a criminal investigation. The conduct can be committed during civil proceedings. *See, e.g., United States v. Fiore*, 381 F.3d 89 (2d Cir.2004) (conviction for perjury and related offenses arising out of civil SEC investigation; perjury calculation enhanced under Section 2J1.3(b)(2)); *United States v. Tankersley*, 296 F.3d 620 (7th Cir.2002) (conviction for criminal contempt of court for selling a yacht in violation of civil injunction and attempting to conceal sale proceeds; calculation enhanced under Section 2J1.2(b)(2)); *United States v. Weissman*, 195 F.3d 96 (2d Cir.1999) (convictions for obstruction and perjury in connection with Senate committee investigation of health care providers; calculation enhanced under Section 2J1.2(b)(2)).

Some courts have stated that a Section 2J1.2(b)(2) enhancement should not be imposed for the governmental effort in exposing and prosecuting the obstruction offense itself. *See infra* n. 18. The guidelines commentary indicates that an adjustment under *Section 3C1.1* should not be imposed on that basis. *See* application notes quoted in the margin.[17] However, whether substantial governmental effort in exposing and prosecuting the obstruc-

---

**17.** The commentary to § 2J1.2 states in pertinent part:

> For offenses covered under this section, Chapter Three, Part C (Obstruction) does not apply unless the defendant obstructed the investigation or trial of the obstruction of justice count.

USSG § 2J1.2, cmt. n. 2. The commentary to Section 2J1.3 contains parallel language. *See* USSG § 2J1.3, cmt. n. 2.

Application note 7 to Section 3C1.1, which corresponds to the above commentary in Sections 2J1.2 and 2J1.3, states:

> If the defendant is convicted of an offense covered by ... § 2J1.2 (Obstruction of Justice), § 2J1.3 (Perjury or Subornation of

Perjury; Bribery of Witness), ... this adjustment [a § 3C1.1 adjustment] is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (*e.g.*, if the defendant threatened a witness during the course of the prosecution for the obstruction offense).

USSG § 3C1.1, cmt. n. 7 (bracketed material added). This guidelines commentary thus indicates that under certain circumstances it can be appropriate to add a Section 3C1.1 adjustment to a calculation that already includes a Section 2J1.2(b)(2) adjustment. That topic is addressed *infra*.

tion offense itself will support an adjustment under *Sections 2J1.2(b)(2) or 2J1.3(b)(2)* appears to be an open question. *See infra* n. 19.

■ We need not resolve that issue here, because that same body of case law demonstrates that if the obstructive conduct that is the basis of an obstruction conviction also results in significant additional governmental effort in conducting the investigation or prosecution that defendant obstructed, Section 2J1.2(b)(2) applies. *Compare Tackett,* 193 F.3d at 883–87 (where defendants' conduct underlying their obstruction convictions caused substantial additional governmental expenditures to prosecute those convictions as well as other charges against a related party for conduct already under investigation, and defendants' obstructive conduct was directed to defeat that previously-commenced investigation, Section 2J1.2(b)(2) enhancement was warranted);[18] *United States v. Sinclair,* 109 F.3d 1527, 1538–40 (10th Cir.1997) (Section 2J1.3(b)(2) adjustment affirmed where defendant's conduct underlying perjury conviction also caused increased governmental expenditures in prosecution of his two acquaintances already under indictment); *United States v. Harrington,* 82 F.3d 83, 86–87 (5th Cir. 1996) (additional governmental expenditures caused by defendant's obstruction offense aided in prosecution of defendant for obstruction but were also necessary for the government to convict defendant in the previously-commenced prosecution for other criminal conduct; Section 2J1.2(b)(2) enhancement was proper); *with United States v. Duran,* 41 F.3d 540, 542–43, 546 (9th Cir.1994) (Section 2J1.3(b)(2) adjustment reversed where it was based solely on the cost of prosecuting defendants for offenses including obstruction and perjury);[19] *cf. United States v. McSherry,* 226 F.3d 153, 157–59 & n. 1 (2d Cir.2000)

---

**18.** The Sixth Circuit in *Tackett* articulated this issue, but ultimately concluded:

> Based on the sound reasoning in *Harrington* and *Sinclair,* this panel need not address the issue of whether a § 2J1.2(b)(2) enhancement may stem solely from expenses incurred during the investigation and prosecution of the underlying charge for obstruction of justice.

193 F.3d at 886.

**19.** A close reading of the *Duran* opinion indicates that the result was more properly based on the fact that there, the government could not identify any extra expenses in addition to the costs of bringing defendants to trial on the obstruction and perjury counts of conviction. In other words, the record did not show any unnecessary expenses caused by defendants' obstruction of the government investigation of the underlying subject matter, which in that case was suspected money laundering and related offenses. *See Duran,* 41 F.3d at 546. The *Duran* court went on to state, perhaps in dicta, "[w]e agree with the Second Circuit that expenses associated with the underlying perjury offense should not form the basis of an upward adjustment under 2J1.3(b)(2)."

*Id.,* citing *United States v. Jones,* 900 F.2d 512, 522 (2d Cir.1990). However, the *Jones* court made no such statement. The stated basis in *Jones* for reversing a Section 2J1.3(b)(2) enhancement was that the district court did not make any specific findings that the defendant's perjury to the grand jury investigating securities fraud had caused any substantially increased governmental expenditures, nor did the record reveal such. *Jones,* 900 F.2d at 521–22. The *Duran* court also purported to support its above-quoted statement by citing, as a *see also* reference, *United States v. Pattan,* 931 F.2d 1035, 1042 (5th Cir.1991). *Duran,* 41 F.3d at 546. The *Pattan* court affirmed application of enhancements for perjury offenses under both Section 2J1.3(b)(2) and Section 3C1.1, without indicating any reasoning supporting the Section 2J1.3(b)(2) enhancement. The discussion in *Pattan* was limited to the facts supporting the Section 3C1.1 enhancement. *Pattan,* 931 F.2d at 1038, 1042–43. As such, we believe that any reliance on *Jones* or *Pattan* by the *Duran* court was misplaced. *See supra* nn. 16–17, explaining that there are critical differences between Sections 2J1.2(b)(2) or 2J1.3(b)(2), and Section 3C1.1.

(reversing enhancements under Sections 2J1.2(b)(2) and 2J1.3(b)(2) where defendant parole official falsely denied in grand jury testimony that he was improperly influenced or corrupt, thus causing general bad publicity for the administration of the parole system, but no further basis was given for imposing the enhancement; appeals court stated in footnote that "[c]onceivably, a public official who lies to a grand jury and thereby misdirects the grand jury's inquiry may be said to 'substantial[ly] interfere with the administration of justice.' ").

The case law has uniformly rejected arguments that a Section 2J1.2(b)(2) enhancement is improper because it is based on the same conduct that is the subject of the underlying obstruction conviction, and therefore constitutes improper double counting. The Second Circuit in *Tankersley,* for example, addressed this argument as follows:

> [Defendant] contends that because his base offense level for criminal contempt was calculated using the guideline for obstruction of justice, it is not logical to allow an enhancement for substantially interfering with the administration of justice. This argument is misplaced. The Sentencing Guidelines expressly contemplate analyzing the same conduct that constitutes obstruction of justice to determine whether "the offense result[s] in substantial interference with the administration of justice" and, if so, the Sentencing Guidelines direct the sentencing court to enhance the sentence by three levels. U.S.S.G. § 2J1.2(b)(2).

> [Defendant] further contends that this enhancement cannot apply to him because the district court engaged in double counting by considering the same conduct to enhance his sentence as it considered to punish him for criminal contempt. Contrary to [defendant's] ar-

gument, however, double counting occurs when a sentencing court applies two or more *upward adjustments* based on the same conduct.... In this case, the district court convicted [defendant] of criminal contempt because he sold his yacht and he attempted to transfer the proceeds of this sale to the Bahamas. Then, at sentencing the district court enhanced [his] sentence because [his] conduct resulted in a substantial interference with the administration of justice.

296 F.3d at 623–24 (emphasis in original).

These authorities demonstrate that one of the circumstances warranting enhancement under Section 2J1.2(b)(2) is where the defendant's obstructive conduct, which did result in an obstruction conviction, also had but-for consequences of causing unnecessary additional expenditure of substantial government resources in an underlying investigation or prosecution that was already in progress. That investigation or prosecution could be of defendant himself, or of other persons or entities. As the Sixth Circuit explained in *Tackett,* "§ 2J1.2(b)(2) increases the punishment for a defendant who obstructs justice when such obstruction has negative consequences." 193 F.3d at 886 n. 3.

The guidelines do not define "substantial" as used in this context. *Id.* at 887. However, "[t]he government need not particularize a specific number of hours expended by a government employee." *Id.,* citing *Jones,* 900 F.2d at 522; accord, *Weissman,* 195 F.3d at 100; *Sinclair,* 109 F.3d at 1540; *United States v. DeSalvo,* 26 F.3d 1216, 1224 (2d Cir.1994); *United States v. Bradach,* 949 F.2d 1461, 1463 (7th Cir.1991). Indeed, the necessary proof by "a preponderance of the evidence may consist of reasonable inferences drawn from circumstantial evidence." *Jones,* 900 F.2d at 522.

Courts have generally agreed with the Second Circuit in *Jones,* that in at least one factual situation, substantiality may be inferred. That court stated: "In some cases, when the defendant has concealed evidence and is the only known source of information, substantial interference with the administration of justice may be inferred." *Id.,* citing *United States v. Barnhart,* 889 F.2d 1374, 1379–80 (5th Cir. 1989); *accord, Tackett,* 193 F.3d at 887; *Sinclair,* 109 F.3d at 1539–40; *DeSalvo,* 26 F.3d at 1224; *Bradach,* 949 F.2d at 1463. As the *Tackett* court observed:

> This is a logical proposition: if a person is the only source of important information, her active concealment of this information will almost certainly change the course of the proceedings, making the investigation more difficult and costly, and hampering the truth-seeking function of government agents.

*Tackett,* 193 F.3d at 887–88 (affirming Section 2J1.2(b)(2) enhancement based upon inference of substantiality and stating that evidence in the record corroborated the inference).

■ The district court must, in deciding whether to apply Section 2J1.2(b)(2) on this ground, make a specific finding that the defendant's conduct resulted in the expenditure of substantial government resources. *See, e.g., id.* at 887; *Serafini,* 233 F.3d at 771; *Jones,* 900 F.2d at 521–22. The Sixth Circuit in *Tackett* described this obligation thus:

> Specifically, we believe the district court must: (1) identify a particular expenditure of governmental resources (time or money), (2) which but for the defendant's conduct would not have been expended, and (3) was "substantial" in amount.

*Tackett,* 193 F.3d at 887 (citations omitted).

Enhancements under Sections 2J1.2(b)(2) or 2J1.3(b)(2) have been affirmed, and the requisite "substantiality" was found to exist, in a wide range of circumstances. *See, e.g., United States v. Leung,* 360 F.3d 62, 67–68 (2d Cir.2004) (extra investigative steps were required to be undertaken by U.S. Marshals to find bail-jumping defendant because he faked his own death); *Tankersley,* 296 F.3d at 623 (many weeks of investigative work went into tracking down and determining what happened to the assets defendant sold in committing criminal contempt); *Serafini,* 233 F.3d at 771 & n. 19 (district court specifically found that defendant's perjury resulted in the need to re-interview a witness who was defendant's employee); *Weissman,* 195 F.3d at 100 (Senate subcommittee staff was required to spend significant additional time on the investigative hearings as a result of defendant's obstructive conduct); *Tackett,* 193 F.3d at 888 (inference of substantiality supported because defendants were sole source of knowledge of falsity; record also showed that truthful testimony by defendants would have changed the course of investigation of the underlying events); *Sinclair,* 109 F.3d at 1539–40 (government had to re-interview and re-call two witnesses who had been induced to perjure themselves); *United States v. Atkin,* 29 F.3d 267, 268 (7th Cir.1994) (defendant's perjury caused the grand jury to summon five additional witnesses to complete the underlying investigation, one from a distant state); *DeSalvo,* 26 F.3d at 1223–24 (defendant, who was in high position in law firm being investigated and had personal knowledge of cases under investigation, had he testified truthfully "[w]ithout doubt .... would have saved the government substantial investigative and trial expenses"); *United States v. Butt,* 955 F.2d 77, 87–88 (1st Cir.1992) (but for defendant's perjury to grand jury, the govern-

ment would not have needed to locate several corroborating witnesses and might not have immunized persons whom it otherwise could have prosecuted); *Bradach*, 949 F.2d at 1463 (defendant suborned perjury from all persons who knew the true nature of the events under investigation, thus impairing the grand jury investigation as well as necessitating perjury-related trials of the defendants and the other perjured witnesses); *United States v. Lueddeke*, 908 F.2d 230, 232–34 (7th Cir.1990) (defendant's perjury before grand jury resulted in the work of two officers for "two weeks trying to sort out the truth"); *Barnhart*, 889 F.2d at 1374, 1379–80 (defendant's uncooperative and untruthful statements to FBI agent and perjury to grand jury hindered investigation of underlying events and persons involved); *see also United States v. Kilgarlin*, 157 Fed.Appx. 716, 720–21 (5th Cir.2005) (substantial government expenditure recognized as supporting enhancement where EPA investigators had to conduct further investigation into company procedures and equipment, and interview witnesses, to prove that documents provided by defendants were fabricated; also substantiality was inferred to extent defendant was sole source of the information she was concealing).

This Court makes the following factual findings based on the trial record, applying Section 2J1.2(b)(2) and the judicial interpretations summarized above. Here we incorporate by reference and cite the detailed description of the relevant trial evidence, including evidence of the expenditures of time and effort of government investigators in the civil OSHA investigations, set forth in our post-trial Memorandum Opinion, dkt. 721.

The Coxe investigation is the subject of substantive convictions of PRISQUE, FAUBERT, and MAURY on Count 9 (obstruction), and of FAUBERT also on Counts 7 and 10 (false statements and obstruction). *See supra* n. 13. Each of those defendants was also convicted of every alleged objective of the Count 1 conspiracy that refers to OSHA: Objective C, defraud the United States; Objective D, false statements; and Objective E, obstruction of OSHA. *See supra* n. 12. In other words, the verdict found that their obstructive conduct as to that workplace fatality was not unilateral but rather that they each knowingly participated in a conspiratorial agreement with the objective of obstructing OSHA as to that investigation.

■ We find that the record supports a 3–level enhancement for substantial interference with the administration of justice under Section 2J1.2(b)(2), as to each of defendants PRISQUE, FAUBERT, and MAURY in connection with the Coxe investigation. We base this finding on the evidence pertaining to obstruction of the OSHA efforts to investigate the Coxe forklift fatality by PRISQUE, FAUBERT, and MAURY. (*See* dkt. 721 at 147–159, 163–176.)

This conclusion, as to PRISQUE, FAUBERT, and MAURY in relation to the OSHA investigation of the Coxe fatality, is supported by the inference of substantiality permitted where, as here, all the relevant knowledge was in the control of those defendants and subordinates whom they could influence. Further, it is fully corroborated by the trial evidence itself, which demonstrates that the obstructive actions of those defendants caused substantial unnecessary interference with OSHA's efforts to investigate that fatality. Those obstructive actions were undertaken collectively by PRISQUE, MAURY, and FAUBERT, and by seeking the assistance of lower-level employees whose communications with OSHA they were in a position to influence. The facts that OSHA eventually uncovered—despite the ongoing ob-

structive actions of those defendants—were that the driver of the forklift that ran over Coxe had been involved in a prior, unreported incident in which he ran over and seriously injured another supervisor (Marchan), and that the forklift itself was not in good operating condition. Those two key facts were concealed by the obstruction and conspiratorial conduct of those defendants, thus requiring substantial unnecessary expenditure of time and effort by OSHA investigators to unravel the truth about the circumstances of Coxe's death. (*See* dkt. 721 at 147–159, 163–176.)

Specifically as to the condition of the forklift, the trial evidence documented the painstaking efforts required of OSHA to get to the truth on that topic, caused by the coordinated obstructive conduct of defendants. It began with the untruthful statement of FAUBERT (the designated company liaison to OSHA) to OSHA inspector Tiedeman, just hours after the Coxe fatality, that nothing had been done to the forklift post-incident. That statement, and the deceptive forklift demonstration that defendants were able to present that day, caused OSHA to undertake an extensive investigation to ultimately determine that the forklift had been tampered with while in the maintenance garage so that its pre-incident defects such as impaired brakes had been corrected by the time OSHA arrived that day. Also, the untruthful statements on a document

resulting from efforts of MAURY and FAUBERT, which FAUBERT presented to OSHA the next day, stating that the forklift was in "perfect operating condition" when inspected on that day, formed part of the puzzle that OSHA had to unravel.[20] To do so, OSHA had to undertake an exhaustive examination of forklift maintenance records, as to the subject forklift as well as similar forklifts, that revealed a pattern of defects both before and soon after the Coxe incident. That extensive document review was coupled with interviews of numerous workers during several more visits to the plant by OSHA inspectors, as the inspectors sought to understand the forklift maintenance practices and failures that featured in causation of the Coxe fatality. Even after conducting most of that review, the OSHA inspector interviewed MAURY who continued to give evasive answers to the questions OSHA had about forklift driver checklists. The investigation included numerous interviews of workers, some who testified at trial, as to the poor condition of the forklifts they were forced to use at the plant. The evidence at trial revealed that all of this OSHA investigation was done in an atmosphere where workers were warned not to reveal the truth. One foreman, for example, testified at trial that on the day of the Coxe fatality he was warned by PRISQUE not to tell the truth to OSHA investigators about the incident. This was conduct covered by Count 9 of the indict-

---

**20.** The Court recognizes that Count 5, which pertains to that particular false written statement, was not charged against FAUBERT and was the subject of an acquittal of MAURY and only a conviction against ATLANTIC STATES. *See supra* n. 13. The evidence pertaining to the involvement of MAURY and FAUBERT in the conduct underlying that count is summarized in our Memorandum Opinion, dkt. 721 at 147–149. We do find the evidence of that conduct sufficient to support a finding of relevant conduct by MAURY and FAUBERT, by

the preponderance of the evidence standard, for purposes of analyzing the enhancement. *See Grier*, 475 F.3d at 568 (evidence of conduct on uncharged or acquitted counts can be relevant conduct for purposes of making guideline calculations). Even without that additional conduct, we find the trial evidence ample to support an enhancement for MAURY and FAUBERT under Section 2J1.2(b)(2) as to the OSHA investigation of the Coxe fatality.

ment. (*See* dkt. 721 at 163–176.) We find that those obstructive actions by defendants PRISQUE, FAUBERT, and MAURY can be inferred to have caused, and the record shows that they did in fact cause, substantial expenditure of OSHA investigative effort that would not have been necessary if they had been truthful about material facts pertaining to the forklift involved in the Coxe fatality.

The evidence of unnecessary expenditure of OSHA investigative time and effort was also established, for the aspect of the Coxe investigation that came to focus on the forklift driver's earlier mishap in which he ran over supervisor Marchan and caused him injury. OSHA had to read about that incident in the newspaper. When the OSHA investigator asked FAUBERT about it, he responded orally that he did recall such an incident in about 1999. The investigator asked for any accident reports and entries in log records, as were required to be maintained. When that investigator and a colleague next returned to the plant, FAUBERT and his subordinate handed OSHA a written document signed by Marchan that contained false statements so as to justify the lack of any accident report or log entries. OSHA was then given access to the worker, Marchan, to interview him, at which point Marchan lied consistently with the written statement. FAUBERT and his subordinate backed up that fiction while again being interviewed by OSHA. Only through further investigation by OSHA was it determined that Marchan had (1) been treat-

ed for a fracture at the local hospital, (2) been in a cast and on crutches for about five weeks, and (3) lied under instructions of FAUBERT as reinforced by PRISQUE. This was the conduct covered by Counts 7 and 10 of the indictment. (*See id.* at 149–159.) [21] We find that this concert of obstructive actions by PRISQUE and FAUBERT can be inferred to have caused, and the record shows that it did in fact cause, further substantial expenditure of OSHA investigative effort that would not have been necessary if they had been truthful about facts pertaining to the accident history of the driver of the Coxe forklift.

The civil investigation of the Coxe fatality did not result in a separate prosecution of defendants under the OSHA statute. *See supra* n. 15. The obstruction of that civil OSHA investigation by those defendants did, however, clearly prolong and unnecessarily complicate that OSHA investigation, as we have explained above. This reason alone requires application of the enhancement under Section 2J1.2(b)(2) as to the Coxe investigation. That same obstruction was also very intricate and time-consuming for law enforcement to present through numerous witnesses at trial, even if that alone might not support this enhancement because no substantive OSHA offenses were charged at trial. *Id.* (Gov. I at 42–43.) For these reasons, we will apply the 3–level enhancement under Section 2J1.2(b)(2) to the base offense level for the OSHA obstruction-related convictions of PRISQUE, FAUBERT, and MAURY pertaining to the Coxe fatality investigation.[22]

---

**21.** In addition to his counts of conviction relating to OSHA's investigation of the Coxe fatality, PRISQUE was charged in Count 10 and acquitted. (Dkt. 721 at 3 n. 4.) The evidence pertaining to his involvement in the conduct underlying that count is summarized in the portions of our Memorandum Opinion (dkt. 721), cited in the text accompanying this footnote. We do find the evidence of that

conduct sufficient to support a finding of relevant conduct by him, by the preponderance of the evidence standard, for purposes of analyzing the enhancement under Section 2J1.2(b)(2). Even without that additional conduct, we find the trial evidence ample to support an enhancement for PRISQUE under Section 2J1.2(b)(2) as to the OSHA investigation of the Coxe fatality.

■ This Court also finds that the same 3–level enhancement under Section 2J1.2(b)(2) is warranted for the conduct of defendant PRISQUE in obstructing the separate OSHA investigations of the serious workplace injuries sustained by employees Owens and Velarde. PRISQUE was convicted of obstructing both of those OSHA investigations as well as the Coxe investigation. Here again, the trial evidence amply documents that substantial unnecessary governmental expenditures were caused by PRISQUE during those OSHA investigations. The investigating OSHA officers had to spend unnecessary and substantial effort to "sort out the truth," in the face of elaborate deceptions by PRISQUE and his involved subordinates. The material facts that OSHA eventually obtained—despite the ongoing obstructive efforts of PRISQUE—were regarding the workplace conditions at a cut saw station where employee Owens was struck by a flying saw blade fragment and sustained a fractured skull and lost eye, and at a "jumpered" cement mixer where employee Velarde lost three fingers to rotating mixer blades.

Obstruction of the OSHA investigation of the Owens incident was charged in Count 8, and obstruction of the OSHA investigation of the Velarde incident was charged in Count 11, and on both of those counts PRISQUE was convicted. *See* text accompanying n. 10 *supra.* PRISQUE's obstructive conduct pertaining to the Owens incident was to instruct line worker Marchan–Mendoza to lie to OSHA about the pre-incident condition of a safety shield, which the OSHA inspector testified at trial was material to his investigation. That worker later withdrew his lie as a result of further government investigation, and provided the truthful information before and during trial. (Dkt. 721 at 159–163.) PRISQUE'S obstructive conduct pertaining to the Velarde investigation was his participation in an amazing series of steps to prevent OSHA from discovering that the electrical safety mechanism on the cement mixer had been bypassed at PRISQUE's direction. The steps that it took OSHA in turn to unravel that deception were very involved, including actually watching the night shift in operation, taking repeated series of pictures, reviewing the manual, re-interviewing co-conspirator Harbin (who again changed his story), and contacting the out-of-state manufacturer for information and documentation. (Dkt. 721 at 176–188.) As in the case of the OSHA investigation of the Coxe incident, we find that the untruthful and deceptive actions of PRISQUE and his involved subordinates in the Owens and Velarde investigations were a "but-for" cause of substantial investigative effort by OSHA inspectors to discover the causes of those injuries.[23]

22. The government argues that the obstructive conduct of FAUBERT in connection with the OSHA investigations of two other serious workplace injuries, involving workers Lieberman and Rocca, was also of a nature and degree to support enhancement under Section 2J1.2(b)(2). (Gov. I at 41–44.) We have found that FAUBERT's obstructive conduct in those OSHA investigations, although not the subject of separate substantive counts, was sufficiently established by the trial evidence to be included as relevant conduct for his OSHA-related convictions. *See infra* n. 66.

We decline to make factual rulings as to whether that conduct would further support enhancement for FAUBERT under Section 2J1.2(b)(2), because in our view the findings that we have made relative to his obstruction of the Coxe OSHA investigation are fully sufficient to support the adjustment under Section 2J1.2(b)(2), without adding the Lieberman and Rocca obstructions.

23. The evidence showed that FAUBERT was also involved in the obstructive conduct that supported count 8, pertaining to the OSHA

To summarize, the Court finds that a 3–level enhancement is warranted pursuant to Section 2J1.2(b)(2) for PRISQUE, FAUBERT, and MAURY in connection with their obstruction of the Coxe forklift fatality investigation by OSHA. We further find that this enhancement is supported, as to PRISQUE, in connection with his obstruction of the Owens and Velarde injury investigations by OSHA.

## B. CWA–RELATED OFFENSES

### 1. Review of convictions

Defendants PRISQUE, MAURY, and DAVIDSON were convicted of conspiracy and substantive offenses relating to violations of the CWA.[24] Those substantive counts of conviction are:

| | | |
|---|---|---|
| PRISQUE | Ct. 27 | (CWA neg. only, pp. 215–231) |
| MAURY | Ct. 3 | (false statement re: 12–4/5–99 discharge, pp. 136–141) |
| | Ct. 27 | (CWA neg. only, pp. 215–231) |
| | Cts. 28–32 | (CWA discharges from # 4 pit, pp. 231–243) |
| DAVIDSON | Ct. 4 | (false statement re: 12–4/5–99 discharge, pp. 141–146) |
| | Cts. 12–20, 22–26 | (CWA neg. only, pp. 189–215) |
| | Ct. 27 | (CWA neg. only, pp. 215–231) |

Counts 12–20 and 22–27 were charged as felony offenses under 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A). (Dkt. 721 at 133–134.) ATLANTIC STATES was convicted of those felony offenses, but the named individual defendants (PRISQUE, MAURY, and DAVIDSON on the stated counts) were convicted of the lesser-included substantive negligent offenses under 33 U.S.C. § 1319(c)(1)(A). (*Id.* at 3 n. 4.)

Counts 28–32 were also charged as felony offenses under 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A). (*Id.* at 133–134.) Both named defendants, ATLANTIC STATES and MAURY, were convicted on those counts as charged. (*Id.* at 3 n. 4.)

Counts 3 and 4 are false statement felony counts under 18 U.S.C. § 1001, related to the unpermitted discharge of petroleum-contaminated wastewater from the cement pit underlying Count 27 ("the 12–4/5–99 discharge"), and the subsequent CWA-related investigation. (Dkt. 721 at 136–146, 215–231.) Defendant MAURY was convicted on Count 3, and DAVIDSON was convicted on Count 4.

It can be argued that the false statement offenses that are the subject of Counts 3 and 4 should be calculated under the Chapter Two guideline section for the corresponding CWA substantive violations, because those false statements directly related to the environmental offenses about which the false statements were made.[25]

---

investigation of the Owens incident. (Dkt. 721 at 159–163.) FAUBERT was not charged in that count, and we make no findings as to whether his conduct in that matter would support enhancement under Section 2J1.2(b)(2).

**24.** PRISQUE, MAURY, and DAVIDSON were also convicted of conspiring to knowingly violate the CWA, Objective A of the Count 1 conspiracy, and Objective D (false statements). In addition, PRISQUE and MAURY were convicted of conspiring to defraud federal agencies including EPA (Objective C), and to make false statements to federal agencies including EPA (Objective D). (Dkt. 711 at 11; dkt. 721 at 112–113, n. 64.)

**25.** A false statement offense typically would not be "more aptly covered" by the environmental offense provisions, Part Q of Chapter 2 of the guidelines. *See* USSG § 2F1.1, cmt. n. 14. However, Section 2Q1.2(a)(5) and its parallel provision, Section 2Q1.3(a)(5), provide a cross-reference stating that "[i]f a recordkeeping offense reflected an effort to conceal a substantive environmental offense, use the offense level for the substantive offense." The commentary to those provisions defines "recordkeeping offense" to include "the giving of false information." USSG § 2Q1.2, cmt. n. 1; USSG § 2Q1.3, cmt. n. 1. We interpret those provisions to refer to the giving of false information in required regulatory reporting or record-keeping, rather than the false statements given by these defendants

No party has urged that treatment of Counts 3 and 4, and we conclude that those counts of conviction are properly analyzed under the general fraud provisions of Chapter Two, Part F. *See infra* Sec. II.B.8.

The following discussion addresses each of the CWA-related counts as a separate count. Grouping of counts, where applicable, is addressed *infra* Sec. V.

### 2. USSG § 2Q1.3–Mishandling of environmental pollutants

■ The Court will apply Section 2Q1.3 rather than Section 2Q1.2 to the CWA offenses in this case.

The Statutory Index states that for violations of 33 U.S.C. § 1319(c)(1) and (c)(2), either Section 2Q1.2 or Section 2Q1.3 may apply. USSG App. A. Section 1B1.2, entitled "Applicable Guidelines," provides in pertinent part:

(a) Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted). . . .

(b) After determining the appropriate offense guideline section pursuant to subsection (a) of this section, determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct). USSG § 1B1.2.

■ As explained in *Watterson v. United States*, 219 F.3d 232, 235 (3d Cir.2000), the sentencing court may not consider relevant conduct until after it selects the appropriate offense guideline section. *See United States v. Pizzuto*, No. 94–5433, 1995 WL 610346 (4th Cir.1995) (once the applicable guideline is known, relevant conduct is used to determine which specific offense characteristics apply); *United States v. Goldfaden*, 959 F.2d 1324, 1329 (5th Cir.1992) ("The district court . . . should have relied solely on Appellant's offense of conviction to determine the base offense guideline;" district court erred in selecting Section 2Q1.2 instead of Section 2Q1.3 where offense conduct involved nontoxic industrial waste, and hazardous waste was only involved in relevant conduct.).[26]

Section 2Q1.2, by its title, applies to "Mishandling of Hazardous or Toxic Substances or Pesticides". Its commentary, quoted in the margin, describes what is meant by those terms for guideline purposes.[27] Its base offense level is 8. USSG § 2Q1.2(a). That commentary explains, "[a]lthough other sections of the guidelines

---

during a search warrant execution. Therefore, we will analyze Counts 3 and 4 under the general guideline provisions for fraud, Chapter Two, Part F, rather than under the environmental provisions in Chapter Two, Part Q. *See infra* Sec. II.B.8.

26. There is a limited body of case law to date under Sections 2Q1.2 and 2Q1.3. We have attempted to review all available opinions at the circuit and district court levels, both reported and unreported. We have taken the liberty of citing to any of those cases that are relevant here.

27. The commentary to Section 2Q1.2 states in pertinent part:

This section applies to offenses involving pesticides or substances designated toxic or hazardous at the time of the offense by statute or regulation. A listing of hazardous and toxic substances in the guidelines would be impractical. Several federal statutes (or regulations promulgated thereunder) list toxic, hazardous wastes and substances, and pesticides. These lists . . . are revised from time to time. "Toxic" and "hazardous" are defined differently in various statutes, but the common dictionary meanings of the words are not significantly different.

USSG § 2Q1.2, cmt. n. 3.

generally prescribe a base offense level of 6 for regulatory violations, § 2Q1.2 prescribes a base offense level of 8 because of the inherently dangerous nature of hazardous and toxic substances and pesticides." USSG § 2Q1.2, cmt. background.

Section 2Q1.3, by its title, applies to "Mishandling of Other Environmental Pollutants". Its commentary states that "[t]his section parallels § 2Q1.2 but applies to offenses involving substances which are not pesticides and are not designated as hazardous or toxic." USSG § 2Q1.3, cmt. background. Its base offense level is 6. USSG § 2Q1.3(a).

The statutory structure of the CWA does distinguish the general term "pollutants" from more specifically identified substances including "oil," "hazardous substances," and "toxic pollutants." *Compare* 33 U.S.C. § 1362(6) ("pollutant") *with id.* § 1321(a)(1) ("oil"), §§ 1321(a)(14) and (b)(2)(A) ("hazardous substance," other than oil, to be designated by regulation), and § 1362(13) ("toxic pollutant").

Defendants PRISQUE, MAURY, and DAVIDSON were convicted of substantive offenses of discharging "a pollutant," in the form of "petroleum-contaminated wastewater." (*See* dkt. 721 at 189–190, 215, and 231 (quoting text of Counts 12–26, 27 & 28–32).) That conduct was also described in Count 1, alleged Overt Acts 1, 3, and 4, respectively. (Dkt. 711 at 15–16.) The jury was instructed that to prove the CWA offenses, as charged in the indictment, the proof must establish "that a discharge of a pollutant" occurred, and that the defendant knew "that he was discharging petroleum-contaminated wastewater." (Dkt. 721 at 11.) The term "pollutant" was defined in the jury instructions to mean "solid waste and industrial waste discharged into water, including petroleum-impacted wastewater." (Dkt. 717 at 53.)

Defendants PRISQUE, MAURY, and DAVIDSON were also convicted of conspiring to knowingly violate the CWA, Objective A of the Count 1 conspiracy. *See supra* n. 24. There were numerous overt acts alleged as part of this objective. (*See* dkt. 711 at 15–17.) However, the jury was not asked to render verdicts as to which alleged overt acts were or were not established by the evidence. (Dkt. 721 at 15, 262; dkt. 717 at 37.)

The government does not contend that petroleum-contaminated wastewater is designated as hazardous or toxic. Rather, it argues that we should apply Section 2Q1.2 to the CWA offenses, "because Defendants' conduct included the discharge of hazardous paint into the Delaware River." (Gov. I at 32.) This is a reference to evidence presented at trial in support of Count 1, Overt Acts 7–9, which alleged that ATLANTIC STATES, PRISQUE, MAURY, and co-conspirators also took affirmative steps to conceal from authorities the discharge of asphalt-based waste paint to the storm sewers. (Gov. I at 29–32.) Defendants contend that Section 2Q1.3 is applicable to the CWA offenses of which they were convicted. (Atlantic States I at 77–79; Prisque I at 105–110; Maury I at 38–44; Davidson I at 50–54; Prisque II at 32–35; Maury II at 4–7, 11–15; Davidson II at 23–25.)

Section 1B1.2(a) directs the court to "[d]etermine the offense guideline section in Chapter Two ... *most applicable* to the offense[s] of conviction." USSG § 1B1.2(a) (emphasis added). Clearly, here the CWA offenses on which the jury was instructed, and on which these defendants were convicted, primarily involved discharge of the "pollutant" of "petroleum-contaminated wastewater." The jury was instructed on the definition of "pollutant" under the CWA. (Dkt. 717 at 53.) The jury was given no definition of "hazardous"

or "toxic" under that statute. Indeed, not one of the 108 verdict points presented to the jury for decision in this case required the jury to make a factual finding as to any substance meeting a definition of "hazardous" or "toxic." [28]

The indictment charged 22 substantive counts of CWA violations involving discharges of petroleum-contaminated wastewater, with corresponding overt acts alleged under Count 1. Convictions were obtained on the charged offense on 5 of those counts (Cts. 28–32), and on the lesser-included offense under 15 of those counts (Cts. 12–20, 22–27). The indictment charged no substantive counts involving discharge of asphalt-based paint into the water.

It is true that several alleged overt acts of the Count 1 conspiracy referred to efforts to conceal discharges of asphalt-based waste paint into the storm sewers, and trial evidence was presented on that topic. However, given the nature of the CWA charges and convictions in this case, we do not believe that concealment of mishandled asphalt-based paint can be considered the determinant offense conduct for purposes of selecting the applicable guideline section. We conclude that the offense guideline section in Chapter Two that is "most applicable" to the CWA offenses of conviction as to PRISQUE, MAURY, and DAVIDSON is Section 2Q1.3. *See* USSG § 1B1.2(a).[29]

### 3. USSG § 2Q1.3(a)—Base offense level

The base offense level for each of the CWA offenses is 6. USSG § 2Q1.3(a).[30]

---

**28.** By our tally, the jury was presented with 108 questions upon which to render verdicts (including, if a defendant was found guilty of the Count 1 conspiracy, separate questions on each of the five alleged objectives). (*See* separate verdict sheets, dkt. 609, 610, 611, 612, 613, 614.)

**29.** *Compare* offense conduct in CWA cases applying § 2Q1.3: *United States v. Abrogar,* 459 F.3d 430, 433 (3d Cir.2006)(oil); *United States v. Ortiz,* 427 F.3d 1278, 1283–86 (10th Cir.2005) (chemical pollutants including propylene glycol, not alleged to be hazardous or toxic); *United States v. Perez,* 366 F.3d 1178, 1183 (11th Cir.2004) (substances described by circuit court as non-toxic pollutants); *United States v. Kuhn,* 345 F.3d 431, 433–38 (6th Cir.2003) (sewage sludge); *United States v. Cooper,* 173 F.3d 1192, 1205 (9th Cir.1999) (sewage sludge); *United States v. W. Indies Transp.,* 127 F.3d 299, 308–09, 315 (3d Cir. 1997) (concrete, sand, rebar, paint chips, raw sewage); *United States v. Strandquist,* 993 F.2d 395, 397–99 (4th Cir.1993) (raw sewage); *Goldfaden,* 959 F.2d at 1329 (reversing sentence based on Section 2Q1.2 where offense conduct involved non-hazardous industrial waste and only the relevant conduct involved hazardous waste); *with* offense conduct in CWA cases applying Section 2Q1.2: *United States v. Wilson,* 151 Fed. Appx. 295 (5th Cir.2005) (garbage; error to base selection of guideline section on relevant conduct rather than offense conduct); *United States v. Technic Servs.,* 314 F.3d 1031, 1037, 1047–48 (9th Cir.2002) (asbestos-contaminated wastewater); *United States v. Overholt,* 307 F.3d 1231, 1256–57 (10th Cir.2002) (conspiracy objectives and substantive convictions included improper transportation of hazardous materials in violation of RCRA, along with improper discharge of wastewater polluted with petroleum and unspecified chemicals in violation of CWA and Safe Drinking Water Act); *United States v. Van Loben Sels,* 198 F.3d 1161, 1163–66 (9th Cir.1999) (benzene-contaminated wastewater); *United States v. Hart,* No. 94–1005, 1995 WL 445685 (10th Cir. July 28, 1995) (falsifying test results showing exceedances of water permit parameters including chlorine, oil, and grease); *United States v. Hagerman,* 525 F.Supp.2d 1058, 1061 (S.D.Ind. 2007) (falsifying test results showing exceedances of water permit parameters including copper, zinc, and phenol), *aff'd,* 301 Fed. Appx. 552 (7th Cir.2008); *United States v. King,* 915 F.Supp. 244, 247–48 (D.Kan.1996) (hazardous chemical methyl acrylate).

**30.** If this Court were to select Section 2Q1.2 as the applicable offense guideline section in this case, after applying base offense level 8

### 4. USSG § 2Q1.3(b)(1)(A) or (B)— Discharge, release, or emission of pollutant

The guidelines recognize that not all environmental offenses involving mishandling of a pollutant also include an actual discharge, release, or emission of the pollutant. *See United States v. Ellen,* 961 F.2d 462, 468–69 (4th Cir.1992) ("§ 2Q1.3 applies to offenses that do not involve the discharge of a pollutant, *see, e.g.,* 33 U.S.C. § 403 (prohibiting, *inter alia,* the obstruction of navigable waters)"). For those that do involve an actual discharge, an incremental specific offense adjustment is provided as follows:

(A) If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment, increase by 6 levels; or

(B) if the offense otherwise involved a discharge, release, or emission of a pollutant, increase by 4 levels.

USSG §§ 2Q1.3(b)(1) ("Subsection (b)(1)")(A) and (B).[31]

The application note to Subsection (b)(1) states in pertinent part:

Subsection (b)(1) *assumes* a discharge or emission into the environment resulting in actual environmental contamination.

USSG § 2Q1.3, cmt. n. 4 (emphasis added) ("Note 4, First Sentence").[32]

There is a line of case law interpreting Subsection (b)(1) and Note 4, First Sentence. The opinions differ somewhat in articulating what the Subsection (b)(1) standard is, and the Third Circuit has stated that the "circuits are split on the question whether [under that provision] the government must prove that the discharge caused actual environmental contamination." *United States v. Chau,* 293 F.3d 96, 99–100 (3d Cir.2002). We present

---

the Court would still face the same array of subsidiary issues under that section as under Section 2Q1.3. Those two sections are largely parallel although not identical, as to specific offense characteristics and potential guided departures. *Compare* USSG § 2Q1.2 & cmt. *with* USSG § 2Q1.3 & cmt. Thus, case law on Section 2Q1.2 is usually pertinent to Section 2Q1.3, as cited herein. For purposes of this case, the relevant provisions are fully parallel. However, the numbers of the subsections and application notes are different, reflecting that some provisions found in Section 2Q1.2 are not in Section 2Q1.3. *See infra* n. 32.

**31.** This portion of guidelines text is also relevant to the CAA-related offenses discussed *infra,* Sec. II.C. Several other provisions of Section 2Q1.3 also require analysis under both the CWA and CAA convictions here, as we will discuss.

**32.** This Court is applying Section 2Q1.3 rather than Section 2Q1.2 to the CWA offenses in this case. *See supra* Sec. II.B.2. We have pointed out that the numbering of the provisions and commentary in the two sections does not precisely correspond, although both have parallel provisions insofar as relevant here. *See supra* n. 30. For example, Subsection (b)(1) is similar in the text of both sections, but the application note explaining Subsection (b)(1) in Section 2Q1.2 is Note 5, whereas the analogous application note explaining Subsection (b)(1) in Section 2Q1.3 is Note 4. The same applies to Subsection (b)(4), which has similar text in both sections, but the application note explaining Subsection (b)(4) in Section 2Q1.2 is Note 8, whereas the analogous application note explaining Subsection (b)(4) in Section 2Q1.3 is Note 7. Adding to the confusion is the fact that although both Section 2Q1.2 and Section 2Q1.3 contain an application note permitting downward departure in cases involving negligent conduct, that is Note 4 in Section 2Q1.2 and Note 5 in Section 2Q1.3. Note 4 in Section 2Q1.3, as we have seen, applies not to Subsection (b)(4) but to Subsection (b)(1). Therefore, in the interest of clarity, whenever we refer to these application notes we will use the numbers in Section 2Q1.3 (*e.g.* "Note 4"), and we will substitute "[Note 4 analogue]" for the actual note number when referring to decisions interpreting Section 2Q1.2.

here a brief summary of that case law, because it concerns whether a Subsection (b)(1) adjustment applies in a given case, and the Third Circuit has not expressly adopted either view. *Id.* As will be seen, it also becomes relevant when considering the guided departure language in Notes 4 and 7. *See infra* Sec. II.B.6.

The text of Subsection (b)(1) requires a *"discharge, release, or emission"* for the adjustment to apply. *See* USSG § 2Q1.2(b)(1)(A)-(B); USSG § 2Q1.3(b)(1)(A)-(B). (We use emphasis here to identify the key terms discussed in the cases.) The adjustment under Subsection (b)(1)(A) for "ongoing, continuous, or repetitive" further requires that the discharge, release or emission be *"into the environment."* *Id.* The sentence we call "Note 4, First Sentence," under 2Q1.3(b) (as well as Note 4 analogue under Section 2Q1.2(b)), states that "Subsection (b)(1) assumes a *discharge or emission into the environment* resulting in actual environmental *contamination."* *See* USSG § 2Q1.3, cmt. n. 4; USSG § 2Q1.2, cmt. n. 5.

Note 4, First Sentence, explains *whether to impose* the Subsection (b)(1) adjustment. The remaining text of Note 4 lists factors to consider for possible *guided departure* from a Subsection (b)(1) adjustment. *See infra* text quoted in Sec. II.B.6. One of those factors is *"harm* resulting from the emission, release or discharge." USSG § 2Q1.3, cmt. n. 4.; USSG § 2Q1.2, cmt. n. 5. In other words, Note 4 read literally does not require evidence of *harm* to the environment for the adjustment to apply. *Harm* becomes relevant as one of

the factors to consider for possible upward or downward departure.

The Ninth Circuit Court of Appeals has interpreted [Note 4 analogue], First Sentence, using a dictionary definition of "contamination" meaning " 'to soil, stain, or infect by contact or association' or 'to make ... impure by admixture.' " *United States v. Ferrin,* 994 F.2d 658, 664 (9th Cir.1993) (quoting dictionary source). The *Ferrin* defendant pled guilty to illegal disposal of hazardous waste under a section of the Solid Waste Disposal Act that defined the offense as "discharge ... so that such [waste] *may enter* the environment." *Id.* at 662 (emphasis in original). The evidence at sentencing showed that the waste defendant had deposited in a dumpster was retrieved by officials before it leaked out, but defendant had also mixed the waste in open air "as clouds of gas [were] emitted from a fuming drum." *Id.* at 660. The circuit court upheld refusal to impose a Subsection (b)(1) adjustment for the material placed in the dumpster, "because, owing to the fortuitous intervention of the authorities, there was no actual contamination." *Id.* at 664. It reversed for findings, however, as to whether the gas released into the air was a hazardous substance "since, if it was, its escape into the atmosphere contaminated the environment," and Subsection (b)(1) would apply. *Id.*[33]

The *Ferrin* court noted with some approval three earlier decisions applying Subsection (b)(1) where there was evidence of actual contamination of the environment, but not necessarily evidence of actual harm. *Id.* at 663, citing *United States v. Bogas,* 920 F.2d 363 (6th Cir.1990) (offense

**33.** The *Ferrin* court defined "environment," as used in Subsection (b)(1) and Note 4, by referring to the CERCLA statutory definition, "in pertinent part as 'surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.' " *Ferrin,* 994 F.2d at 664 (quoting 42 U.S.C. § 9601(8)).

was failure to report release of hazardous wastes into the environment, and there was visual contamination of the soil); *United States v. Sellers,* 926 F.2d 410 (5th Cir.1991) (offense was improper disposal of hazardous waste, and one drum was actually leaking onto creek embankment); and *Goldfaden,* 959 F.2d 1324 (offense was discharge of industrial waste, and there was evidence of illegal dumping of wastewater into municipal sewer system). *Ferrin* commented that although offenses such as in *Goldfaden* "necessarily embrace[ ] a contaminating environmental discharge[, o]ther types of offenses covered by Section 2Q1.2, such as the illegal hazardous waste disposal engaged in by Ferrin, however, may or may not result in de facto environmental contamination." *Id.* at 663. The *Ferrin* court concluded that "an enhancement under subsection (b)(1) requires a showing that some amount of hazardous substance in fact contaminated the environment." *Id.* It added: "Proof of environmental contamination does not necessarily require a full-blown scientific study. We see no reason why in most cases reasonable inferences from available evidence concerning the offense at issue would not suffice to support a conclusion that the illegal acts resulted in contamination." *Id.* at 664. The Ninth Circuit reiterated its view in *United States v. Cooper,* 173 F.3d 1192 (9th Cir.1999): "The [Subsection (b)(1) ] enhancement requires 'actual environmental contamination,' not actual environmental harm." *Id.* at 1205 (quoting *Ferrin,* 994 F.2d at 664). It appears to us that what *Ferrin* did was refuse to conflate the terms "contamination" and "harm," each term being used separately in Note 4. *Ferrin* states the view that no finding of *harm* is required for Subsection (b)(1) to apply, so long as *contamination* of the environment is shown.

Most of the circuits that have considered this topic simply use the terms *contamina-*

*tion* and *harm* as if they were synonymous, for purposes of determining what proof is necessary for a Subsection (b)(1) adjustment to apply. *See, e.g., Goldfaden,* 959 F.2d at 1331 ("[W]e interpret [Note 4 analogue] to explain that subsection (b)(1) takes environmental contamination as a given, but allows for upward or downward departures depending on the potency, size, or duration of the contamination;") *United States v. Liebman,* 40 F.3d 544, 550–51 (2d Cir.1994) ("[Note 4 analogue] states the obvious—that when a hazardous or toxic substance is discharged into the environment, it will be assumed that contamination of that environment ordinarily ensues.... Alternatively, the district court ... may be regarded as implicitly having inferred[ ] that the ... asbestos discharges inevitably resulted in contamination to the environment."); *United States v. Cunningham,* 194 F.3d 1186, 1201–02 (11th Cir. 1999) ("We join the Second and Fifth Circuits in holding that [Note 4 analogue] does not impose any additional requirements on the application of the [Subsection (b)(A) ] enhancement beyond those contained in the guideline itself. The government does not have to prove actual environmental contamination in order for the enhancement to apply."); *United States v. Perez,* 366 F.3d 1178, 1182 (11th Cir.2004) ("We reach the same conclusion with respect to § 2Q1.3. The Commentary for § 2Q1.3 does not impose any additional requirements on the application of the § 2Q1.3(b)(1)(A) enhancement beyond those contained in the guideline itself.")

Each circuit court case decided under Sections 2Q1.2 and 2Q1.3, in which a Subsection (b)(1) adjustment was considered appropriate, did involve a discharge, release, or emission of the substance into the environment, thus "contaminating" the environment. In other words, once those facts were shown (at trial and/or in the

sentencing process), the Subsection (b)(1) adjustment was seen to be applicable. This was the result regardless of whether the decision applied the "majority" view or the *Ferrin* test, or did not reach the "circuit split" issue, or simply noted the adjustment because it was not an issue on appeal.

We have described those rulings and circumstances in *Ferrin, Bogas, Sellers,* and *Goldfaden, supra.* The other pertinent decisions are: *United States v. Ortiz,* 427 F.3d 1278, 1280–81, 1285–86 (10th Cir. 2005) (polluted wastewater discharged into storm drains via toilet and pumping onto ground); *United States v. Rubenstein,* 403 F.3d 93, 97, 99–100 (2d Cir.2005) (exposed asbestos hanging from pipes and in open boxes); *Perez,* 366 F.3d at 1180–83 (pollutants dumped by truck into wetlands); *United States v. Kuhn,* 345 F.3d 431, 433, 438 (6th Cir.2003) (sewage sludge dumped into ditch); *United States v. Technic Servs.,* 314 F.3d 1031, 1047–48 (9th Cir. 2002) (asbestos washed down the drains and escaping into air); *United States v. Ho,* 311 F.3d 589, 608–609 (5th Cir.2002) (asbestos removal project in unsealed building); *United States v. Overholt,* 307 F.3d 1231, 1256–57 (10th Cir.2002) (hazardous wastes dumped into Class II disposal wells); *Chau,* 293 F.3d at 99–100 (asbestos disturbed in building and exposed to the air); *United States v. Hoffman,* Nos. 99–4515, 99–4516, 99–4517, 2000 WL 309001 (4th Cir. Mar.27, 2000) (contaminated wastewater discharged into sewer system); *United States v. Van Loben Sels,* 198 F.3d 1161, 1165–66 (9th Cir.1999) (same); *Cunningham,* 194 F.3d at 1201–02 (hazardous substance released in landfill and on the ground); *United States v. Tomlinson,* No. 99–30020, 1999 WL 511496 (9th Cir. July 16, 1999) (asbestos released into the air and down sinks and toilets during renovation project); *Cooper,* 173 F.3d at 1205 (sewage sludge dumped on farmland);

*United States v. Shurelds,* No. 97–6265, 1999 WL 137636 (6th Cir. Mar.2, 1999) (asbestos released outside containment area); *United States v. W. Indies Transp.,* 127 F.3d 299, 303–04, 315 (3d Cir.1997) (pollutants dumped into bay); *United States v. Jarrell,* No. 95–5718, 1996 WL 690062 (4th Cir. Dec.3, 1996) (pollutants discharged into public waters); *United States v. Hart,* No. 94–1005, 1995 WL 445685 (10th Cir. July 28, 1995) (dumping hazardous waste into treatment plant headworks); *Pizzuto,* 1995 WL 610346 (PCBs released into environment by leaking onto ground, remaining as film on scrap sold, and escaping into air when scrap burned); *United States v. Catucci,* 55 F.3d 15, 16–18 (1st Cir.1995) (PCB-laden transformers leaked onto streets and highway, and contents dumped into gravel pit); *Liebman,* 40 F.3d at 549–51 (asbestos emitted into air and dumped into gravel pit in open bags); *United States v. Suarez,* No. 92–10674, 1994 WL 6663 (9th Cir. Jan.10, 1994) (fill material placed into wetlands); *United States v. Strandquist,* 993 F.2d 395, 399–400 (4th Cir.1993) (raw sewage discharged into storm grate); *Ellen,* 961 F.2d at 463–64, 468 (filling in wetlands); *United States v. Irby,* No. 90–5113, 1991 WL 179110 (4th Cir. Sept.13, 1991) (sewage sludge discharged into river).

None of the cases have required the government to prove actual environmental harm to support a Subsection (b)(1) adjustment, where the facts do show an actual release into the environment. In addition, none to date have presented the rare hypothetical situation envisioned in *Ferrin,* where an environmental offense prosecuted and sentenced under Section 2Q1.2 [or 2Q1.3] did not result in the escape of at least some of the substance onto land or into air or water. As our Court of Appeals observed in *Chau,* without taking a position whether to agree with the *Ferrin*

interpretation: "even under *Ferrin*, the record here supports a [Subsection (b)(1)] enhancement.... Here, there is substantial evidence that Chau disturbed the asbestos in the building. There is also evidence that some asbestos became exposed to the air.... Thus, the district court correctly applied this enhancement to Chau's sentence." *Chau*, 293 F.3d at 100.

All of the pertinent decisions do agree that when the standard of Subsection (b)(1) is met, the sentencing court is required to apply a Subsection (b)(1) adjustment. Failure to do so is error. *See, e.g.,* *Ho*, 311 F.3d at 589–611 (reversing district court refusal to impose Subsection (b)(1) adjustment where preponderance of evidence showed that asbestos escaped into environment); *Van Loben Sels,* 198 F.3d at 1164–66 ("The record here supports the district court's finding that hazardous material had been continuously discharged into the environment. This is the appropriate predicate for upward adjustment under subsection (b)(1), ... and thus, it is reasonable to infer ... that [defendant's] illegal acts resulted in contamination, necessitating application of section 2Q1.2(b)(1)(A);" reversing district court refusal to impose Subsection (b)(1) adjustment); *Suarez,* 1994 WL 6663, at *1 ("Either subsection [ (b)(1) ](A) or subsection (B) always applies to violations that involve a discharge, release, or emission of a pollutant. As it is undisputed that [defendant's] offense involved a discharge of a pollutant into the environment, the remaining question is whether that discharge was ongoing ...;" reversing district court refusal to impose Subsection (b)(1) adjustment); *Ferrin,* 994 F.2d at 664 ("On re-

mand, the court must consider whether the gas was a hazardous substance since, if it was, its escape into the atmosphere contaminated the environment, and an increase in [defendant's] offense level is warranted under subsection (b)(1)"); *Bogas,* 920 F.2d at 368 ("[I]t would be clearly erroneous, on this record, to find no actual environmental contamination. There may have been no actual harm, but there was at least some visual contamination of the soil at the disposal site, and there must have been some water contamination even if the fortuitous presence of the nearby foundry sand filter prevented any possible damage to anyone's water supply;" reversing with instructions for district court to apply Subsection (b)(1) adjustment before considering any requested departures).

Two or more discharges require application of Subsection (b)(1)(A), the 6–level adjustment for an "offense result[ing] in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment." USSG § 2Q1.3(b)(1)(A). *See, e.g., Ortiz,* 427 F.3d at 1285–86 ("[Defendant] stands convicted of discharging pollutants in contravention of the CWA on two dates: [stated dates]. These two convictions suffice for application of the § 2Q1.3(b)(1)(A) enhancement.... The finding that [defendant's] offense did not result in an ongoing, continuous, or repetitive discharge of a pollutant is clearly erroneous.");[34] *Rubenstein,* 403 F.3d at 99–100 ("We agree ... that the illegal asbestos removal ... was repetitive. It occurred during two separate one-week periods [in specified months]—on multiple floors of the building. There

---

**34.** The *Ortiz* court rejected defendant's argument that a conviction for negligent discharge under 33 U.S.C. § 1319(c)(1)(A) does not count as a discharge for purposes of applying Subsection (b)(1)(A). *Ortiz,* 427 F.3d at 1286; *see Van Loben Sels,* 198 F.3d at 1162, 1164–66

(reversing and remanding sentencing on plea to negligent discharge of hazardous wastewater into municipal sewer system, with instructions to apply Subsection (b)(1)(A) for the repeated discharges).

was sufficient evidence of this conduct to support the six-level [Subsection (b)(1)(A)] enhancement."); *Catucci*, 55 F.3d at 18 ("[Defendant] argues that it was mere happenstance that the two PCB-laden transformers were dumped on different days.... We discern no error.... U.S.S.G. § 2Q1.2(b)(1)(A) is triggered if the offense *resulted in* an ongoing, continuous or repetitive discharge.... [T]he two PCB-laden transformers were dumped on separate occasions. Nothing more need be shown to activate the repetitive discharge adjustment."); *Strandquist*, 993 F.2d at 400–01 (district court properly applied Section 2Q1.2(b)(1)(A) adjustment because discharges occurred on two different dates, even where underlying counts of conviction were subject to grouping).

The issue of relevant conduct must be addressed in making guidelines calculations for each defendant at sentencing. The guidelines instruct that after the court selects the applicable offense guideline section [here, we have selected Section 2Q1.3], the court must "determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)." USSG § 1B1.2. Section 1B1.3 directs in pertinent part that the specific offense characteristics and cross-references in Chapter Two, as well as adjustments in Chapter Three, shall be determined on the basis of all relevant conduct, as defined in that section. USSG § 1B1.3(a).[35]

Section 1B1.3 provides in pertinent part that relevant conduct includes:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, ... or in the course of attempting to avoid detection or responsibility for that offense; [and]

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction....

USSG § 1B1.3(a)(1)-(2).

The commentary states, "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision." *Id.*, cmt. n. 2. In making the further determination whether acts and omissions were part of a common scheme or plan under subsection (a)(2), "they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.*, cmt. n. 9(A). Also, in evaluating whether the same course of conduct is present under subsection (a)(2), the court should consider "the degree of similarity of the offenses, the regularity (repetitions) of

---

**35.** We review the authorities on relevant conduct at this point in the memorandum. The same legal framework applies to all Chapter Two and Chapter Three guideline calculations that must be made in this case, except where expressly noted.

the offenses, and the time interval between the offenses." *Id.*, cmt. n. 9(B).

■ The scope of evidence used to determine relevant conduct for guideline calculation purposes is expressly not confined to the offense conduct. *See Witte v. United States*, 515 U.S. 389, 399–401, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (guidelines sentence validly based on conduct not charged in indictment); *United States v. Watts*, 519 U.S. 148, 156–7, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) ("jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *see, e.g., United States v. Brennan*, 326 F.3d 176, 195, n. 5 (3d Cir.2003) ("[I]f both the concealment of the bearer bonds [charged conduct] and concealment of the profits [uncharged conduct] are part of the same course of conduct, the profits may be included in the loss calculation."); *United States v. De-Laurentis*, 47 Fed.Appx. 170, 173 (3d Cir. 2002) ("[Defendant] contends it was error to consider conduct underlying acquitted Counts 1 through 4 in enhancing his sentence under [Section] 2C1.1(b)(1) (requiring an increase of two levels if the offense involved more than one extortion). This assertion is contrary to U.S.S.G. § 1B1.3(a)(2) and ... *Watts*"). Uncharged conduct and acquitted conduct, if meeting the criteria of Section 1B1.3, thus will be included in relevant conduct subject to the limitations announced in *Booker*. USSG § 1B1.3, cmt. n. 1; *id.*, cmt. background ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."). *See U.S. v. Booker*, 543 U.S. 220, 240–41, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) ("None of our prior cases is incon-

sistent with today's decision;" discussing, *inter alia, Witte* and *Watts*.).

Sentencing decisions in environmental cases provide examples of the relevant conduct rules applied in this context. *See, e.g., United States v. LeBlanc*, 119 Fed. Appx. 654 (5th Cir.2005) (conviction for discharge of pollutants into wetlands without a permit; relevant conduct included unauthorized operation of landfill beginning in 1995); *United States v. Morris*, 85 Fed.Appx. 117 (10th Cir.2003) (conviction for falsifying hazardous waste manifests; relevant conduct included illegal storage of hazardous waste without a permit); *United States v. Moran*, 69 Fed.Appx. 398 (9th Cir.2003) (conviction for negligent discharge of pollutant into publicly owned water treatment works; circuit opinion does not specify nature of relevant conduct but states, "the district court did not err in relying on acquitted conduct that was proved by a preponderance of the evidence in sentencing"); *United States v. Freeman*, 43 Fed.Appx. 233 (10th Cir.2002) (conviction for aiding and abetting in injection of hazardous waste without permit, and in disposal of hazardous waste without a permit; relevant conduct included foreseeable conduct of co-conspirators in also discharging on roads and in overflow pit); *Jarrell*, 1996 WL 690062 (guilty plea to one count of illegal discharge of pollutants into public waters; relevant conduct included similar discharges underlying dismissed counts); *Pizzuto*, 1995 WL 610346 (guilty plea to three counts involving illegal storage of PCBs; relevant conduct included repetitive discharge of PCBs into the environment underlying dismissed count); *Hart*, 1995 WL 445685 (guilty plea to three counts of falsifying records in violation of CWA; relevant conduct included dumping of hazardous waste in violation of RCRA underlying dismissed counts).

We now turn to application of these principles to the guideline calculations of the named defendants for their CWA-related conduct in this case. We think it is clear that the trial evidence of the discharges from the cement pit and the # 4 pit in this case will satisfy any of the views expressed in the case law as to what constitutes a discharge meeting the criteria stated in Section 2Q1.3, Subsection (b)(1), as explained in Note 4, First Sentence. This is because the discharges of polluted industrial wastewater from the cement pit and the # 4 pit were discharges into the municipal storm sewer system. (*See, e.g.,* dkt. 721 at 214 (cement pit) and 271 (# 4 pit).) That sewer system is part of the "environment" as described in the case law. *See supra* n. 33. On those facts, Subsection (b)(1) applies because "contamination" of the environment resulted from those discharges. *See, e.g., Chau,* 293 F.3d at 100. The parties do not appear to dispute that basic point.

The succeeding sentences of Note 4 provide for a possible guided departure of up to two levels in either direction, based on stated factors. The individual defendants who have CWA-related convictions indicate that they each seek a downward departure under Note 4, and under Note 7 that contains similar factors. *See infra* Sec. II.B.6. First we must see whether and to what extent Subsection (b)(1) applies to these defendants for their CWA-related conduct. *See, e.g., Morris,* 85 Fed. Appx. at 122 ("The distinction between an adjustment and a departure is critical. . . . The district court may consider a departure only after completing the adjustments required in the offense guideline. Application [Note 7 analogue] necessarily presumes all adjustments have been made when it invites departure consideration.").

■ We find that the repetitive discharges shown in the substantive CWA convictions against MAURY and DAVIDSON are thereby established for purposes of applying the 6–level enhancement to each of them under Subsection (b)(1)(A). Specifically, the convictions of DAVIDSON under Counts 12–20 and 22–27 (lesser-included negligent offense), and MAURY under Count 27 (lesser-included negligent offense) and on Counts 28–32 (felony offense), did involve discharges of petroleum-contaminated wastewater during successive months—and, as to Count 27, on a specific date during a successive month. (*See* dkt. 721 at 189, 215, 231 (quoting text of indictment, Cts. 12–26, 27, 28–32); *id.* at 208, n. 117 (distinguishing Cts. 24 and 27 as to date of offense in Dec., 1999).) The fact that some of those convictions were for lesser-included negligent offenses does not alter this conclusion.

Our analysis of this issue does not end there, however. We must also determine which sources of contaminated wastewater discharge can be attributable to which named defendants, in order to complete our rulings on the Subsection (b)(1) adjustments and to discuss any potential guided departures *infra.*

It will be recalled that the substantive convictions on Counts 12–20 and 22–27 established wastewater discharges from the cement pit, located in the pipe finishing area. On the other hand, the convictions on Counts 28–32 established wastewater discharges from the # 4 pit, located in the casting area. (Dkt. 721 at 192–193, 232.) Evidence of numerous similar discharges from both pits is contained in the evidence pertaining to Objective A of the conspiracy (to knowingly cause discharge of a pollutant into the waters, in violation of the CWA).

DAVIDSON received multiple convictions for repetitive wastewater discharges from the cement pit (Cts. 12–20, 22–27), for which he receives the 6–level enhance-

ment under Subsection (b)(1)(A). We will refer to the discharges established in those counts as "the cement pit discharges." We do not recall any evidence linking DAVIDSON to the ongoing discharges from the # 4 pit, for sentencing accountability purposes. *See* USSG § 1B1.3(a)(1). We will not include the discharges from the # 4 pit as relevant conduct of DAVIDSON under Section 2Q1.3.

There is, however, ample evidence linking MAURY to the ongoing cement pit discharges. We find as to defendant MAURY, under Sections 1B1.3(a)(1)(A), 1B1.3(a)(1)(B), and 1B1.3(a)(2), that the cement pit discharges were (1) aided, abetted, commanded, induced, or willfully caused by him; (2) reasonably foreseeable conduct of others in furtherance of the scope of criminal activity that this particular defendant agreed to jointly undertake; (3) of a nature that would require grouping of multiple counts, *see infra* Sec. V; and (4) part of both the same course of conduct and the common scheme or plan underlying his convictions on Count 27 and Count 1, Objective A. For these findings, we rely primarily on the summary of evidence relevant to cement pit discharges contained in our post-trial memorandum opinion. (*See* dkt. 721 at 136–146, 189–231, 257–260, 265.) This finding is further supported by the convictions of PRISQUE and DAVIDSON, along with MAURY, on Count 1, Objective A. Therefore, although MAURY was charged and convicted under only one substantive count as to the cement pit (Ct. 27), we find that a preponderance of the trial evidence requires us to ascribe to MAURY the ongoing discharges from the cement pit, as well as those from the # 4 pit, as relevant conduct supporting application of Subsection (b)(1)(A) to him.

PRISQUE was not substantively charged with repetitive CWA discharges, such as under Counts 12–26 and 28–33. The only CWA-related substantive count charged against PRISQUE was Count 27, on which he was convicted of the lesser-included negligent offense. (Dkt. 721 at 3, n. 4.) Count 27 alleged a discharge of petroleum-contaminated wastewater from the cement pit on 12–4/5–99. (Dkt. 711 at 46.) PRISQUE clearly qualifies for the 4-level adjustment under Subsection (b)(1)(B) for his Count 27 conviction. However, the government argues that all CWA-convicted defendants, including PRISQUE, qualify for the 6-level adjustment under Subsection (b)(1)(A). (Gov. I at 15; tr. 738 at 133–134.)

We do find that the relevant conduct of defendant PRISQUE includes accountability for the ongoing, successive, and repetitive pattern of discharges of petroleum-contaminated wastewater from the cement pit. We do not make a similar finding linking PRISQUE to the ongoing discharges from the # 4 pit, for sentencing accountability purposes.[36] Specifically, we find as to PRISQUE, under Sections 1B1.3(a)(1)(A), 1B1.3(a)(1)(B), and 1B1.3(a)(2), that the cement pit discharges were (1) aided, abetted, commanded, induced, or willfully caused by him; (2) reasonably foreseeable conduct of others in furtherance of the scope of criminal activity that this particular defendant agreed to

---

**36.** There was testimony from witness Bobinis that PRISQUE refused to speak with him when Bobinis tried to resist being fired after confronting MAURY about the illegality of the intentional discharges from the # 4 pit. (*See* dkt. 721 at 239.) That is about all the evidence that would link PRISQUE to the intentional # 4 pit discharges, other than the fact that PRISQUE ran the plant and could well have been involved in causing or aiding and abetting those discharges. We do not find that quantum of evidence sufficient to meet the preponderance standard, for purposes of determining the relevant conduct of PRISQUE for his CWA-related offenses.

jointly undertake; (3) of a nature that would require grouping of multiple counts, *see infra* Sec. V; and (4) part of both the same course of conduct and the common scheme or plan underlying his convictions on Count 27 and Count 1, Objective A. For these findings we rely primarily on the summary of evidence relevant to cement pit discharges contained in our post-trial memorandum opinion. (*See* dkt. 721 at 136–146, 189–231, 257–260, 265.) This finding is further supported by the convictions of MAURY and DAVIDSON, along with PRISQUE, on Count 1, Objective A. Therefore, although PRISQUE was charged and convicted under only one substantive count as to the cement pit (Ct. 27), we find that a preponderance of the trial evidence requires us to ascribe to PRISQUE the ongoing discharges from the cement pit (but not from the #4 pit), as relevant conduct supporting application of the 6–level Subsection (b)(1)(A) adjustment to him.

The government suggests that in addition to the evidence of petroleum-contaminated wastewater discharges, the evidence pertaining to concealment of discharges of asphalt-based waste paint into storm sewers on several occasions should support a 6–level Subsection (b)(1)(A) enhancement for the CWA offenses. (Gov. I at 15.) We do not find that evidence, even by the preponderance standard, establishes a basis for the Subsection (b)(1) enhancements, because there was no evidence that as to any of these defendants the discharges themselves were other than accidental. (*See, e.g.,* tr. 416 at 75–81, & evidence summarized in Atlantic States I at 19–20.)

A failure to report such spills can be posited as a "recordkeeping" offense.[37] That evidence therefore is part of the body of evidence supporting the conspiracy convictions of those convicted on Count 1, Objectives A (violate CWA), C (defraud EPA) and D (obstruct EPA). (*See* dkt. 711 at 16–17, Overt Acts 7–9.) However, we would not see that as conduct supporting a Subsection (b)(1) enhancement for the discharge itself.

The commentary provides for a potential departure under Subsection (b)(1). We address that topic, as to the CWA offenses of conviction, in Section II.B.6 *infra.*

### 5. USSG § 2Q1.3(b)(4)—Discharge without or in violation of permit

Section 2Q1.3 provides a 4–level enhancement if the environmental offense "involved a discharge without a permit or in violation of a permit." USSG § 2Q1.3(b)(4) ("Subsection (b)(4)").

The Court does find, for purposes of sentencing, that the discharges of petroleum-contaminated wastewater from the cement pit and the #4 pit that were the subject of the substantive CWA counts of conviction, and the additional similar discharges indicated in the evidence of the conspiracy, were in violation of the Atlantic States water permits. (*See* summary of evidence, dkt. 721 at 189–243.) *See, e.g., Ortiz,* 427 F.3d at 1284–85 (factual impossibility of obtaining a permit is not a defense to a Subsection (b)(4) enhancement); *Perez,* 366 F.3d at 1186, n. 10 (same); *United States v. Fitzpatrick,* No. 96–4713, 1997 WL 639334 (4th Cir. Oct.17,

---

**37.** The failure to report even accidental spills could be treated as a "recordkeeping offense" under the guidelines. *See, e.g.,* USSG § 2Q1.3, cmt. n. 1. However, Subsection (b)(5) provides that only if a "recordkeeping offense reflected an effort to conceal a substantive environmental offense," we should use the offense level for the substantive offense. USSG § 2Q1.3(b)(5). Therefore, a "recordkeeping offense" to conceal an accidental spill would not appear to qualify for the Subsection (b)(1) enhancements. *See generally* USSG Ch.1, Pt. A., intro. cmt. 4(f), Regulatory Offenses.

1997) (this adjustment is not limited to those who operate a plant subject to permit; it applies to anyone convicted of a violation of the statute); · *United States v. Spanish Cove Sanitation*, Nos. 94–6508 & 94–6509, 1996 WL 366313 (6th Cir. June 28, 1996) (this adjustment applied where permit allowed discharge from one point and defendant discharged from four points of discharge); *Ferrin*, 994 F.2d at 664–65 (reversing district court failure to impose 4–level Subsection (b)(4) adjustment where employee convicted under RCRA of illegal disposal of hazardous waste, and employer lacked permit for disposal; appeals court noted possibility of departure on remand but only on bases authorized by [Note 7 analogue] ). Therefore, we find that the 4–level enhancement under Subsection (b)(4) applies to defendants PRISQUE (Count 27), MAURY (Counts 27–32), and DAVIDSON (Counts 12–20, 22–27).

The commentary provides for a potential departure under Subsection (b)(4). We address that topic, as to the CWA offenses of conviction, in the next section *infra*.

### 6. USSG § 2Q1.3, Notes 4 and 7— Departure of up to two levels either direction

Note 4 of the commentary to Section 2Q1.3 ("Note 4") provides for a potential departure of up to two levels in either direction under Subsection (b)(1), stating as follows:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending on the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk as-

sociated with the violation, a **departure of up to two levels in either direction** from that prescribed in these specific offense characteristics may be appropriate.

USSG § 2Q1.3, cmt. n. 4 (emphasis added).

Note 7 of the commentary to Section 2Q1.3 ("Note 7") provides for a potential departure of up to two levels in either direction under Subsection (b)(4), stating as follows:

> Subsection (b)(4) applies where the offense involved violation of a permit, or where there was a failure to obtain a permit when one was required. Depending upon the nature and quantity of the substance involved and the risk associated with the offense, a **departure of up to two levels in either direction** may be warranted.

USSG § 2Q1.3, cmt. n. 7 (emphasis added).

These provisions reflect the general guidelines rule that in determining the guidelines calculation for specific offense characteristics under Chapter Two of the guidelines, as well as Chapter Three adjustments, the score should be determined based on "all harm that resulted from the acts and omissions [constituting relevant conduct], and all harm that was the object of such acts and omissions". USSG § 1B1.3(a)(3).

The government and defendants take opposing positions as to both Note 4 and Note 7 departures here. Defendants seek 2–level downward departures in relation to their CWA-related conduct under both Note 4 and Note 7. (Atlantic States I at 18–23, 55–56; Prisque I at 19–30, 93–94, 105, 118–121; Maury I at 44–48; Davidson I at 48–49, 54–57; Atlantic States II at 48–51; Prisque II at 26–27, 36–46; Maury II at 7–11; Davidson II at 21–22, 25–28; tr. 738 at 16–26, 81–83, 104–106, 162.) The government opposes any downward depar-

ture under those provisions, and seeks 2–level upward departures under both. (Gov. I at 35–37, tr. 738 at 134–139.)

It is evident from the language of these two application notes that a Note 4 departure can only apply to a Subsection (b)(1) enhancement, and a Note 7 departure can only apply to a Subsection (b)(4) enhancement.[38] The contentions of the parties under Note 4 and Note 7 tend to merge, however, because the two-factor basis for the Note 7 departure is encompassed within the four-factor basis for the Note 4 departure. *See infra* n. 40. We will also address Note 4 and Note 7 under the CWA together here, recognizing that they are distinct bases for departure, applicable to different specific offense characteristics.

Defendants point out that before trial, the Court granted an *in limine* motion by the government seeking to exclude any evidence or argument from defendants to the effect that any discharges and emissions shown by the evidence were not harmful in the environment. (Dkt. 168 at 1–4, 12–15, 18; tr. 212 at 64–84.) The sound reason the Court excluded that topic—at trial—was that environmental harm was not an element of any of the CWA or CAA offenses charged, nor was lack of harm a defense, so it would be irrelevant and could invite jury nullification.

Defense counsel agreed that there should be no such argument by either side at trial. (*See, e.g.,* dkt. 181 at 2–3.) Indeed, when the Court granted that motion by the government, defense counsel requested and obtained a reciprocal ruling

that the government could not suggest at trial that the discharges and emissions were harmful. (Tr. 212 at 74–75; tr. 231 at 23.) The Court's reason for that ruling was obvious, albeit not articulated at the time because the government did not object. Not only that it was it fair to have the prohibition run both ways, but adducing evidence of actual environmental harm at trial would be irrelevant and risked unfair prejudice to defendants.

There was another motion *in limine,* made by defendants, seeking to exclude any evidence or argument from the government pertaining to potentially hazardous or carcinogenic air pollutants such as arsenic, cadmium, chromium, lead, nickel, and mercury.[39] (Dkt. 172; tr. 212 at 97–142.) We directed the government not to mention such substances in its opening arguments (tr. 231 at 28–30), and as the trial progressed we continued that exclusion.

Defense counsel vigorously policed the prohibition against suggestion of environmental harm throughout the trial, and Court concurred as reflected in its rulings and instructions to the jury. (*See, e.g.,* tr. 464 at 111 (trial); tr. 466 at 34 (trial); tr. 467 at 24–59 (sidebar); tr. 466 at 35–36 (limiting instruction).) In fact, the final jury instructions expressly stated that "the government is not required to prove that the discharge of a pollutant caused any damage or harm in order to establish the criminal offense charged under the [CWA];" and the parallel CAA jury in-

---

**38.** The text of Note 4 makes clear that the potential departure under Note 4 applies only where a defendant has received an enhancement under Subsection (b)(1), that is, because the offense involved a discharge, release or emission. Note 7 creates a similar but not identical basis for potential departure where a defendant has received an enhancement un-

der Subsection (b)(4), because the discharge was without or in violation of a permit.

**39.** We mention this procedural background here, in the discussion of guideline calculations for the CWA convictions, because it is pertinent to the Note 4 and Note 7 departure issues under both the CWA and the CAA.

structions omitted any mention of harm. (Dkt. 717 at 53, 58–60.)

Here at the sentencing stage, defendants argue that they are entitled to downward departures under Notes 4 and 7, because (1) there is no proof in the trial record of environmental harm; and (2) they were prevented from proving lack of environmental harm at trial by the *in limine* ruling on the government's motion to exclude such evidence. They contend that if permitted, they would have done that through their environmental chemistry expert, Dr. James S. Smith, who did testify at trial on other CWA issues. (*See, e.g.,* Prisque I at 19–30, 93–94.) Defendants submit two post-trial declarations by Dr. Smith (collectively, "the Smith affidavit"), setting forth his opinion that there was "only a de minimis environmental impact, if any, to the ecosystem" by the wastewater discharges shown in the evidence at trial. (*See* Atlantic States I, Attachment: Smith declaration 10–11–07; Atlantic States II, Ex. P: Smith declaration 12–18–07; copies also attached to sentencing briefs of Prisque, Maury, Davidson.)

The government argues that there is enough evidence in the trial record relating to the CWA offenses to both negate downward departures *and* support upward departures under Notes 4 and 7. It points out the fallacy in defendants' argument that since proof of environmental harm was not presented at trial, the actual harm must therefore have been limited and deserving of downward departure. The government describes the Smith affidavit as unreliable and submits published Material Safety Data Sheets on the petroleum products discussed in the Smith affidavit. The

government also contends that if the Court were inclined to rely on any contents of the Smith affidavit, the Court should have him testify in court subject to cross-examination. The government adds that it would also consider presenting more evidence on these departure issues, which would further prolong the sentencing proceedings. It contends, however, that the trial record is sufficient for the Court to apply the upward departures to the CWA offenses under Notes 4 and 7. (Gov. I at 35–37, 53–54; Gov. I, Attachments A and B; tr. 738 at 134–139.)

This debate presents an evidentiary challenge at sentencing. As previously noted, Note 4 lists four factors, and Note 7 lists two of those factors, as described in the margin.[40] We will speak of the Note 4 factors in this discussion, since they cover the Note 7 factors and more. The question is whether the Court must make findings of fact at sentencing addressing all of the factors in Notes 4 and 7, when the trial evidence was deliberately and properly limited to only some of those factors. If so, the further question is how much post-trial evidence should the Court consider, and whether to conduct an evidentiary hearing for that purpose.

There is considerable trial evidence addressing Note 4 factors (2) and (3), namely the quantity and nature of the polluted wastewater discharges, and the duration of the offenses. (*See, e.g.,* evidence summarized in dkt. 721 at 189–243.) There is no trial evidence directly addressing Note 4 factors (1) and (4), the harm resulting from the discharges and the risk associated with the violations. The latter type of evidence

40. Note 4 has four factors: (1) the harm resulting from the emission, release or discharge, (2) the quantity and nature of the substance or pollutant, (3) the duration of the offense, and (4) the risk associated with the violation ("the Note 4 factors"). USSG

§ 2Q1.3, cmt. n. 4. The two-factor Note 7 test is based on items (2) and (4) from that list, namely quantity and nature of the substance, and risk associated with the offense ("the Note 7 factors"). *Id.* n. 7.

was excluded from the trial, at the insistence of both sides, because it was irrelevant to the charges and defenses to be decided by the jury. *See supra* pp. 222–23. It appears that in these circumstances, the Court should consider evidence outside the trial record if it is to make specific factual findings for either mitigation or aggravation under factors (1) and (4) at sentencing.[41]

The trial evidence and the convictions indisputably established that there were ongoing and repetitive discharges from the cement pit of polluted industrial wastewater that included petroleum and other materials, during at least the period covered by Counts 12–20 and 22–27. (*See* dkt. 721 at 189–231.) We have found, pursuant to Subsection (b)(1)(A), that defendants PRISQUE, MAURY, and DAVIDSON are each accountable for those discharges for sentencing purposes. A similar ongoing pattern of discharging polluted industrial wastewater from the # 4 pit has also been found attributable to defendant MAURY.[42] *See supra* Sec. II.B.4.

 We have considered the post-trial evidence submitted by the parties going to the issue of harm or risk from the cement pit and # 4 pit discharges. In our view at this stage of the sentencing process, which is Step 1 rather than Step 2, neither side has met its burden of persuasion in favor of an upward or downward departure from the CWA-related guideline calculations under Note 4 or Note 7. *See United States v. McDowell*, 888 F.2d 285, 291 (3d Cir.1989) (stating Government bears burden of persuasion for upward adjustment of sentence, and defendant bears burden of justifying downward departure).

The trial evidence established that during the period covered by Counts 12–20 and 22–27, the contents of the cement pit included industrial wastewater containing petroleum lubricating oil and byproducts of the cement lining operation, including particulate matter. The evidence and the verdicts established that those pollutants were regularly discharged into the Delaware River through the municipal storm system. Those pollutants were among the constituents identified in the samples that were taken from the river on the occasion of the 8½ mile spill that appeared on the river on December 5, 1999, and was traced back to the cement pit by laboratory studies. (*See* dkt. 721 at 189–230.)

The evidence also established that the cement pit discharges did violate the limited water permit authorization allowing only stormwater to flow down the identified storm drains, and only during rain events. (*Id.*) We have rejected, as did the jury, defendants' contention that the lack of a visible petroleum sheen on the river during daylight on most other days meant there were little or no such constituents going into the river during those ongoing discharges. (*See id.* at 230, n. 141.)

Based upon the trial evidence and the limited additional evidence presented by the parties thus far in the sentencing process, this Court tentatively concludes that both the cement pit and the # 4 pit discharges fall generally within the heartland of cases sentenced with Subsection (b)(1) and (b)(4) specific offense characteristics,

---

41. This same dilemma arises when we consider Note 4 and Note 7 departures under the CAA, as discussed *infra* Sec. II.C.6.

42. We have declined to enhance any of these defendants' Subsection (b)(1) and Subsection (b)(4) guidelines scores for concealment of asphalt-based waste paint discharges to the storm sewer system, for reasons stated above. *See supra* Sec. II.B.4. Therefore, in our view that conduct is not relevant to whether guided departures should be granted under Notes 4 and 7, respectively, which apply only to those two subsections. *See supra* n. 38.

and do not likely warrant any departures under Notes 4 and 7 as to PRISQUE, MAURY, or DAVIDSON. In other words, those ongoing polluted wastewater discharges were far from minor in nature, quantity, and degree of resulting contamination of the environment, but neither are they considered to have created major environmental conditions. (Tr. 738 at 135–137.) If anything, such discharges might warrant upward departures under Notes 4 and 7, a point that we understand the government has not fully developed at Step 1 because issues of departures will be fully briefed and resolved only at Step 2 of the sentencing process.

Our review of the case law to date has revealed a few reported cases (published and unpublished) on the subject of guided departures under Notes 4 and 7 of Section 2Q1.3, or the analogous application notes of Section 2Q1.2. Here we provide a summary of those decisions.

A discretionary refusal to depart downward is typically considered to not be reviewable on appeal. *See, e.g., United States v. Watson,* 482 F.3d 269, 271 n. 2 (3d Cir.2007). This general rule has been applied in environmental sentencing cases. *See, e.g., LeBlanc,* 119 Fed.Appx. at 655–56 (unpermitted operation of landfill in wetlands for several years; no departure under Note 4 and/or 7); *United States v. Jones,* No. 99–2433, 2000 WL 1648056 (6th Cir. Oct.26, 2000) (unpermitted transportation and abandonment of hazardous ink wastes on one occasion; no departure under Note 7 analogue); *United States v. Hill,* No. 96–30340, 1998 WL 133570 (9th Cir. Mar.18, 1998) (conviction included two counts of unpermitted transportation of hazardous waste; no departure under Note 7 analogue).

Some appellate decisions, however, have expressly upheld refusal to depart downward based on lack of sufficient mitigating circumstances. *See, e.g., Perez,* 366 F.3d at 1185–86 (conviction included two counts of unpermitted discharge of pollutants into wetlands; no departure under Note 7; no valid mitigating circumstances raised at sentencing hearing); *Freeman,* 43 Fed. Appx. at 237–38 (convictions for aiding and abetting injection of hazardous waste and unpermitted disposal of hazardous waste; no downward departure under Notes 4 and 7 analogues; district court considered quantity, nature, and duration of offense and commented that had the concentrations been higher, upward departure would have been appropriate); *United States v. Kyle,* 24 Fed.Appx. 447, 450–51 (6th Cir. 2001) (convictions and relevant conduct included unpermitted storage and disposal of hazardous waste for approximately two years; defendant presented no evidence at sentencing hearing to support minimal risk argument; appeals court found no merit to contention that district court erred in not making specific factual findings when it denied departure under Note 7 analogue); *United States v. Goldsmith,* 978 F.2d 643, 646 (11th Cir.1992) (transportation of approximately 38 drums of hazardous waste to unpermitted facilities during one-month period; no departure under Note 7 analogue; not clearly erroneous despite defense contentions of little environmental damage or risk).

Decisions to grant upward or downward departures are, of course, appealable, but we have found no appellate decisions in which downward departures under Notes 4 and 7 have been challenged by the government on appeal. In one case where the sentencing court granted Note 4 and Note 7 downward departures that the government did not challenge on appeal, the appeals court merely noted the departures without expressing disapproval, based on the facts found by the district court. Those facts were that the discharge was

dumping of almost-completely treated sewage sludge into a ditch from which runoff could flow to a creek and thence to a river, but testing of the affected areas did not reveal any presence of PCBs, and the district court could not determine whether any of the ditch contents reached the river, noting that "the environmental harm did not seem to be very great." *Kuhn,* 345 F.3d at 438; *see Strandquist,* 993 F.2d at 399–401 & n. 5 (convictions for illegally discharging sewage into navigable waters on two separate dates; district court granted one-level downward departure under Note 4; not appealed but noted by appeals court without comment); *Ellen,* 961 F.2d at 463–65, 467–69 & n. 3 (convictions on multiple counts of filling in wetlands without a permit; district court granted two-level downward departures under Notes 4 and 7; not appealed but noted by appeals court without comment).

Upward departures granted under Notes 4 and 7 were upheld by the Fourth Circuit on appeal in *Jarrell,* 1996 WL 690062. There, based on a guilty plea to one count of illegal discharge in excess of water permit limitations and relevant conduct from dismissed counts, the district court relied upon the PSR and stated:

> I could go on and on, but just to indicate that this, in my opinion, is an extremely serious offense. It was a health hazard. It was extremely nasty. It was so derelict on your part, so deliberately derelict on your part.

*Id.* at *2. The appeals court in *Jarrell* noted that on at least three occasions, the EPA conducted "grab sampling" of waste water areas around the treatment plant and neighborhood subdivision. The samples contained 230,000 parts, 750,000 parts, and 830,000 parts of fecal coliform per 100 milliliters of waste water. Defendant's operating permit allowed only 400 parts per 100 milliliters of waste water. The court

concluded, "[g]iven the egregiousness of defendant's violations, it can hardly be said that his offenses were of such a minor nature as to prompt this court to hold that the district court abused its discretion" in departing upward under Notes 4 and 7. *Id.*

A downward departure under Note 4 analogue was granted in an unappealed district court case, *United States v. King,* 915 F.Supp. 244 (D.Kan.1996). The case involved a guilty plea (during trial) to knowingly introducing pollutants into the public water treatment plant, and the court took additional testimony in an evidentiary hearing at sentencing. It made findings that (1) the harm resulting from the discharge was relatively minor because the discharge was discovered promptly and officials were able to respond to prevent serious or lasting damage or health effects; (2) the amount of hazardous pollutant was not vast, even by the government's estimates; and (3) the duration of the offense was very short, in contrast with offenses involving a continuing course of conduct over an extended period of time. *Id.* at 247–48.

Circumstances somewhat factually analogous to the present case were presented in *United States v. Hagerman,* 525 F.Supp.2d 1058 (S.D.Ind.2007), which was recently affirmed. *See* Nos. 07–3874 & 07–3875, 2008 WL 5120116 (7th Cir. Dec.5, 2008). It was a post-*Booker* sentencing on a jury conviction of the owner/operator of a plant that held a water permit allowing it to discharge wastewater into the Wabash River, subject to limits on concentrations of listed pollutants. The convictions were for record-keeping offenses, but the relevant conduct was found to include unpermitted discharges of many millions of gallons of polluted wastewater (containing hazardous substances) over at least 10 months. After the court applied the adjustments under Sections 2Q1.2(b)(1)(A)

and (b)(4), defendant requested a downward variance (rather than departures under Note 4 and Note 7 analogues). The court denied a variance on that basis, stating:

> The defense pointed out that there is no proof of specific environmental harm resulting from WET's wastewater discharges. If there had been such proof, the case might well have warranted a heavier sentence. The argument does not persuade the court to be more lenient because the defendant's own conduct made it very difficult for the government to measure and prove any such harm. By falsifying the MMRs and DMRs, [defendant] concealed from regulatory authorities for many months the quantities of pollutants in the millions of gallons of wastewater that he was discharging into the Wabash River. By the time environmental authorities learned of his violations, those pollutants had washed down-river and could not be traced back to WET. When the authorities finally learned of his violations, they shut down the business promptly to prevent further harm, but the absence of proof of more specific harm is not a significant mitigating factor here.

*Id.* at 1064.

We can say at this juncture, and based upon our review of this case law, that if this Court finds itself compelled to hold an evidentiary hearing on the Note 4 and 7 issues under the CWA convictions, the relevant evidence would not necessarily be confined to the petroleum hydrocarbons aspect of the wastewater involved. The trial evidence established that large quantities of cement pit wastewater were regularly discharged down the storm drains.

This industrial wastewater was polluted in several ways. For example, DEP water inspector Hirsch testified to his observations of the cement pit in full operation on the day of the search warrant execution and during his prior routine inspections: "The water was dark green, very turbid; did not look very good." (Tr. 363 at 135–136.) Therefore, for sentencing purposes the measurement of quantity would not be limited to estimates of the petroleum content. The measurement of quantity would look to the total volume of untreated industrial wastewater being discharged on a regular basis, including but not limited to its estimated petroleum content.

The Court will further, if requested by the government, probably be compelled to consider other constituents involved in the wastewater discharges that were also regulated under the water permits. For example, the trial evidence indicates that additional parameters including zinc, lead, cadmium, total suspended solids and chemical oxygen demand had been identified by DEP as problematic at the storm drain sampling location nearest the cement pit during the relevant period.[43] (Tr. 363 at 115–116.) Indeed, at approximately the time of the search warrant execution in February, 2000, ATLANTIC STATES was being placed on monthly DEP monitoring at that location because of repeated serious regulatory violations. (*See* dkt. 721 at 192–193, 192–193, n. 106, 223, n. 133.) It is reasonable to infer from the trial evidence that such substances were in the cement pit liquid, or were picked up from the roadway and adjacent surface areas and were carried into the storm drains as the cement pit liquid flowed down the roadway

---

**43.** Heavy metals such as these are arguably not included in the federally-regulated parameters of the Atlantic States air permits. We have heard no such argument as to the water permits, and the trial evidence did refer to these parameters as included in the regulatory enforcement of the water permits.

and into the drains. (*Id.;* tr. 363 at 40–42, 44–47, 50–52, 115–116, 124–137.)

The evidence of discharges from the # 4 pit describes similar pollution constituents, and others, contained in the dark-colored liquid discharged from that pit onto the roadway and into the storm drains on numerous occasions. (*See* dkt. 721 at 231–243.) However, we also do not believe that the available evidence supports an upward or downward departure under Notes 4 and 7 as to defendant MAURY for those additional discharges without a hearing.

Our tentative conclusion is that neither upward nor downward departures are appropriate under Notes 4 and 7 as to defendants PRISQUE, MAURY, and DAVIDSON for their CWA-related offenses. If the Court finds that post-trial evidence must be further evaluated to complete Step 2, we will conduct an evidentiary hearing.[44]

### 7. USSG § 2Q1.3, Note 3—Departure involving negligent conduct

Note 3 of the commentary to Section 2Q1.3 ("Note 3") provides for a downward departure, relating to the specific offense characteristics of that section, in cases involving negligent conduct. It states as follows:

The specific offense characteristics in this section assume knowing conduct.

In cases involving negligent conduct, a downward departure may be warranted. USSG § 2Q1.3, cmt. n. 3.

Defendants PRISQUE and DAVIDSON, who were convicted only of lesser-included negligence offenses under the CWA substantive counts, as well as MAURY, who was convicted of both negligence and knowing offenses under the CWA substantive counts, seek a downward departure under this provision. (Prisque I at 134, n. 12;; Davidson I at 57–58; Prisque II at 36–37; Maury II at 7–8; Davidson II at 25–26.) The government opposes any downward departure on this ground. (Tr. 738 at 132–133.) We have located a few cases relevant to this provision, which we summarize here.

Defendant in *United States v. Hanousek*, 176 F.3d 1116 (9th Cir.1999), was convicted of negligent discharge of oil into navigable water in violation of 33 U.S.C. § 1319(c)(1)(A), the same statute underlying the substantive CWA convictions of PRISQUE and MAURY in this case. *Id.* at 1116. His total offense level was stated to be 12. *Id.* at 1125. Although the circuit decision did not provide his guideline calculation, it can be derived from information in the decision to be as follows, applying Section 2Q1.3 based on the nature of the substance as oil pollutant: Base offense level 6; add 4 levels for one-time discharge under Subsection (b)(1)(B); add 2 levels for supervisory role, *id.;* total

---

44. We do not have a basis to evaluate the expertise of defendants' affiant, Dr. Smith, on issues of toxicology or epidemiology relating to harm or risk of pollutants in the environment. At trial he described only his qualifications as a Ph.D. chemist, specializing in use of instruments to analyze and determine what chemical compounds exist in a water or soil sample. He was offered and accepted "as an expert in chemistry including hydro carbon chemistry, forensic chemistry, environmental site investigations, and fate and transport of spilled contaminants." (Tr. 464 at 113–115.)

We also note that defendants did not include in their pretrial expert disclosures any proposed opinions from Dr. Smith on issues of environmental impact or harm. This is true despite the fact that the government's motion to exclude such evidence was filed after defendants disclosed Dr. Smith's proposed testimony. (*Compare* 7–1–05 ltr. from Atlantic States counsel to AUSA providing expert discovery pursuant to Rule 16(b)(1)(C) [not docketed] *with* dkt. 168, government motion in limine filed 7–29–05.)

offense level: 12. In other words, it appears that he did not receive a downward departure under Note 3 for negligent conduct. Although Note 3 was not mentioned in the decision, the circuit court did hold that it lacked jurisdiction to review the district court's refusal to depart downward, stating: "The district court recognized that it had the discretion to make the departures requested by Hanousek, but chose not to do so." *Id.* at 1126.

The Tenth Circuit has observed in dicta that, "[p]lainly, the commentary contemplates application of a § 2Q1.3(b)(1)(A) enhancement to sentences for negligent discharge violations, but authorizes a downward departure in such circumstances." *Ortiz,* 427 F.3d at 1285–86 (reversing judgment of acquittal after guilty verdict on CWA negligence offense; also finding error in district court refusal to apply Subsection (b)(1)(A) and (b)(4) enhancements based on both knowing and negligent convictions). The Sixth Circuit also observed in dicta in *United States v. Rutana,* 932 F.2d 1155 (6th Cir.1991) that "U.S.S.G. § 2Q1.2 assumes knowing conduct, and downward departure may be warranted in cases involving negligent violations." *Id.* at 1159 (contrasting issues in appellant's sentencing for knowing CWA violations with situation of non-appealing co-defendants who pled guilty to negligent violations).

A later Sixth Circuit unpublished decision did discuss Note 3 where defendant was convicted under a provision of FIFRA that created a misdemeanor conviction for a "knowing" violation. *See United States v. Kelly,* No. 99–5327, 2000 WL 1909397 (6th Cir. Dec.28, 2000). There a jury convicted defendant on 20 counts of knowing sale or use of registered pesticides for unauthorized purposes, which was a misdemeanor under the offense statute. The appeals court reversed a Section 5K2.0 departure, holding that none of the combination of factors described by the sentencing court took the case out of the heartland for guidelines purposes, and that Note 3 did not warrant departure because the violation was "knowing" in that case.[45] It also held that neither the misdemeanor nature of the convictions, nor lack of knowledge of serious harm, would justify departure under Section 5K2.0. *Id.*

The Fourth Circuit noted without comment an unappealed refusal to grant a Note 3 departure in *Fitzpatrick,* 1997 WL 639334. The facts were unusual. Defendant participated in a theft ring that stole

---

**45.** The *Kelly* court, discussing the Note 3 analogue under Section 2Q1.2, referred to the knowing and negligent offenses under CWA, stating as follows:

> [Note 3 analogue] states that "[T]his section assumes *knowing* conduct. In cases involving *negligent* conduct, a downward departure may be warranted." Guidelines § 2Q1.2, cmt. n. 4 (1998) (emphasis added). This distinction in a defendant's mens rea is clarified by referencing another of the statutes correlated to § 2Q1.2: 33 U.S.C. § 1319. Section 1319 provides that the mens rea required for a knowing violation is an awareness that the toxin is actually being released. *See* 33 U.S.C. § 1319(c)(2) (1994). Conversely, a negligent violator is not aware that a toxin is being released,

perhaps because of careless storage. *See* 33 U.S.C. § 1319(c)(1). Consequently, [note 3 analogue] warrants a downward departure for Kelly if he did not know he was *spraying.* This was not the finding of the district court, nor does Kelly allege that this was the case.... We agree that, inasmuch as Kelly never claimed that he was unaware that he was spraying a pesticide, Kelly's crime was "knowing."

*Kelly,* 2000 WL 1909397, at *4. In the present case, of course, defendants PRISQUE and DAVIDSON were convicted, in part, of the lesser-included substantive offense of "negligent" violations under 33 U.S.C. § 1319(c)(1). The issue at sentencing is whether this Court should exercise its discretion to grant them a structured departure based on Note 3.

electrical breakers and starters from industrial sites and sold them. When he stole the breakers from the public water treatment plant, the pumps at a lift station were rendered inoperable. This caused the plant to discharge millions of gallons of raw sewage into the river in violation of its permit. Defendant pled guilty to a negligent CWA violation, and appealed his sentence on various grounds not including refusal to grant him a Note 3 departure. The circuit court merely observed that the district court "declined to depart downward on the ground that [defendant] acted negligently rather than knowingly, although the commentary encourages such a departure." *Id.* at *1.

■ Our tentative conclusion on this issue is that downward departures are not warranted under Note 3 as to defendants PRISQUE, MAURY, and DAVIDSON for their lesser-included substantive convictions under 33 U.S.C. § 1319(c)(1), for the following reasons. First, they were each convicted also of the conspiracy objective of violating the CWA, Count 1, Objective A. (*See* dkt. 721 at 113, n. 64.) It is undisputed that proof of conspiracy requires a knowing mens rea, which we have found was established in this case as to each conspiracy objective for which a given defendant was found guilty. (*Id.* at 257–260.) Second, as explained in our post-trial memorandum opinion, we have concluded as a matter of law that the evidence was sufficient, beyond a reasonable doubt, to establish each of the essential elements of the felony offense charged against each of the named defendants on Count 27, including PRISQUE, MAURY, and DAVIDSON. (*Id.* at 215–231.) We have also made an identical ruling as to DAVIDSON on Counts 12–20 and 22–26. (*Id.* at 189–215.) In addition, defendant MAURY has felony CWA convictions on Counts 28–32 for knowingly causing or aiding and abet-

ting the discharges from the # 4 pit. (*Id.* at 231–243.) Thus, despite the fact that the verdicts granted those defendants acquittals on certain CWA substantive felony counts and instead found them guilty of the lesser-included negligence offenses, our tentative view is that departure under Note 3 is not appropriate as to any of them based on the trial evidence. All rulings on this and other departure motions must, however, await Step 2 of the sentencing process.

**8. USSG § 2F1.1(a)—Base offense level**

Defendant MAURY was convicted on Count 3, and defendant DAVIDSON was convicted on Count 4. Each of those offenses was charged as a false statement felony count under 18 U.S.C. § 1001. They were committed in connection with the 12–4/5–99 discharge of petroleum-contaminated wastewater from the cement pit and the subsequent CWA-related official investigation. (Dkt. 721 at 136–146, 215–231.)

We will apply the general fraud guidelines section to these offenses. *See supra* n. 25. That section is Section 2F1.1(a), which provides a base offense level of 6. No specific offense enhancements under that section appear to apply. *See generally* USSG §§ 2F1.1(b)-(c). We calculate that for each of Counts 3 and 4, the Chapter Two offense level is 6.

**C. CAA–RELATED OFFENSES**

**1. Review of convictions**

Defendant PRISQUE was convicted on Count 34, a substantive offense involving violation of the CAA. (Dkt. 721 at 3, n. 4.) Count 34 alleged that during the period of approximately February to August, 2003, PRISQUE knowingly operated in violation of the Atlantic States Title V air permit requirements by causing more than 55 gal-

lons per day of waste paint to be burned in the cupola, in violation of 42 U.S.C. § 7413(c)(1). (Dkt. 711 at 48.) PRISQUE was also convicted on the corresponding objective of the Count 1 conspiracy, as described in the margin.[46]

### 2. USSG § 2Q1.3—Mishandling of environmental pollutants

■ The Court will apply Section 2Q1.3 rather than Section 2Q1.2 to the CAA offenses in this case. The distinction between those two guideline sections is described in Sec. II.B.1 *supra*. The Statutory Index states that for violations of 42 U.S.C. § 7413(c)(1), either Section 2Q1.2 or Section 2Q1.3 may apply. USSG App. A.

As we have seen, Section 1B1.2(a) requires that the "offense conduct" be used to determine which guideline section applies. Only then does "relevant conduct" come into the equation in determining the applicable guideline range. USSG § 1B1.2(b). The sentencing court may not consider relevant conduct until after it selects the appropriate offense guideline section. *Watterson*, 219 F.3d at 235. *See supra* Sec. II.B.2.

The government argues that there was trial evidence that some of the paint burned in the cupola during the periods relevant to the CAA offenses was solvent-based waste paint, which was hazardous. It cites the MSDS for the product used at Atlantic States before it switched to water-based paint in the Spring of 2003, which showed it had a flashpoint qualifying it as hazardous under federal regulations, such that if the solvent-based paint was in liquid form when disposed of in the cupola it was hazardous. It also cites trial evidence that some of the waste paint burned in the

cupola was observed to be in liquid form, including during the time frame of Count 34 (Feb. to Aug., 2003). (Gov. I at 33–35.) PRISQUE argues that the CAA-related counts (Counts 1 and 34) refer only to "waste paint," not "hazardous waste paint;" that the substantive offense of conviction did not require proof of hazardous waste paint, nor was such technical evidence advanced by the government at trial; and that the Court properly rejected the government's effort to obtain a jury instruction on solvent-based paint as being hazardous waste paint. (Prisque I at 110–112, 114–117.) We will rely upon the trial ruling in which we rejected the government's arguments seeking to place the issue of hazardous waste paint before the jury in connection with the CAA-related counts of the indictment. (*See* dkt. 721 at 247, n. 156 & accompanying text.)

The existing case law in this area pertains to CAA offenses involving asbestos, which is a hazardous substance. Those asbestos cases have been sentenced using Section 2Q1.2, without dispute. *See, e.g., Rubenstein*, 403 F.3d at 99–101; *Technic Servs.*, 314 F.3d at 1047–48; *Ho*, 311 F.3d at 608–10; *Chau*, 293 F.3d at 99–103; *Tomlinson*, 1999 WL 511496; *Shurelds*, 1999 WL 137636, at *5; *Liebman*, 40 F.3d at 549–52. The parties have not cited, nor have we located, any reported decisions on the issue of other types of pollutants, including waste paint, as the subject of CAA convictions.

Section 1B1.2(a) directs the court to "[d]etermine the offense guideline section in Chapter Two . . . *most applicable* to the offense[s] of conviction." USSG § 1B1.2(a) (emphasis added). Clearly, here the CAA offenses on which the jury

---

46. PRISQUE was also convicted of conspiring to knowingly violate the CAA, Objective B of the Count 1 conspiracy. (Dkt. 721 at 112–113, n. 64.) That objective was alleged in the indictment as: "To knowingly violate a requirement and prohibition of a . . . Title V permit, in violation of [42 U.S.C. § 7413(c) ]." (Dkt. 711 at 12.)

was instructed, and on which defendant PRISQUE was convicted, primarily involved discharge of the "pollutant" of waste paint. The jury was instructed only that the air permits prohibited the burning of more than 55 gallons per day of "waste paint" in the cupola. (Dkt. 717 at 58–59.) The jury was not asked to make a factual finding as to any substance that would be "hazardous waste paint" under the CAA counts. We conclude that the offense guideline section in Chapter Two that is "most applicable" to the CAA offenses of conviction as to PRISQUE is Section 2Q1.3.[47]

The following discussion addresses the CAA-related offenses as separate counts (Cts. 1 and 34). Grouping of counts, where applicable, is addressed *infra* Sec. V.

### 3. USSG § 2Q1.3(a)—Base offense level

The base offense level for the CAA offenses is 6. USSG § 2Q1.3(a).

### 4. USSG § 2Q1.3(b)(1)(A) or (B)—Discharge, release, or emission of pollutant

The guidelines provide a specific offense enhancement for environmental offenses that involve an actual discharge, release, or emission of a pollutant. USSG §§ 2Q1.3(b)(1) ("Subsection (b)(1)") (A) and (B). The Subsection (b)(1) enhancement is 6 levels if the emission was ongoing, continuous, or repetitive, and 4 levels otherwise. *See supra* Sec. II.B.4.

The charging language of Count 34 does not allege any discharge or emission of a pollutant. Instead, it alleges that from in or about February 2003 to in or about August 2003, the named defendants

"knowingly operated such major stationary source in violation of its Title V permit requirements by causing more than 55 gallons per day of waste paint to be burned in the cupola." (Dkt. 711 at 48.)

The CAA-related text of Count 1, the conspiracy count, does allege excess emissions of pollutants as a result of those permit violations. Those allegations include the following:

23. EPA has identified and set standards for six "criteria pollutants" in the ambient air. 40 C.F.R. Part 50. Two such criteria pollutants are carbon monoxide ("CO") and nitrogen oxides ("Nox").

\* \* \*

35. For the cupola scrubber system, … ATLANTIC STATES … was … required by the … permits to maintain equipment to continuously monitor its CO emissions. This equipment was known as the continuous emissions monitor, or "CEM." The maximum hourly average concentration for CO could not exceed 2,500 parts per million ("ppm"). The permits allowed up to three days per quarter with hourly average concentration for CO over 2,500 ppm, but never more than 4,000 ppm.

\* \* \*

**Overt Act Number 16:** From in or about May 2001 to in or about August 2003, on a routine and regular basis, [named defendants including PRISQUE] directed employees … to burn greater than 55 gallons per day of waste paint in the cupola, which caused an increase in

---

**47.** We do address the parties' contentions regarding hazardous waste paint in the cupola in our discussion of possible Note 4 and Note 7 departures, *infra* Sec. II.C.6.

CO emissions and which violated the [air permits].

(Dkt. 711 at 7, 10, & 18.)

The Indictment thus alleged, and the trial evidence established, that carbon monoxide ("CO") is a "pollutant" when released into the ambient air. The air permits issued to Atlantic States limited the permissible amount of those and other emissions from the cupola stack. Those emissions limits were coordinated with the permit limitations on substances that could be burned in the cupola, including the requirement that no more than 55 gallons of non-hazardous waste paint could be burned in the cupola per day. (*See* dkt. 721 at 243–250.) In other words, under the CAA the air emissions from Atlantic States were regulated through the permit process both at the *input* side (what could be burned as "fuel" in the cupola), and on the *output* side after air pollution control treatment (what quantities of "criteria pollutants" could be emitted from the cupola stack into the ambient outside air). (*See* Gov. I at 16.)

There was trial ample trial evidence that when PRISQUE routinely caused the burning of more than 55 gallons per day of waste paint in the cupola, this was not merely a permit violation on the *input* side, but actually did cause higher emissions of the pollutant CO into the ambient air on the *output* side. (*See, e.g.*, dkt. 721 at 250–257; Gov. Ex. 2–293a.) However, PRISQUE objects to any Subsection (b)(1) enhancement, contending that there is no trial evidence that those increased emissions caused any violation of the specific CO limitations of the Atlantic States air permit, or of the National Ambient Air Quality Standards established by EPA. (Atlantic States I at 23–27, 29–30; Prisque I at 30–37, 42–45.)

PRISQUE is correct that there was no testimony at trial to the effect that on a given date or dates, the burning of excess waste paint in the cupola, on the input side, caused a permit violation for CO emissions on the output side. That would have required technical proof that because more than 55 gallons of waste paint were burned in the cupola on a given day or days, the resulting CO emissions violated the permit limits of hourly average concentrations over 2,500 ppm per quarter, except three days over that limit but never more than 4,000 ppm, as measured by the Atlantic States CEM monitoring equipment.

There is, however, trial evidence to support a finding, by at least a preponderance, that on March 17 and 18, 2003, CO emission levels spiked as a direct result of workers following orders by PRISQUE to get rid of approximately forty 55–gallon drums containing waste paint by burning them in the cupola, and that this was accomplished over that two-day period. (*See* dkt. 721 at 253–256; Gov. Ex. 2–293a.) Witnesses testified at trial that this was the typical result when excessive amounts of waste paint were burned in the cupola. (*See* dkt. 721 at 253–254.) There is also strong evidence that PRISQUE routinely took deliberate steps to manipulate the reportable cupola emissions so that the quarterly data of exceedances would not be accurately reported. (*See id.* at 256, n. 163.)

■ This Court does not believe that technical proof of a violation of the permit quarterly CO emission limitations, specifically linked to burning of excess paint in the cupola, is necessary in order for Subsection (b)(1) to apply in these circumstances. We have found no case law addressing this issue. We conclude that the offense conduct and relevant conduct of PRISQUE, as shown in the trial evidence, supports a Subsection (b)(1) adjustment. The evidence supports a finding, by at

least a preponderance, that his conduct of violating the air permits by burning more than 55 gallons of waste paint per day did result in CO emissions into the environment that would not have been released but for that conduct.

We next consider whether this Subsection (b)(1) adjustment should be 6 levels for an "ongoing, continuous, or repetitive discharge, release, or emission." USSG § 2Q1.3(b)(1)(A). Otherwise, Subsection (b)(1) imposes a 4–level adjustment for discharge. USSG § 2Q1.3(b)(1)(B). *See supra* Sec. II.B.4 (text and case law discussed therein). The government contends that the 6–level adjustment is warranted. (Gov. I at 37–38.)

Case law under CAA, consistent with that which we have described above under CWA, holds that two or more discharges require the 6–level adjustment under Subsection (b)(1)(A). *See Rubenstein,* 403 F.3d at 99–100 (illegal asbestos removal was during two separate one-week periods); *Technic Servs.,* 314 F.3d at 1047 (asbestos removal project involved "long periods of time when this facility . . . was not even close to contained for . . . asbestos abatement"); *Ho,* 311 F.3d at 608–10 (reversing district court refusal to apply Subsection (b)(1)(A) for repetitive discharge of asbestos during building renovation); *Chau,* 293 F.3d at 99–100 (asbestos removal project; district court found that there had been continuous discharge, and finding is entitled to deference); *Tomlinson,* 1999 WL 511496 (same); *Liebman,* 40 F.3d at 549–51 (adjustment under Section 2Q1.2(b)(1)(A) warranted where defendant had untrained workers remove asbestos from factory, and workers unlawfully

dumped the material on several different days). *See supra* Sec. II.B.4.

PRISQUE argues that the evidence described only one instance, during the Count 34 time frame in 2003, in which he may have directed the burning of more than 55 gallons per day, and no evidence that this resulted in exceeding the permit CO emissions limits. (Prisque I at 122–123; Prisque II at 46–47.) We have already found that the evidence of increased CO emissions from burning of excess amounts of waste paint, whether or not it caused violations of the quarterly CO permit limits, requires a Subsection (b)(1) adjustment. Now we make the further finding that the trial evidence is sufficient to show that those emissions were "ongoing, continuous, or repetitive," thus triggering a 6–level adjustment under Subsection (b)(1)(A).

The "one instance" to which PRISQUE refers occurred in the Spring of 2003, when according to the testimony of several workers, PRISQUE ordered the disposal in the cupola of approximately 40 drums containing waste paint that had accumulated in the scrapyard. The workers could not accomplish the entire disposal in one day, and sent approximately 20 drums into the cupola on two successive days, causing the CO readings to spike each time. (*See* dkt. 721 at 254–256.) This is corroborated by cupola furnace records for March 17 and 18, 2003. (*See* Gov. I at 37–38; Gov. Ex. 2–293a; tr. 572 at 146–147.) Moreover, there was strong testimony that it was a routine and regular practice to burn approximately four or more 55–gallon drums containing waste paint per day, under the authority and direction of PRISQUE, during and before the time of that instance. (*See* dkt. 721 at 243–257.)[48]

---

**48.** Before May, 2001, the Atlantic States air permits allowed the burning of 55 gallons per *hour* of waste paint. Therefore, the indictment allegations and the evidence relevant to

permit violations for burning more than 55 gallons per *day* of waste paint is confined to the period after 5–18–01, when that permit change was effective. (*See* dkt. 711 at 18, 48;

For these reasons we find that the 6–level enhancement under Section 2Q1.3(b)(1)(A) is applicable to defendant PRISQUE for his CAA-related offenses.

The commentary provides for a potential departure under Subsection (b)(1). We address that topic, as to the CAA offenses of conviction, in Sec. II.C.6 *infra.*

### 5. USSG § 2Q1.3(b)(4)—Discharge without or in violation of permit

Section 2Q1.3 provides a 4–level enhancement if the environmental offense "involved a discharge without a permit or in violation of a permit." USSG § 2Q1.3(b)(4) ("Subsection (b)(4)"). *See supra* Sec. II.B.5.

The Court does find, for purposes of sentencing, that the burning of more than 55 gallons of waste paint per day in the cupola, and the related conduct that was the subject of the convictions of PRISQUE on Count 1, Objective B and Count 34, were in violation of the Atlantic States air permits. (*See* summary of evidence, dkt. 721 at 243–260; *see also* environmental offense cases cited *supra,* Sec. II.C.5.) [49] Therefore, the 4–level enhancement under Subsection (b)(4) applies to defendant PRISQUE on his CAA-related offenses.

The commentary provides for a potential departure under Subsection (b)(4). We address that topic, as to the CAA offenses of conviction, in the next section *infra.*

### 6. USSG § 2Q1.3, Notes 4 and 7— Departure of up to two levels

Note 4 of the commentary to Section 2Q1.3 ("Note 4") provides for a potential departure of up to two levels in either direction under Subsection (b)(1), "[d]epending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation." USSG § 2Q1.3, cmt. n. 4. *See supra* Sec. II.B.6.

Note 7 of the commentary to Section 2Q1.3 ("Note 7") provides for a potential departure of up to two levels in either direction under Subsection (b)(4), "[d]epending upon the nature and quantity of the substance involved and the risk associated with the offense." USSG § 2Q1.3, cmt. n. 7. *See supra* Sec. II.B.6.

Defendant PRISQUE seeks 2–level downward departures under both Note 4 and Note 7 for his CAA-related offenses. (Prisque I at 125–127; Prisque II at 46–50.) The government, here at Step 1 of the sentencing process, opposes departure

---

dkt. 721 at 246–247.) We have also considered defendants' argument that the contents of the 55–gallon drums burned in the cupola were not confined to waste paint, and typically also contained some plastic, Speedy Dry, and other materials. (Atlantic States I at 29–30; Prisque I at 43–45, 122–125.) This argument did not prompt us to find insufficient evidence to support the convictions on Count 1, Objective B, and Count 34, and it also fails to persuade us that the resulting emissions do not qualify for adjustment under Subsection (b)(1). (*See* dkt. 721 at 251–257.)

**49.** The CAA asbestos regulatory scheme does not operate by means of a permitting system, and courts have determined that Subsection (b)(4) is therefore not applicable to CAA of-

fenses involving mishandling of asbestos. *See, e.g., Rubenstein,* 403 F.3d at 100–01; *Chau,* 293 F.3d at 100–03. Those cases are inapposite and Subsection (b)(4) does apply where, as here, a CAA offense is based upon a violation of air permits issued pursuant to the federal permit program. This would presumably also be so if a defendant were convicted of violating a CAA permit requirement, even when obtaining a permit for the particular conduct would not be feasible. *Cf. Perez,* 366 F.3d at 1186 n. 10 (Subsection (b)(4) adjustment appropriate for CWA offense involving failure to obtain required permit even if factually, the conduct would not qualify to receive a permit under federal permit program).

on that basis and indicates that at Step 2 it may seek upward departures under those provisions. (Gov. I at 38–39; tr. 738 at 139–140.)

▮ The burden of persuasion is upon the party seeking a departure. *McDowell*, 888 F.2d at 291. We have located no case law discussing or applying Notes 4 and 7 in CAA sentencing. Therefore, we will rely on the CWA precedent discussed in Sec. II.B.6 *supra*, and incorporate that discussion here by reference.

PRISQUE first argues that, "as the government conceded in argument during the Jury Charge Conference, Count Thirty-Four involved the burning of water-based paint rather than solvent-based paint. Thus there was no issue that the nature of the waste paint charged in the cupola was non-hazardous." (Prisque I at 126; *see also* Prisque II at 47, citing tr. 555 at 106.) This statement is not totally accurate.

The only concession the government made on that topic at trial was that it would make no argument to the jury "there were any issues regarding flash point [referring to solvent-based paint] once the company switched to water base paint." (Tr. 555 at 106 (bracketed material added).) The government contended then, and continues to contend, that it was likely that drums containing hazardous solvent-based waste paint were burned in the cupola during the period of the indictment, including the time period of Count 34. (*See id.* at 106–109; Gov. I at 33–35, 38–39.) NJDEP inspector Heil testified that hazardous waste paint would be hazardous in the air because of the increased volatile organic chemicals ("VOCs") released when it burned. (*See* dkt. 721 at 247.)

The time period stated in Count 34 was approximately February, 2003 through August, 2003. (Dkt. 711 at 48.) February 20, 2003 was the effective date of the combined air permit for Atlantic States known as the Title V permit. That permit contained the same 55–gallon per day limitation on burning of waste paint in the cupola that had been in effect since May, 2001. (*See* dkt. 721 at 245–247.) The time frame stated in Count 1, Overt Act 16, which alleged conspiracy to violate the CAA by burning more than 55 gallons per day of waste paint in the cupola, was approximately May, 2001 to August, 2003. May 18, 2001 was the effective date of the Atlantic States air permit that reduced the allowable quantity of waste paint to be burned in the cupola from 55 gallons per *hour* to 55 gallons per *day*. (*Id.*) [50]

It was undisputed that Atlantic States switched to water-based paint sometime in the Spring of 2003, and before that it used solvent-based paint. The air permits at no time allowed Atlantic States to burn hazardous waste paint in the cupola. (Dkt. 721 at 247.) The air permits allowed it to burn the solvent-based paint waste in the cupola only if it had been rendered "non-hazardous;" *i.e.*, its characteristics of liquidity and volatility had been reduced

---

**50.** Summer, 2001 was also the approximate date when Atlantic States introduced its new cupola emissions control system, which was supposed to eliminate the chronic exceedances problems that had caused Atlantic States to face approximately $600,000 in outstanding fines under its air permits for the period 1999–2001, although there was no trial evidence as to the specific cause of those exceedances. Those fines were treated by NJDEP as a civil enforcement matter that was later settled and a settlement figure paid. (*See* dkt. 721 at 250, n. 1.) NJDEP inspector Heil testified that despite installation of that new emissions system in mid–2001, the emissions problems continued. (*Id.*) Here it may be noted that the reduction from 55 gallons per *hour* to 55 gallons per *day* in the air permits was suggested by Atlantic States. (*See* evidence cited in Atlantic States I at 26–27.) Of course, once that became the new limit it was obligatory.

below the regulatory definition of "hazardous" before it was introduced into the cupola. In other words, when Atlantic States used solvent-based paint in its operations, that paint formula was hazardous when delivered and would have to be rendered non-hazardous before it could go into the cupola as waste paint. This could be accomplished by allowing the paint to solidify to the point where it no longer had its original liquidity [and/or volatility] characteristic by the time it was burned in the cupola. Whether that was done by Atlantic States remained a disputed issue at trial, upon which the jury was not asked to rule. And neither side did any testing of the waste paint in the drums awaiting disposal in the scrapyard during the relevant period. (*See, e.g.,* tr. 555 at 106–120.)

We note the ongoing dispute by the parties on whether "hazardous" waste paint was burned in the cupola during the period covered by the indictment, but we have no testing or other technical evidence upon which a ruling could be made during this sentencing phase. (*Id.;* Gov. I at 33–35, 38–39; Atlantic States I at 29–30; Prisque I at 42–45,110–112, 114–117; Prisque II at 35–36.) Nor do we recall any trial evidence of emissions data that might specifically indicate whether "hazardous" waste paint was burned in the cupola during the indictment period.

In our view, if it could be proven that the relevant conduct under Count 1, Objective B and Count 34 included the burning of "hazardous" waste paint in the cupola, that might support an upward departure under Note 4 and Note 7. But it also cannot be proven that "hazardous" waste paint was not burned in the cupola during the indictment time period, and there is at least anecdotal evidence that it was. (*See* Gov. I at 34.) At any rate, the trial evidence does support a finding, by at least a preponderance, that quantities of waste paint—whether or not in hazardous state—in excess of 55 gallons per day were routinely burned in the cupola during the entire period covered by those counts, with the knowledge and direction of defendant PRISQUE. The evidence also supports a finding that excessive amounts of such waste in the cupola did result in increased CO emissions.

PRISQUE also argues that there was no trial evidence that any paint-related CO emissions caused Atlantic States to violate its quarterly CO permit limits. He adds that even when Atlantic States did report exceedances (for whatever cause), those did not violate the National Ambient Air Quality Standards, which were always within EPA compliance in the region during the relevant period; and indeed it was Atlantic States that voluntarily reduced its permit limits to 55 gallons per day rather than 55 gallons per hour in 2001. (Atlantic States I at 56–57; Prisque I at 95–96, 127–127; Prisque II at 46–50; *see supra* n. 50.) We do weigh those facts in determining whether downward departures are warranted under Notes 4 and 7.

The government counters that "[e]nvironmental laws and regulations seek to foster economic activity while controlling environmental harm; the fact that a particular activity is permitted—or, as here, that it was once permitted—does not mean that it is not harmful to the environment." (Gov. I at 38–39.) It argues that based on the evidence that defendants routinely burned illegal amounts of waste paint, including as many as 20 drums per day, "even if emissions somehow did stay within regulated limits, this cannot be taken as a certification that no substantial environmental harm occurred." (*Id.*)

When considering possible departures under Notes 4 and 7 for the CAA-related offenses of defendant PRISQUE, we also bear in mind the considerable evidence of his efforts to manipulate the emissions rec-

ords that Atlantic States was required to maintain and self-report to NJDEP. The government presented strong evidence that PRISQUE employed various devices to try to keep from reporting excess COs. Those devices included instructing workers to shut down the CO monitor, and to run the cupola extra hours to reduce average emission readings. (*See* dkt. 721 at 256, n. 163; tr. 572 at 190–191.) There was also a body of evidence showing that PRISQUE knowingly participated in deception of NJDEP in formal "stack tests" of emissions, by ordering special raw materials for the testing. (*See id.* at 249 and evidence summarized in dkt. 641 at 171–172.) This evidence further undercuts his argument that no discernible environmental harm was caused by the practice of burning excess amounts of paint waste in the cupola, and that he should be granted a downward departure with respect to his permit violations and the resulting emissions.

Our tentative conclusion is that neither upward nor downward departures are appropriate under Notes 4 and 7 as to the CAA-related offenses of defendant PRISQUE. We will continue to consider this issue for ultimate resolution at Step 2, although we see no reason to conduct an evidentiary hearing on this aspect of the sentencing.

## III. CHAPTER THREE, PART B (ROLE IN OFFENSE)

### A. Guidelines Introductory Commentary

Chapter Three, Part B addresses role in the offense. The commentary introducing Part B advises:

This Part provides adjustments to the offense level based upon the role the defendant played in committing the offense. The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.,* all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction.

When an offense is committed by more than one participant, § 3B1.1 or § 3B1.2 (or neither) may apply. Section 3B1.3 may apply to offenses committed by any number of participants.

USSG Ch. 3, Part B, introductory cmt.

This commentary expressly states, in the second sentence, that the "determination of a defendant's role in the offense *is to be made on the basis of all ... [relevant conduct, specifically] all conduct included under § 1B1.3(a)(1)-(4)." Id.* (emphasis added).

Section 1B1.3(a)(1)(B) "embodies the principle enunciated in *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that a conspirator is criminally liable for the acts of other members of the conspiracy that were taken in furtherance of the conspiracy and reasonably foreseeable as a necessary and natural consequence of the conspiracy." *United States v. Pojilenko,* 416 F.3d 243, 248 n. 5 (3d Cir.2005).[51] The second sentence of the Introductory Commentary to Chapter Three, Part B, quoted above, expressly includes relevant conduct under all

---

**51.** The *Pinkerton* language of Section 1B1.3(a) is:

in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not

charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity....

USSG § 1B1.3(a)(1)(B).

four subsections of Section 1B1.3(a)(1)-(4) as within the scope of conduct to be considered in determining whether Role in the Offense adjustments are warranted. That would seem to include *Pinkerton* conduct of others.

But we observe that the Third Circuit has sided with the Fourth Circuit in what may be an emerging circuit split on whether Role in the Offense adjustments should be determined on the basis of *Pinkerton* principles but should be confined to the role the individual defendant played in committing the offense. *See Pojilenko,* 416 F.3d at 247–49 (remanding for post-*Booker* sentencing; holding as matter of first impression that co-conspirator's reasonably foreseeable use of a minor cannot be attributed to other conspirators for purposes of applying role in the offense enhancement under Section 3B1.4; discussion broadly addressed all Role in the Offense enhancements under Chapter Three, Part B; not addressing second sentence of Introductory Commentary to Chapter 3, Part B.) *But see United States v. Isaza–Zapata,* 148 F.3d 236, 239 (3d Cir.1998) (discussing interplay between Section 1B1.3(a) and Introductory Commentary to Chapter Three, Part B regarding consideration of all relevant conduct under Part B).[52]

■■■ This Court will be guided by *Pojilenko* and will confine our examination of the Role in the Offense issues in this case to the role the individual defendant played in committing the offense. Under this approach the relevant conduct of that defendant, as defined in the non-*Pinkerton* provisions of Section 1B1.3(a)(1)-(4), must still be included in the analysis.[53]

## B. USSG § 3B1.1—Aggravating Role

The government seeks upward adjustments for each defendant under Section 3B1.1 (Aggravating Role) at the following levels: PRISQUE (4 levels); FAUBERT (3 levels); MAURY (3 levels); DAVIDSON (3 levels). (*See* Gov. I at 14–15, 44–47, 50–52.)

Each defendant opposes any upward adjustment under Section 3B1.1. (*See* Prisque I at 77, 127–129; Prisque II at 51; Faubert II at 4–6; Faubert III at 6–8; Maury I at 33–34, 48–51, 54; Maury II at 26–27; Davidson I at 58–61; Davidson II at 28–30.)

The individual defendants also claim that they should receive a downward adjustment under Section 3B1.2 (Mitigating Role), either instead of or in combination with any upward adjustment imposed for

---

**52.** If our reading of *Pojilenko* is correct as stated above, that ruling would appear to require the sentencing court in considering role adjustments, even in a conspiracy case, to sharply confine the relevant conduct of the individual defendant to that defendant's own relevant conduct without regard for the foreseeability of acts of other co-conspirators. This is difficult to do in many conspiracy cases, as well as other cases involving jointly undertaken criminal activity. Nor do we believe that courts in this circuit or other circuits have generally thought to interpret the Introductory Commentary to Chapter Three, Part B in this manner. *See, e.g., United States v. Gotti,* 459 F.3d 296, 300–302, 317–18, 347–49 (2d Cir.2006) (lead defendant, "acting boss" of organized crime family, convicted of

RICO conspiracy and money laundering; district court found that numerous predicate crimes established in substantive convictions of co-defendants were "relevant conduct" in calculating defendant's guideline range; no appeal on this issue and circuit court noted those findings without criticism). We simply make this observation in passing, because we believe that *Pojilenko* controls our analysis of role adjustment issues here.

**53.** Relevant conduct, for purposes of a Section 3B1.1 analysis, does include uncharged and acquitted conduct if that conduct is shown by a preponderance of the evidence. *See supra* n. 20.

aggravating role. That topic is addressed in the next Section *infra.*

The guidelines provide upward adjustments for aggravating role as follows:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

USSG § 3B1.1.

A "participant" under Section 3B1.1 "is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (*e.g.,* an undercover law enforcement officer) is not a participant." *Id.,* cmt. n. 1.

■ "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id.,* cmt. n. 2. Thus, "[t]o apply section 3B1.1, a district court must find that the defendant exercised control over at least one other person." *United States v. Katora,* 981 F.2d 1398, 1402 (3d Cir. 1992). The district court must also find that there were multiple participants in the crime and that there was some differentiation in their relative culpabilities. *Id.*

at 1405. The Third Circuit has explained that "a manager or supervisor is one who exercises some degree of control over others involved in the offense." *Chau,* 293 F.3d at 103. This requirement also applies to one who is considered an organizer or leader. *United States v. Helbling,* 209 F.3d 226, 243 (3d Cir.2000).

■ Once it is determined that a defendant exercised control over at least one other person in the criminal activity, a 2-level adjustment is appropriate under Subsection 3B1.1(c). *Katora,* 981 F.2d at 1405. However, to meet the criteria of "five or more participants," for 3-level or 4-level adjustments under subsections (a) and (b), it is not required that defendant have exercised control over at least five participants. Under those subsections defendant himself is counted as one of the five or more participants. *See United States v. Inigo,* 925 F.2d 641, 660 (3d Cir.1991) (counting defendant as one of the required five participants to meet that criteria). Also, some of the other four participants may actually be higher than defendant in the criminal activity, so long as defendant exercised control over at least one other person. *See, e.g., United States v. Ortiz,* 878 F.2d 125, 127 (3d Cir.1989) ("five or more participants" included defendant and several of his subordinate participants, along with higher-level participant).

■ Even when the criminal activity involves fewer than five participants, the criteria of Section 3B1.1, subsections (a) and (b), can be met if the criminal activity was otherwise extensive. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be consid-

ered extensive." USSG § 3B1.1, cmt. n. 3. In determining whether a criminal activity is "otherwise extensive," the focus is upon the number and roles of the individuals knowingly, and unknowingly, involved. *Helbling,* 209 F.3d at 245.

The Second Circuit has suggested a three-factor test for "otherwise extensive:" "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *United States v. Carrozzella,* 105 F.3d 796, 803–04 (2d Cir.1997), *abrogated in part on other grounds, United States v. Kennedy,* 233 F.3d 157, 160–61 (2d Cir.2000). The Third Circuit has adopted this test, and expanded upon it as follows:

> The defendant may be considered as one of the participants.... The court must next determine whether the defendant used each non-participants' [sic] services with specific criminal intent. Third, the court must determine the extent to which the services of each individual, non-participant, were peculiar and necessary to the criminal scheme.... Utilizing this test, the ... Second Circuit has upheld the consideration of individuals used by the defendant to legitimize, facilitate or hide the criminal activity.
>
> ....
>
> After deciding which individuals may be counted, the court must then consider whether the sum of the participants and countable non-participants is the "functional equivalent" of five participants.... In deciding whether the total is the equivalent to five participants, the sentencing court may consider other factors, including the nature of the criminal scheme, to evaluate the relative value of the various countable non-participants.

*Helbling,* 209 F.3d at 248 (internal citations omitted).

■ Factors to consider in distinguishing the various roles under Section 3B1.1 include the following:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

USSG § 3B1.1, cmt. n. 4. It is clear under this commentary that "more than one person at more than one level of a conspiracy may act as a supervisor." *United States v. Garcia,* 413 F.3d 201, 224 (2d Cir.2005) (affirming Section 3B1.1 enhancement for two supervisors, at different levels, who both supervised the same lower-level participant).

The Third Circuit, interpreting this same portion of the commentary, has explained:

> The commentary to the guidelines purports only to suggest various factors the court should consider. Evidence of every factor is not a prerequisite to a finding that the defendant is a leader or organizer under § 3B1.1, nor is evidence that the defendant is the sole or predominate leader required. The government need only show sufficient authority to justify such a finding.

*United States v. Bass,* 54 F.3d 125, 128–29 (3d Cir.1995), citing *United States v. Ortiz,* 878 F.2d 125, 126–27 (3d Cir.1989).

"[T]he Guidelines direct that a defendant's role *in the criminal activity* is the operative issue" in determining whether a role enhancement applies under Section 3B1.1. *United States v. DeGovanni,* 104 F.3d 43, 46 (3d Cir.1997) (italics original). Some cases thus present the issue of "when is a supervisor not a supervisor?" *Id.* at 44. The Third Circuit has ruled that "one must ... have an active supervisory role *in the actual criminal conduct* of others" to justify a Section 3B1.1 enhancement. *Id.* at 46 (italics original).

The defendant in *DeGovanni* was a police sergeant who pleaded guilty to two substantive offenses but was allegedly a participant in a broad-ranging conspiracy involving illegal conduct with fellow police officers.[54] The evidence showed that although his job as sergeant placed him in a supervisory role in the police force, the criminal activity in which he and others engaged did not require that he play an active supervisory role in the criminal offenses of the others, nor did he play such a role. The district court imposed a Section 3B1.1(c) adjustment. The circuit reversed, holding that "one is only a 'supervisor' under U.S.S.G. § 3B1.1(c) when he is so involved in, and connected to, the illegal activity of others that he actually supervises their illegal conduct, and is not just a supervisor by virtue of his *de jure* position in the police department hierarchy." *Id.* at 44.

This issue has arisen in other factual contexts, with varying results depending on the circumstances. For example, *United States v. Gonzales,* 436 F.3d 560 (5th Cir.2006), involved a law enforcement officer whose Section 3B1.1(c) role enhancement was affirmed on appeal. Gonzales was the designated team leader in an INS unit assigned to track down and deport illegal aliens. He and his co-defendants were convicted of criminal civil rights violations for excessive force and indifference to medical needs while apprehending a suspect. Defendant's conduct included supervising his subordinates in the criminal activities and participating in them himself. There the court distinguished *DeGovanni* on the facts, observing that Gonzales "both led and participated in the criminal activity." *Id.* at 584–85; *see United States v. Gotti,* 459 F.3d 296, 347–50 (2d Cir.2006) (holding there was no clear error in district court's refusal to apply Section 3B1.1(a) based on factual finding that, despite "acting boss" status, defendant did not exercise sufficient level of control to be deemed an organizer or leader of the enterprise); *United States v. Woods,* 335 F.3d 993, 1002–03 (9th Cir.2003) (reversing Section 3B1.1(a) adjustment where defendant, "corporate secretary" for company engaged in telemarketing scheme involving at least five criminally responsible participants including herself, did not manage or supervise any of them).

Environmental case law rulings give us some factual context for evaluating the parties' contentions here.[55] The following

**54.** The *DeGovanni* court described the underlying conspiracy as follows:

These [substantive] charges stem from De-Govanni's alleged participation in a conspiracy with fellow police officers from 1988 until 1995, in which the co-conspirators engaged in activities such as assaulting drug suspects, conducting illegal searches,

fabricating evidence, illegally seizing money from suspected drug dealers, and making arrests without probable cause.
*DeGovanni,* 104 F.3d at 44 n. 1.

**55.** These cases have all been cited in this memorandum, but we repeat the full citation

decisions have affirmed district court rulings applying aggravating role adjustments under Section 3B1.1.

*United States v. Rubenstein*, 403 F.3d 93, 99–100 (2d Cir.2005), involved CAA offenses during an asbestos removal project in a building of a family-owned corporate entity. The father was president and adult son was his "right-hand man," who were among "at least two knowing participants." *Id.* at 99. They used at least 7 workers (the "unknowing participants") to perform the removal, and took other steps to further the criminal activity. Each defendant received a Section 3B1.1 adjustment, the president as "leader" and the son as "supervisory." *Id.* at 99. The district court had ruled that the "otherwise extensive" criteria of Section 3B1.3 was met (thus indicating that the president received 4 levels and the son received 3 levels under subsections (a) and (b), respectively). *See* Reply Brief for Appellants, 2004 WL 3525372, at *8. The circuit decision upheld the Section 3B1.1 adjustment as to both defendants, observing as to the unknowing workers that the "labor of these persons was clearly necessary to the violation." *Rubenstein*, 403 F.3d at 99.

*United States v. Technic Services*, 314 F.3d 1031, 1048 (9th Cir.2002), involved a corporate defendant and its secretary/treasurer convicted of CAA and CWA offenses committed during asbestos removal. Five workers, including two who said they "worked for" the individual defendant, stated that he played an active role in leading the practical aspects of the demolition, and that they did not adhere to asbestos work place standards. Their testimony was found sufficient to establish that he was the leader of a criminal endeavor involving five or more people who violated the CAA, thus supporting a 4–level aggra-

vating role adjustment under Section 3B1.1(a).

*United States v. Chau*, 293 F.3d 96, 103 (3d Cir.2002), was a CAA conviction of a building owner who hired a laborer and ordered him to clean up the asbestos-laden structure, then participated with the laborer and the building handyman to dump the asbestos illegally. His 2–level supervisory role adjustment under Section 3B1.1(c) was upheld based on a finding that he did exercise some degree of control over the two other participants.

*United States v. Overholt*, 307 F.3d 1231 (10th Cir.2002), involved a multi-object conspiracy and numerous substantive convictions for mail fraud and environmental offenses in connection with unlawful injection of petroleum-impacted wastewater into disposal wells. One of the individual defendants attempted to appeal the 4–level adjustment he received under Section 3B1.1(a), but the appeals court ruled that he was procedurally barred. (*Id.* at 1251–52.) That defendant was the owner of a trucking company. He had his workers dump truckloads of the untreated wastewater in underground disposal wells and other unlawful locations, instructing them to act at night and falsify bills of lading to misrepresent the origin and characteristics of the loads. *Id.* at 1237. (This ruling was thus not affirmed because the issue was not reached on appeal, but we include it in this discussion because it is illustrative and the result was that the 4–level Section 3B1.1(a) enhancement was not overturned.)

*United States v. Cooper*, 173 F.3d 1192, 1207 (9th Cir.1999), was a CWA conviction of a secretary/treasurer and half-owner of a small company that contracted to haul sewage sludge from a municipal treatment plant that had an NPDES permit. He

here for convenience. A few of these cases also appear in Sections III.C and III.D *infra*.

caused quantities of sludge to be dumped at an unauthorized location, a farm that he contacted. In the process, he hired and supervised one worker whom he instructed to falsify records, and he induced trucking contractors to violate trucking regulations. A 2–level adjustment under Section 3B1.1(c) was upheld on the ground that he had supervised at least one other participant.

*United States v. Hanousek,* 176 F.3d 1116 (9th Cir.1999), was the case of the railway roadmaster convicted of a negligent CWA offense. He was responsible for safe performance of projects, and during his tenure a contractor's employee operating a backhoe in a construction project on the tracks struck the adjacent petroleum pipeline, causing discharge into the river. The evidence showed that after defendant took over project responsibility, the sections of track on which the work progressed did not include construction of proper temporary protection for the pipeline. His 2–level supervisory role adjustment under Section 3B1.1(c) was upheld, the circuit court stating: "[T]he district court did not clearly err by finding that Hanousek was a supervisor because, although the backhoe operator was not prosecuted, he was nonetheless a participant in the criminal activity, and Hanousek supervised the project at 6–mile." *Id.* at 1125.

*United States v. Shurelds,* 1999 WL 137636 (6th Cir.1999), was a CAA conviction of a company employee for improper asbestos removal. The company and three other individuals pleaded guilty; defendant was convicted at trial. Many witnesses testified that defendant was in charge of the project and exercised direct control over the site workers. The district court imposed a 4–level leadership role adjustment under Section 3B1.1(a), finding that the criminal activity had five or more participants. The ruling was affirmed, de-

spite the failure of the district court to name who those participants were. The circuit court held that based on the evidence, there were at least five "criminally responsible" participants. It listed the defendant, the three other convicted individuals, and two others as to whom it said their participation was clear: those two workers testified that they witnessed and participated in dry asbestos removal at the site.

*United States v. Liebman,* 40 F.3d 544 (2d Cir.1994), was another asbestos removal case. Defendant was in a family-owned company that was selling its mill. Prior to sale, the owner was required to remove existing asbestos including two large asbestos-insulated boilers. Defendant had allowed his real estate broker, on his behalf, to hire two individuals who were local salvagers to remove the boilers. Those individuals hired two teenagers and another man as additional workers. The broker did not continue, and defendant himself eventually dealt directly with the workers and paid them directly. He and the broker and the two salvagers pleaded guilty to CAA offenses. The district court imposed a 3–level adjustment on him under Section 3B1.1(b). The circuit court upheld the district's court finding that defendant was a supervisor of a criminal activity, but remanded for specific factual findings on whether it involved five or more participants or was otherwise extensive. *Id.* at 547–49. At resentencing the district court made factual findings and ruled that the criminal activity in which defendant was a supervisor did involve five or more "participants," and that it was otherwise extensive. The ruling was affirmed on appeal. *United States v. Liebman,* No. 95–1190, 1995 WL 760395 (2d Cir. Dec.26, 1995).

*United States v. Dean,* 969 F.2d 187 (6th Cir.1992), involved multiple counts of conviction under RCRA of the production

manager of a corporate facility that did metal stamping, plating, and painting and used hazardous materials in the process. As production manager, defendant had day-to-day supervision of the plant's production process and employees. His duties included instructing employees on hazardous waste handling and instruction, whereas no permit was sought for the plant, and numerous practices at the plant violated RCRA. In addition, he instructed employees to shovel solid wastes from hazardous-contaminated rinse tanks into 55 gallon drums, and ordered construction of a pit where the drums were dumped. Other individuals indicted were the two corporate owners and the plant manager. Defendant (production manager) obtained a trial severance and was convicted, and the opinion did not state the resolution of the other indictments. Nevertheless, defendant's 3–level supervisory role adjustment under Section 3B1.1(b) was affirmed, based on his role as manager or supervisor (but not organizer or leader) of criminal activity involving five or more participants. The circuit court stated:

> Defendant argues that the enhancement was error because there was evidence that, at most, he supervised only two persons. This contention mistakes the language of the Guideline, which refers not to "subordinates" but to "participants," thus encompassing those on an equal footing or superior to defendant in a criminal hierarchy as well as those below. In addition to defendant and the two employees concededly involved, the owners and [the plant manager] are also relevant for purposes of the Guideline. Accordingly, there were five or more participants in the offense, and the district court did not err in enhancing defendant's sentence on this ground.

*Id.* at 197.

*United States v. Irby*, 1991 WL 179110 (4th Cir. Sept.13, 1991), was a CWA conviction of the plant manager of a wastewater treatment plant. The record showed that he ordered discharge of approximately 500,000 gallons of partially treated sludge into the river at least twice a week for two years. A 2–level adjustment imposed under Section 3B1.1(c) was upheld, the circuit court stating: "The district court found that Irby 'exercised decision-making authority and authority to direct other employees in the plant.' The court also found that Irby supervised an employee whom he directed to bypass the sludge treatment system at night after hours. . . . Thus, the court's finding of fact is not clearly erroneous." *Id.*

We have located no appellate decisions in the environmental context holding that aggravating role adjustments that were imposed under Section 3B1.1 were improper. The only reversals have been for legal error, failure to make sufficient factual findings, or unwarranted departures after imposing such adjustments. We summarize those few decisions here.

*United States v. Kuhn*, 345 F.3d 431 (6th Cir.2003), involved CWA convictions of the superintendent of a municipal water treatment plant for causing workers to dispose of sewage sludge improperly and causing them to assist him in falsifying discharge monitoring reports. His guideline offense level calculation included a 2–level role enhancement under Section 3B1.1(c), to which he did not object. He also received other adjustments, including a 2–level enhancement for abuse of position of trust under Section 3B1.3 (discussed *infra* Sec. III.D). The district court granted an unguided departure, stating as one of its reasons that applying those two specific offense characteristics cumulatively did not technically constitute double-counting, but it amounted to over-counting in the instant case. The appeals

court reversed that departure, stating, *inter alia,* that the Section 3B1.1 adjustment for supervisory role was correctly applied. *Id.* at 437.

*United States v. Ho,* 311 F.3d 589 (5th Cir.2002), involved CAA convictions of a building owner for improper asbestos removal. Defendant hired a handyman to supervise the work, who in turn hired at least ten Mexican nationals (apparently illegal aliens, the court noted) to perform the work. Defendant also hired another individual whom he directed to provide supplies to the workers, monitor their hours, and perform related work on-site (which did not go well: a resulting explosion burned that individual and three workers, and blew a hole in the building). No one contended that the Mexican workers were "participants" for purposes of a role adjustment. The district court refused the government's request for a 4–level enhancement under Section 3B1.1(a), and instead imposed a 2–level role adjustment under Section 3B1.1(c), finding that defendant was an organizer, but the criminal activity did not involve at least 5 participants nor was it "otherwise extensive." The appeals court reversed and remanded. It ruled as a matter of law that the application note explaining "otherwise extensive" (Section 3B1.1, cmt. n. 3) "instructs the court to examine number of persons involved in the activity, not the nature of the criminal organization." *Id.* at 610. It held that the district court "erred by interpreting the phrase 'otherwise extensive' in § 3B1.1(a) to refer to the nature of the criminal organization, as distinguished from the number of participants and persons involved." *Id.* at 611.

*United States v. Rutana,* 932 F.2d 1155 (6th Cir.1991), was an early guidelines sentencing case in which the government appealed an unguided departure down to a probationary sentence and the circuit court reversed. It held, *inter alia,* that where different defendants received differing role adjustments but the district court departed as to the lead defendant in order to give uniform sentences to all, "departure in order to achieve conformity among co-defendants is not appropriate where there is a basis for disparity." *Id.* at 1159. There the lead defendant, part-owner and CEO of a company operating a metal finishing plant, pleaded guilty to 18 felony CWA charges. His guideline score included a 2–level upward role adjustment under Section 3B1.1(c), to which he did not object. His co-defendants, the plant manager and a minority shareholder, received plea deals allowing them to plead to superseding negligent CWA charges, and each also received 4–level "minimal participant" downward adjustments under Section 3B1.2. (The facts upon which those downward adjustments were based were not stated or discussed in the opinion.) The appeals court concluded: "Rutana's situation was not the same as that of his co-defendants, and we decline to hold as a matter of law that his sentence should be the same." *Id.* at 1159.

PRISQUE, FAUBERT, MAURY, and DAVIDSON each argue that they should not receive enhancements under Section 3B1.1. (*See* Prisque I at 127–130; Prisque II at 51; Faubert II at 4–6; Faubert III at 6–8; Maury I at 50–51; Maury II at 26–27; Davidson I at 59–61; Davidson II at 28.) They rely upon a Fifth Circuit decision, *United States v. Moeller,* 80 F.3d 1053 (5th Cir.1996), which we will now address as to all defendants.[56] To the

---

**56.** Defendants also attempt to rely on *Gotti,* 459 F.3d at 347–50, which we find distinguishable on its facts. In *Gotti,* unlike here,

the district judge determined that the evidence was not sufficient to support a finding that defendant was actively involved in the

degree that each defendant advances additional arguments in opposition to a Section 3B1.1 adjustment, we address those arguments in the context of their individual relevant conduct.

Defendant Mike Moeller was deputy commissioner of the Texas Department of Agriculture ("Department"). He was indicted with four other individuals in connection with a "contracts for politics" scheme in which two "political consultants" did fund-raising for Moeller's intended election campaign, and in return the Department awarded sham consulting contracts to the two consultants. The illegal fund-raising efforts successfully victimized employees of the Department, officers of banks where the Department held funds, and the businesses regulated by the Department. The other four defendants were the two consultants (Boyd and Koontz), and two of Moeller's underlings at the Department (McRae and Quicksall). McRae "worked closely with Moeller, holding positions as Moeller's special assistant at [the Department], and as the associate director of [a related agricultural inspection agency]." *Moeller*, 80 F.3d at 1055–56. Quicksall, an older man of long government service and limited education, "also worked for Moeller, holding various positions at both [the Department and the inspection agency]." *Id.* at 1056.

The two consultants were severed before trial. *Id.* at 1055, n. 2. Moeller, McRae, and Quicksall, who were thereafter referred to as "the defendants," were all convicted of conspiracy and underlying substantive offenses of misapplication of state funds and bribery. The circuit court found the evidence sufficient to establish that "the defendants were acting on their agreement to exchange state funds for Boyd's and Koontz' political efforts." *Id.* at 1059.

The government cross-appealed three aspects of the sentencing rulings in *Moeller*.[57] First, it challenged the district court's creative approach to selecting a base offense level by making a "compromise" between Sections 2C1.1 and 2C1.2, both of which were potentially applicable.[58] That ruling was firmly reversed, thus necessitating a remand for resentencing. *Id.* at 1061.

The government also challenged a downward departure granted to Quicksall under Section 5K2.12 on grounds of duress. The district court based that departure on a finding that Quicksall was "economically and psychologically pressured by fear of career loss into following the orders he was given." The circuit court also reversed that ruling, referring to the guidelines commentary and concluding that economic hardship "is not the type of duress contemplated by § 5K2.12." *Id.* at 1063. It did, however, state that Quicksall would likely qualify for a 4–level downward "departure" [sic] as a minimal participant un-

---

supervision of participants in the criminal activity. That factual finding was affirmed on appeal under the applicable "clearly erroneous" standard of review. Here, we find that the trial evidence does support Section 3B1.1 adjustments, so they must be included in the guideline calculations.

57. The 1993 guidelines edition was applied without dispute. *Moeller*, 80 F.3d at 1061.

58. The district court in *Moeller* had struggled to decide whether the applicable section in Chapter 2 was Section 2C1.1, covering bribery, or Section 2C1.2, covering gratuities. The former had a base offense level of 10, while the latter had a base offense level of 7. The district court decided to "compromise[ ]" by settling upon a base offense level of 8, reasoning that the offense conduct was somewhat more culpable than a mere gratuity, but somewhat less culpable than bribery." *Moeller*, 80 F.3d at 1061. The appeals court took a dim view of that approach.

der Section 3B1.2(a), and it encouraged the district court to consider that on remand. *Id.*

The third sentencing ruling challenged by the government in *Moeller* was the refusal of the district court to impose a 4-level adjustment for defendant Moeller under Section 3B1.1(a), and a 3-level adjustment for defendant McRae under Section 3B1.1(b). The circuit court approached the issue as a factual finding reviewable for clear error, and upheld the ruling under that standard. *Id.* at 1062. It articulated its reasoning as follows:

> Moeller occupied a high-ranking position within [the Department], and was the political candidate for much of the fundraising involved in the offense. McRae was his assistant, and worked closely with Moeller in a variety of capacities. Nonetheless, the record as a whole does not support the conclusion that Moeller and McRae either initiated the bribery scheme or participated in a more culpable manner than other co-conspirators, with the possible exception of Quicksall. The defendants' "inheritance" of a historically corrupt and deep-rooted system is not immaterial. The continuance of the exact same conduct after Moeller announced he would not run for office indicates that the scheme alleged was not dependent upon the managerial or leadership roles of these defendants, and depended instead largely upon the energy and creativity of Boyd and Koontz.

*Id.*[59]

 Defendants here argue that part of the government's theory of this case is that the parent company, McWane, imposed a corporate culture of violating envi-

ronmental and workplace safety laws and regulations and obstruction to conceal those violations, which defendants here simply inherited. Therefore, following the logic expressed in *Moeller,* they should receive no role adjustments under Section 3B1.1. We reject this argument for several reasons, not the least of which is that each of the individual defendants in this case testified at trial, and said no such thing. They each denied that they were criminally involved in any such conduct at Atlantic States. We understand, however, that defendants are raising this argument because of the position advanced in the government's theory of the case, so we will address it in the context of the *Moeller* ruling.

Our research has not revealed any case law discussing this aspect of the *Moeller* decision, nor is it binding precedent in the Third Circuit. However, we have pondered it carefully, and we respectfully disagree with that holding on both factual and legal grounds. First, as to the legal basis, we believe that the *Moeller* court overlooked binding Fifth Circuit precedent that if defendant exercised a supervisory role over at least one criminally responsible participant, a role enhancement under Section 3B1.1 was applicable. *See United States v. Okoli,* 20 F.3d 615, 616 (5th Cir. 1994), discussed *infra.* The *Moeller* court simply failed to hold the district court to the requirement of making a factual determination on that point. Second, if the district court had addressed that issue, it would likely have found that both Moeller and McRae supervised at least one participant in the criminal activity, and the criminal activity did involve at least five crimi-

---

**59.** The reference in this quote to the "continuance of the exact same conduct," after Moeller withdrew from politics, refers to trial evidence that Moeller's political prospects ended when his boss, the incumbent commissioner, announced that he would run for re-election. At that point the "consultants," Boyd and Koontz, "solicited campaign contributions for [the commissioner's] campaign using similar tactics." *Id.* at 1057.

nal participants. The evidence was that Moeller supervised both McRae and Quicksall, and McRae also supervised Quicksall—*in the criminal activity*—and the two "consultants" brought the total to five criminally responsible participants. Those portions of the *Moeller* opinion are quoted in the margin.[60]

The inescapable conclusion is that while it may have been factually correct to conclude that Moeller and McRae did not supervise the two consultants—who played their role with wellhoned experience and needed no direction—it was abundantly clear that McRae was Moeller's immediate subordinate in carrying out the criminal activity at the Department, and Quicksall, at the bottom of the totem pole, was a

criminal subordinate of both Moeller and McRae. In addition, the circuit court in *Moeller* ended its analysis too soon when it concluded that since Moeller and McRae did not "organize or plan" the criminal activity but rather inherited it, they could not qualify for a role enhancement. As Section 3B1.1 and its commentary make clear, "organizing and planning" is only one of the factors to consider in determining what level of role enhancement is appropriate. A person can be a "leader," "manager," or "supervisor" and thus eligible for a Section 3B1.1 enhancement, even if that person is not an "organizer."

Fifth Circuit precedent at the time of *Moeller* had adopted the teaching of Note 2 of the commentary to Section 3B1.1,

---

**60.** The recitation of facts in *Moeller* included the following:

The record adequately supports the required inference that the essential purpose of the sham contracts was to compensate Boyd and Koontz for raising political contributions to benefit Moeller, and later [the commissioner]. Boyd and Koontz traveled with Quicksall to visit [Department and inspection agency] regulated businesses on government time, using funds made available by the consulting contracts, for the purpose of soliciting campaign contributions.... Quicksall, who was travelling in his capacity as an agency official, was at least once assigned the task of holding the money collected, and recorded contributions in the same small ledger used for agency business. Quicksall, who knew that Boyd and Koontz were asking $1,000 from each "target," was also aware that soliciting contributions in the context of agency business raised serious legal and ethical questions under Texas law. Indeed, Quicksall attempted to anticipate when the request for money was coming, and would try to extricate himself from the room before the request was made. Quicksall was not always successful in this effort, and numerous representatives from regulated entities testified that they felt intimidated or coerced into contributing to Moeller's campaign.

. . . .

McRae was heavily involved in both the administration of the consulting contracts, and in the management of funds received by [Moeller's political action committee]. McRae instructed other agency officials to approve invoices submitted by Boyd and Koontz without instructing them on the established procedure for being sure the work was performed.

. . . .

Moeller's and McRae's knowledge may also be inferred from circumstances surrounding the establishment of the PAC, maintenance of the accounts used to hold campaign contributions, and testimony indicating that they probably directed, and were at least aware of, Quicksall's travels with Boyd and Koontz. Quicksall testified that he acted on instructions from Moeller and McRae.

. . . .

Quicksall clearly had an inadequate understanding of the contracts-for-politics scheme, as compared to his superiors at TDA and TFIS [referring to Moeller and McRae] and political consultants Boyd and Koonz. As recognized by the district court, Quicksall's inability to grasp the finer points of the conspiracy was probably the reason he was selected for the role he played.

*Moeller*, 80 F.3d at 1057–58, 1063 (bracketed material added).

which states in relevant part: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG § 3B1.1, cmt. n. 2 (1993). This Note was added to the guidelines effective November 1, 1993. *See* USSG App. C, Amend. 500. As explained in the Amendment, it was added as a clarification, to resolve a split in the circuits over whether a defendant could receive a Section 3B1.1 enhancement even if defendant did not directly supervise other persons. The result, as expressly accepted by the Fifth Circuit in 1994, was that Section 3B1.1 is read to require that defendant was the "organizer, leader, manager, or supervisor of *one or more other participants.*" *Okoli,* 20 F.3d at 616 (italics original). The *Moeller* sentencing was conducted under the 1993 version of the guidelines, *see supra* n. 57, so that commentary was applicable.

We also have serious reservations that a factor such as "inherited corruption" is material to the specific offense characteristics analysis under Section 3B1.1, as the *Moeller* court seemed to suggest. As we have noted, the Introductory Commentary to the Role in the Offense provisions states that the determination of a defendant's role in the offense is to be made on the basis of relevant conduct. *See supra* Sec. III.A. The commentary to the relevant conduct guideline, Section 1B1.3, states that "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct (*e.g.,* in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level)." USSG § 1B1.3, cmt. n. 2. In other words, the relevant conduct of a given defendant does include events that occur after that defendant joins an ongoing conspiracy. To the degree that *Moeller* would absolve a defendant of enhancement as an organizer, leader, manager, or supervisor because he enters the criminal activity after it has begun, that aspect of the *Moeller* decision appears to conflict with these provisions of the guidelines.

For all of these reasons, we decline to follow *Moeller* in making determinations under Section 3B1.1 in this case. Relying on the applicable and analogous authorities discussed above, we make the following rulings.

\* \* \*

■ This Court finds that the evidence supports a 4–level role adjustment for defendant PRISQUE under Section 3B1.1(a). This finding is not based upon his title as plant manager at the Atlantic States foundry, but rather upon his active participation in a primary leadership role in the criminal activities shown in the evidence. Just as the alleged conspiracy was many-faceted, so too were his leadership activities. His offense conduct includes convictions under all five alleged objectives of the conspiracy, and under all but one of the substantive counts against him. (*See* dkt. 721 at 3 n. 4 & 112–113 n. 64.)

The relevant conduct of PRISQUE, exclusive of foreseeable acts of others under *Pinkerton* analysis, places him squarely in an active leadership role in most of the criminal conduct depicted in the evidence. Without attempting an exhaustive summary of all that conduct, we find that the trial evidence established, by at least a preponderance, the following facts:

(1) PRISQUE was convicted on Count 8 (obstruction of OSHA's investigation of the injury of worker Owens by a saw blade),

and on the corresponding conspiracy objectives, Count 1, Objectives C, D and E. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) That aspect of the conspiracy involved at least two other knowing participants: FAUBERT (who was the "white shirt" having direct contact with OSHA about the Owens incident, under PRISQUE'S command), and the worker Marchan–Mendoza who, although unwilling, nevertheless lied to OSHA at the instruction of PRISQUE. (*See* dkt. 721 at 159–163.) [61]

(2) PRISQUE was convicted on Count 9 (obstruction of OSHA's investigation of the Coxe forklift fatality), and on the corresponding conspiracy objectives, Count 1, Objectives C, D, and E. That aspect of the conspiracy involved FAUBERT and MAURY, who were also convicted on Count 9 and the same conspiracy objectives. (*See* dkt. 721 at 3 n. 4 & 112–113 n. 64.) It also involved Shepherd, who testified at trial as to his knowing participation under directions from PRISQUE. Another worker, foreman Robert Rush, testified to being instructed by PRISQUE to lie to OSHA about the condition of the forklift but objecting. Shepherd also testified that before OSHA arrived that day, PRISQUE held a meeting with "white shirts" including himself, MAURY, and DAVIDSON, and told them to make preparations for the expected OSHA visit. (*Id.* at 163–176.) The evidence pertaining to the related counts, Counts 7 and 10, showed that PRISQUE intervened directly in the further efforts of FAUBERT to obstruct that investigation by having worker Marchan lie to OSHA, and that both Marchan and FAUBERT's subordinate Maddock were also knowing participants in that sub-plot of the obstruction of that OSHA investigation. [62]

(3) PRISQUE was convicted on Count 11 (obstruction of OSHA by altering the cement mixer involved in amputation injury of worker Velarde), and on the corresponding conspiracy objectives, Count 1, Objectives C, D, and E. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) That aspect of the conspiracy also involved knowing participants "maintenance manager" Harbin and "white shirt" Shepherd, both of whom were subordinate to PRISQUE in the criminal hierarchy for that activity. (*Id.* at 176–188.)

(4) PRISQUE was convicted, along with his subordinates MAURY and DAVIDSON, of the lesser-included CWA negligent offense under Count 27 (contaminated

---

61. The evidence was unequivocal that PRISQUE as plant manager was the top person running the day-to-day operations of the foundry, under a "chain of command" that was enforced. (*See* dkt. 721 at 186–187, 200–201.) Evidence of the organization structure at the plant, and explanation of the "white shirt" designation for the supervisors who reported directly to PRISQUE, is also provided in the trial testimony. (*See, e.g.,* tr. 416 at 6–34; dkt. 721 at 164, 181 n. 102, 186.) Most of the persons who had "white shirt" status were established by the evidence to have been participants in the criminal conspiracy. That proof was provided by their conduct, not by their titles or status in the company structure. On the other hand, their positions of authority at the plant contributed to their ability to commit the charged offenses.

62. Although PRISQUE was not charged in Count 7 and he was acquitted of Count 10, his criminal subordinate FAUBERT was convicted as charged in Counts 7 and 10, which also related to the overall obstruction of OSHA in its investigation of the Coxe forklift fatality. The evidence on those counts showed that PRISQUE intervened directly in the successful efforts of FAUBERT to get worker Marchan to lie to OSHA. (*See* dkt. 721 at 149–159.) We find this is relevant conduct by PRISQUE to include for his guidelines calculation purposes. Another "knowing participant" in these events was Maddock, who was subordinate to FAUBERT in obstructing that OSHA investigation. (*Id.*)

wastewater from cement pit into Delaware River during the 12–4/5–99 discharge). He was also convicted on the conspiracy objective of knowingly violating the CWA, Count 1, Objective A. He was not charged in any of the false statement counts relating to the 12–4/5–99 discharge, but his subordinates MAURY and DAVIDSON were convicted on Counts 3 and 4, respectively, for those offenses. PRISQUE was also convicted, along with MAURY and DAVIDSON, of the false statements objective of the conspiracy, Count 1, Objective D. (*See* dkt. 721 at 3 n. 4 & 112–113 n. 64.) We have found that the evidence was sufficient to support convictions of knowing CWA violations of PRISQUE, MAURY, and DAVIDSON as to the pattern of intentional cement pit discharges (including but not limited to the 12–4/5–99 discharge), even though they were convicted of lesser-included substantive negligent offenses regarding the cement pit. In so ruling, we have also found that the relevant conduct of PRISQUE included his own misleading statements to investigators on the day of the search warrant execution investigating the 12–4/5–99 discharge. (*Id.* at 225–231.) The relevant conduct of PRISQUE on that aspect of the conspiracy demonstrated that his leadership role over MAURY and DAVIDSON extended to those ongoing cement pit discharges and the efforts to obstruct inspectors and investigators in that connection. We hereby also find that

there were other knowing participants in the cement pit aspect of the conspiracy, including foremen Scott Rodney and Rush, who in turn were supervised in this criminal activity by DAVIDSON. (*See id.* at 192–231.) We hesitate to include workers such as Chase and Owens as "knowing" participants, but it is clear that they and many other workers were at least "unknowing" participants in the routine cleaning out of the cement pit by discharging its polluted contents down the storm drains. (*Id.*) [63]

(5) PRISQUE was convicted under Count 34 (violating the CAA by burning excess amounts of waste paint in the cupola in violation of the air permits). He was also convicted on the conspiracy objective of knowingly violating the CAA, Count 1, Objective B. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) We have found that his relevant conduct on that aspect of the conspiracy included efforts to obstruct EPA and NJDEP in their regulatory duties. (*See supra* Sec. II.C.) We find that "knowing" participants in that aspect of the conspiracy included Harbin, the "white shirt" serving as "maintenance manager;" Dalrymple, the casting/melting department superintendent who was another "white shirt" reporting to PRISQUE; and foremen Rush and Kolbe, who also had direct and indirect supervision from PRISQUE in their CAA-related criminal activities.[64] "Unknowing" participants would include

---

**63.** We ruled at trial, over objection by the government, that the essential elements of a knowing CWA or CAA violation in this case included knowledge that the discharge was in violation of the water or air permits, although knowledge of the precise features of the permits was not required. (*See* dkt. 721 at 38–75.) Based on that definition of mens rea, we do not believe the trial evidence would support a finding of "knowing" participation by workers such as Chase and Owens, who were among the many workers directed by their foremen to participate in pumping the cement

pit liquids that were discharged down the storm drains.

**64.** Harbin and Dalrymple were identified as Co-conspirators Y and Z, respectively, in the Indictment, and by name in the jury instructions. (*See, e.g.,* dkt. 711 at 29–31 (Overt Acts 67–71, 73); *id.* at 30–33 (Overt Acts 72, 75, 80–83); dkt. 717 at 38.) We have not had occasion to make any findings as to them beyond those contained in our post-trial memorandum opinion (dkt. 721) and in this opinion.

the many workers who routinely brought excess amounts of waste paint to the cupola from the finishing department and scrapyard crane operators such as Johnson and Zettlemoyer, who lifted the paint into the cupola and on more than one occasion were instructed to hide drums containing waste paint by covering them with scrap metal when inspectors were expected. (*See* dkt. 721 at 243–257; *supra* Sec. II.C.)

This Court finds, on the basis of the evidence to which we refer here and the balance of the relevant trial evidence, that PRISQUE did directly supervise one or more criminal participants, and that he was actively involved as a leader in criminal activity that (1) had at least five "knowing" participants, and (2) was otherwise extensive. Therefore, a 4–level adjustment under Section 3B1.1(a) applies to PRISQUE. This ruling is made under Section 3B1.1 and its commentary, and in recognition of the relevant case law as summarized above.

Our findings identifying "knowing" participants in relation to PRISQUE's role in the offense is not intended to be exhaustive, but it is more than sufficient to support this ruling.[65] In making this ruling we have considered each of the factors delineated in Note 4 of the commentary to Section 3B1.1, quoted *supra*. We find that, with the possible exception of the financial share factor, the evidence on all of the stated factors strongly supports this enhancement on the basis that PRISQUE was a "leader" based on his relevant conduct. Therefore, we find that a 4–level

adjustment is applicable to PRISQUE under Section 3B1.1(a). A further finding that he was also an "organizer" is not required for Section 3B1.1(a) to apply. We do find, however, that at least as to obstruction of the OSHA investigations of the Coxe forklift fatality and the Owens saw blade injury, as well as the CAA violations, PRISQUE was both an "organizer" and a "leader."

\* \* \*

■ We find that the evidence supports a 3–level supervisory role adjustment for defendant FAUBERT under Section 3B1.1(b). This finding is not based upon his various titles as human resources manager or safety director at Atlantic States, but rather upon his active participation in those aspects of the criminal activities constituting his offense conduct and his relevant conduct (exclusive of foreseeable acts of others under *Pinkerton* analysis). Without attempting an exhaustive summary as to FAUBERT's conduct, we find that the trial evidence established, by at least a preponderance, the following facts.

FAUBERT was convicted on Counts 7, 9 and 10 (false statements and obstruction of OSHA's investigation of the Coxe forklift fatality and the related Marchan forklift injury). He was also convicted on the corresponding conspiracy objectives, Count 1, Objectives C, D, and E. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) We find that aspect of the conspiracy involved knowing participants including, at a minimum, PRISQUE, FAUBERT, MAURY,

**65.** PRISQUE argues that his boss, Dennis Charko, was the General Manager on site, and that was the highest ranking position. PRISQUE mentions that his own purchasing limit, even though he was plant manager, was only $1,000 unless approved by the General Manager. (*See* Prisque I at 77–78.) These arguments are unavailing because as the commentary expressly states, in determining lead-ership roles in a criminal activity, titles such as "boss" are not controlling, and "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." USSG § 3B1.1, cmt. n. 4. Nor did the government allege or present any evidence that Charko was a co-conspirator. (*See* Gov. I at 14.)

Shepherd, Maddock, and worker Marchan. *See supra* n. 62. FAUBERT acted in a supervisory role over at least two participants in that criminal activity, namely Maddock and Marchan. (*See* dkt. 721 at 149–159.) We further find that FAUBERT exercised a similar supervisory role over Maddock in obstructive conduct relating to OSHA's investigation of the workplace injuries of Lieberman and Eloy Rocca. *See supra* n. 22.

The additional relevant conduct of FAUBERT described in certain Overt Acts alleged under Count 1, which we hereby find was established by a preponderance of the evidence, is described in the margin.[66]

Based on these facts, we find that the criminal activity in which FAUBERT was involved did include at least five criminally responsible participants, and he exercised a supervisory role over at least one of those participants. Therefore, a 3–level role adjustment under Section 3B1.1(b) applies to FAUBERT.

\* \* \*

■ We find that the evidence supports a 3–level supervisory role adjustment for defendant MAURY under Section 3B1.1(b). This finding is not based upon his title as maintenance superintendent at Atlantic States, but rather upon his active participation in those aspects of the criminal activities constituting his offense conduct and his relevant conduct (exclusive of foreseeable acts of others under *Pinkerton*

analysis). Without attempting an exhaustive summary as to MAURY's conduct, we find that the trial evidence established, by at least a preponderance, the following facts:

(1) MAURY was convicted on Count 3 (false statement about the 12–4/5–99 discharge into Delaware River). He was also convicted, along with PRISQUE and DAVIDSON, of the false statements objective of the conspiracy, Count 1, Objective D. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) We have summarized the evidence supporting those convictions. (*Id.* at 136–141, 257–260.)

(2) MAURY was convicted on Count 9 (obstruction of OSHA's investigation of the Coxe forklift fatality), and on the corresponding conspiracy objectives, Count 1, Objectives C, D, and E. PRISQUE and FAUBERT were also convicted on those offenses. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) We have summarized the evidence supporting those convictions. (*Id.* at 163–176, 257–260.)

(3) MAURY was convicted, along with PRISQUE and DAVIDSON, of the lesser-included CWA negligent offense under Count 27 (the 12–4/5–99 discharge). He was also convicted, with them, on the conspiracy objective of knowingly violating the CWA, Count 1, Objective A. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) We have found that the evidence was sufficient to support convictions of knowing CWA vio-

---

**66.** Severe workplace injuries were sustained by workers Lieberman and Rocca, as described in the Indictment and the evidence. FAUBERT is alleged to have participated in obstruction of OSHA regarding those two injuries as well. Alleged Overt Acts 50–52 pertain to the Lieberman incident. (Dkt. 711 at 26.) We find those allegations established as against FAUBERT, by a preponderance, based on the trial testimony of OSHA compliance officer Kulick and related exhibits. (Dkt. 359 at 4–26.) Alleged Overt Acts 60–63

pertain to the Rocca incident. (*Id.* at 28–29.) We find those allegations established by a preponderance, by the trial testimony (and related exhibits) of witnesses including the injured worker, Rocca (dkt. 422 at 146–160; dkt. 424 at 4–29), treating physician Dr. Noel (dkt. 422 at 102–120), and OSHA compliance officer Tiedeman (dkt. 424 at 146–156; dkt. 428 at 18–24). The obstructive conduct pertaining to the Rocca incident was jointly committed by FAUBERT and his subordinate, Maddock, as described by officer Tiedeman.

lations of PRISQUE, MAURY, and DAVIDSON as to the pattern of intentional cement pit discharges, including but not limited to the 12–4/5–99 discharge. (*Id.* at 225–231.) We have also found that there were other knowing participants in the cement pit aspect of the conspiracy, including foremen Rodney and Rush. We have found that there were numerous "unknowing" participants in this criminal activity, including Chase (who was supervised indirectly by MAURY and DAVIDSON), foremen and millwrights who were part of the maintenance staff under MAURY, and foremen and workers (such as Owens) who worked in the finishing department under DAVIDSON.

(4) MAURY was convicted on Counts 28–32 (discharges from pit under casting machine # 4). We disregard his similar conviction on Count 33, which we have dismissed post-trial. As noted above, he was also convicted on the corresponding conspiracy objective of knowingly violating the CWA, Count 1, Objective A. (*See* dkt. 721 at 3 n. 4, 112–113 n. 64, 242–243.) We have found that knowing participants in this aspect of the criminal activity included foreman Bobinis, supervised by MAURY. Unknowing participants included foremen, millwrights (such as Schultz and Delker), crane operators and electricians working in maintenance functions under MAURY. (*Id.* at 231–243.) We also find, by a preponderance based on the trial evidence, that then-Atlantic States president James Singleton, identified as Co-conspirator X in the Indictment and by name in the jury instructions, was a criminal participant in this phase of the criminal activity. (*See* dkt. 711 at 15–16, Overt Acts 4 and 5; dkt. 717 at 38.) Bobinis testified that when he was fired, MAURY and PRISQUE refused to speak with him. He had received a company-issued list of the management hierarchy. He went up the chain of command until he succeeded in getting in to

see Singleton. Bobinis testified that he told Singleton about the regular intentional discharges of pollutants from the # 4 pit into the storm drains, but Singleton took no action. (Dkt. 721 at 238–239.)

Based on these facts, we find that the criminal activity in which MAURY was involved did include at least five criminally responsible participants, and he exercised a supervisory role over at least one of those participants. It was also "otherwise extensive," given the numerous "unknowing" participants necessary to carry out the practice of regularly discharging polluted wastewater from the cement pit and the # 4 pit. Therefore, a 3–level role adjustment under Section 3B1.1(b) applies to MAURY.

\* \* \*

■ We find that the evidence supports a 3–level supervisory role adjustment for defendant DAVIDSON under Section 3B1.1(b). This finding is not based upon his title as finishing department superintendent at Atlantic States, but rather upon his active participation in those aspects of the criminal activities constituting his 'offense conduct and his relevant conduct (exclusive of foreseeable acts of others under *Pinkerton* analysis). Without attempting an exhaustive summary as to DAVIDSON's conduct, we find that the trial evidence established, by at least a preponderance, the following facts:

(1) DAVIDSON was convicted on Count 4 (false statement about the 12–4/5–99 discharge into Delaware River). He was also convicted, along with PRISQUE and MAURY, of the false statements objective of the conspiracy, Count 1, Objective D. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) We have summarized the evidence supporting those convictions. (*Id.* at 141–146, 257–260.)

(2) DAVIDSON was convicted, along with PRISQUE and MAURY, of the lesser-included CWA negligent offense under Count 27 (the 12–4/5–99 cement pit discharge). He was also convicted, individually, of the lesser-included CWA negligent offenses under Counts 12–20 and 22–26 (cement pit discharges during specified time periods). We disregard his similar conviction on Count 21, which we have dismissed post-trial. He was also convicted, with PRISQUE and MAURY, on the conspiracy objective of knowingly violating the CWA, Count 1, Objective A. (*See* dkt. 721 at 3 n. 4, 112–113 n. 64, 208–209, 257–260.) We have found that the evidence was sufficient to support convictions of knowing CWA violations of PRISQUE, MAURY, and DAVIDSON with respect to the pattern of intentional cement pit discharges, including but not limited to the 12–4/5–99 discharge. (*Id.* at 189–231.) We hereby also find that there were other knowing participants in the cement pit aspect of the conspiracy, including foremen Scott Rodney and Robert Rush, who in turn were supervised in this criminal activity by DAVIDSON. (*See id.* at 192–231.) We have found that there were numerous "unknowing" participants in this criminal activity, including Chase (who was supervised indirectly by MAURY and sometimes DAVIDSON), foremen and millwrights who were part of the maintenance staff under MAURY, and foremen and workers (such as Owens) who worked in the finishing department under DAVIDSON. (*Id.*)

Based on these facts, we find that the criminal activity in which DAVIDSON was involved did include at least five criminally responsible participants, and he exercised a supervisory role over at least one of those participants. It was also "otherwise extensive," given the numerous "unknowing" participants necessary to carry out the practice of regularly discharging polluted wastewater from the cement pit. Therefore, a 3–level role adjustment under Section 3B1.1(b) applies to DAVIDSON.[67]

## C. USSG § 3B1.2—Mitigating Role

The guidelines provide downward adjustments for mitigating role as follows:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

USSG § 3B1.2.

"This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant. The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that is heavily dependent upon the facts of the particular case." *Id.*, cmt. background. A "participant" under Section 3B1.2 has the same

---

**67.** DAVIDSON is also mentioned in trial testimony concerning the circumstances surrounding Count 9 (OSHA investigation of Coxe forklift fatality), Count 11 (OSHA investigation of Velarde cement mixer injury), and Count 34 (CAA violations involving burning of excess waste paint). (*See, e.g.,* dkt. 721 at 174, 182–183, 251–253.) He was not charged in those counts, nor did his convictions under Count 1 include the corresponding objectives of the conspiracy. We do not consider it necessary to rule on whether that evidence is relevant to his guideline calculations.

meaning as under Section 3B2.1. *Id.,* cmt. n. 1.

The familiar commentary describing "minimal participant" and "minor participant" is quoted in the margin.[68] It expressly states that in order to receive even a two-level mitigating role reduction, the defendant must be "less culpable than most other participants." *Id.,* cmt. n. 3. The Third Circuit has noted that:

> [T]he mere fact that a defendant was less culpable than his co-defendants does not entitle the defendant to "minor participant" status as a matter of law.... If this were the case, then the least culpable member of any conspiracy would be a minor participant, regardless of the extent of that member's participation. We reject this approach because there are varying degrees of culpability present in virtually every criminal conspiracy.

*United States v. Brown,* 250 F.3d 811, 819 (3d Cir.2001) (internal citation omitted).

■ The Third Circuit has recommended that in assessing eligibility for a mitigating role adjustment, district courts consider factors such as the following to determine the defendant's relative culpability: (1) the nature of the defendant's relationship to the other participants; (2) the importance of the defendant's actions to the success of the venture; and, (3) the defendant's awareness of the nature and scope of the criminal enterprise. *United States v. Headley,* 923 F.2d 1079, 1085 (3d Cir.1991), citing *United States v. Garcia,* 920 F.2d 153 (2d Cir.1990).

■ "[T]he Court is not limited to the three *Headley* factors if it can come up with other relevant considerations." *United States v. Rodriguez,* 342 F.3d 296, 301 (3d Cir.2003). The sentencing court must consider a defendant's involvement, knowledge, and culpability when determining whether the defendant is a minor participant, and only grant the role reduction to a defendant who is "substantially less culpable than the average participant." *Isaza–Zapata,* 148 F.3d at 238–39.

■ A defendant bears the burden of demonstrating that other participants were involved and that, under these standards and the facts of a particular case, the minor role adjustment should apply. *Id.* at 240. *See, e.g., United States v. Perez,* 280 F.3d 318, 352 (3d Cir.2002) (no clear error in denying a minor role reduction to defendants who knew of scope of conspiracy and performed a different role than other co-conspirators but without which "the conspiracy could not have succeeded.")

The Third Circuit holds that an upward adjustment for aggravating role and a downward adjustment for mitigating role,

---

**68.** The pertinent commentary to Section 3B1.2 (Mitigating Role) states:

1. Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

2. It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

3. For purposes of § 3B1.1(2)(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal.

USSG § 3B1.2, cmt.

for the same defendant, are not mutually exclusive. *United States v. Tsai*, 954 F.2d 155, 167 (3d Cir.1992) (sentence vacated and remanded because district court erroneously assumed that an enhancement under Section 3B1.1 precluded consideration of a downward adjustment under Section 3B1.2). *Accord, United States v. Jackson*, 207 F.3d 910, 921–22 (7th Cir.2000) ("Section 3B1.2 does not say that a manager or supervisor cannot be a minor participant; all that is required is that he be less culpable than more of the other participants"), *remanded for consideration in light of Apprendi*, 531 U.S. 953, 121 S.Ct. 376, 148 L.Ed.2d 290 (2000); *judgment reinstated*, 236 F.3d 886 (2001); *but see United States v. Conley*, 156 F.3d 78, 85–86 (1st Cir.1998) (stating contrary view); *see also United States v. Perry*, 340 F.3d 1216 (11th Cir.2003) (noting apparent circuit split; remanding for further legal and factual rulings; no appeal from resentencing).

Defendant DAVIDSON contends that he should receive a 4–level minimal role adjustment under Section 3B1.2(a). (*See* Davidson II at 30.) He relies upon all of the arguments advanced in his individual objections to upward role adjustments under Section 3B1.1. (*Id.*) He cites *Tsai*, pointing out that applicability of Section 3B1.2 is not mutually exclusive to an enhancement under Section 3B1.1. He argues that "the facts of this case as they relate to [him] ... clearly establish that [his] role, like his culpability, in the government's theory of a multi-faceted long range and wide sweeping conspiracy, makes him a minimal participant under § 3B1.2(a)." (*Id.*)

■ We agree that *Tsai* is good legal authority in this circuit, but we disagree that the downward adjustment is warranted with respect to DAVIDSON. For the reasons stated in the preceding section, we have found that DAVIDSON was one of the key participants in the aspect of the conspiracy pertaining to the cement pit discharges and the obstructive efforts to conceal those CWA violations from inspectors and investigators. In that aspect of the conspiracy he was subordinate to PRISQUE and on a managerial level with MAURY, while knowing participants including foremen Rush and Rodney were subordinate to him. We have also found that there were numerous "unknowing" participants who carried out orders from foremen acting under his direction, resulting in the continuous discharges of contaminated wastewater from the cement pit. We have also rejected the argument that his substantive convictions for negligent CWA violations should prevent any upward role adjustment under Section 3B1.1. *See supra* Sec. III.B.

Even looking at only the aspects of the conspiracy for which we have found DAVIDSON responsible for guideline calculation purposes, it is evident that he was not "substantially less culpable" than the average participant. (*Id.*) Looking out across the broader conspiracy, we cannot say that DAVIDSON occupied a less culpable position than others in the criminal hierarchy. Others were involved in some of the same aspects, and in other aspects of the multifaceted conspiracy. However, the structure of the other aspects was much similar to the structure of the cement pit aspect, with PRISQUE at the apex and "white shirts" such as DAVIDSON, FAUBERT, and MAURY at the next supervisory level, and other "knowing" participants acting at and below their level in the criminal activities. (*Id.*) For these reasons, we find that a mitigating role adjustment is not warranted based upon the offense conduct and relevant conduct of DAVIDSON. We also reject such arguments on behalf of defendants PRIS-

QUE, FAUBERT, and MAURY. *See supra* Sec. III.B.

### D. USSG § 3B1.3—Abuse of Position of Trust

The guidelines provide a two-level upward adjustment for abuse of a position of trust, in pertinent part as follows:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

USSG § 3B1.3.

The pertinent application note is quoted in the margin.[69] "This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime." *Id.*, cmt. background.[70]

■■■■ The Third Circuit employs a two-step analysis in applying this guideline: whether the defendant (1) occupied a position of public or private trust; and, (2) abused this position of trust in a way that significantly facilitated the crime. *United States v. Iannone*, 184 F.3d 214, 222 (3d Cir.1999) (citing *United States v. Craddock*, 993 F.2d 338, 340 (3d Cir.1993)).[71]

"Determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task. Neither Section 3B1.3 nor its applicable Commentary clearly defines what is meant by a 'position of trust.'"

**69.** Application Note 1 to Section 3B1.3 states:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors. Notwithstanding the preceding paragraph, because of the special nature of the United States mail an adjustment for an abuse of a position of trust will apply to any employee of the U.S. Postal Service who engages in the theft or destruction of undelivered United States mail.

USSG § 3B1.3, cmt. n. 1.

**70.** Section 3B1.3 also provides that an adjustment based on abuse of position of trust can be imposed in addition to a Section 3B1.1 aggravating role adjustment, but not an adjustment based on use of a special skill. *Id.* In this case we have found that Section 3B1.1 applies to each defendant. Therefore, we here consider whether a Section 3B1.3 adjustment is applicable based on abuse of position of trust, but not based on use of a special skill. The Third Circuit has admonished that we are not to conflate the analysis for abuse of position of trust with the analysis for use of a special skill. "[T]hese are two discrete concepts, and the text of § 3B1.3 cannot accommodate their admixture." *United States v. Hickman*, 991 F.2d 1110, 1112 (3d Cir.1993).

**71.** The Third Circuit holds that under its two-step analysis for Section 3B1.3, (1) the determination whether a defendant *occupied* a position of trust is a legal question for *de novo* review; and (2) a finding that a defendant *abused* a position of trust is a factual question reviewable for clear error. *United States v. Hart*, 273 F.3d 363, 376 (3d Cir.2001).

*Id.* (citing *United States v. Smaw,* 993 F.2d 902, 905 (D.C.Cir.1993)).

■■■■ The Third Circuit has articulated a three-factor test to determine that first question, whether defendant occupied a position of trust. As announced in *United States v. Pardo,* 25 F.3d 1187 (3d Cir. 1994), those factors are: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant visa-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position. These factors should be considered in light of the guiding rationale of the section—to punish 'insiders' who abuse their position rather than those who take advantage of an available opportunity." *Id.* at 1192. " '[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.' " *United States v. Lieberman,* 971 F.2d 989, 993 (3d Cir.1992) (quoting *United States v. Hill,* 915 F.2d 502, 506 (9th Cir.1990)).

A determination that a person occupied a position of trust "is a necessary, but not a sufficient, condition to warrant the ... increase for abuse of position of trust." *Lieberman,* 971 F.2d at 993. The Court must also find that the second step of the analysis is supported by the evidence. The key to applying the enhancement is that defendant *abused,* rather than merely *breached,* a duty of trust. *United States v. Georgiadis,* 933 F.2d 1219, 1225 (3d Cir. 1991).

■■■ The defendant "must also have abused his position of trust 'in a manner that significantly facilitated the commission or concealment of the offense.' " *Lieberman,* 971 F.2d at 993 (quoting Section 3B1.3). "An offense has been 'significantly facilitated' by a position of trust when the trust aspects of the position make the offense substantially easier to commit or conceal." *Craddock,* 993 F.2d at 342.

"To abuse a position of trust, a defendant must, by definition, have taken criminal advantage of a trust relationship between himself and his victim. The additional wrong undergirding the upward adjustment is the corrupt abuse of that trust relationship." *United States v. Hickman,* 991 F.2d 1110, 1112 (3d Cir. 1993) (citing *Hill,* 915 F.2d at 506 & n. 3).[72] Clearly, the Court is required in each case to identify the "victim" or "victims" of the defendant's conduct. The Court must make this determination in order to determine whether a trust "relationship" existed, and if so whether it was abused within the meaning of Section 3B1.3. *See, e.g., United States v. Cianci,* 154 F.3d 106, 108–09, 110–13 (3d Cir.1998), discussed *infra* n. 75. Identification of the "victim" or "victims" is therefore a necessary—and sometimes pivotal—step in the Section 3B1.3 analysis.

The government contends that each of the defendants in this case should receive an abuse of position of trust enhancement as to each of their convictions. (*See* Gov. I at 15, n. 3, 47; Gov. II at 1.) The defendants oppose this enhancement. (*See* Pris-

---

**72.** The oft-quoted statement from *Hill* is as follows:

> For purposes of section 3B1.3, a position of trust, if any, must be established from the perspective of the victim. For example, in the case of an embezzlement by an ordinary bank teller, the question is whether a trust relationship exists between the teller and his or her employer, the bank. However, a trust relationship may also exist among other parties as well such as between a customer and an employee.

*Hill,* 915 F.2d at 506, n. 3.

que I at 130; Prisque II at 51–61; Maury I at 51–52; Maury II at 16–24; Davidson I at 61; Davidson II at 30–35.) Here again, as with some of the guidelines issues addressed in the preceding sections, there is limited relevant case law. Most of the case law under Section 3B1.3 is not directly on point. Nevertheless, we have found it necessary to survey the broad sweep of appellate decisions in which this enhancement has been addressed in various other factual settings, in order to give context to the abuse of trust issues presented in this case.

\* \* \*

Here we provide an overview of case law determining in which factual circumstances an adjustment under Section 3B1.3 is warranted. The ruling usually, but not always, turns on the first prong of the analysis, whether defendant occupied a position of trust in relation to the victim or victims.[73] The basic principles appear to have developed fairly consistently, whereas the results have been fact-specific. In the cases summarized here, the abuse of trust enhancement was applied except where noted to the contrary.

**1. This enhancement has been applied most commonly in the contractual setting. The contracts can be in the public or the private sector.**

A common contractual situation may involve what we could call a "trusted fraud artist." This defendant not only defrauds the victim, but does so by creating—or exploiting—a commercial relationship of special trust or reliance. This is sometimes referred to as a "fiduciary or quasi-fiduciary relationship with the victim." *Iannone,* 184 F.3d at 235 (Becker, C.J., concurring).

Examples of cases in the "trusted fraud artist" category are as follows. *Compare United States v. Hoffecker,* 530 F.3d 137, 145–50, 202 (3d Cir.2008) (defendant ran sophisticated and highly successful fraudulent offshore telemarketing scheme targeted at seniors and other vulnerable victims); *United States v. Santoro,* 302 F.3d 76, 78–82 (2d Cir.2002) (stock broker convicted of conspiracy to defraud clients lacked discretionary investment authority, but occupied a position of trust in choosing stocks to recommend, and abused it by recommending artificially inflated stocks and not disclosing excessive commissions on those fraudulent sales); *Hart,* 273 F.3d at 375–78 (enhancement applied in securities fraud conspiracy where defendants used techniques to convince customers to rely on their perceived integrity and advice); *United States v. Hirsch,* 239 F.3d 221, 226–28 (2d Cir.2001) (defendant occupied position of trust as broker and investment advisor entrusted with investment discretion; he abused the position by disbursing funds beyond the scope of his discretion to support Ponzi scheme, and by violating other obligations of the trust granted to him); *Iannone,* 184 F.3d at 217–19, 222–26 (defendant was CEO of oil and gas drilling business who solicited investment funds from passive investors who entrusted him with the task of completing the drilling project); *United States v. Ben-*

---

73. We have organized this review of case law in the following broad conceptual categories for discussion purposes, recognizing that there is some overlap among them. There are also a few situations falling outside these categories that we will not further discuss except to note here. *See, e.g., United States v. Ledesma,* 979 F.2d 816, 822 (11th Cir.1992)

(defendant had young adult daughter bag cocaine and relay drug-related messages); *United States v. Zamarripa,* 905 F.2d 337 (10th Cir.1990) (defendant sexually abused child while babysitting as friend of the family); *United States v. Ellis,* 935 F.2d 385, 395 n. 9 (1st Cir.1991) (similar domestic child abuse).

*nett,* 161 F.3d 171, 194–96 (3d Cir.1998) (defendant created fictitious organizations and defrauded donors who trusted him and his promises that their money would be used for charitable purposes); *United States v. Sokolow,* 91 F.3d 396, 412–13 (3d Cir.1996) (defendant laundered for his own use monies he obtained by devising and marketing fraudulent insurance plans to small business owners and self-employed persons); *with United States v. Garrison,* 133 F.3d 831, 837–42 (11th Cir.1998) (reversing abuse of position of trust enhancement for defendant who was owner/CEO of nursing home convicted of Medicare fraud; holding that the position of that defendant in relation to the victim, Medicare, was "too attenuated" for her to have received the enhancement because the fraudulent claims were prepared by the vice president/CPA of the nursing home, and Medicare relied on an intermediary (Aetna) to review and submit proper claims); *United States v. Jolly,* 102 F.3d 46, 47–50 (2d Cir.1996) (defendant running Ponzi scheme was president of a company seeking capital from investors, not acting as an investment advisor; no position of trust resulted); *United States v. Brown,* 47 F.3d 198, 205–06 (7th Cir.1995) (defendants perpetrating separate bank fraud and Ponzi-style investor fraud schemes were in commercial relationships, but were not in position of trust in relation to any of the victims); *United States v. Moore,* 29 F.3d 175, 179–80 (4th Cir.1994) (appellants, suppliers who engaged in fraud and kickback scheme with an insider of the victim company, were not in position of trust with the company; the victim company was in an ordinary commercial relationship with the suppliers even though the insider abused his position of trust); *Pardo,* 25 F.3d at 1189–93 (bank customer who committed check kiting scheme was not in position of trust with the victim bank, even though due to his friendship with the branch manager the bank failed to conduct routine background check that would have prevented the loss); *United States v. Trice,* 245 F.3d 1041, 1042 (8th Cir.2001) (no abuse of trust for official of non-profit corporation making fraudulent statements to HUD to obtain federally funded loans; although United States was the victim, the defendant was not in a position of trust and the relationship was nothing more than an arms length business relationship).

Another common contractual situation may involve a "trusted unfaithful servant." This defendant is an employee or contractor who is entrusted with significant discretion or managerial control over the property of the victim or the services to be rendered to the victim. This is sometimes referred to as a "trusted employee of the victim" situation. *Iannone,* 184 F.3d at 235 (Becker, C.J., concurring). The bank executive committing a fraudulent loan scheme is mentioned as an example in the Application Notes. *See supra* n. 69.

Examples of cases in the "trusted unfaithful servant" category are as follows. *Compare United States v. Sedore,* 512 F.3d 819, 820–26 (6th Cir.2008) (defendant who prepared tax returns for individuals committed theft of identity information regarding customer's children); [74] *United States v. Bracciale,* 374 F.3d 998, 1005–09 (11th Cir.2004) (corporate executive abused position of trust when he arranged unautho-

---

**74.** There is generally no dispute that tax offenses do not support an abuse of trust enhancement as to the government or the public. *See, e.g., Sedore,* 512 F.3d at 824 (Section 3B1.3 enhancement applied to defendant's identity theft conviction, not to his IRS false claims conviction). Relevant conduct can, however, warrant the enhancement if it also represents an abuse of public or private trust as to another victim of defendant's conduct. *Id.* at 823–26.

rized discount sales and received paybacks from the customer); *United States v. Cruz*, 317 F.3d 763 (7th Cir.2003) (dishonest employee abused position of trust with her employer when she committed bank fraud using employer's bank account); *United States v. Thomas*, 315 F.3d 190, 193–94, 204–05 (3d Cir.2002) (home health care aide for elderly victim abused position of trust when causing victim to sign checks and travel interstate to the bank with defendant in the course of defendant's fraudulent scheme); *United States v. Castro*, 46 Fed.Appx. 58 (3d Cir.2002) (bookkeeper/secretary for small company was trusted totally and given almost complete control of financial accounts of the company; she abused that trust by embezzling from employer); *United States v. Linville*, 228 F.3d 1330 (11th Cir.2000) (same as *Cruz*); *United States v. Nathan*, 188 F.3d 190, 205–08 (3d Cir.1999) (president of defense contracting company abused position of trust as to the government and was not in merely arm's length relationship because government vested significant unsupervised authority in him and he could instruct workers and suppliers to violate the contract in a manner difficult to detect);

*Cianci*, 154 F.3d at 108–09, 110–13 (high-ranking corporate executive used his position of trust with the employer to obtain money by embezzlement and kickbacks; that *relevant* conduct supported Section 3B1.3 enhancement although the *offense* conduct was tax evasion, which would not qualify for this enhancement); [75] *United States v. Glymph*, 96 F.3d 722, 727–28 (4th Cir.1996) (similar to *Nathan;* defense contractor abused position of trust when permitted to ship parts to government without inspection based on defendant's certification of compliance with specs); *United States v. Boggi*, 74 F.3d 470, 472, 478 (3d Cir.1996) (union official convicted of racketeering in connection with exacting illegal payments from contractors received abuse of trust enhancement on each of three guideline groupings; enhancement was proper because defendant betrayed the victim union's membership to enrich himself through his union position); *Craddock*, 993 F.2d at 339–44 (teller at wire transfer payment office abused position of trust with employer because position afforded opportunity to pay known imposters without detection by routine auditing and sur-

**75.** In the Third Circuit, when considering a role enhancement for abuse of trust, the sentencing court must consider all relevant conduct of the defendant, and not restrict its consideration to the offense conduct only. Thus in *Cianci*, where the offense conduct was tax evasion (of which the victim is the federal government), our court of appeals looked to the defendant's relevant conduct and upheld an abuse of trust enhancement because the unreported income was obtained by defendant abusing his trust position with the victim employer. *Cianci*, 154 F.3d at 110–13. This willingness to impose an abuse of trust enhancement where the underlying relevant conduct involves abuse of trust, whether or not the offense conduct involves abuse of trust, appears to be the majority view. *Compare United States v. Brickey*, 289 F.3d 1144, 1153–55 (9th Cir.2002) (tax offense calculation properly enhanced where

INS border guard abused trust of the employer in accepting bribes for official misconduct); *United States v. Young*, 266 F.3d 468, 474–81 (6th Cir.2001) (money laundering calculation properly enhanced for abuse of trust based on underlying embezzlement conduct); *United States v. Bhagavan*, 116 F.3d 189, 193–94 (7th Cir.1997) (tax offense calculation properly enhanced for abuse of trust of minority shareholder victims in uncharged relevant conduct); *with United States v. Guidry*, 199 F.3d 1150, 1159–60 (10th Cir.1999) (restricting tax offense calculation to offense conduct only, where relevant conduct did involve abuse of trust of defendant's employer); *United States v. Barakat*, 130 F.3d 1448 (11th Cir.1997) (same). However, as with other role enhancements, *Pinkerton* conduct of co-conspirators would appear to be excluded even under the majority rule. *See Pojilenko*, 416 F.3d at 247–49; *Moore*, 29 F.3d at 177–79.

veillance); [76] *United States v. Boyle,* 10 F.3d 485, 488–89 (7th Cir.1993) (president of armored car company that contracted with Federal Reserve Bank and two other large customers to pick up, store and segregate their cash and deliver it when directed, occupied position of trust and abused that position with all three victims by commingling and misappropriating substantial sums); *Lieberman,* 971 F.2d at 990–94 (bank executive embezzled from bank fund over which defendant had sole discretion); *Georgiadis,* 933 F.2d at 1221, 1227 (bank mortgage loan executive embezzled from loan origination fees by re-encoding deposit slips and altering settlement statements under his control); *Hill,* 915 F.2d at 504–08 (long-distance truck driver was in position of trust in relation to families relocating to Germany whose belongings he was transporting to intermediate shipping point; he abused that position when he stole from the cargo while in his possession); *United States v. McMillen,* 917 F.2d 773 (3d Cir.1990) (savings and loan branch manager used his discretionary authority to commit bank fraud scheme); *with United States v. Brogan,* 238 F.3d 780, 783–86 (6th Cir.2001) (employee whose position was essentially that of a technician or computer programmer did not occupy position of trust with employer despite fact that he successfully obtained authorization for fraudulent wire transfer from his unwitting supervisor); *United States v. Ragland,* 72 F.3d 500, 503 (6th Cir.1996) (bank customer service representative did not occupy position of trust because duties were ministerial rather than discretionary); *United States v. Broderson,* 67 F.3d 452, 454–56 (2d Cir.1995) (executive who negotiated contract with NASA on behalf of his employer did not occupy a position of trust in relation to NASA when he made fraudulent statements on contract forms; NASA entrusted defendant with no discretion in compliance with the contract and related statutory and regulatory requirements); *United States v. Brunson,* 54 F.3d 673, 675, 677–78 (10th Cir.1995) (reversing abuse of trust enhancement where defendant contractor defrauded customer in contract to construct brick plant: "Even relatively unsophisticated businessmen like the Russian Coal Company would undoubtedly detect that no brick plant was built."); *Smaw,* 993 F.2d at 905–06 (rejecting notion that merely being an employee would qualify as position of trust in relation to stealing identification data of other employees for fraudulent credit card scheme; remanding for findings on whether defendant's specific job duties gave her special access to information not available to other employees).

In an analogous situation, the president and CEO of a nonprofit rural development organization that was the sub-recipient of federal grant funding did receive an abuse of trust enhancement on convictions for misapplication of federal funds and submitting false documents in connection with receipt of grant moneys. *United States v. Buck,* 324 F.3d 786, 789–90, 794–95 (5th Cir.2003). The *Buck* court affirmed the enhancement, holding that defendant

---

**76.** The *Craddock* court, in affirming application of Section 3B1.3 to a pay window teller, observed that a job may have both trust and non-trust aspects. *Craddock,* 993 F.2d at 343. It explained that the determination does not depend upon managerial authority but is fact-specific, stating as follows:

Courts have consistently rejected the argument that persons in positions providing little or no supervisory or managerial authority cannot be placed in positions of trust.

*Id.* at 343, n. 7 (citing cases wherein Section 3B1.3 applied to a military pay account technician, a mail carrier, a post office window clerk, a truck driver, a babysitter, and a security guard).

maintained significant direct ties to the government in connection with the participation of the organization in the grants program, and the government relied on the accuracy of her submissions because neither the government agency nor the intermediary entity could easily verify the existence or validity of the grant recipients allegedly served by the organization. The court also held that defendant abused a position of trust with the intermediary entity, which it held was another victim of defendant's wrongful conduct in the grants program. *Id.* at 794–95.

## 2. The enhancement has also been applied to public employees occupying positions of trust.

Public employees can be placed in a position of trust where the nature of the position entrusts them with significant discretion or managerial control in relation to the public responsibilities of the position. We could refer to this as the "trusted unfaithful public servant" situation, which is akin to the "trusted unfaithful servant" seen in the contract setting. The postal letter carrier is mentioned as an example in the Application Notes. *See supra* n. 69. A city manager who defrauded his municipality by diverting public funds to fictitious companies he created would be another classic example of this situation. *See United States v. Young,* 266 F.3d 468, 471–72, 474–75 (6th Cir.2001).

There are numerous cases where law enforcement personnel have been found to use an acknowledged position of public trust to facilitate criminal offenses. *Compare United States v. Brickey,* 289 F.3d 1144, 1153–55 (9th Cir.2002) (INS border inspector abused wide discretion entrusted to him by employer when he participated in scheme to allow cars to cross into U.S. from Mexico without subjecting them to routine inspection); *Young,* 266 F.3d at

474–81 (city manager with substantial discretionary authority embezzled municipal funds); *United States v. Belwood,* 222 F.3d 403, 406 (7th Cir.2000) (corrections officer abused position of trust to smuggle marijuana into prison where by virtue of his supervisory position he was not subject to search when entering the prison); *United States v. Sierra,* 188 F.3d 798, 802–03 (7th Cir.1999) (policeman used badge to facilitate entry into store that he robbed); *United States v. Pedersen,* 3 F.3d 1468, 1471–72 (11th Cir.1993) (police officer used position of trust to illegally acquire and disseminate confidential information); *United States v. Brann,* 990 F.2d 98, 102–03 (3d Cir.1993) (narcotics strike force agent kept government money issued for unsurveilled drug purchases during investigation, faking the transactions and turning in spurious drug mixtures); *United States v. Claymore,* 978 F.2d 421, 423 (8th Cir.1992) (tribal police officer stopped minor for violating curfew and raped her in patrol car); *with United States v. Nuzzo,* 385 F.3d 109, 115–17 (2d Cir.2004) (INS agent, who did occupy position of trust as to some functions, did not "abuse" that position where his offense of drug conspiracy was not shown to have a direct nexus to his INS position).

We are aware of two reported appellate cases involving environmental offenses by a public employee where the issue of an abuse of trust enhancement arose. Both were in the Sixth Circuit. In each case the defendant was superintendent of a public water treatment plant, and he received an enhancement under Section 3B1.3 for abuse of a position of public trust. The first of those decisions was *United States v. White,* 270 F.3d 356, 360–61, 371–73 (6th Cir.2001), which reversed the district court's refusal to impose an abuse of public trust enhancement in sentencing defendant superintendent for false statements contained in required water

turbidity reports that he prepared. There the court explained its reasoning as follows:

> We do not believe that all members of the general public share such a quasi-fiduciary relationship with all public servants. It seems impossible that the sentencing commission intended that every "faceless" government bureaucrat performing her duties with some measure of discretion should be subject to an abuse-of-trust enhancement should she be convicted of any crime.... In this case, it is obvious that customers of the Water District placed a high degree of trust in the District to provide them with potable drinking water, and granted the District substantial discretion, subject to federal and state regulation, as to how to provide such a service. The District, in turn, placed White in charge of its water purification efforts with apparently little or no administrative oversight; indeed, it appears that White's misdeeds would never have been discovered had there not been a surprise inspection by Division of Water agents. Given these facts, we believe that the quasi-fiduciary trust relationship between the District and its customers should be imputed to White, and thus that the abuse-of-trust enhancement was appropriate here given his violation of the public trust.... This result also follows the apparent reasoning of our sister circuits that officers charged with protecting public health and safety, whether or not elected by or known to members of the public, enjoy a special trust relationship with the public that is breached when they commit a crime.

*Id.* at 372–73.

The Sixth Circuit followed its *White* decision in *United States v. Kuhn,* 345 F.3d 431, 432–38 (6th Cir.2003) (reversing district court departure after imposing unop-posed abuse of trust enhancement). There the defendant was also a superintendent of a municipal water treatment plant, who was convicted of causing a CWA discharge violation and participating in submitting false CWA discharge monitoring reports. The Court of Appeals stated in *Kuhn,* "[I]t is clear that the enhancement was properly applied. Kuhn was a government employee, charged with the safe and efficient operation of a wastewater treatment operation.... [H]is high-level position with respect to his public function of wastewater treatment, 'contributed in some significant way to facilitating the commission' of his offense." *Id.* at 437 (quoting Section 3B1.3, cmt. n. 1).

### 3. The enhancement has been applied to certain persons holding government-issued professional or occupational licenses.

A government-issued professional or occupational license can contribute to creation of a position of public and/or private trust, and the enhancement may apply if that privilege is abused. The underlying rationale appears to be that such persons make their livelihood by holding those credentials (or pretending to hold those credentials), and may thereby place themselves in positions of special trust in relation to their victims. The physician sexually abusing a patient and the attorney/guardian embezzling from a client are mentioned as examples in the Application Notes. *See supra* n. 69. Even in this setting, however, the determination must be fact-specific.

Examples of cases involving government-issued professional or occupational licenses are as follows. *Compare United States v. Gonzalez–Alvarez,* 277 F.3d 73, 75–76, 81–82 (1st Cir.2002) (licensed dairy farmer abused position of public trust when he knowingly adulterated milk to

increase volume and delivered it to processing plant; his position as licensed supplier significantly facilitated his commission of the offense);[77] *United States v. Liss*, 265 F.3d 1220, 1229–30 (11th Cir. 2001) (physicians accepting kickbacks for referrals to specific lab occupied position of trust with Medicare and abused it, even though claims were medically necessary and physicians did not submit fraudulent claims to Medicare); *United States v. Velez*, 185 F.3d 1048, 1050–51 (9th Cir.1999) (operator of private immigration consulting firm possessing statutorily-designated status with INS to assist aliens submitting legalization applications abused position of trust in submitting false statements that could not be discovered in routine review);[78] *United States v. Sherman*, 160 F.3d 967, 968–71 (3d Cir.1998) (physician defrauded insurer with claims for medical services never rendered: "The mere possession of a professional license, medical or otherwise by a defrauder, does not mandate a § 3B1.3 enhancement. But where a defendant obtains his minimally-supervised position by virtue of his professional training and license and then takes advantage of the discretion granted to him in a way which significantly facilitates the fraud, we can rightly say that he has abused a position of trust."); *United States v. Harrington*, 114 F.3d 517, 519 (5th Cir.1997) (attorney abused position of public trust in attempting to obtain fraudulent affidavits to obstruct justice); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir.1997) (ophthalmologist convicted of Medicare mail fraud); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir.1995) (physician convicted of receiving kickbacks paid out of welfare funds); *with United*

*States v. Hall*, 349 F.3d 1320, 1324–26 (11th Cir.2003) (church pastor who conducted "roadshow meetings" to attract non-parishioners to fraudulent investment scheme did not occupy position of trust as to victims); *United States v. Morris*, 286 F.3d 1291, 1297 (11th Cir.2002) (abuse of trust did not apply where attorney's status may have enhanced his ability to lure victims to investment fraud scheme, but he had no attorney-client relationship with them).

### 4. The enhancement has been applied to a manager for abuse of trust by forcing mine workers to falsify safety training certifications.

The Fourth Circuit has held that defendants abused positions of public and private trust in a case where defendants were employers who caused their workers to sign false certifications that the workers had received safety training required under a federal mine safety law. In *United States v. Turner*, 102 F.3d 1350 (4th Cir. 1996), defendants were the operators of a coal mine that was subject to safety training and certification requirements of the Federal Mine Safety and Health Act. They were convicted of violating that law by causing the mine workers to sign certifications falsely stating that they had received required safety training, under threat that if they did not sign they would lose their jobs. *Id.* at 1352–53. The district court applied a Section 3B1.3 enhancement and the circuit court affirmed, stating:

> By virtue of their positions as owner, President, and mine operators of [the mining company], both Turners regular-

---

**77.** This decision has been criticized in later case law, discussed *infra*.

**78.** The Third Circuit, commenting upon *Velez* while discussing Section 3B1.3 in *Nathan*,

stated: "Velez had statutory authorization (comparable to an oligopoly) that entitled him to benefits—and responsibilities—other entities did not have." *Nathan*, 188 F.3d at 207.

ly exercised managerial discretion at the mine. The miners, as employees of the Turners, had to privately trust in them and defer to their judgment regarding mine safety and training. In addition, the rest of society had to publicly trust the Turners to follow the mine safety laws during operation of the ... mine. Accordingly, both Turners held a position of public and private trust.

. . . .

If a miner was prosecuted, the enhancement for abuse of a position of trust under USSG § 3B1.3 would not apply. Such an enhancement would apply to the Turners, however, because, as mine operators, each held a position in management which gave them leverage over the miners, and which enabled them to convince the miners to commit and conceal the false statements made on the ... forms. Moreover, because society trusted the Turners to follow the mine safety laws and ensure that the ... miners actually received the required safety training, their position of public trust also made detection of the violations ... more difficult. Thus, the district court was not clearly erroneous in giving the Turners a two level enhancement under USSG § 3B1.3 for their abuse of a position of public or private trust.

*Id.* at 1360.

This holding in *Turner* has been cited with approval by the Third Circuit in dicta. See *Bennett,* 161 F.3d at 195, n. 15. It has been rejected in part, but only as to its finding of abuse of a public trust, by the Ninth Circuit in *United States v. Technic Services,* 314 F.3d 1031, 1053, n. 15, discussed *infra.* The *Technic Services* court did adopt its reasoning as to the potential for an abuse of private trust enhancement where evidence showed that defendant supervisor altered personal air-monitoring devices worn by asbestos removal workers, and solicited the workers to sign false statements denying environmental violations. *Id.* at 1036–37, 1052–53 (remanding for resentencing to make findings on issue of abuse of private trust). We have not found, nor have the parties cited, any other appellate decisions discussing an enhancement for abuse of private trust in a similar factual setting.

**5. There is sharp disagreement whether the enhancement applies to environmental offenses by private persons.**

We have noted above that the First Circuit held in 2002 that a licensed dairy farmer abused a position of public trust when he knowingly adulterated milk and delivered it to a processing plant for distribution to consumers. *Gonzalez–Alvarez,* 277 F.3d at 75–76, 81–82. We have also described the Fourth Circuit ruling in *Turner,* that mine operators abused a position of public (and private) trust when they caused false certificates to be prepared that they were required to maintain under federal mine safety law. *Turner,* 102 F.3d at 1360.

There is a sharp conflict in the circuits on the basic issue of whether an abuse of public trust enhancement applies where the defendant is neither a public official nor entrusted with discretionary authority by public agencies, and commits criminal violations of federal environmental or licensing laws directed to public health and safety. Both *Turner* (re: regulated mine operators) and *Gonzalez–Alvarez* (re: licensed dairy farmer) were criticized and not followed, as to the abuse of public trust issue, by the Ninth Circuit in *Technic Services* in 2002. *Technic Services,* 314 F.3d at 1050–53 & n. 15. *Technic Services* held in pertinent part that defendant, who managed a private contracting entity performing asbestos removal under a government

contract (but had no discretion as to how to comply with CAA or CWA restrictions, which he violated along with obstructing environmental agency proceedings), did not occupy a position of public trust. *Id.* at 1048–52. However, *Technic Services* itself was a split decision with a strong dissent on this issue. *Id.* at 1054–59. Next, the Seventh Circuit disagreed with *Technic Services* in *United States v. Snook,* 366 F.3d 439 (7th Cir.2004). *Snook* held that an environmental manager at a private petroleum refinery, who conspired to defraud the federal government by violating the CWA and concealed information required to be included in discharge reports, abused a position of trust to the municipal water treatment district into which the refinery discharged and to the public. The *Snook* majority relied in part on *Gonzalez–Alvarez* and *Turner. Id.* at 445–46. The *Snook* dissent, also strongly phrased, sided with the majority position in *Technic Services,* including its criticism of *Gonzalez–Alvarez. Id.* at 446–51 & n. 3.

We have studied the reasoning expressed in both the majority and dissents in *Technic Services* and *Snook.* At the very least, we believe that the cases cannot be readily distinguished on their facts. Defendant Snook was "environmental manager" at a company that discharged water to a municipal water district under regulation but had some discretion in setting up the testing program, whereas defendant in *Technic Services* was secretary/treasurer and a workplace supervisor at a company that did government-contracted asbestos removal subject to licensing and regulation.

The disagreements expressed in the conflicting opinions in *Technic Services* and *Snook,* majority as well as dissent, go to the heart of interpretation of Section 3B1.3, when considering private individuals (not public servants) who commit criminal

violations of environmental regulatory laws or related statutes prohibiting false statements and obstruction in that context. Here we quote just a sample of the divergent positions regarding abuse of public trust expressed in those divided opinions:

*Majority opinion in Technic Services:*

Here, [defendant] was charged with violating the Clean Water Act and the Clean Air Act and with obstructing agency proceedings. Because the Clean Water Act and the Clean Air Act are public welfare legislation, the victim of those offenses is the public.... The victims of [defendant's] obstruction offenses are the federal government, whose proceedings were obstructed, and the public, to the extent that the obstruction interfered with the enforcement of the Clean Air Act and the Clean Water Act. Thus, in order for [defendant] to be eligible for an enhancement for abuse of public trust, he must have been in a position of trust vis-a-vis the public or the federal government.

The record does not support a conclusion that [defendant] held a position of trust with respect to either public victim....

[I]n this case, [defendant] had no trust relationship with the government by virtue of government employment; nor was he a public officer with a "special" or quasi-fiduciary relationship to particular members of the public because of duties to protect their health; nor did he hold a position in which the public directly delegates duties and places the public welfare in the incumbent's hands....

We decline to find that [defendant's] position as an employee of a private firm that was a government contractor is, without more, one on which the public relied....

Nor are we willing to hold that [defendant's] position with a private firm hold-

ing a government contract warrants an "abuse of trust" enhancement because the contract called for dangerous work, asbestos abatement.... [Defendant] was required to follow environmental and safety laws and regulations, and his failure to do so exposed him to criminal liability. But the public's expectation that [defendant] would follow important laws, in itself, is not enough to trigger the "abuse of trust" enhancement.

. . . .

To put it simply, the public expects *everyone* to comply with applicable health and safety regulations. This expectation is codified in the substantive law that prohibits the violation of those regulations. To hold that it is relevant that the public expects an individual to conform his or her behavior to the law provides no meaningful screen with which to filter out enhancement-eligible defendants. The abuse-of-trust enhancement would become applicable to nearly any defendant.

The fact that [defendant] was licensed to perform asbestos abatement does not necessarily transform his position into one of public trust, either. Licenses and certification requirements—which commonly are justified on grounds of public health and safety—cover many activities, including quite ordinary ones like driving a car. Not every licensed activity is a position of public trust.

. . . .

[T]here is nothing on which to rest a conclusion that [defendant] occupied a "position of public ... trust." An obligation to follow important laws that further the public health and safety cannot, merely by its own force, create a position of public trust. To hold otherwise would convert the enhancement into the general rule.

*Technic Servs.*, 314 F.3d at 1048–51 (italics original; bracketed material added; citations and footnotes omitted).

*Majority opinion in Snook:*

[Defendant] contends that he occupied a position of trust with respect to [his employer] but not to the [municipal water] District or the public. We disagree. The Clean Water Act is public-welfare legislation and the victims of violations are the public.... As Environmental Manager at [the petroleum refinery], [defendant] was given discretion to devise [its] wastewater treatment and testing systems, as well as to decide when to conduct such testing. And although the District did periodically conduct its own testing, it was for the most part dependent on the data that [the refinery] reported. The facts here illustrate this point effectively—for over three years [the refinery's] wastewater had numerous violations that went undetected because [defendant], in his unique position as Environmental Manager, did not report them. Moreover, unlike other self-reporting situations (taxpayers, for example), the regulations here apply to matters that directly and significantly affect the public's health and safety.... Given the responsibility and discretion given to [defendant] in his position as Environmental Manager in complying with the District's regulations, and his abuse of that position, the district court did not err in applying the sentencing increase.

*Snook*, 366 F.3d at 445–46 (bracketed material added; citations omitted).

It is noteworthy, we think, that the vast majority of environmental criminal decisions in the appellate case law have not included any reference to Section 3B1.3 as an enhancement issue, nor have they indicated that it was applied in the sentencing of the defendants. We have scrutinized

the many environmental decisions cited in all other sections of this memorandum, and in our post-trial opinion (dkt. 721), and none except the handful noted here have contained any reference to this topic. For example, in the Third Circuit, the defendants in each of the following environmental cases appealed their convictions on various grounds, but none of those decisions indicated that defendants had received an abuse of trust enhancement or that the issue had even been considered: *United States v. Abrogar*, 459 F.3d 430 (3d Cir. 2006); *United States v. Chau*, 293 F.3d 96 (3d Cir.2002); *United States v. W. Indies Transp.*, 127 F.3d 299 (3d Cir.1997). This is true of all the other environmental cases we have discussed in this and our prior opinion, except those described in this subsection. *See, e.g.*, environmental sentencing decisions summarized *supra*, Sec. III.B.

\* \* \*

Given this unsettled state of the case law on facts such as we have in the present case, this Court must choose how to proceed in evaluating whether and how an abuse of trust enhancement may apply to any of the defendants here.

■ We will follow that aspect of *Turner* that would apply an enhancement for abuse of a position of *private* trust if a defendant occupied a "position in management which gave them leverage over the [workers], and which enabled them to convince the [workers] to commit and conceal the false statements" made in responding to required health and safety reporting obligations of the employer. *Turner*, 102 F.3d at 1360. As noted in the foregoing discussion, *Turner* was decided in 1996. Its holding regarding *private* trust on the facts presented has raised no controversy. Neither the Ninth nor the Seventh Circuit, in *Technic Services* and *Snook*, respectively, took issue with that aspect of the *Turner* holding, and the Third Circuit has cited *Turner* with apparent approval in *Bennett*, 161 F.3d at 195, n. 15. In fact, the majority in *Technic Services* followed that aspect of *Turner* in finding that the defendant supervisor did hold a position of private trust with respect to the asbestos workers, and remanding for resentencing to determine whether that position of trust was abused within the meaning of Section 3B1.3.[79]

■ We will not follow the other aspect of *Turner*, as followed by the majority

---

**79.** The majority opinion in *Technic Services* directed:

> The remaining question, then, is whether [defendant] abused his position of private trust in the course of committing his crimes. There is reason in this record to think that he did. [Defendant] was convicted of, among other crimes, "altering, concealing and deactivating" personal air-monitoring devices worn by his workers, or causing others to do so. That conduct clearly placed the workers in jeopardy, and it arguably constituted a violation of [defendant's] position of private trust. For the "abuse of trust" provision to apply, the position must also contribute in some significant way to the commission or concealment of the underlying offense.... This condition might also be satisfied: It was

> [defendant's] supervisory role (and his concomitant power to fire uncooperative employees) that allowed him to convince workers to state falsely that they were complying with abatement regulations and to manipulate the air-monitoring devices. We cannot discern from the record below whether the district court would have found this conduct alone sufficient to warrant an "abuse of trust" enhancement on a *private* trust theory, or whether its incorrect belief that [defendant] held a position of *public* trust was necessary to its conclusion that the enhancement applied. We therefore remand to the district court for resentencing. *Technic Servs.*, 314 F.3d at 1053 (italics original; bracketed material added; citations omitted).

in *Snook* but rejected by the majority in *Technic Services*, that would find a position of *public* trust inherent in the status of being a manager at a private entity required to comply with environmental or health and safety laws and regulations. As we have noted, the Third Circuit has not had occasion to rule in this factual context, and its apparent approval of *Turner* was in dicta in *Bennett*, where the facts were a conventional (albeit spectacular) "trusted fraud artist" scenario. This Court is more persuaded by the reasoning of the *Technic Services* majority and the *Snook* dissent on this point, rather than the contrary reasoning expressed by the *Snook* majority and the *Technic Services* dissent.

■■■ Put as simply as possible, in our view the text and commentary of Section 3B1.3 itself, and the vast body of relevant cases as summarized in detail above, lead us to conclude that an individual functioning in a private capacity, not entrusted with any special discretion under law or by a government permit, license, or contract as to how to comply with governmental health and safety standards, does not thereby occupy a "position of trust" in relation to the government or the public. The logic that would extend the concept of a fiduciary or quasi-fiduciary duty to a private actor in relation to the government or the public in those circumstances is simply too attenuated to support a sentencing enhancement under this section of the guidelines. Such a defendant is surely criminally liable, and other enhancements may apply under the guidelines (as we have found here), but we do not think the "public trust" concept is properly applied in that setting. It certainly is not suggested in any of the examples in the commentary to Section 3B1.3, or in the reams of cases presenting typical "public trust" situations through the years. If it is to be

determined for sentencing policy reasons that "public welfare" statutes create a "public trust" relationship between a private defendant and the government or public so as to warrant this enhancement, that would seem to be something the Sentencing Commission should consider before we would impose it as part of an individual sentencing decision.

Relying on Section 3B1.3 and its commentary and applicable case law as discussed above, we make the following rulings.

\* \* \*

■■■ This Court finds that the evidence supports a 2–level upward role adjustment as to defendants PRISQUE and FAUBERT for abuse of a position of private trust in relation to Atlantic States workers, under Section 3B1.3. This finding is not based upon their titles as plant manager or human resources manager/safety director, respectively. Rather, it is based upon their specific offense conduct and relevant conduct (exclusive of foreseeable acts of others under *Pinkerton* analysis) that is pertinent to this guidelines section. We do not find that the evidence supports an adjustment under Section 3B1.3 for defendants MAURY or DAVIDSON.

This ruling is sufficiently supported by those aspects of the evidence showing that PRISQUE and FAUBERT each held a "position in management which gave them leverage over the [workers], and which enabled them to convince the [workers] to commit and conceal ... false statements." *Turner*, 102 F.3d at 1360. We have described that evidence in detail *supra*, Sec. III.B., and incorporate that discussion and record citations here by reference. We specifically find, under Section 3B1.3, the following:

(1) PRISQUE was convicted on Count 8 (obstruction of OSHA's investigation of the injury of worker Owens by a saw blade),

and on related conspiracy Objectives C, D, and E. That aspect of the conspiracy also involved knowing participants FAUBERT (the manager having direct contact with OSHA about the Owens incident, under PRISQUE's command), and the worker Marchan–Mendoza who, although unwilling, nevertheless lied to OSHA at the instruction of PRISQUE. (*See* dkt. 721 at 159–163.) [80]

(2) FAUBERT was convicted on Count 10 (obstruction of OSHA's investigation of the Coxe forklift fatality), and on related conspiracy Objectives C, D, and E. That aspect of the conspiracy also involved knowing participants PRISQUE, and the worker Marchan who, having been threatened with loss of his job if he disobeyed, lied to OSHA at the instruction of FAUBERT and the urging of PRISQUE. (*See* dkt. 721 at 157–159 & n. 88.)

As to defendants PRISQUE and FAUBERT, we find the evidence established, by at least a preponderance, that those defendants (1) occupied a position of private trust in relation to the workers whom they induced to lie to OSHA; and (2) abused that position in a way that significantly facilitated those crimes. *Iannone*, 184 F.3d at 222.

We base our finding on the first of those prongs on the three-factor *Pardo* test: (1) their positions did allow those defendants to commit a difficult-to-detect wrong; (2) they did have sufficient authority over those workers to induce those workers to lie under threat of firing; and (3) those workers did have to rely on the integrity of those defendants when the workers were approached by OSHA for information about the worker safety incidents OSHA was investigating. *Pardo*, 25 F.3d at 1192.

We base our finding on the second prong on the fact that each of those defendants did abuse his position of authority over those workers in such a way as to contribute significantly to the commission and concealment of the worker's misrepresentations to OSHA: "It was [defendant's] supervisory role (and his concomitant power to fire uncooperative employees) that allowed him to convince workers to state falsely" in response to questions asked of them in the OSHA investigations. *Technic Servs.*, 314 F.3d at 1053.

We further find that each of those defendants "abused his position of trust 'in a manner that significantly facilitated the commission or concealment of the offense'" of having the workers participate in the obstruction of OSHA. *Lieberman*, 971 F.2d at 993 (quoting Section 3B1.3). Workers in the position of those foundry laborers were not likely to come forward and overcome their fears to reveal that they had lied to the government inspectors under threat by their superiors. For these reasons, we find that a Section 3B1.3 adjustment does apply to defendants PRISQUE and FAUBERT.

■ This Court does not find that type of conduct, specifically inducing workers to make false statements in official records or to inspectors, in the evidence involving defendants MAURY and DAVIDSON. We are not of the view that, at least under the current case law, the Section 3B1.3 enhancement applies to supervisors who direct their workers to participate in violations of OSHA, the CWA, or the CAA, or even to cover up those violations by the

---

**80.** This finding is further supported, as to PRISQUE, based on the evidence of his efforts to falsify reportable cupola air emission data by instructing worker Kolbe to manipulate operations and equipment to conceal the actual results. (*See* dkt. 721 at 256, n. 163.) Although there is no overt threat of firing in the evidence by Kolbe, the command structure ensured that workers knew PRISQUE gave orders with that authority. (*Id.* at 186.)

workers' actions or their silence, without the added feature of directing those workers to make misrepresentations to authorities in oral statements or written records. Accordingly, we do not impose a Section 3B1.3 adjustment on defendants MAURY or DAVIDSON.[81]

## IV. CHAPTER THREE, PART C (OBSTRUCTION OF JUSTICE)

### A. USSG § 3C1.1–Obstructing or Impeding the Administration of Justice—Perjury

The guidelines provide a two-level upward adjustment for obstructing or impeding the administration of justice as follows:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1.[82]

Among the types of conduct to which this adjustment applies, the commentary identifies: "committing ... perjury." USSG § 3C1.1, cmt. n. 4(b).

▉ A "defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (citations omitted). As the Supreme Court has observed, "[a] sentence enhancement based on perjury does deter false testimony"; and "[i]t furthers legitimate sentencing goals relating to the principal crime, including the goals of retribution and incapacitation." *Id.* at 97, 113 S.Ct. 1111.

The burden is on the government in seeking this as well as other guidelines enhancements. The Third Circuit has described that burden under Section 3C1.1 as follows:

> Because the government is the party seeking to upwardly adjust [defendant's] sentence, the government bears the burden of proving by a preponderance of the evidence that the defendant *willfully* obstructed or impeded, or *willfully* attempted to obstruct or impede, the administration of justice.... The government bears the ultimate burden of persuasion on this issue: "[t]his prevents the criminal defendant from having to 'prove a negative' in order to avoid a stiffer sentence."

---

**81.** The government also argues that a Section 3B1.3 adjustment is warranted for all four individual defendants, based on a theory of abuse of private trust, for their various roles in creating, maintaining, and covering up unsafe working conditions that caused injuries and deaths at Atlantic States. We do not interpret *Turner* or *Technic Services* as supporting such a theory, without the added feature of inducing workers to misrepresent workplace facts to authorities. In addition, as to defendant DAVIDSON, his counts of conviction are limited to environmental offenses, which would not group with workplace safety offenses. Therefore, the evidence against him regarding workplace safety would not qualify as relevant conduct to be considered for this enhancement. *See* USSG §§ 1B1.3(a)(1)(A) & (2).

**82.** There have been numerous amendments to Section 3C1.1 and its commentary, some to resolve circuit splits on various issues. *See, e.g.*, USSG App. C, Amendment 581 (1998); *United States v. Jenkins*, 275 F.3d 283, 291 (3d Cir.2001) ("Despite several amendments, U.S.S.G. § 3C1.1 is no model of clarity."). We have reviewed all amendments to Section 3C1.1, as well as the circuit splits and the underlying guidelines issues. They are not relevant to the factual issues under Section 3C1.1 in this case, except where noted.

*United States v. Belletiere*, 971 F.2d 961, 965 (3d Cir.1992) (internal citations omitted).[83]

■ The facts underlying a sentencing enhancement for perjury under Section 3C1.1 need only be proven by a preponderance of the evidence. *United States v. Miller*, 527 F.3d 54, 60 n. 5 (3d Cir.2008).

The analysis required of the sentencing court is exacting, however, because of the important interests at stake. Thus:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.... When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if ... the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.

*Dunnigan*, 507 U.S. at 95, 113 S.Ct. 1111. The rationale for this requirement is that "[t]he concern that courts will enhance sentences as a matter of course whenever the accused takes the stand and is found guilty is dispelled by our ... explanation that if an accused challenges a sentence increase based on perjured testimony, the trial court must make findings to support all the elements of a perjury violation in the specific case." *Id.* at 96–97, 113 S.Ct. 1111.

The Supreme Court has adopted the federal criminal definition of perjury as the standard for this guidelines enhancement:

> In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621. *A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.*

*Id.* at 94, 113 S.Ct. 1111 (emphasis added).

The commentary to Section 3C1.1 was amended, effective November 1, 1997, to incorporate this *Dunnigan* standard for evaluating alleged false testimony of defendant. *See* USSG, App. C, Amendment 566 (1997). The 1998 version of the guidelines applicable in this case thus provides:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, *the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements*

---

**83.** The commentary specifies the scope of relevant conduct for this enhancement, impliedly excluding *Pinkerton* liability:

> Under this section, the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused.

USSG. § 3C1.1, cmt. n. 9.

*necessarily reflect a willful attempt to obstruct justice.*

USSG § 3C1.1, cmt. n. 2 (emphasis added to indicate revised portion of text).

The text that was deleted in that amendment had stated: "such testimony or statements should be evaluated in a light most favorable to the defendant." *See* USSG App. C, Amendment 566 (1997). The commentary text emphasized above was inserted in lieu of that deleted clause. *Id.* Thus, as of November 1, 1997 and all succeeding versions of the guidelines, the "most favorable" language is no longer applicable, and the *Dunnigan* standard has replaced it. *See United States v. Thundershield,* 474 F.3d 503, 509 (8th Cir. 2007).[84]

■ The essential factual elements of a perjury violation for purposes of a Section 3C1.1 enhancement are therefore "that the defendant (1) gave false testimony (2) concerning a material matter (3) with the willful intent to provide false testimony." *United States v. Fiorelli,* 133 F.3d 218, 221 (3d Cir.1998) (citing *Dunnigan*). It is mandatory, and not discretionary, that the court must apply this enhancement if the court finds that the factual predicates have been met. *United States v. Williamson,* 154 F.3d 504, 505–06 (3d Cir.1998).

A "material" matter is defined in the guidelines commentary as "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." USSG. § 3C1.1, cmt. n. 6. This definition has been adopted by the majority of circuits, including the Third Circuit, for determining whether the materiality element of perjury has been established for the purpose of this enhancement. *Miller,* 527 F.3d at 79–80 & n. 22.

■ Where a defendant exercises his or her right to testify at their own trial, a "simple denial of guilt ... is not a basis for an obstruction-of-justice enhancement." *United States v. Godinez,* 110 F.3d 448, 456 (7th Cir.1997); *see, e.g., United States v. Keys,* 899 F.2d 983, 988 (10th Cir.1990) ("We agree that a denial of guilt or exercise of the constitutional right to testify in one's own defense is not a proper basis for application of Guidelines section 3C1.1."). *But see United States v. Aguilar–Portillo,* 334 F.3d 744, 748–49 (8th Cir.2003) (rejecting this view as not consistent with current Supreme Court precedent).[85]

■ On the other hand, "The giving ... of perjurious testimony, however, is not the exercise of a constitutional right." *Id.* Thus, "the law is clear that when a

**84.** Statements in reported decisions that cite or apply the defendant-favorable inference in the former commentary to Section 3C1.1 are not applicable to the analysis in this case, or for that matter to any cases decided under the 1997 or later editions of the guidelines. This despite the fact that some later cases still (erroneously, in our view) cite that former language or cases decided thereunder. *See, e.g., United States v. Gobbi,* 471 F.3d 302, 314 (1st Cir.2006), citing *United States v. Akitoye,* 923 F.2d 221, 228–29 (1st Cir.1991).

**85.** The Eighth Circuit in *Aguilar–Portillo* ruled that "there can be no such thing as an 'exculpatory no' defense," in other words, even "a simple denial of guilt can be as perju-

rious as any other false statement as long [as] the defendant willfully intended to provide false testimony." *Aguilar–Portillo,* 334 F.3d at 749. However, it did not rest its holding upon that ruling but rather upon other findings of the district court. *Id.* at 748–49. We need not resolve whether this is a more current statement of the law, or if it signals a circuit split with those courts holding that a simple denial of guilt will not support a guidelines enhancement for perjury. In this case the government cites specific testimony by defendants, beyond their simple denials of guilt, as allegedly perjurious. *See* discussion *infra.*

defendant 'decide[s] to take the stand and tell the jury a story,' he does so at his own risk, for if he commits perjury, the court may, at the time of sentencing, enhance his sentence for obstructing justice." *United States v. Hickok,* 77 F.3d 992, 1007 (7th Cir.1996) (citation omitted).

This potential guideline enhancement presents courts with "the question of when a defendant's election to testify may serve as a boomerang, elevating his offense level if the judge believes the testimony to have been knowingly false." *United States v. Akitoye,* 923 F.2d 221, 228 (1st Cir.1991). The Seventh Circuit in *Godinez* recognized this inherent tension by quoting with approval the following observation of the sentencing court:

> [I]f a defendant gets up and just makes a general denial that he is guilty of the allegations in the indictment, the Court ... would be hard pressed to invoke 3C1.1. The problem being is that hardly ever occurs, because ... when they do take the stand in their own defense, and when they're waiving their constitutional right ... they are not only subjecting themselves to the examination of their client [sic], but also the cross examination of the government attorney. And invariably, you get into specifics through either direct examination or cross examination....

*Godinez,* 110 F.3d at 456–57. The *Godinez* court further explained that "[t]he denial of knowledge is not the same as a general denial of guilt." *Id.* at 457.

Courts generally recognize that " 'a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.' " *Boggi,* 74 F.3d at 478–79 (quoting *United States v. Weston,* 960 F.2d 212, 218 (1st Cir.1992)). However, when a jury renders a general verdict, establishing that the verdict necessarily determined any particular fact can be very difficult. *United States v. McLaughlin,* 126 F.3d 130, 138 (3d Cir. 1997). The Third Circuit has cautioned that "[g]iven the concerns reflected in *Dunnigan'*s requirement of findings, if a sentencing court is going to rely on the verdict of the jury as laying part of the foundation for a § 3C1.1 enhancement, there should be no question but that the relevant finding was necessarily made by the jury." *Fiorelli,* 133 F.3d at 225.

■ Nor is a finding of falsity by the jury sufficient to satisfy the inquiry the sentencing court must make to determine whether defendant committed perjury. "[A] jury finding of falsity does not necessarily mean there has been perjury." *Id.* at 223. Indeed, "a jury's verdict cannot itself support a finding of perjury." *Miller,* 527 F.3d at 77 n. 19. In other words, "the perjury of the defendant must ... be ... supported by evidence *other than the jury's having disbelieved him* ...." *Id.* at 76 (quoting *McLaughlin,* 126 F.3d at 140 (emphasis in original)). "[W]e prohibit a district court from automatically enhancing a defendant's sentence just because a jury returned a guilty verdict after the defendant testified in his or her own defense. Were it otherwise we would enhance the risk of chilling that constitutionally protected right." *United States v. Jones,* 983 F.2d 1425, 1430 (7th Cir.1993). "*Dunnigan'*s requirement of fact-finding insures that courts will not automatically enhance sentences whenever the accused takes the stand and is thereafter found guilty." *United States v. Catano–Alzate,* 62 F.3d 41, 42 (2d Cir.1995).

■ The sentencing court thus has the obligation to determine whether all factual elements of the perjury definition have been met—that is, falsity, materiality, and willfulness. *See Boggi,* 74 F.3d at 479. "Although the jury adjudicates guilt, the district court is responsible for making

findings relevant to the matter of obstruction, and if the government does not convince the court that the defendant willfully intended to provide false testimony, an enhancement for obstruction because of false testimony is not warranted." *Aguilar–Portillo,* 334 F.3d at 749.

The Supreme Court in *Dunnigan* held that there was sufficient evidence, and the district court had made sufficient factual findings, to support a perjury enhancement under Section 3C1.1. *Dunnigan,* 507 U.S. at 95–96, 113 S.Ct. 1111. There, defendant was accused of conspiring to distribute cocaine. The government's case in chief consisted of five witnesses who testified to their personal knowledge of her drug trafficking. Defendant testified and denied all criminal acts attributed to her. On cross-examination, the government questioned her regarding the testimony of the five prosecution witnesses. She denied their inculpatory statements and said she had not possessed or distributed cocaine during that time or at any other time. The government's rebuttal included another witness, who testified to purchasing crack cocaine from defendant. The jury found defendant guilty. *Id.* at 89–90, 113 S.Ct. 1111. The district court's finding of perjury is quoted in the margin.[86] The Court concluded, "[g]iven the numerous witnesses who contradicted respondent regarding so many facts on which she could not have been mistaken, there is ample support for the District Court's finding." *Id.* at 95–96, 113 S.Ct. 1111.

The requirements imposed upon the district court when the government seeks a guideline enhancement under Section 3C1.1 for alleged perjury have not changed after *Booker.* "Post-*Booker,* it remains the province of the sentencing court to determine by a preponderance of the evidence whether a factual basis for a finding of perjury (and, thus, for an obstruction of justice enhancement) exists." *United States v. Gobbi,* 471 F.3d 302, 314 (1st Cir.2006). The process by which the sentencing court makes its independent determination, however, is case-specific and need not become a "mini-trial" in itself. As the Court of Appeals for the Seventh Circuit has stated:

> Our review of the relevant case law, including ... *Dunnigan,* ... persuades us that the "independent finding requirement" is not as exacting as the appellant would have this court believe.... As *Dunnigan* makes clear, a district judge deciding whether to apply a sentence enhancement for obstruction of justice need not conduct a mini-trial with respect to each of the defendant's false statements, nor is it necessary for the sentencing judge to set forth his findings specifically in terms of the elements of perjury.... In fact, the findings at issue in *Dunnigan* were considerably less specific than those challenged in this appeal, yet the Supreme Court held that those findings were adequate for purposes of applying a sentence enhancement pursuant to § 3C1.1.

*Hickok,* 77 F.3d at 1008.

Reported post-*Dunnigan* appellate decisions affirming imposition of this en-

---

**86.** The finding of perjury by the district court in *Dunnigan,* as quoted in the Supreme Court opinion, was as follows:

> The court finds that the defendant was untruthful at trial with respect to material matters in this case. The defendant denied her involvement when it is clear from the evidence in the case as the jury found beyond a reasonable doubt that she was involved in the conspiracy alleged in the indictment, and by virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels.

*Dunnigan,* 507 U.S. at 91, 113 S.Ct. 1111.

hancement, based upon sufficient factual findings of perjury at trial, include the following. *See, e.g., Thundershield,* 474 F.3d at 507–09; *Gobbi,* 471 F.3d at 314–15; *United States v. Owens,* 308 F.3d 791, 794–95 (7th Cir.2002); *United States v. Johnson,* 302 F.3d 139, 153–54 (3d Cir. 2002); *United States v. Haas,* 171 F.3d 259, 268 (5th Cir.1999); *Godinez,* 110 F.3d at 456–57; *Boggi,* 74 F.3d at 478–79; *Hickok,* 77 F.3d at 1006–09; *United States v. Weitzenhoff,* 35 F.3d 1275, 1292 (9th Cir.1993); *see also United States v. Lipscomb,* 284 Fed.Appx. 924 (3d Cir. 2008) (same).

Circuit court decisions applying the same principles, but reversing and remanding Section 3C1.1 perjury enhancements based upon inadequate factual findings, include the following. *See, e.g., Fiorelli,* 133 F.3d at 220–25; *Catano-Alzate,* 62 F.3d at 42–43; *United States v. Hilliard,* 31 F.3d 1509, 1518–21 (10th Cir. 1994); *see also Miller,* 527 F.3d at 74–81 (holding that record did not support findings of willful falsity [applying "rule of fundamental ambiguity"], or of materiality); *United States v. Friedman,* 998 F.2d 53, 57–58 (2d Cir.1993) (remanding for more specific findings where district court found trial testimony not believable but apparently declined to impose perjury enhancement on the belief that such was discretionary).

Defendants cite one reported appellate decision affirming a district court's refusal to impose a Section 3C1.1 perjury enhancement where it found that the government did not prove that defendant was lying. *Aguilar–Portillo,* 334 F.3d at 748–49. Defendants also cite two nonappealed district court decisions, each holding that the factual elements of perjury were not sufficiently established to require enhancement under Section 3C1.1. *United States v. Lester,* 376 F.Supp.2d 679, 683–84 (W.D.Va.2005); *United States v. Biheiri,* 356 F.Supp.2d 589, 600 (E.D.Va.2005).

The government seeks enhancements under Section 3C1.1 for alleged perjury against PRISQUE, FAUBERT, MAURY, and DAVIDSON. (Gov. I at 54–64.) Each of those individual defendants opposes enhancement on that ground. (Prisque I at 91–92; Prisque II at 22–25; Faubert III at 8–14; Maury II at 31–34; Davidson I at 45–47; Davidson II at 17–21.)

▮ Here at the outset of this discussion, the Court must reject any contention by a defendant that if he has an underlying conviction for obstruction of justice (Counts 8–11 in this case), no enhancement under Section 3C1.1 is permissible. (*See, e.g.,* Prisque I at 92.) The application notes to both Sections 2J1.2 and 3C1.1 clearly state that if a significant further obstruction occurs during the prosecution of an underlying obstruction offense, that further obstruction will trigger enhancement under Section 3C1.1, as we explain in the margin.[87]

---

**87.** The commentary to Section 2J1.2 (Obstruction of Justice) provides in pertinent part:

> For offenses covered under this section, Chapter Three, Part C (Obstruction) does not apply, unless the defendant obstructed the investigation or trial of the obstruction of justice count.

USSG § 2J1.2, cmt. n. 2.

The corresponding commentary to Section 3C1.1 (Obstructing or Impeding the Administration of Justice) provides in pertinent part:

> If the defendant is convicted of an offense covered by ... § 2J1.2 (Obstruction of Justice), ... this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (*e.g.,* if the defendant threatened a witness during the course of the prosecution for the obstruction offense).

USSG § 3C1.1, cmt. n. 7.

We also reiterate that in making all findings on these issues, the Court has used the standard for interpreting a defendant's testimony as set forth in *Dunnigan* and the corresponding guideline application note, Section 3C1.1, cmt. n. 2. *See supra* n. 84 & accompanying text. This means that we recognize that the former standard, which was to interpret defendant's trial testimony in the light most favorable to defendant, is not applicable here. *Id.* On the other hand, there is no suggestion in the guidelines or the case law that the district court should interpret the evidence in the light most favorable to the government in making findings under this guideline section. That, of course, was the applicable standard for deciding defendants' motions under Rule 29. (*See, e.g.,* dkt. 721 at 130–131.) Rather, here the Court will simply use the *Dunnigan* standard, basing its findings on the trial evidence and Court's own observation of the trial.

The Court will confine its analysis to the instances of alleged perjury identified by the government against each individual defendant. *Belletiere,* 971 F.2d at 965 (government bears burden of proof and ultimate burden of persuasion under Section 3C1.1). Relying on the text and commen-tary of Section 3C1.1 as it pertains to perjury, and the applicable authorities discussed above, we make the following findings.

First, we find that as to all matters discussed below, the testimony of the defendant concerned a material matter because "if believed, [that] testimony would tend to influence or affect the issue under determination." USSG § 3C1.1, cmt. n. 6. The government keyed its specific contentions to the counts of conviction of each individual defendant, as cited below, and we agree that those portions of the defendants' testimony were material to the particular count.

We find that the government has carried its burden on the remaining elements of perjury as to some, but not all, of the portions of testimony it cites in support of this enhancement.

### 1. John Prisque

The jury found defendant PRISQUE guilty on three counts of obstruction of justice (Counts 8, 9, and 11), and one count of intentional violation of the CAA (Count 34), as well as the Count 1 conspiracy count and all five alleged unlawful objectives of the conspiracy. (*See* dkt. 721 at 3 n. 4 & 112–113 n. 64.)[88] Defendant PRIS-

---

These provisions, read together, do require enhancement of an obstruction of justice conviction where the sentencing court finds that defendant was also responsible for significant further obstruction during the investigation or prosecution of that offense. Perjury by defendant, or attempting to influence other witnesses, does therefore qualify for a Section 3C1.1 enhancement of the guidelines calculation for the underlying obstruction offense. Nor is it impermissible double-counting if an enhancement is applied under Section 2J1.2(b)(2) and a Section 3C1.1 enhancement is also applied, where the facts separately support both enhancements. *See, e.g., Lueddeke,* 908 F.2d at 234–35. ("[A] second adjustment for obstructing justice (on top of an adjustment for the substantial interference with the administration of justice) does not amount to "double counting" as the Guidelines clearly call for two adjustments in a case where, as here, a defendant interferes with one investigation and then also interferes with a resulting investigation of the interference.") *Id.* at 234 n. 2.

88. As previously noted, PRISQUE was found not guilty on Count 10 (obstruction by instructing Marchan to falsely inform OSHA that his leg had not been broken when hit by a forklift driven by the same driver involved in the Coxe fatality); and found guilty only of a lesser-included negligence offense under the CWA (Count 27; the 12–4/5–99 discharge). (*See* dkt. 721 at 3 n. 4.) The government does not explicitly argue a Section 3C1.1 perjury

QUE testified for three trial days on direct, cross, and redirect examination. He denied all criminal acts attributed to him, by asserting general denials of guilt and by his specific testimony elicited by counsels' questions. (Tr. 485 at 37–224; tr. 487 at 4–130; tr. 489 at 4–189.)

The general denial of guilt by defendant PRISQUE was stated in his direct examination as follows: [89]

Q Mr. Prisque, we've been here since, taking testimony since October. And, we're now in the end of February. We've heard witnesses come and make allegations that you involved yourself in wrongdoing. Did you ever involve yourself for the purpose of committing a crime while at work, any time, any day, any minute?

A No, I didn't.

(Tr. 487 at 97.)

The government points to each of his substantive felony counts of conviction, and gives what it considers to be examples of willfully false testimony by him, as we discuss below. PRISQUE argues that he did not commit perjury, and that his convictions hinged upon mental state and not necessarily the act itself. (Prisque II at 22.)

### a. Count 8

Count 8 alleged that defendant PRISQUE engaged in obstructive conduct with respect to the OSHA investigation of the incident in which employee Robert Owens sustained a fractured skull, shattered nose, and loss of an eye while operating "cut off saw" machinery as a relief worker. Spe-

cifically, Count 8 alleged that PRISQUE instructed the regular operator of that machinery, Isabel Marchan–Mendoza, to falsely inform the OSHA inspectors that the safety shield for the saw had not been changed since that incident, when in fact a steel wire screen had been added to the shield post-incident. (*See* dkt. 721 at 159.)

The government's evidence on that count consisted primarily of testimony of the OSHA inspector, Alex Salerno, and the named worker, Marchan–Mendoza, as well as the injured worker, Owens. Their testimony is summarized in the post-trial opinion. (*Id.* at 159–163.) Owens and Marchan–Mendoza both testified that the shield had no wire screen at the time of the injury. Salerno testified that he observed what appeared to be a newly-constructed shield when he made his on-site inspection, and it included wire mesh over plexiglas. He said that if the wooden shield had been changed in any way since the Owens injury three weeks prior, he would have needed to know that because it would not depict conditions on the day of the injury. Marchan–Mendoza testified that a few days after the injury, a plant carpenter added the wire mesh to the shield, and that PRISQUE initiated a conversation with him in which PRISQUE communicated that "if somebody asked me if that ... metal was there, ... I was supposed to say yes." Marchan–Mendoza said he agreed to say that because he wanted to keep his job. Salerno and Marchan–Mendoza both testified that Salerno did ask Marchan–Mendoza that very question during his inspection, and Marchan–Mendoza said he lied when he told Salerno

enhancement for him as to the verdicts on those counts. (Gov. I at 55–59.)

**89.** Citation to trial transcripts in this opinion uses the same citation form adopted in our post-trial Memorandum Opinion. (*See* dkt.

721 at 3 n. 5.) In quoting testimony we do correct obvious clerical errors without so indicating; otherwise the quotations are verbatim.

that the shield had always been like that. (*Id.* at 159–163.)

The finding of this Court on Count 8 in the post-trial opinion (applying the standard of Rule 29), was: "We find that the evidence was sufficient for a reasonable jury to find that Prisque did instruct Marchan–Mendoza to falsely inform the [OSHA] inspectors that the saw safety shield had not been changed since [the Owens incident], when in fact, a steel wire screen had been added to the shield after the accident.... Accordingly, we find that the verdicts of conviction on Count 8 are supported by sufficient evidence." (*Id.* at 163.)

Defendant PRISQUE testified on cross examination:

Q And Mr. Isobel Marchan [sic], Mr. Marchan said that you told him to lie to OSHA about the wire mesh being over the—a protective screen (indiscernible) cut saw, did you do that?

A No. No. As far as I can remember (indiscernible).

COURT: Can't hear you.

THE WITNESS: As far as I remember that shield always had a screen on it.

Q As far as you know?

A Yeah.

Q And so he's mistaken about that, correct, that you told him to lie to OSHA?

A Isobel's trying to help his brother, yeah.

Q Is that correct, he's mistaken?

A Yeah.

(Tr. 489 at 99.)

This Court makes the following findings as to the government's evidence on Count 8, and the specific contrary testimony of PRISQUE:

(1) The facts in the government's evidence, referred to above, were the essential facts necessary to support the verdict on this count. Therefore, the falsity of the conflicting testimony by PRISQUE is necessarily implicit in the jury's verdict on Count 8. In addition, we find that the government's evidence on that count was sufficiently credible on the essential facts disclosed in that evidence, and that the conflicting testimony of PRISQUE on the same factual issues was false.

 (2) The Court makes an independent finding that PRISQUE's testimony on Count 8 was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Given the nature and extent of the testimony of the government's witnesses who contradicted PRISQUE regarding the essential facts, on which PRISQUE could not have been mistaken (although he certainly did deny those facts), we find that PRISQUE's testimony on those essential facts under Count 8 was willfully false.

### b. Count 9

Count 9 alleged that defendants PRISQUE, FAUBERT, and MAURY engaged in obstructive conduct with respect to the OSHA investigation of the incident in which employee Coxe sustained fatal injuries when he was run over by forklift # 24, driven by a worker named De Los Santos. Specifically, Count 9 alleged that those defendants "[took] steps to conceal facts regarding [that] forklift fatality ... from [OSHA] inspectors." (*See* dkt. 721 at 163.)

The government's evidence on Count 9 consisted of extensive testimony and exhibits in support of the allegation that defendants PRISQUE, FAUBERT, and MAURY took steps to conceal the fact that the particular forklift had defective brakes and other problems at the time of the incident. The government's witnesses in

its case in chief included the OSHA inspector, Tiedeman, detective Barsony from the local prosecutor's office, responding police officer Ken Decker, and workers including George Shepherd, Robert Fretz, Robert Rush, and Kevin Redcay. The government also presented rebuttal witnesses including responding police officer Robert Schmeltzly. Both police officers testified that they did not give anyone at the plant permission to move the forklift from the incident scene that morning. (Tr. 372 at 106 (Decker); tr. 554 at 5–9 (Schmeltzly).) The testimony of the other government witnesses on that count is summarized in the post-trial opinion. (*See* dkt. 721 at 163–176.) Here we give a brief overview of that testimony.

The Coxe incident occurred at approximately 6:00 a.m. on March 24, 2000. PRISQUE was plant manager, FAUBERT was head of human resources and designated OSHA liaison person at the plant, and MAURY was maintenance superintendent. OSHA (Tiedeman) arrived at the plant at about 10:30 a.m. She asked to see the incident location and the forklift involved. FAUBERT showed her the scene, which had been swept clean, and informed her that the forklift was in the maintenance shop. Tiedeman asked for it to be brought out and demonstrated. FAUBERT drove it, and the brakes, lights and horn were working. Tiedeman asked FAUBERT if anyone had touched the forklift, and he said no. OSHA's later examination of maintenance records indicated that the forklift had a long history of maintenance problems reported by various drivers, and that the driver on the shift immediately before the Coxe incident had written that the headlights and warning lights were not working and the brakes were defective.

Shepherd testified that after the responding police left, PRISQUE told MAU-RY to have Shepherd, another "white shirt" superintendent, take the forklift down to the garage and have the mechanic go over it, and "make sure there's nothing wrong with it." MAURY came over to Shepherd, and Shepherd got on the forklift and drove down the roadway, past the production areas and the main gate, to the maintenance garage. Shepherd testified that while he was driving, MAURY was walking alongside and MAURY told him to try the brakes, and the brakes were not working right, which Shepherd told MAU-RY. At the garage, MAURY went away and Shepherd went in and told the mechanic, Yukna, "to go over the forklift, make sure there's nothing wrong with it, to just fix it. And I told him the brakes weren't working." Yukna refused, according to Shepherd. (Neither the driver, De Los Santos, nor mechanic Yukna testified at trial; there were no eyewitnesses to the fatal incident.) Another forklift operator, Fretz, testified that he was in the mechanic's garage at that time, and he heard Shepherd tell Yukna to make sure everything worked. Fretz saw Yukna put his hand on the brake and push it very easily right to the floor, and heard him say that he figured there was no fluid in the master cylinder. Shepherd reported back to FAUBERT's subordinate, safety officer Maddock, that he had taken the forklift to the garage and told Yukna that the brakes weren't working and told him to go over the forklift and make sure there were no problems and fix it. Meanwhile, Rush, a line foreman who saw the condition of Coxe under the forklift, encountered PRISQUE shortly after leaving the scene, and PRISQUE asked what he was going to tell OSHA when asked. Rush replied to PRISQUE that he was going to tell the truth, that the forklift had no horn, no lights, no brake. PRISQUE told Rush to tell OSHA that the forklift was fully operational and the driver was driving reckless-

ly. Rush refused, and PRISQUE told him to do so in the "best interest of your employment." Redcay, a maintenance supervisor under MAURY, testified that within about two hours after the medics left with Coxe, he went to MAURY's office and saw gathered there various "white shirt" individuals including PRISQUE, MAURY, and Shepherd. Shepherd testified that PRISQUE told them in that meeting to go out into the plant and make preparations for the expected OSHA arrival. Later that morning, Shepherd saw FAUBERT participate in the forklift demonstration requested by OSHA, and saw that the brakes worked fine. The government relied on this and other circumstantial evidence to support its contention that someone did fix up that forklift while it sat in the maintenance garage for approximately three hours after the police left and before OSHA arrived. (*Id.* at 163–176.)

The findings of this Court on Count 9 in the post-trial opinion (applying the standard of Rule 29), were as follows:

We hold that the evidence, together with the reasonable inferences from the evidence, was sufficient to support a verdict based on findings that Prisque, Faubert and Maury each "did corruptly obstruct, impede, and endeavor to obstruct and impede ... a pending proceeding ... before [OSHA] ..., by taking steps to conceal facts regarding the forklift fatality on March 24, 2000 from [OSHA] inspectors," as charged in Count 9.... Specifically, the evidence supports a finding that each of them, anticipating an immediate OSHA investigation in the wake of the Coxe fatality, knowingly participated in causing the forklift to be fixed up sufficiently to pass the OSHA

inspection that morning, and did so "corruptly" as defined in the statute, with the specific intent to impede and obstruct OSHA from discovering the defective condition of the forklift at the time of the incident. We also hold that the evidence supported a reasonable finding that someone at Atlantic States did tamper with the forklift while it was out of sight for at least three hours on the morning of the Coxe fatality, with the intention to obstruct the OSHA investigation, and that each of the named defendants knowingly associated with that unlawful conduct with the intention that such persons commit the conduct, and that Prisque, Maury and Faubert each, by his individual acts, knowingly and willfully participated as an aider and abetter ..., also charged in Count 9.

(*Id.* at 176.) [90]

Defendant PRISQUE testified on cross examination concerning Count 9:

Q Mr. Prisque, I think you testified—I think it was Thursday—that after Mr. Coxe was crushed by forklift 24, you did not tell anyone [to move] the forklift. Is that correct?

A That's correct.

Q And you never told anyone to fix the brakes. Is that correct?

A That's correct.

Q Did you tell Jeff Maury to take the forklift to the shop?

A No.

Q Did you tell Jeff Maury to make sure everything worked on the forklift?

A No.

**90.** This summary of the government's evidence on Count 9, and the Court's post-trial findings, is also applicable to our analysis of the contentions of the parties on potential perjury enhancements for defendants FAUBERT and MAURY on that count. *See* discussion *infra*.

Q Did you tell Jeff Maury to tell George Shepherd to do that?

A No.

Q Did you say anything like that to anyone?

A No, I didn't.

(Tr. 489 at 23–24.)

Q You knew OSHA was expected at the plant later that day. Correct?

A Correct. Anytime there's a fatality, everybody knows that OSHA's going to come in.

Q And so are you saying you have no knowledge that the forklift would be moved between the time the police was there and the time OSHA got there?

A I don't think OSHA cares about, you know, where. All they care about is a piece of equipment.

Q That's what you thought at the time?

A That's what I think.

(*Id.* at 25.)

Q Let me get back to my question. Having no knowledge of what the police did that day, nonetheless, you were not concerned about that forklift being moved.

A No.

Q And you had no knowledge that the forklift would be moved. Is that right?

A I had no knowledge that it was going to be moved. The second time I went out, it was already gone.

Q And you had no discussions with anyone about the condition of the forklift—

A None.

Q —either?

A None.

Q That's your testimony?

A Yes.

Q So as plant manager, after this fatality of somebody you say is a close friend of yours, you were not interested at all in the condition of that forklift. Is that correct?

A Not at the time.

Q You weren't?

A Not at the time.

Q You weren't interested in whether the lights worked. Is that correct?

A That's correct.

Q You weren't interested in whether the brakes worked. Is that correct?

A Correct.

Q But Al Coxe was a close friend of yours?

A Yes, he was.

Q And as a close friend of yours, you were not interested at all in whether a defect in that forklift had something to do with him getting crushed by it. Is that correct?

A The forklift was taken down to the garage and parked. The police did their investigation. I don't know. I don't know what was wrong with the forklift.

Q Well, as plant manager and as Al's good friend, you weren't even remotely curious about the condition of that forklift. Is that what you're saying?

A Not at the time.

Q Not at the time?

A No.

Q And is it your testimony that you personally—now we're talking about between the time the police were there and the time OSHA got there. So your testimony is that you personally did nothing to fix the lights or the brakes on that forklift?

A Nothing to fix the lights.

Q Okay, or the brakes?

A Or the brakes.

Q Is it your testimony that Jeff Maury did nothing to fix the lights or the brakes on the forklift, to your knowledge?

A To my knowledge, he wouldn't do it. No.

Q Is it your testimony that Mr. Yukna did nothing to fix the lights or the brakes on that forklift before OSHA got there, to your knowledge?

A To my knowledge, no.

Q And you did not direct any of those people to do anything like that. Is that correct?

A That's correct.

(*Id.* at 28–30.)

Q And after you met with Mr. Charko, isn't it correct that you then huddled with several of your white shirts in that room off the oven; is that correct?

A That's not correct.

. . . .

Q Isn't that where Mr. Redcay walked in on you?

A I don't know where Mr. Redcay walked in at. That's what he testified.

Q Sorry?

A That's what he testified to.

Q You disagree with that.

A I disagree with that.

Q You say that meeting never happened?

A No.

Q You['re] saying the meeting never happened; is that correct?

A The meeting never happened.

(*Id.* at 56–57.)

Q He [Mr. Rush] also testified that you told him to lie to OSHA about the Coxe forklift (indisc.). Do you dispute that?

A He's around a lot of scenes, isn't he?

Q Do you dispute that—

A Yes.

Q —question?

A Yes.

Q He's mistaken about that?

A Yes.

(*Id.* at 94–95.)

This Court makes the following findings as to the government's evidence on Count 9, and the specific contrary testimony of PRISQUE:

(1) The facts in the government's evidence concerning the actions of defendants including PRISQUE, to conceal from OSHA the defective condition of the forklift involved in the Coxe fatality, were the essential facts necessary to support the verdict on that count. Therefore, the falsity of the conflicting testimony by PRISQUE is necessarily implicit in the jury's verdict on Count 9. In addition, we find that the government's evidence on that count was sufficiently credible on the essential facts disclosed in that evidence, as corroborated by an array of various witnesses and documents, and that the conflicting testimony of PRISQUE on the same factual issues was false.

▮▮▮▮ (2) The Court makes an independent finding that PRISQUE's testimony on Count 9 was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Given the nature and extent of the testimony of the government's witnesses who contradicted PRISQUE regarding the essential facts, on which PRISQUE could not have

been mistaken (although he certainly did deny those facts), we find that PRISQUE's testimony on those facts under Count 9 was willfully false.

### c. Count 11

Count 11 alleged that defendant PRISQUE and others engaged in obstructive conduct with respect to the OSHA investigation of the incident in which employee Hector Velarde sustained the loss of three fingers while cleaning the interior of a cement mixer, by altering the condition of the mixer and concealing from OSHA inspectors that they had bypassed a safety device designed to shut it down when the doors were opened. (*See* dkt. 721 at 176.)

The government's evidence on that count consisted of the testimony of Velarde himself, OSHA officer Tiedeman, a representative of the manufacturer of the cement mixer, and employee Shepherd, who was a "white shirt" and general electrical foreman at the time of the Velarde injury in December, 2002. There were also photographs in evidence of the cement mixer, both at the time of manufacture and at key points in the OSHA investigation. The evidence is summarized in the post-trial opinion. (*Id.* at 176–188.) Here we give a brief overview of that evidence.

Velarde was injured when he reached inside the cement mixer while cleaning it, and his co-worker activated the mixer without alerting him. The mixing blades rotated and amputated three of his fingers. The mixer had been manufactured with external wires and components (collectively called a "limit switch," "interlock," or similar names) attached to the doors, which operated to cut off the electricity when the doors were opened. The limit switch was not on the mixer when OSHA (Tiedeman) arrived to begin investigating approximately ten days after the Velarde injury. She was escorted to the cement mixer by PRISQUE, Don Harbin (maintenance manager), and Mark Neetz (new safety director). Tiedeman did not recall whether PRISQUE was still present during the ensuing discussion. Harbin told her how the injury occurred, and she asked whether the mixer came with a limit switch on the doors. Harbin said no, but after he spoke with an individual below the mixer platform (who turned out to be Shepherd), Harbin said one probably could be installed. The next time Tiedeman returned to the plant in her continuing investigation, the mixer did have a limit switch, which Harbin and Shepherd proudly demonstrated, along with Joseph Surca, the current human resources person. The problem was—as Tiedeman's investigation eventually revealed and the manufacturer so testified—the mixer had arrived new at the plant complete with a limit switch and with a manual giving instructions and the warning, "Do not bypass any electrical safety interlock device." When Tiedeman confronted Harbin with this fact, Harbin changed his story and said the mixer had come with an interlock, but it was removed by a nameless employee who was no longer there. (Harbin was designated an unindicted co-conspirator by the government, and was not called as a witness at trial.) The remainder of the evidence came from the testimony of George Shepherd. He testified that he had been called to the identical prior mixer (the 2000 mixer) by PRISQUE and DAVIDSON,[91] who was

---

91. DAVIDSON was not charged in Count 11, and the verdict did not find him implicated in any Count 1 conspiracy objective pertaining to obstruction of OSHA. (*See* dkt. 721 at 3–4 n. 4 & 113 n. 64.) Therefore, we do not comment further upon any participation he may or may not have had in the events leading up to the Velarde injury. He did testify to his version of those events at trial, which conflicts with the government evidence. (Tr.

complaining that the new mixer was stopping every time a worker had to check the cement inside, and it was holding up production on the cement line. Shepherd said he could "jumper" the inside of the wiring box, leaving the limit switch apparatus in place but disabling it from operating. PRISQUE directed Shepherd to do so. When an identical replacement mixer arrived in 2002, Shepherd did the same on his own, following the prior directions from PRISQUE. After the Velarde injury, according to Shepherd, there was a meeting in PRISQUE's office attended by himself and PRISQUE, along with other trusted "white shirts" including Harbin. Shepherd told PRISQUE and the assembled group that he had "jumpered" the new mixer, like the former mixer, so the limit switch was not working at the time of Velarde's injury. As soon as Harbin and Shepherd left PRISQUE's office following that meeting, they devised the charade they later acted out when OSHA first arrived to investigate, including having Shepherd disconnect and hide the limit switch apparatus before OSHA arrived, to make it appear that it never had such equipment. After the "new" limit switch had been installed on the mixer, and the OSHA investigation was over, Shepherd testified that he and Harbin agreed that he should "jumper" it out again so that production could continue unimpeded as before. (*Id.* at 176–185.)

The findings of this Court on Count 11 in the post-trial opinion (applying the standard of Rule 29), were as follows:

We find that this evidence, together with the reasonable inferences from it, was sufficient to support a verdict based on findings that Prisque knowingly participated in, and approved of, the decision to alter the mixer between the time of

the Velarde incident and the first OSHA inspection of it, for the purpose of obstructing the OSHA investigation.... The evidence also supported a reasonable finding that if Prisque did not cause this post-accident alteration to the mixer, he knowingly associated himself with the unlawful conduct of Harbin and Shepherd with the intention that they commit the conduct, and by his acts he knowingly and willfully participated as an aider and abettor ..., also charged in Count 11.

(*Id.* at 188.)

Defendant PRISQUE testified on direct examination concerning Count 11:

Q There's been testimony here about the unfortunate incident that occurred to Mr. Velarde on December 7th of 2002. Okay. At that cement mixer. Do you recall that?

A Yes, I do.

Q And Mr. Shepherd testified that in 2000 there was a discussion—where he had a discussion with you about jumpering the limit switch, correct, remember that?

A Correct, yes.

Q And he said he did it on his own in 2002, because of that conversation in 2000. Did you ever tell Mr. Shepherd to jumper limit switches?

A I never told Mr. Shepherd to jump limit switches.

Q Did you ever, when OSHA was coming in to inspect, in connection with the accident on Mr. Velarde, in December of 2002, and whenever they came in 2003, did you ever direct, suggest, request, either Mr. Shepherd or Mr. Harbin to lie, to misre-

548 at 174–181.) The government does not seek to enhance the guideline calculation for

him based on that testimony. (*See* Gov. I at 63–64.)

present any fact at all in connection with that accident?

A No, I didn't.

Q Did you ever tell Mr. Shepherd or Mr. Harbin to tell Ms. Tiedeman that the machine did not come with limit switches?

A No, I didn't.

(Tr. 485 at 210–211.)

Defendant PRISQUE testified on cross examination concerning Count 11:

Q Now, regarding the cement mixer, Mr. Shepherd testified about a meeting where you were there with Mr. Davidson, and Mr. Davidson said, there's no way they can keep up with a cement mixer with the limit switches on and that you approved the bypass. Did that not happen?

A It's not correct.

Q You deny there was a conversation where Mr. Davidson told you that there was no way they could keep up with those limit switches on?

A That's a lie. . . .

. . . .

Q And therefore you never approved the bypass of the limit switches, is that correct?

A No (indisc.).

Q So Mr. Shepherd was mistaken about that?

A Either that or Mr. Shepherd was scared.

Q He also testified—again, I'm still on the cement mixer—that after Mr. Velarde's injury there was a meeting in your office and—where you discussed the issue, and then Mr. Harbin directed Shepherd to hide the limit switches. Did that happen?

A We had no meeting.

Q No meeting?

A No meeting.

Q So he's mistaken about that?

A I don't know what he said when he went down (indisc.) at my office we didn't have a meeting.

(Tr. 489 at 115–116.)

Q And isn't it correct that you only had the limit switches put back on the cement mixer after Mr. Velarde lost his fingers?

A That's incorrect. The limits were always on there, sir.

Q Well, you saw the photos when they weren't on, didn't you?

A The day after the accident for that— on that Saturday when I was informed that there was an accident, that Monday me and Mark Neetz and Joseph went down there. And we checked the mixer out. What we found out is the limits on the door didn't work. That morning I called George Shepherd down there and I said, George, how come the limits ain't working on the door? He went to explain to me that everybody is always knocking them off [with] the jackhammer, they're hard to keep running. So my opinion was the OSHA requirements lock out/tag out. If you have the lock out/tag out in place, that's sufficient for the mixer. That's what happened that time. And limits were on that door that Monday.

Q But they were bypassed, were they not?

A When I opened the door, they didn't work.

Q That's because they were bypassed?

A George Shepherd told me that everybody was knocking them off, so I don't know. I didn't get into details. I'm not an electrician. I didn't get into details on the what's and the

who's and why's. He explained to me that every time they clean it they bust a conduit, they bust the limits, they're knocking the box off, they went through a whole scenario of what's breaking. So me and Mark Neetz and Joseph felt that the OSHA requirements lock out/tag out [sic]. If you have the lock out/tag out in place, that's what OSHA wants.

Q And is that what OSHA was told?

A I don't know what OSHA was told.

Q And you did not inquire about that either, did you?

A Why would we tell Carol Tiedeman? It's silly. Why would you tell her something that's not there or something that's there and it's not there when the first thing she does when she comes in on an accident, she wants to look at the service manual. And the service manual will tell you exactly what the mixer is.

Q So are you saying that Carol Tiedeman's testimony also about what she was told when she came in to look at the mixer, that is also a mistake?

A No, I'm not saying that. I'm telling you what happened. I'm telling you what really happened.

Q Well, you heard the testimony?

A I heard the testimony.

Q And you deny having a conversation with Mr. Shepherd and Mr. Davidson where this was specifically discussed and it was directed that the limit switches be bypassed, you deny that, correct?

A I deny that.

(*Id.* at 149–151.)

This Court makes the following findings as to the government's evidence on Count 11, and the specific contrary testimony of PRISQUE:

(1) The facts in the government's evidence concerning the actions of individuals including PRISQUE, to alter the condition of the cement mixer before OSHA arrived to investigate the Velarde injury, and thus conceal that the safety switch on the prior identical mixer had been intentionally disabled at the direction of PRISQUE, were the essential facts necessary to support the verdict on that count. Therefore, the falsity of the conflicting testimony by PRISQUE is necessarily implicit in the jury's verdict against PRISQUE on Count 11. In addition, we find that the government's evidence on that count was sufficiently credible, despite the fact that it relied heavily on the testimony of one witness (Shepherd) for essential details to explain the behavior of PRISQUE and the others as observed by OSHA.

■■■ (2) The Court makes an independent finding that PRISQUE's testimony on Count 11, that he did not direct Shepherd to "jumper" the limit switch on the prior mixer, and that he did not conduct a meeting in his office in anticipation of the OSHA investigation of the Velarde injury, was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Given the detailed nature of the testimony of the government's chief witness on that count (Shepherd), and the corroborating detail provided by Velarde, OSHA and the mixer manufacturer, we find that PRISQUE's testimony on those essential facts was willfully false.

### d. Count 34

Count 34 alleged that from in or about February 2003 to in or about August 2003, defendant PRISQUE knowingly operated the plant in violation of its CAA permit requirements by causing more than 55 gal-

lons per day of waste paint to be burned in the cupola. (*See* dkt. 721 at 243.)

The government's evidence on Count 34 consisted of testimony by NJDEP senior officials Heil and Wormley summarizing the features of the air permits issued to ATLANTIC STATES insofar as relevant to Count 34, and the testimony of workers including scrapyard crane operators Mark Johnson, Joe Delker, and Neal Zettlemoyer, paint line foreman Robert Rush, melting and casting area foreman Craig Kolbe, and former "white shirt" Shepherd. Here we give a brief overview of that testimony.

The CAA permit for the cupola, during the period relevant to Count 34, allowed 55 gallons per day of non-hazardous waste paint to be burned in the cupola. ATLANTIC STATES had a long history of civil air permit enforcement problems with its carbon monoxide ("CO") emissions, and in 2001 it installed a major new cupola emissions control system. However, workers testified that the emissions problems continued. PRISQUE was aware of the permit limits on waste paint and as plant manager signed many of the required air emissions reports going to NJDEP. Workers described that the nightly clean-up of the paint line generally included scooping up waste paint into 55–gallon drums, filling the drums to near the top, and adding "chills" (small pieces of iron) into each drum so the magnet of the crane in the scrapyard could lift them to send to the cupola. The drums would be taken to the scrapyard, in quantities of approximately 4 to 8 drums per night. Plastic dropcloth material would also get into the drums, although such materials were not permitted to be burned according to the air permit. Crane operators would see that when the drums broke while being lifted into the cupola, paint would fall out onto the scrap or the ground. Crane operator Johnson testified that during the rele-

vant period for Count 34, he put at least four such 55–gallon drums, full to the top with waste paint, into the cupola charge, periodically on a daily basis. Delker testified to similar experiences. Kolbe, melting and casting foreman, had the responsibility to monitor the cupola emissions data. PRISQUE told him that the permit allowed burning two drums of paint a day, and Kolbe did not question that. He did notice, from his working knowledge, that when he saw emissions data spike, he concluded it was due to paint (and/or tires) being burned in the cupola. Johnson testified that he was told by his supervisors, including PRISQUE, that if he put more than four drums of paint a day in the cupola, emissions would rise. Crane operator Zettlemoyer stated that during the same period, an average of four drums a day went into the cupola, of which at least two would be full with paint to the top and two would include paint and plastic. He recalled at one point in approximately 2003, his supervisor Tom Dalrymple told him to put one drum per hour into the cupola, and he did that. He recalled that about the same time NJDEP was expected at the plant, and Harbin and Shepherd told him to pick up the extra drums containing paint and put them in the cupola, but the crane could not pick them all up, and the ones he could not pick up he covered with fine shredded scrap to hide them. Johnson testified that he was instructed by PRISQUE, on at least one occasion in the presence of Harbin, to bury more than ten drums containing paint with scrap to hide them just before he observed "visitors" in the scrapyard. Shepherd testified that the incident to which Zettlemoyer referred was in approximately April, 2003, when OSHA was expected and PRISQUE called Shepherd and Harbin into his office and told them to walk the plant. When Shepherd reached the scrapyard and saw a lot of drums, he and Har-

bin directed Zettlemoyer to send them to the cupola, but when that failed Harbin told the yard crane operator, Johnson, to bury the smashed ones with fine scrap. One day shortly after that State inspection, PRISQUE directed Shepherd to get Dittinger and his crew to get rid of those drums in the cupola. That day they burned approximately 20 drums, and immediately Dalrymple and Kolbe called Shepherd because the CO readings had spiked. The next day the same procedure was repeated with the remaining 15–20 drums, and the CO readings again spiked. Shepherd told Dalrymple he would call PRISQUE to tell him those results, and he did. PRISQUE replied that it was fine; that the paint and all had nothing to do with it, and "don't go there." (*Id.* at 243–256.)

The findings of this Court in the post-trial opinion (applying the standard of Rule 29), were as follows:

We hold that the evidence was sufficient to establish that defendant Prisque, as the plant manager who was acutely aware of the air permit emissions limits and the consequences of exceedances, did know of the waste paint limitation of 55 gallons per day that was ... [in] the air permits in effect in 2003. A reasonable jury could further find from the evidence that Prisque knowingly participated in causing a volume of more than 55 gallons of waste paint (exclusive of plastic and any other substances) per day to be burned in the cupola, on one or more days during the period February to August, 2003, as charged in Count 34.

(*Id.* at 256.)

Defendant PRISQUE testified on direct examination concerning Count 34:

Q Did you ever direct anybody to cover drums with shredded material for the purpose of hiding it from DEP or any other government agency?

A No, I did not.

(Tr. 485 at 140.)

Q Did you, at any time, in terms of the cupola, while you were plant manager, ever illegally use or manipulate the cupola in any way to violate a permit requirement in any way, shape or fashion?

A No, I didn't.

Q Did you instruct anybody?

A No, I didn't.

(*Id.* at 149.)

Defendant PRISQUE testified on cross examination:

Q Mark Johnson testified that you were there as he was being instructed to—directed to bury paint drums. Is that correct or not?

A It's not correct. (Indisc.) containment area, we could stick all the drums we wanted (indisc.) didn't' have to bury them (indisc.) just load them to the containment area (indisc.) minutes, five minutes.

Q So he's mistaken about that, is that correct?

A Correct.

Q Okay. He also testified that you told him to burn more than four paint barrels a day. Did you do that?

A Who testified to that?

Q Mr. Johnson.

A I don't remember his testimony (indisc.).

Q On January 4th, page 194 (indisc.) he testified to that, that he was—

A I told him to burn more than four?

Q That's correct.

A (Indisc.) burn (indisc.) crane, the charging crane.

Q If he testified to that is he mistaken?

A Correct.

(Tr. 489 at 108–109.)

Q He [referring to Mr. Shepherd] talked about a particular incident where, and this is the incident about burying scrap, where you told him that the State was coming, make sure there's nothing they could find and they found all these 55 gallon drums of paint, did that happen?

A Who said that?

Q Mr. Shepherd said that happened. That you told them to make sure there's nothing they could find and they found these drums. Did that ever happen?

A No. I don't remember the testimony—

Q (Indisc.) 1/19 transcript, I believe, on Page 5, Mr. Shepherd said that you said that (indisc.) the State's coming make sure there's nothing they could find and then they went out in the scrap yard and found these 55 gallon drums with paint in them?

A That's—No.

Q And then the drums were buried so that DEP couldn't find them, did that happen?

A You don't have to bury them—manifest them out.

Q That did not happen?

A No. It's a lot easier manifesting them out than burying them.

Q So he's mistaken about that, is that correct?

A Correct.

Q As is Mr. Johnson, Mr. Zettlemoyer, as well, correct?

A They testified to different things. They didn't say that.

Q After DEP left then, Mr. Shepherd testified you told—you directed them that they had to get rid of these drums and that they were then burned in the cupola, did that happen?

A Incorrect.

Q He's mistaken about that?

A Correct. If you understand how it worked. I guess you don't want to hear it.

Q They also said that when they did burn these drums then the CO sky-rocketed, did that happen?

A Not to my knowledge.

Q He says he talked to you about it and you said don't go there, did that happen?

A No.

Q So he's mistaken on both those points?

A Correct.

(*Id.* at 121–123.)

This Court makes the following findings as to the government's evidence on Count 34, and the specific contrary testimony of PRISQUE:

(1) The facts in the government's evidence concerning the actions of defendant PRISQUE, in causing workers to burn more than 55 gallons per day of waste paint in the cupola, in violation of the air permit limit, were essential facts necessary to support the verdict on that count. Therefore, the falsity of the conflicting testimony on that point by PRISQUE is necessarily implicit in the jury's verdict on Count 34. In addition, we find that the government's evidence on that count was sufficiently credible on the essential facts disclosed in that evidence, as corroborated by various witnesses and other evidence, and the conflicting testimony of PRISQUE on the same factual issues was false.

(2) This Court makes an independent finding that PRISQUE's testimony on Count 34 was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Given the nature and extent of the testimony of the government's witnesses who contradicted PRISQUE regarding those essential facts, on which PRISQUE could not have been mistaken (despite his denial of those facts), we find that his testimony on those facts under Count 34 was willfully false.

### e. Count 1

The government points out that the jury convicted PRISQUE of conspiring for all five objectives of the conspiracy count. It argues that all the citations to his testimony outlined as to Counts 8, 9, 11, and 34 (discussed above) are examples of his falsehoods that should produce a perjury enhancement under Section 3C1.1 for PRISQUE as to Count 1 as well. (Gov. I at 59.)

This Court declines to make findings under Count 1 as to alleged perjury of defendant PRISQUE. We do this for two reasons: First, although the jury verdict was against him on all five alleged objectives, there were myriad alleged overt acts in Count 1 of the indictment, including but not limited to the acts underlying Counts 8, 9, 11, and 34. It would be speculation for this Court to attempt to determine what facts found are "necessarily implicit" in the jury's verdict on Count 1. Second, as a practical matter the conspiracy count will group with those respective substantive counts of conviction. *See infra* Sec. V.A. In these circumstances, we see no purpose in making separate findings under Section 3C1.1 on a potential perjury enhancement under Count 1.[92]

### 2. Scott Faubert

The jury found defendant FAUBERT guilty on two counts of obstruction of justice relating to the OSHA investigation of the Coxe forklift fatality (Counts 9 and 10), as well as one false statement count in the same investigation (Count 7). It also found him guilty on Count 1, only as to the alleged objectives of the conspiracy involving OSHA, Objectives C, D, and E. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.)[93] Defendant FAUBERT testified for two trial days on direct and cross examination. He denied all criminal acts attributed to him, by asserting general denials of guilt and by his specific testimony in response to questioning. (Tr. 501 at 79–230; tr. 506 at 4–233.)

The government points to each of his substantive counts of conviction, arguing that with respect to those counts of conviction, "the jury found these denials and the many alternative explanations [he] offered for his conduct, to be patently false." (Gov. I at 59–60.) The government also cites instances in which it contends his testimony was directly refuted. (*Id.* at 60–61.) FAUBERT argues that the jury's verdict does not disclose whether it rejected any part of his testimony, and he ad-

---

**92.** This same reasoning will apply as we consider the government's arguments for perjury enhancements for FAUBERT, MAURY, and DAVIDSON under Section 3C1.1 for their convictions under Count 1. *See* discussion *infra.*

**93.** As previously noted, the jury reached no verdict on Count 2 (false statement to OSHA that he was unaware of a pit excavated in the casting department), on which this Court en-

tered judgment of acquittal in favor of FAUBERT and ATLANTIC STATES post-trial. (*See* dkt. 721 at 135–136.) The government does argue a Section 3C1.1 perjury enhancement for him, partially based on the evidence under Count 2. (Gov. I at 61.) We need not reach that issue, having made sufficient rulings on the government's other arguments here.

dresses the specific instances of alleged falsehood cited by the government. (Faubert III at 10–14.)

### a. Counts 7 and 10

Counts 7 and 10 address a particular aspect of the OSHA investigation of the Coxe forklift fatality. In the course of that investigation, OSHA officer Tiedeman learned that the driver of the forklift in the fatal Coxe incident, De Los Santos, had been involved in an earlier incident in which he ran over another employee while driving a forklift. Tiedeman's investigation thus led her to inquire about that prior incident involving the same driver.

Tiedeman first heard about this prior incident not from a review of the employee injury logs that were required to be maintained at ATLANTIC STATES (the "OSHA 200 logs"), because there was no such entry in those logs. She heard about it from news articles that appeared shortly after the Coxe fatality, and asked FAUBERT for facts pertaining to that incident. The name of the injured employee was Marchan, identified as "employee A" in Counts 7 and 10.

Count 7 alleged that on or about May 11, 2000, defendant FAUBERT knowingly and willfully made a false statement to OSHA inspectors—that the reason why there was no entry on the OSHA 200 log concerning a April 27, 1999 incident was because employee "A" did not break his leg—when FAUBERT then knew and believed that the employee had sustained a fractured bone in his leg on April 27, 1999, after being struck by a forklift. (*See* dkt. 721 at 149.)

Count 10 alleged that on or about July 24, 2000, defendants FAUBERT and PRISQUE obstructed, and endeavored to obstruct, that OSHA investigation by instructing Marchan to falsely inform the OSHA inspectors that his leg had not been broken when he was struck by a forklift (driven by De Los Santos) on April 27, 1999.

The jury verdict found defendant FAUBERT guilty on both Counts 7 and 10. (*See* dkt. 721 at 3 n. 4.)[94] The government's evidence on those counts consisted primarily of the testimony of OSHA officer Tiedeman, injured employee Marchan, and Marchan's treating physician, Dr. Reid, as well as medical records and other documents. Their testimony is summarized in the post-trial opinion. (*Id.* at 149–159.) Here we give a brief overview of that evidence.

The Coxe forklift fatality occurred on March 24, 2000, launching the resulting OSHA investigation of that incident. The investigation widened into a comprehensive safety and health inspection of the facility, conducted by Tiedeman and accompanying OSHA officers, including Mike Silva. As of April 7, 2000, Tiedeman was aware of the news articles suggesting a prior incident with driver De Los Santos, and she took the OSHA 200 logs from the plant to review. On April 27, 2000, she asked FAUBERT if De Los Santos had been involved in a prior forklift accident in 1999. She testified that FAUBERT at that point "chuckled, and said, yes, he backed up and hit a supervisor and broke his leg." (*Id.* at 151.) Tiedeman asked when did that occur, and FAUBERT said he thought it was sometime in 1998 or

94. Defendant PRISQUE was not charged in Count 7, and was found not guilty on Count 10. However, we have found the evidence against PRISQUE on Count 10 sufficient to include it as relevant conduct in his guidelines calculation. *See supra* n. 21. That aspect does not feature in our analysis of a perjury enhancement for either PRISQUE or FAUBERT under Section 3C1.1.

1999. Tiedeman requested an accident report on that incident. On May 9, Tiedeman and a colleague returned to the plant for several days, commencing the comprehensive inspection that OSHA had determined to perform. While she was at the plant that week, on or about May 11, 2000, FAUBERT handed her a document that was a statement by the injured employee, Marchan, showing that the date of his injury was in April, 1999. There was no corresponding entry in the 1999 OSHA log. Tiedeman read the document and questioned FAUBERT about the lack of entry in the log. Her testimony describing his response is quoted in the margin.[95] That is the statement that forms the basis of Count 7. (*Id.* at 149–157.)

Tiedeman and her colleague interviewed Marchan on July 24, 2000, in the presence of FAUBERT. Marchan told the OSHA officers that the forklift driven by De Los Santos did strike him and went over his foot and he fell and it went over his leg, but he did not break his leg; he only had a scratch and a bruise. That statement about his injuries was false, as Marchan later testified at trial and as confirmed by Dr. Reid and the medical records. In fact, Marchan sustained injuries to both legs that included a non-displaced fracture of the right ankle cuboid bone that was treated with a splint for one week and a cast for 4–5 more weeks. Dr. Reid testified that a fracture of the cuboid bone is not described in laymen's or medical terms as a broken leg; it is part of the foot and part of the ankle, and is obviously connected to the leg. Tiedeman testified that if Marchan had suffered any fracture, including

to the foot or ankle, it would have to be recorded in the OSHA 200 log. Marchan testified at trial that he was interviewed about that incident by OSHA, with FAUBERT present, and before the interview FAUBERT told him that he should not tell the interviewers that his foot was broken; to say that he got only a couple of scratches; otherwise he would lose his job. He said he did tell that lie because he was afraid of losing his job. That is the conduct that forms the basis of Count 10. (*Id.* at 152–159.)

The findings of this Court on Count 7 in the post-trial opinion (applying the standard of Rule 29), were as follows:

> We find that the evidence was sufficient to support a finding that when Tiedeman asked Faubert during the May 11 interview why there was no entry of the Marchan injury on the 1999 OSHA log, and he responded that Marchan did not break his leg, the statement meant that the reason the injury was not on the log was because Marchan did not break his leg. Therefore, we find the evidence sufficient to establish that Faubert made the statement alleged.

> Defendants also contend that the alleged statement was not false because Marchan in fact did not break his leg; he broke the cuboid bone in his foot. We find that a reasonable jury could conclude from the evidence that Faubert knew Marchan had sustained a fracture in his right lower extremity as a result of the injuries to his legs in the forklift incident, and that the semantic distinction between "leg" and "foot" is

---

**95.** The oral statement by FAUBERT described in Count 7, as testified by OSHA officer Tiedeman, is as follows:

I asked him if this [document] was all he had regarding the accident and he stated yes, and after reading this I also asked him, well, didn't he break his leg? And at that time Mr. Faubert said no, he didn't break his leg, he was back to work that day.... I asked him why it wasn't on the log and he had said—he had made that statement that he didn't break his leg, that he came back to work the next day.
(Tr. 424 at 122–123.)

not significant in this context. We further conclude that a reasonable jury could conclude that if Faubert said Marchan did not break his "leg," and Faubert thereby meant to obscure the fact that the fracture was actually to a bone in the foot (which is, after all, part of the leg), such a half-truth was materially false. Under either view, a reasonable jury could conclude that the false statement was made with the intent to deceive the OSHA officers who were seeking facts relevant to the Coxe fatality.

(*Id.* at 156–157 (transcript citations omitted).)

The findings of this Court on Count 10 in the post-trial opinion (applying the standard of Rule 29), were as follows:

We find that the evidence is sufficient as to Count 10. As we have concluded in the discussion of Count 7, *supra*, the distinction between "leg" and "foot" does not invalidate the evidence the government presented as to the nature of the fracture that Marchan did in fact suffer in that forklift incident. Further, Marchan testified that before OSHA interviewed him about that incident, he was in Faubert's office. Faubert told him not to tell the persons who were going to speak with him that his foot was broken; to say that it was only a couple of scratches. Faubert told Marchan that he had to say that or Marchan would lose his job. Marchan testified that he was then taken to a basement office where a male and a female asked him questions about his injury, with Faubert present. Marchan testified that he told the visitors that nothing was wrong, and nothing was broken. That, according to Marchan, was a lie that he told because he was afraid of losing his job. We conclude that the evidence presented by the government relevant to Count 10

was sufficient to support the verdicts of guilty on Count 10.

(*Id.* at 158–159 (transcript citations omitted).)

Defendant FAUBERT testified extensively about the circumstances surrounding the false statement alleged in Count 7. Here we quote a fair sampling of that testimony, on both direct and cross examination.

On direct examination concerning Count 7, FAUBERT testified:

Q And what was the incident?

A This takes context from more than one conversation.

Q Well, let's go back, let's start at the beginning, though. Let's talk about April 27, 1999. What was that incident that they made reference to in Count 7?

A That was when Gabriel Marchan's foot got run over by a forklift.

. . . .

Q Did you see the aftermath of the accident?

A Yes, I was called to the scene.

Q What did you see?

A Mr. Marchan was laying on the ground, and I was told by a couple of witnesses that he had run up behind the forklift operator as he was backing up—

. . . .

Q They say you lied about that. You said, they say, that the reason there was no entry on the OSHA log was because he did not break his leg, when in truth, you knew and believed that he had . . . sustained a fractured bone in his leg after being struck by a forklift.

. . . .

Q Did you know he broke his leg?

A He didn't break his leg.

Q Okay now, they say you made that statement on May 11th, 2000. Do you remember May 11th, 2000?

A Saying that he didn't break his leg?

Q Well, May 11th, 2000, something happened at the company, where you made a statement to OSHA. Do you remember that particular incident?

A I remember that day, yeah.

Q May 11th, 2000?

A Yes.

Q When you spoke to whom, do you remember that?

A I spoke with Ms. Tiedeman and Mr. Silva.

Q Do you remember being asked about Marchan's broken leg?

A Initially I was asked about the newspaper article regarding that accident.

Q What were you asked about the newspaper article regarding that accident?

A It was following Mr. Coxe's accident, they were involved in an ongoing investigation.

Q Who's they?

A OSHA

Q They were doing a wall to wall, is that the expression?

A Yes, they were involved in a wall to wall.

Q Let's put it in context again. Go one step at a time. The Coxe accident occurred—

A March 24, 2000.

Q —2000, and by May they were involved in an investigation of that accident, is that right?

A That's correct.

Q And that's the day, May 11th, they say you made this statement about Marchan's leg, is that correct?

A Yes.

Q And it started out with, go ahead, tell us.

A It started out with the newspaper article. They said, didn't this forklift operator have a prior accident? And I told them, yes, he did. And they—

Q Now, when you say—did you see the newspaper article?

A They asked me if I had read the newspaper article, and I—

Q What did you say?

A That was where the infamous chuckle came from. I said, yeah, I read it, too, it said he ran over his supervisor and broke his leg.

Q And you chuckled?

A And that was the chuckle.

Q You didn't chuckle because you thought it was funny that he broke his leg?

A No, I thought it was, I chuckled because the newspaper article was wrong. He didn't break his leg.

. . . .

Q First of all, as far as you knew, that incident occurred how long before May of 2000?

A Over a year.

Q Was there any doubt in your mind about the injury that Mr. Marchan suffered?

A No, none whatsoever.

Q Did you tell Ms. Tiedeman and Mr. Silva that there was no entry in the OSHA 200 log because he did not break his leg?

A No.

Q What did you say?

A Actually, I told them, the first thing I told them was I said, look at the log, it should be on the OSHA 200 log. . . . I told them to look at the OSHA 200 log, it should be there.

Q Whose job was it in April of 1999 to fill out the 200 log?

A Joe Maddock's.

Q Whose job was it in May of 2000 to fill out the OSHA 200 log?

A Joe Maddock's.

Q Did you regularly review those logs or not?

A No.

Q Were those logs sent out to OSHA?

A No, they had to be posted on the bulletin board in plain view of all employees once a year.

Q Did OSHA ever get to see those logs?

A They generally asked for the OSHA 200 logs every time they came in.

. . . .

Q They're kept for their ability to audit those logs, is that right?

A Correct.

Q Now, I interrupted. You're talking about the newspaper article, talking about the injury. What happened at that point?

A They told me—well, I had told them, I said, check the OSHA log, it should be there. And they said, we did check it, and it's not there. And Joe said, I forgot to enter it.

Q Was it your job to enter it on the log?

A No, it was Joe's.

Q Did Joe say he forgot to enter it?

A Yeah.

Q Did you ever say that he didn't put it in there because he did not break his leg?

A No, but they said, later in that conversation, they said, well, you told us he broke his leg.

Q And you said?

A I don't remember saying that. And I said, and he didn't break his leg.

. . . .

Q Were you talking about the incident or the article?

A The initial conversation was about the article, which said he broke his leg. I had read the article, I acknowledged I read the article. Later on, they were insistent that he broke his leg.

Q Still?

A Yes, they were.

. . . .

Q And so, in that indictment, when it says, "When in truth and in fact, Scott Faubert then well knew and believed that Employee A," that's Marchan, "sustained a fractured bone in his leg," that wasn't true, was it?

A He didn't break his leg, no.

Q Did you lie to them, sir?

A No, I didn't.

Q Did Mr. Marchan break his leg in (indisc.)?

A No, he did not.

Q Did you ever intend to lie to them?

A Absolutely not.

Q Did you mislead them in any way?

A No.

Q Do you think you're guilty of that offense, sir?

A No, I don't. . . .

. . . .

Q What did you do, if I may jump back to April 27th of '99, when you came upon the scene of Marchan lying on the ground by the forklift?

A I called an ambulance.

Q Where did you send Marchan?

A Warren Hospital.

Q Did you sent him to Redi Care?

A No.

Q Why did you send him to Warren Hospital?

A Because it was about 6 o'clock in the morning, and Redi Care didn't open until eight.

Q Did you think he was seriously hurt?

A He was in a lot of pain, so I was not going to take chances.

Q Did you knew that he had been run over by a forklift, or at least he said [he] was?

A Yes, I did.

. . . .

Q What did you find out?

A I found out that he walked up to the forklift operator and—

Q No, I'm talking about what happened to his treatment.

A Joe took care of that follow up.

Q Did you see Mr. Marchan after that?

A Yeah.

Q Did you find out what happened to his foot?

A Yeah, I found out he had a broken bone.

Q Did you know it was in his foot?

A Yeah.

Q Did you ever believe that he broke his leg?

A No.

Q A year later, when you talked to OSHA, did you try to mislead them into believing that there was no break in his foot?

A No.

Q Why not?

A They were insistent he had a broken leg, it was, that's how—it's out of context.

Q What did you tell them?

A They were insistent that he broke his leg, and I said, he did not break his leg.

Q Did you tell them what he did break?

A Not at that point.

Q Were the medical records, long since available, and closed, as far as this case was concerned?

A Absolutely.

(Tr. 501 at 217–229.)

Q Overt Act number 55 is Count 7 all over again. It's the same language. I just want to read it, and we've already talked about it. It says that you falsely told OSHA inspectors that the reason there was no entry on the OSHA logs for April 27th, 1999, that's the Marchan foot, is because the employee's leg had not been broken. Did you tell them that's the reason it wasn't on the log?

A No.

Q Did you tell them the reason it wasn't on the log?

A I told them it was on the log.

Q Was it on the log?

A No, it wasn't.

Q Do you know why it wasn't on the log?

A Because Joe forgot to put it on the log.

Q Did you tell him the reason it wasn't there was because Marchan had not broken his leg?

A No.

. . . .

Q Did OSHA ask you if that was on the log?

A They were asking me about the accident, and then they were asking me about the log. And I said, "Check the log. It's there." And Mr. Silva, at that point, said, "We've already checked the log, and no, it's not."

Q Did you intentionally mislead him, sir?

A No.

Q Did you think it was there?

A Yes, I did.

Q Did you ever tell him or anybody else that it wasn't on the log because Marchan did not break his leg?

A No.

(Tr. 506 at 82–84.)

On cross examination concerning Count 7, FAUBERT testified:

Q Well, isn't it on March 11, I mean on May 11th, 2000, that she says, well, didn't he break his leg?

A I think it was more along the lines of, didn't you say he broke his leg.

Q Well actually, wasn't your response, no he didn't break his leg, he was back to work that day?

A Not in that exact context, no. I did say that he didn't break his leg, and I did say that he came back to work that day, which, well, which was right.

Q So when she asked about why it wasn't on the log, you did say he didn't break his leg, he was back to work that day, right?

A Not to that question, no.

Q To what question?

A I don't remember the exact question, but not to why it was not on the log. It should have been on the log.

Q It should have been on the log, that's correct.

COURT: What should have—what data should have been on the log?

WITNESS: Mr. Marchan's fractured cuboid bone should have been on the OSHA 200 log.

COURT: Because it was a fracture?

WITNESS: Exactly.

Q Well, Mr. Faubert, if there's any confusion over leg versus foot regarding this accident, it appears that you started it, right?

A I don't understand.

Q Because you're the first one who said, chuckle, yeah, he backed up over his supervisor and broke his leg.

A I said I heard that he did, yes.

. . . .

Q When you said to Ms. Tiedeman, no, he didn't break his leg, he returned to work that day, you meant he wasn't injured at all, didn't you?

A No, I didn't. The records were readily available. Why would I say—there's no reason for me to say that when the records are readily available from both the hospital and the treating physician.

Q The records are readily available? When Ms. Tiedeman asked for everything you had on Gabriel Marchan, you gave her one page, on May 11th, correct?

A She didn't ask for everything I had, she asked for an accident report. That's what Mr. Maddock gave her, that was the accident report contained within his file.

Q So she's mistaken on what she asked for?

A She is.

Q And she then had to issue a subpoena to get the medical records from you, didn't she?

A She didn't have to, she chose to. We never denied OSHA any of their requests.

Q She didn't get those medical records until after she interviewed you on July 24th, 2000, right, that's when she got them?

A Probably, yes.

Q So she didn't have these medical records during all these conversations?

A She didn't ask for them.

(*Id.* at 193–196.)

This Court makes the following findings as to the government's evidence on Count 7, and the specific contrary testimony of FAUBERT:

(1) The facts in the government's evidence concerning the alleged false statement of FAUBERT to OSHA on or about May 11, 2000, were the essential facts necessary to support the verdict on Count 7. Therefore, the falsity of the conflicting testimony by FAUBERT is necessarily implicit in the jury's verdict on Count 7. We make no credibility finding with respect to either party on this count, however, for the reasons set forth in paragraph (2) below.

 (2) The Court does not find that FAUBERT's trial testimony on Count 7 was willfully false. The subject matter of this false statement count concerns an oral exchange that took its meaning, for both parties, from the context of the events surrounding it. The alleged statement was not committed to writing or otherwise recorded, except as memorialized in notes that the interviewing officers may have used to make their later reports and as described in officer Tiedeman's testimony at trial. The subject matter of this statement concerned events in the past, about which FAUBERT was being questioned on or about May 11, 2000. Both sides to the conversation appeared and testified at trial to their conflicting versions of that conversation. We find that the version of that unrecorded conversation offered by FAUBERT at trial was at least plausible in the totality of the circumstances. While the jury rejected his version by its verdict, and this Court has upheld that verdict under the standards for both Rule 29 and Rule 33, we find that using the *Dunnigan* standard under Section 3C1.1, the circumstances do not support a finding by a preponderance of the evidence that FAU-

BERT willfully testified falsely at trial on this topic.

Defendant FAUBERT also testified at trial about the allegations in Count 10. On direct examination concerning Count 10, FAUBERT testified:

Q Count ten charges you with obstruction. . . . [D]id you make the statement to Mr. Marchan? Did you tell him not to tell OSHA that he had broken—that he had broken his leg?

A No, I did not.

Q In fact, did he break his leg?

A No, he did not.

. . . .

Q Did you tell him anything to tell OSHA?

A No. I told him OSHA wanted to talk to him about his accident.

Q Did you obstruct or attempt to obstruct OSHA by telling Marchan to lie?

A Absolutely not.

. . . .

Q This particular charge is that you caused Mr. Marchan to lie to OSHA. Is that your understanding?

A That's my understanding.

Q The accident that he was hurt in was April 27th of 1999 which was obviously more than a year before you spoke to OSHA in July of 2000. Is that correct?

A That is correct.

Q Was there any issue, even days after the original accident in '99, as to exactly what happened to Mr. Marchan's foot?

A No, there wasn't.

. . . .

Q Were those medical records secret or hidden?

A No, they were kept in his medical file in the dispensary under Joe Maddock's charge.

Q Did you think there was any issue about the exact injury that Mr. Marchan suffered on April 27th of 1999?

A No, none whatsoever.

Q Was it ever, as far as you know, a fact that he broke his leg, to use the vernacular or the parlance? Did he break his leg?

A He did not break his leg. That was OSHA's insistence that he had broken his leg.

Q Where did they get that from?

A The newspaper article.

. . . .

Q Are you guilty of count ten, sir?

A No, I'm not.

(Tr. 506 at 41–43.)

Q Now, Overt Act 56 is Count 10. And it relates, again, under instructions from Prisque and Faubert, Employee A, who we now know is Gabriel Marchan, falsely told OSHA that his leg had not been broken when he had been struck by a forklift April 27, '99. We've explained that under Count 10, have we not?

A Yes, we have.

Q Did you ever tell him to say anything that was untrue to OSHA?

A Absolutely not.

(*Id.* at 84.)

On cross examination concerning Count 10, FAUBERT testified:

Q Now, you recall that Gabriel Marchan testified that you instructed him to lie to OSHA, right?

A I recall that, yes.

Q And you recall sitting in on his interview with OSHA on July 24th, 2000?

A I did.

Q And you heard him tell OSHA that he had a bruise and a scratch behind his knee from the forklift accident?

A He said that he didn't have a broken leg, because that's what they questioned him about.

Q Well, do you recall him saying, when they asked what did you have, that he had a bruise and a scratch behind his knee?

A No, they didn't ask him, what injury did you have, they said, did you have a broken leg, and he said no. They said, wasn't your leg broken?

. . . .

Q Do you recall him saying to OSHA, as has been testified, that he had a bruise and a scratch behind his knee?

A No.

Q You don't recall that?

A No, I do not.

Q And you didn't speak up and say, he had a broken cuboid bone?

A No, I did not, nor did he, nor did Mr. Maddock.

Q What are you, playing games with OSHA?

A I gave them whatever information that they wanted.

Q Except the injury the man had.

A They didn't ask me what injury he had had. They insisted he had a broken leg, they insisted he had days away from work.

(*Id.* at 196–198.)

This Court makes the following findings as to the government's evidence on Count 10, and the specific contrary testimony of FAUBERT:

(1) The facts in the government's evidence concerning Count 10, referred to above, were the essential facts necessary to support the verdict on that count. Therefore, the falsity of the conflicting tes-

timony by FAUBERT is necessarily implicit in the jury's verdict on Count 10. In addition, we find that the government's evidence on that count was sufficiently credible on the essential facts disclosed in that evidence, and that the conflicting testimony of FAUBERT on the same factual issues was false.

■ (2) The Court makes an independent finding that FAUBERT's testimony on Count 10 was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Here we rely on the nature of the testimony of the government's witnesses who contradicted FAUBERT regarding the essential facts, especially the fact that the OSHA officer Tiedeman witnessed Marchan lie during the session with FAUBERT present, and Marchan later informed the government and so testified at trial that he had lied under instructions by FAUBERT. These are facts upon which FAUBERT could not have been mistaken (although he did deny those facts at trial). Therefore, we find that FAUBERT's testimony on those essential facts on Count 10 was willfully false.

### b. Count 9

Count 9 alleged that defendants PRISQUE, FAUBERT, and MAURY engaged in obstructive conduct with respect to the OSHA investigation of the incident in which employee Coxe sustained fatal injuries when he was run over by forklift # 24, driven by worker De Los Santos. Specifically, Count 9 alleged that those defendants "[took] steps to conceal facts regarding [that] forklift fatality ... from [OSHA] inspectors." (*See* dkt. 721 at 163.)

We have summarized the government's evidence on Count 9, and the Court's post-trial findings, in discussing that count as against defendant PRISQUE. *See supra.*

That summary is incorporated here by reference.

Defendant FAUBERT testified extensively concerning Count 9. Here we quote a fair sampling of that testimony, on both direct and cross examination.

On direct examination concerning Count 9, FAUBERT testified:

Q Count number nine in substance charges you with obstruction of justice.... Now, first of all, did you obstruct or impede or attempt to conceal any facts from OSHA on either the day of the Coxe accident or the next day, sir?

A No, I did not. We were very forthcoming with them with all the information they asked for.

. . . .

Q Did you have anything to do or ever attempt to repair that forklift on the 24th or the 25th?

A No, I wouldn't know how to repair a forklift.

. . . .

Q How long did you stay at the scene?

A I stayed at the scene until after the ambulance had left, after the police had left, and actually until the police returned.

. . . .

Q [Y]ou said the police returned?

A Yes.

. . . .

Q Yes, you have to tell us.

A At one point everyone had left, including the police.

Q And that would've been how long after the actual accident, if you've got an idea of the time frame?

A I do. I would say maybe a half hour/40 minutes. It really didn't seem that long, but—

Q Did you see the police officers who testified that they measured the scene and checked the forklift and all that?

A Yes, I did.

Q They were from what department?

A Phillipsburg Police Department.

Q There came a time when you went back to your office or you stayed there until the second set of police officers came?

A I stayed there until I believe it was Officer Schmeltzly came back.

Q Came back?

A Yes.

Q He had been a first responder?

A Yes, he was one of the first ones— the first one to arrive.

Q Did you talk to these officers?

A At that point when they returned I did. Prior to that I didn't talk to them.

Q Did you go back to your office at any time before the test that OSHA ran later on?

A Yea, that didn't happen until much later.

Q I understand. Did you go back into your office at any time when the police finally left again?

A Yes.

Q Did you ever call OSHA?

A Yes, I did.

Q What time?

A When the police returned to the scene, they said they needed to know where the driver was—where Mr. De Los Santos was.

Q Okay.

A Because it didn't look like A 1 was going to make it, and they would have to talk to him. They were going to have to take him to the hospital for drug and alcohol testing, so I showed them where the dispensary was.

Q Was that where De Los Santos was?

A Yes, he was in there talking with Joe Maddock at that time. Joe was doing his investigation.

Q What did you do?

A I just told Joe that the police had some things to talk to Mr. De Los Santos about.

Q Was that the first you had heard that Mr. Coxe, quote, might not make it?

A Yes.

. . . .

Q And did you get the information back from Dr. Burke [at the hospital]?

A Yea, I got a return phone call, I don't know, maybe 20 minutes later.

Q What was that news?

A He had—he didn't make it. He passed away.

. . . .

Q What did you do then?

A I called OSHA.

Q Why?

A We're required to contact OSHA if there's a fatality.

. . . .

Q Before you went into your office, while you were still at the scene—

COURT: This is while the police are making measurements?

COUNSEL: Exactly.

Q Where was the lift, 24?

A The lift was up in the middle of the road, and until the police left the first time, before they left Jeff Maury had asked Officer Schmeltzly if it was okay to move the forklift.

Q Were you present for that conversation?

A Yes, I was.

Q Did you hear the conversation?

A Yes, I did.

Q Did you hear what Schmeltzly said?

A Yea, he said it's fine. We're done here.

. . . .

Q Schmeltzly was one of the first responders, sir?

A Yes, he was.

Q He was there, and he did the measurements. Is that what you testified to?

A Yes, he took his photographs.

Q Did you speak to him before he left?

. . . .

A The first time, no, I did not speak to him. That was when Jeff spoke with him, and he said they were all done here, and he left.

Q What happened to the machine?

A Jeff had George Shepherd take it down to the garage.

Q Now, did you talk to Jeff about what to do with the machine? Did you have anything to do with that?

A I don't think—I don't remember talking to Jeff about that. I may have said make sure nobody touches it, but I can't remember for sure.

Q Did you know at that time that OSHA was going to be there at some point?

A At that time, no.

Q Did you think anybody else wanted to look at that machine?

A At that time, no.

Q When you went back to your office and you came back out, did you know where the machine was when you came back out the second time?

A It was in the garage. I saw it down there.

Q When the Medical Examiner came, where was the machine?

A In the garage.

Q Did you ever go to the garage?

A I went past the garage. When I got the call from Dr. Burke that Al didn't make it, I knew John was down in shipping that time of day.

Q John?

A John Prisque. And I went down to tell him what had happened, because I knew he was going to have to tell Dennis right away.

Q Dennis?

A Charko.

Q Did you ever go in the garage to see the machine at that point?

A No, I saw it parked there, but I didn't go in.

Q Did you go back to your office?

A Yes.

Q And when Dr. Mihalakis showed up, was the machine at the scene, or was it in the garage?

A It was in the garage.

Q Did someone ask you to do something at that point?

A They asked that the forklift be brought up, so that they could look it over.

Q When you say they, you're talking about who?

A Dr. Mihalakis and Detective Barsony.

Q Was OSHA there at that point?

A Not yet.

Q When did OSHA finally arrive?

A They came shortly after Dr. Mihalakis arrived.

Q And how many people from OSHA came?

A Just Carol Tiedeman.

. . . .

Q Did you get the machine brought up?

A Yes, I paged Jeff Maury and asked that he have the machine brought up.

Q Do you remember who brought the machine up?

A I believe Jeff did.

Q Did he bring it back to the scene, or did he bring it to some other location at the plant? When I say the scene, I mean the scene of the accident with Al Coxe.

A There was an open area in the road that was kind of off to the side over by my office and the dispensary, and he brought it up there.

. . . .

Q When the machine came up to that spot, who was standing with you?

A Dr. Mihalakis, Detective Barsony, Carol Tiedeman.

Q Did anyone ask you to do something?

A Well, they looked it over first. Carol Tiedeman checked lights and horn and backup beeper.

. . . .

Q Did you do any of that?

A No, Carol Tiedeman did.

Q Did somebody ask you to do something with the machine?

A Yes, Dr. Mihalakis asked me to perform a demonstration to see that the brakes worked.

Q And what did you say?

A I said no.

Q Why?

A Because Al Coxe was a good friend of mine. I had known him for almost 20 years.

Q You just didn't want to drive the machine?

A No, I didn't want to have any parts of it.

Q What did you finally do?

A He asked me to do it as a favor. I did it.

Q What did you do?

A He said just take it out in the road, bring it up to speed, and slam on the brakes.

Q Do you know how to drive one of those machines?

A Yes, I was certified on a forklift.

. . . .

Q Now, tell us what you did with the machine.

A I got on the forklift. I started it up. I took it out into the road, drove it up toward the accident scene, turned it around, and just stepped on the gas, put my foot to the floor, let it wind up, shifted into high gear, let it get wound up, and then I just—

. . . .

Q What did you do then?

A I took my foot off the gas and slammed on the brakes.

Q Did it skid to a halt?

A Yes, it did.

. . . .

Q Did you touch the machine from then on?

A No.

Q Did you see it again?

A It sat out there all day.

(Tr. 506 at 4–28.)

On cross examination concerning Count 9, FAUBERT testified:

Q Let's talk about the Al Coxe incident, March 24, 2000. You indicated when you testified that by the time you got to the scene, the forklift had already been removed from Mr. Coxe?

A That's correct.

Q He was lying out to the side of it?

A I don't remember whether he was laying to the side. I was (indisc.).

Q But—

A But the forklift was off him.

Q And you didn't even know it had run over him or was ever on top of him?

A No. I never went out there.

Q Okay. Now, Mr. Prisque testified, on the other hand, that—2/23/06, at page—starting at the very bottom of 162—he testified that—

. . .

Q It was, "Question: could you please keep your voice up. You heard over the radio there was an accident over at casting and what happened?"; Answer: "—this is Mr. Prisque—"So what I did is I ran over and I tried to see and I seen Al Coxe being under the forklift." "And then what did you do? Do you know where Mr. Faubert went?"; "Not at the time. I didn't know where he was and what he could do. Well, I starting saying somebody call 9–1–1, and Scotty was coming right up behind me, Scott Faubert, and said "I already did." And then, a couple of pages later, he talks about how they subsequently remove the forklift."

COUNSEL: Page?

GOV: Page 165.

Q "A lot of the millwrights and some of the supervisors stayed and I remember Jeff Maury and a couple of other guys getting 4x4's and lifting it up and getting Al out from under the forklift." Now, Mr. Prisque has you there while Al Coxe is still underneath the forklift. Are you mistaken or is he mistaken?

A I remember what I remember and when I got to the scene, the forklift was off him. When I called 9–1–1, I did not tell them that he had been run over by a forklift (indisc.). because that was my understanding. I didn't

find out until [sic] that the forklift had run over him. Mr. Prisque got to the scene before me because I went back to call 9–1–1.

. . . .

Q Well, Mr. Faubert, on that day, sounds like you were the man in charge, right?

COUNSEL: What day are you talking about?

GOV: 3/24/00.

A The man in charge of what?

Q Well, you're the one who called 911?

A I was.

Q And you interviewed three or four men at the scene to try to find out what happened.

A Mr. Maddock interviewed people.

Q Well, in your deposition, on page 51, don't you indicate that you interviewed three or four people to try to ascertain what happened?

A I asked around to try to find what happened, yes. I found that there were no witnesses. Mr. Maddock actually interviewed Mr. De Los Santos.

Q And you're the one who met with Detectives Barsony and Mondzak at 7:10 in the morning, right?

A I believe so.

Q You're the one who informed John Prisque of the fatality.

A I was.

Q You contacted OSHA to report the fatality.

A Correct.

Q You met with OSHA at 10:30 and conducted the demonstration.

A Correct.

Q And you also met with the medical examiner and Detective Barsony, when he returned later.

A Well, that was the same time as OSHA was there, but Mr. Maddock was there, as well.

Q I meant Barsony returned after being there.

A Correct.

Q So why would you, of all people, be excluded from the decision of whether to remove the forklift from the scene?

A I'm not sure I understand.

Q Well, you had nothing to do with moving the forklift, right? Isn't that what you've been saying?

A Mr. Maury asked the Phillipsburg police if it was okay to move the forklift. And the police said it was fine, they were done.

Q According to you, right?·

A According to me.

Q According to you.

A Yes.

Q But you, as the safety person at the plant, you weren't consulted with that, on that decision?

A No, I wasn't.

Q Well, the fact is you made no effort—

A We also, at that time, didn't realize it was a fatality.

Q Pardon me?

A We also, at that point in time, didn't realize that it was a fatality.

Q Well, it was a fatality as of 6:55 that morning, right?

A We didn't find out until later.

Q OSHA learned before 8:30, I believe, is that right.

A OSHA learned when I learned.

Q The fact is you made no effort to preserve the scene, right?

A No, the police said they were done.

. . . .

Q We've heard that officer Schmeltzly left at 6:45 that morning to take Mr. De Los Santos in for testing, right?

A I don't know what time it was, exactly. He had returned to the scene, and he had informed us that it did not look like Al was going to make it. And that's when he said he needed to speak further with the driver, and he was going to need to take him for testing.

Q Well the police reports indicate that that was 6:45. Do you recall that?

A I would accept that, then.

COURT: What was—

GOV: When Officer Schmeltzly left the scene, 6:45. And we believe he was the last uniformed officer there, correct?

A I believe so, yes.

Q And Detectives Mondzak and Barsony arrived at 7:10 to resume the investigation, right? That was Barsony's testimony.

A I believe so.

Q So in those short minutes, 25 minutes, the forklift is moved, right?

A Correct.

Q The street is swept.

A Yeah, I believe it was.

Q The victim's clothing has been misplaced, disappeared.

A Yes.

Q And you didn't take any pictures that day, right?

A I did not.

Q You didn't even write down the names of the people you spoke to about the accident, the ones you were talking to, right?

A I did not.

Q Now, we've heard several times that the forklift had to be moved to clear

this 45 foot wide roadway for other traffic, right?

A Who said that?

Q Haven't several people said it? Didn't you say it to OSHA?

A I don't recall saying that to OSHA, no.

Q You don't recall telling Carol Tiedeman that—

A Mr. Maury asked the police if they were done with the forklift, if it was okay to move it. They said they were done, so it was moved.

Q Do you recall telling Carol Tiedeman that the forklift had to be removed because it was in the way of other traffic?

A I told her it was in the middle of the road, yes.

Q Why would you need to get the forklift out of the way if you were going to stop production?

A Because we have to run out the iron that we have in the cupola. We can't just—it's not like flipping off a light switch, you have to run out the iron that's there. In the meantime, there's work that has to be done.

Q And you can't go around it, huh?

A Well, sometimes there's dump trucks, there's tractor trailers that all use that area.

Q Now, I believe this morning you said you wouldn't know how to fix a forklift?

A No, I wouldn't.

Q Would you know how to put brake fluid in a forklift?

A Brake fluid, yeah, I would know how to put brake fluid in.

Q Because you had operated one in the past.

A Sure.

Q At Atlantic States, and you were certified, right?

A I was.

Q Now, as for Forklift 24—

GOV: If we could have G3–088A.

Q Everybody's seen these before, but this is the drivers daily checklist for the first shift of the day, prior to the death of Mr. Coxe, correct, filled out by Mr. Travarez?

. . . .

Q And this is the checklist that indicates that on the first shift, March 23rd, the machine had obvious damage and leaks, defective head and tail lights—the one with the defects, right, defective warning lights, defective service brakes, defective seat belts, defective parking brake, correct?

A There's X's, but there's no remarks.

Q Going to the second shift, (indisc.) any checklist, filled out for the second shift on that same day, the day before Al Coxe was killed. And he indicates the defects that he found were the head and tail lights, the warning lights, the hour meter, the service brakes, and he indicates no lights and warning, left fork falls off, correct?

A That's what he puts, yes.

Q All right. Following that, there's a fatal accident, right?

A There was.

. . . .

Q After the accident, the forklift is taken to the building where, what do you know, forklifts are repaired?

A That is correct.

Q At 10:30, the forklift is brought out from the place where forklifts are repaired, and you demonstrate it.

A That is correct.

Q And now the headlights that were defective just hours earlier, according to these worksheets, they work.

A That's what it says.

Q The warning lights that were defective just a few hours before this, they work.

A That's what it says.

Q And the tail lights that were defective now work—

. . . .

Q Mr. Faubert—did you testify that Carol Tiedeman checked the lights, the warning, the horn?

A She did.

Q And they worked, right?

A They worked.

. . . .

Q Okay, you affirmatively tell the police when they ask you, that this machine was not touched, right?

A I tell them that, to my knowledge, there's been no work performed on the machine.

(Tr. 506 at 168–182.)

This Court makes the following findings as to the government's evidence on Count 9, and the specific contrary testimony of FAUBERT:

(1) The facts in the government's evidence concerning the actions of defendants including FAUBERT, to conceal from OSHA the defective condition of the forklift involved in the Coxe fatality, were the essential facts necessary to support the verdict on that count. Therefore, the falsity of the conflicting testimony by FAUBERT is necessarily implicit in the jury's verdict on Count 9. In addition, we find that the government's evidence on that count was sufficiently credible on the essential facts disclosed in that evidence, as corroborated by an array of various witnesses and documents, and that the con-flicting testimony of FAUBERT on the same factual issues was false.

■■■ (2) The Court makes an independent finding that FAUBERT's testimony on Count 9 was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Given the nature and extent of the testimony of the government's witnesses who contradicted FAUBERT regarding the essential facts, on which FAUBERT could not have been mistaken (although he certainly did deny those facts), we find that FAUBERT's testimony on those facts under Count 9 was willfully false.

### c. Count 1

The government points out that the jury convicted FAUBERT of conspiring for all objectives of the conspiracy count involving OSHA, Objectives C, D, and E. It argues that all the evidence pertaining to his testimony as to Counts 7, 9, and 10 (discussed above) provides examples of his falsehoods that should produce a perjury enhancement under Section 3C1.1 for FAUBERT as to Count 1 as well. (Gov. I at 59.) It also asserts particular conflicts of testimony pertaining to Count 1, but not to the listed substantive offenses, in support of its arguments for this enhancement. (*Id.* at 60–61.)

This Court declines to make further findings pertinent to Section 3C1.1 concerning Count 1 as to defendant FAUBERT, beyond those specifically addressed under Counts 7, 9, and 10 above. We have stated our reasoning on this topic in discussing this enhancement as to defendant PRISQUE, and we incorporate that statement here by reference. *See supra.*

### 3. Jeffrey Maury

The jury found defendant MAURY guilty on one false statement count (Count

3), one count of obstruction of justice (Count 9), one lesser-included negligence count under the CWA pertaining to the 12–4/5–99 discharge from the cement pit (Count 27), four counts of intentional violation under the CWA pertaining to discharges from the pit under the # 4 casting machine (Counts 28–33), as well as four of the five alleged unlawful objectives of the conspiracy, excluding only the CAA objective. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.)[96] Defendant MAURY testified for four trial days on direct, cross and redirect examination. He denied all criminal acts attributed to him, by asserting general denials of guilt and by his specific testimony in response to questioning. (Tr. 511 at 126–208; tr. 515 at 3–230; tr. 517 at 4–224; tr. 520 at 4–101.)

The government points to each of his substantive counts of conviction and Count 1, arguing that those convictions "demonstrate that the jury found his testimony to be false." (Gov. I at 61.) It lists several specific alleged falsehoods that we discuss below. MAURY objects to any enhancement under Section 3C1.1. (Maury II at 31–34.)

### a. Count 3

Count 3 alleged that on or about February 24, 2000, defendant MAURY knowingly and willfully made a false statement to a federal and a state investigator—that he believed the December 4–5, 1999, spill originated from an hydraulic line on a truck—when MAURY then knew and believed that the December 4 and 5 spill originated from the cement pit. (*See* dkt. 721 at 136.)

The jury verdict found defendant MAURY guilty on Count 3. (*Id.* at 3 n. 4.) The government's evidence on this count was based upon the entire body of evidence pertaining to Count 3 (false statement by MAURY as alleged); Count 4 (alleged false statement by DAVIDSON re: 12–4/5–99 discharge), and Counts 12–27 (alleged discharges from the cement pit on various dates including 12–4/5–99, in violation of CWA). We will not attempt to summarize that evidence here, due to its sheer volume. (*Id.* at 136–146, 189–231.) The key issue under Count 3 at trial, however, was whether, when MAURY was being interviewed by New Jersey Special Agent Christopher Fernicola and FBI agent James Spence during the search warrant execution on February 24, 2000, he made the false statement ascribed to him by the agents.

The findings of this Court on Count 3 in the post-trial opinion (applying the standard of Rule 29), were as follows:

This Court concludes that the government's evidence on Count 3 was sufficient to establish the essential elements of the offense charged in that count. In rendering the following rulings as to Count 3, we expressly incorporate by reference the discussion of evidence under Counts 4 and 12–33, *infra.* Mr. Maury was present for many hours doing the initial cleanup on December 5, 1999, and had the opportunity to observe first-hand the extent and direction of the spill at the plant, and its location between the cement pit and the storm drain. He was also the superintendent of maintenance, and had knowledge of how the cement pit functioned. Based on the relevant evidence, we hold that a

---

**96.** As previously noted, the verdict also found MAURY not guilty on Count 5 (false statement regarding the March 25, 2000 inspection of the Coxe forklift, finding it to be in "perfect operating condition"), although it did convict

ATLANTIC STATES on that count. (*See* dkt. 721 at 147–149.) The government does not mention Count 5 in its arguments under Section 3C1.1 as to MAURY. (Gov. I at 61–63.)

reasonable jury could find beyond a reasonable doubt that (1) Maury made the statement alleged in Count 3; and (2) the statement was knowingly false and made with intent to deceive. The jury could reasonably find that in answer to investigators asking him specifically what he knew about the 12–4/5–99 discharge, Maury stated that he believed that spill originated from a hydraulic line on a truck, as alleged in Count 3. The jury could also infer from the evidence that Maury knew that statement was false and that in fact the discharge "originated from the cement pit." The jury could further reasonably conclude that his false statement was made with intent to deceive the investigators.

(Dkt. 721 at 140–141 (footnote and citations omitted).)

Defendant MAURY testified extensively about the circumstances surrounding the false statement alleged in Count 3. (*See* tr. 511 at 207–208; tr. 515 at 4–23, 214; tr. 517 at 161–175; tr. 520 at 91–93.) Here we quote a fair sampling of that testimony, on direct, cross and redirect examination.

On direct examination concerning Count 3, MAURY testified:

Q On Sunday [12–5–99] were you at home?

A I was at home Sunday.

. . . .

Q As a result of the [phone] conversation Mrs. Prisque had with your wife what did you do?

A I went down to find out what was wrong at the plant.

Q When you got there where did you enter the plant?

A The guard shack.

. . . .

Q What did you say to the guard?

A I asked him what the problem was, and he said he was at the plant, he said there was oil and water and he pointed over by right here where the dumpster is. And I asked him what happened, if a truck blew hydraulic fluid.

Q Why would you ask him if a truck blew hydraulic fluid?

A Well, I knew we weren't running, it was on Sunday and it had happened before, several times.

Q How much traffic goes in and out of that yard?

A A lot, 24/7.

Q What about when you're in shutdown, do trucks come in to pick up pipe?

A Yes.

Q When you saw the oil and the water and you talked to the guard shack what's the next thing you did?

A Walked out of the guard shack and started to walk over to look at it—

. . . .

Q What did you see when you looked in the driveway?

A Water and oil.

Q What did you do after you spoke to the guard?

A I walked out of the guard shack and I started to walk over to where he pointed to and that's when John Prisque came up, came to the—

Q What did you and John decide to do?

A We decided—ultimately we decided to clean the mess up.

Q What did you do to try to clean the mess up?

A We ran the street sweeper, we used hand brooms, and then we—I attempted to use the loader and I wasn't very familiar with running that type of loader so we ended up calling Billy Cathers in.

Q Back up a minute. When you were going to use a loader what were you going to use the loader for?

A To spread sand, dirt, anything to put down on top of the water and oil to soak it up.

. . . .

Q What did Billy Cathers do?

A He came right in, he ran the loader, John and I alternated on the sweeper, I pushed the broom, we got everything cleaned up.

Q What time did you leave the plant that night?

A Somewhere between nine, 9:30.

COURT: What time did you arrive?

A Somewhere between three and 3:30. . . .

Q Do you have any idea what the cause of the spill was?

A No.

Q When you went there that day what was your primary objective?

A To clean it up.

. . . .

Q Now, . . . February 24th 2000 were you working—the day of the search warrant, were you working that day?

A Yes.

Q And did there come a point in time when you were called from the plant into the main office?

A Yes.

Q And when you got the call where did you go?

A I walked over to the main office and before I could walk in the door there were two gentlemen standing outside the door and they asked if I was Jeff Maury, I said yeah, and they said— they identified who they were, and they said they had some questions to ask me about this spill in December.

Q Did you agree to talk to them?

A Sure.

Q Did you tell them get lost, I don't want to talk to you?

A No.

Q Where did you and these two gentlemen go to have this conversation?

A They asked if there was anywhere we can go talk, and I said yeah. I took them downstairs into the conference room.

Q And who was in the conference room besides you and these two gentlemen?

A Nobody.

Q What was asked of you? What kind of questions were asked of you?

A First he started asking about the whole layout of the plant, how the plant operated. . . . .

COURT: Do you know who he is by now? You have two officials with you, right?

WITNESS: Yes. . . .

Q One of them testified, Mr. Fernicola, was that the man that was doing most of the talking or was the other gentleman doing most of the talking?

A He's the only one that was doing the talking.

Q What questions was he asking?

A He was asking me about the bottom drop. He was asking me about cleanup.

Q What is bottom drop?

A When they change the bottom in the cupola.

Q What else was he asking?

A About cleanup. He was asking me about the spill. I don't know all the questions.

Q When he was talking to you was he taking notes?

A No.

Q Was the other gentleman taking notes?

A No.

Q Jeff, you're accused in this overt act of falsely telling Mr. Fernicola A) that you believe that the December 4th, 5th 1999 spill originated from a hydraulic line on a truck. Do you see that?

A Yes.

Q Did you tell that to Agent Fernicola?

A No, I did not.

Q What did you tell Agent Fernicola when you were asked about the spill?

A He asked me what was the first thing I did when I got to the plant. I told him I went to the guard shack and I asked the guard what happened. The guard said he didn't know. And I asked him if a hydraulic line broke on a truck. That's exactly what I said to him.

Q Did you tell Agent Fernicola when he asked you that you did not know the cause of the spill?

A I told him several times I did not know what happened.

. . . .

Q Now, when you had this conversation with Agent Fernicola, was he taking notes on any of the things you were telling him?

A No, he was not.

Q Was he taking notes of any of the things you were telling him?

A No, he was not.

Q Did there come a point in time [when] the conversation between the two of you stopped?

A Yes.

Q What happened? Where did they do?

A He said he was done and he and the other gentleman was going to step out

and they were going to be right back. I said, okay, no problem. We were talking casual like nothing was wrong. And they left, five minutes later they came back, and there was a whole different attitude.

Q When you say it was a whole different attitude tell me what you mean.

A He started calling me a liar . . . .

(Tr. 515 at 11–19.)

Q This is the charge what we call the substantive charge, Jeff, that it formally accuses you of lying to an official. Do you see that?

A Yes.

Q The accusation is that you falsely told Mr. Fernicola and the FBI, "That he believed the December 4th, 5th 1999 spill originated from an hydraulic line on a truck when in fact you then well knew and believed the spill originated from the cement pit."

Q First of all, did you know what the cause of the spill was?

A No, I did not.

Q Is what you're accused of telling the agent accurate?

A No.

Q What is it that you told the agent with respect to what you thought may have happened with the spill?

A I told him several times I did not know where it came from.

Q And with respect to the hydraulic oil, what did you tell him?

A I told him I didn't know where it came from. I told him when I got to the guard I asked the guard if he knew what happened. He said no. I said did a truck blow a hydraulic (indisc.). That's exactly what I said

to the guard, that is exactly what I told this guy, Mr. Fernicola.

(*Id.* at 22–23.)

Q Did you lie to officers when they questioned you and you voluntarily spoke with them?

A No, I did not.

(*Id.* at 214.)

On cross examination concerning Count 3, MAURY testified:

Q [Y]ou testified on direct examination that you were interviewed by Chris Fernicola on February 24th, 2000, correct?

A Yes.

Q And that was the day of the search warrant, correct?

A That's correct.

Q And he was asking about whether you knew where the cause of the oil spill in December of 1999 came from, correct?

A I don't know if it was—if he questioned the spill or the oil, but in general.

. . . .

Q And you told him as far as the spill back in December of 1999, "I believe it came from a hole in the hose."

A No.

Q You never said that.

A No, I did not. That's not in his report, either.

. . . .

Q The question was, as far as the spill in December, 1999, you were questioned whether you knew where the spill came from, correct?

A About either the spill or the oil is what he questioned me about.

Q You don't remember which one it was?

A I don't remember. I don't recall. Probably in his report.

Q And you're saying that you never told him the spill came from a hole in the hose, you never said that.

A I never said that.

. . . .

WITNESS: And that's not in his report, either.

. . . .

Q And you're saying you told him where you believed the oil came from, right?

A That's not what I said.

Q Well, didn't you tell him where you thought it came from?

A No.

Q You never gave any explanation as to where it came from in December 1999.

A If you read his report, it says in there, I think, three times I do not know where it originated from. Then he says that I told him, "I assume it came from a truck—hydraulic hose on a truck." Nothing about like what you have there. That's not what I told him. I told him I asked a guard if that's where it came from.

Q So you—

A The guard said he didn't know. That's what I told him.

Q So, you don't know—your testimony is you have no idea where that oil and that spill in December of 1999, how that originated.

A When he questioned me I had no idea.

. . . .

Q How about after he questioned you?

(Tr. 517 at 161–164.)

Q And let me show you a couple photos. . . . This photo was taken on De-

cember 5, 1999. You recognize what that photo is, right?

A Yes.

Q That's the cement pit, correct?

A That is.

Q And is it fair to say that's how it looked on December 5th, 1999?

A That's what the photo shows. I didn't look at it when I was cleaning up the mess in the plant.

Q You didn't look at the cement pit when you were cleaning up the mess in the plant—

A No, I did not.

Q And you were there for how many hours?

A Probably between 3 and 3:30 'til 9, 9:30 I think it was.

Q About six hours?

A Yeah.

Q .... Again, this photo was also taken December 5th, 1999. Do you recognize that photo?

A What do you mean?

Q What's the area shown in the photo?

A It's the plant.

. . . .

Q And ... if you went to the top of that photo behind that forklift, behind that building, the cement pit [would] be back there?

A The cement pit is to the right of the building.

. . . .

Q You can't see it in this photo.

A Correct.

Q And all of this liquid on the ground, would it be fair to say that you saw that liquid and oil on the ground when you got there on December 5th?

A Not all of it, no. That's not fair.

Q Are you saying there's more in this photo than you saw?

A No.

Q No, there's—you need to explain that.

A The road was a little more dry. There was Speedy Dry all the way around the drain when I got there. There was nothing running down towards the drain.

. . . .

Q But by the time you got here on December 5th, 1999 in the afternoon, about 3 to 3:30 you said, correct?

A Correct.

Q You're saying that there was less oil and water on the roadway.

A I didn't see—obviously I didn't measure it, okay? I didn't see nothing running towards the drain. I didn't see that. There was Speedy Dry around the drains, okay? And where this is like wet, it was dried up a little bit. Puddles. I didn't measure it, you know? Didn't measure it.

. . . .

Q And your testimony is that despite those thousands of fittings and all the leaks and problems you had in the plant, as far as what you believe, you didn't believe that December 4th and 5th had anything to do with inside the plant.

A Say that again?

Q You didn't believe that the oil that you saw, the oil and water on December 5th, 1999, when you came to the plant that afternoon, that that had anything to do with inside the plant and any of your hydraulic lifts.

A My concern when I got [to] the plant was to clean it up.

. . . .

Q So, your objective as a maintenance superintendent wasn't to say, where is all this oil and water coming from?

A There was nothing moving when I got there. It wasn't coming from nowhere. It was there.

. . . .

Q From December 1999 through February of 2000 when you were interviewed by Mr. Fernicola, your testimony is you didn't do any investigation on your own to say, what problems are we having in the plant with leaks?

A No, I wasn't an investigator.

Q You were the maintenance superintendent, right?

A Yes, I'm maintenance, yes.

Q You were in charge of maintaining the equipment, correct?

A Yes. I wasn't an investigator.

. . . .

Q Okay. And when you got there on this day from this area where the drain is leading back to the cement pit which is behind the photo on the photo on the left—and you can see the beginning of the yellow rail—how many feet is that? How close are those two?

A Oh, God, I don't know.

. . . .

Q So, on this date when you say your concern is to clean up, you never turn to John Prisque and say, where did all this oil come from?

A No, I didn't.

Q Never, never came in the conversation? Not one word of the conversation between you and John Prisque was like that?

A No.

Q Your concern was just to clean up.

A That was it.

(*Id.* at 164–171.)

On redirect examination concerning Count 3, MAURY testified:

Q Now, [the government] was asking you questions about conducting an investigation, recall those questions?

A Yes.

Q And I think you indicated—you didn't conduct any investigation, is that true?

A I wasn't involved in any investigation, no.

Q What was your understanding as to what was going to happen in terms of an investigation as to what may have caused the spill in the first place?

A The general manager was handling the investigation with lawyers.

Q Was the DEP involved?

A DEP was involved and the EPA I guess.

Q Did you consider it your job to conduct an investigation? Your job was to take care of the mess you guys found—pit?

A I came in to clean the mess up.

(Tr. 520 at 92–93.)

This Court makes the following findings as to the government's evidence on Count 3, and the specific contrary testimony of MAURY:

(1) The facts in the government's evidence concerning the alleged false statement of MAURY to agents Fernicola and Spence on February 24, 2000, were the essential facts necessary to support the verdict on Count 3. Therefore, the falsity of the conflicting testimony by MAURY is necessarily implicit in the jury's verdict on Count 3. We make no credibility finding with respect to either party on this count, however, for the reasons set forth in paragraph (2) below.

■■■ (2) The Court does not find that MAURY's trial testimony on Count 3 was

willfully false. The subject matter of this false statement count concerns an oral exchange that took its meaning, for both parties, from the context of the events surrounding it. The alleged statement was not committed to writing or otherwise recorded, except as memorialized in notes that the interviewing officers may have used to make their later reports and as described in officer Fernicola's testimony at trial. The subject matter of this statement concerned events in the past, about which MAURY was being questioned on February 24, 2000. Both sides to the conversation appeared and testified at trial to their conflicting versions of that conversation. We find that the version of that unrecorded conversation offered by MAURY at trial was at least plausible in the totality of the circumstances. While the jury rejected his version by its verdict, and this Court has upheld that verdict under the standards for both Rule 29 and Rule 33, we find that using the *Dunnigan* standard under Section 3C1.1, the circumstances do not support a finding by a preponderance of the evidence that MAURY willfully testified falsely at trial on this topic.

### b. Count 9

Count 9 alleged that defendants PRISQUE, FAUBERT, and MAURY engaged in obstructive conduct with respect to the OSHA investigation of the incident in which employee Coxe sustained fatal injuries when he was run over by forklift # 24, driven by worker De Los Santos. Specifically, Count 9 alleged that those defendants "[took] steps to conceal facts regarding [that] forklift fatality . . . from [OSHA] inspectors." (*See* dkt. 721 at 163.)

We have summarized the government's evidence on Count 9, and the Court's post-trial findings, in discussing that count as against defendant PRISQUE. *See supra.*

That summary is incorporated here by reference.

Defendant MAURY testified extensively concerning Count 9. (*See* tr. 511 at 207–208; tr. 515 at 96–104, 112–115, 157–160, 214; tr. 520 at 4–54, 85–87.) Here we quote a fair sampling of that testimony, on direct, cross and redirect examination.

On direct examination concerning Count 9, MAURY testified:

Q Do you recall about when you first learned that this accident occurred?

A Somewhere around 6:00 [a.m.].

Q How did you find out there was an accident?

A I was working on number 6 casting machine and George Shepherd called me on the radio.

Q When you got the call from George Shepherd, what did you do?

A I ran out the waste water door. That's right in line with number 6 casting machine. I ran out there, looked up the road, seen some people standing around, and I came up to the accident scene.

. . . .

Q When you got down to the accident scene, can you tell us what you did? What you saw and what you did?

A Seen Al under the forklift and myself and a couple other people got some four-by-fours, lifted the forklift up, slid him out from underneath it, and then I went for Scott to call 911.

Q Okay. Police respond pretty quickly?

A Yes.

Q How long did you stay on the scene while the police were there?

A The whole time.

Q What were the police—

A I was in the area. I wasn't hovering over top of Al, but I was in the area.

. . . .

Q After you got Mr. Coxe out from underneath the forklift, how [long] did it take before they removed him from the scene in the ambulance?

A I don't know how long.

Q Okay, but he was obviously taken from the scene, correct?

A Yes.

Q And the police were there at that point?

A Yes, the police were there first.

. . . .

Q What were the police doing with the forklift?

A They were checking the forklift out.

Q When you say checking it out, can you describe to the jury, as best you can recall, what you saw them doing?

A They were going over the forklift. What they were doing—I don't know what they were doing. They were hovering over to [sic] of the forklift, going over—looking it over. They were chalk-marking the skid marks, they were measuring the skid marks, they took photos of the skid marks, they took photos—well, they took quite a bit of photos.

Q Okay, about how long were the police there?

A I don't know how long they were there. They were there after the ambulance left.

Q Okay, did anyone interfere with their ability to check out the forklift?

A No.

Q Did the police cord off the area and tell nobody to go near the forklift?

A No.

Q Did the police put cones around the forklift and say don't touch it?

A No.

Q Did there come a point in time when you asked one of the police officers something?

A Yes.

Q What did you ask him?

A He was getting ready—he was walking towards the car getting ready to leave, and I asked him if we could move the forklift out of the middle of the road.

Q And he said?

A He said yes.

Q Now, where was the forklift in the road?

A In the middle of the road.

Q Was it in the way?

A It could have been, yeah.

Q Do vehicles go back and forth in that area of the plant from the road?

A All the time.

Q What kind of vehicles?

A Tractor trailers back down the road. They don't drive down forward, they back down the road, so that's a hindrance right there. Forklifts carry pipe up and down the road. Forklift swings in right there to go to the casting machines to supply them with cores. There's all kind of traffic in there.

Q When you asked the police officer if you could move the forklift what did he say to you?

A Yes. He was done. He was done with his investigation.

Q What did you do?

A I turned and told George Shepherd—George Shepherd was standing right behind me. I turned and told George Shepherd, "Go ahead and take it down to the garage."

Q Why didn't you just drive it?

A Why didn't I?

Q Yeah.

A I just didn't.

Q Did George get on the machine?

A Yes, he did.

Q Where were you in relation to the machine when George got on the machine?

A (No verbal response).

Q In front of it, behind it?

A I was on the side of it. And when he started to go I told him to stop. I went over and picked up the fork, and I put the fork in the back of the fork truck.

Q And what did George have to do to get—well, where was George going to take the machine? Let's put it that way.

A Down to the garage.

Q And what did he have to do to get back toward the garage?

A He turned around right in the road right there. He turned around and he drove down right behind the police car, right down the road.

Q Now, did you say anything to George Shepherd when he was driving the machine?

A No.

Q Did you ask him to check the brakes?

A No, I did not.

Q At that point in time did you have any reason to ask him to check the brakes?

A No, I had no reason at all to question the brakes. I stood there and I seen the skid marks, seen the cops take pictures of them, seen the cops measuring them. I had no reason to question the brakes.

Q When you got to the garage—by the way, how far is the garage from the area where the accident happened?

A It's down the road to the left. I don't know—I don't know what the distance is.

Q All right. When you got to the garage what happened?

A George was already parked when I got down there, and I told Jimmy Yukna not to let nobody touch it.

Q And what did Yukna say? Did he say anything to you?

A No. He said okay.

Q Where was Shepherd when you said this to Yukna?

A I don't recall.

Q Okay. When you got—after you told Yukna not to let anybody touch it where did you go?

A I went back down to the plant.

Q Back to work?

A Yes.

. . . .

Q Now, did there come a time when you were asked to bring the forklift— to move the forklift? That day, did there come a time later in the day when you were asked to move the forklift?

A Yes.

Q Who asked you to move the forklift?

A Scott Faubert.

Q And where were you asked to take the forklift?

A Asked me to bring it up to the dispensary/personnel. Building's the same, just two different offices. Bring it up there because OSHA wanted to see it.

Q Okay, did you drive it to the area of the dispensary?

A Yes, I did.

. . . .

Q After you drove the forklift to the dispensary from the garage where did you go?

A I went back to work.

Q Did you have anything to do with any demonstration that was conducted at the request of OSHA?

A No.

Q Did you have any participation in it whatsoever?

A None.

Q Where were you when this demonstration was taking place?

A I went back in the shop.

. . . .

Q Did you have anything else to do with that forklift on March 24th after you drove it down to the dispensary?

A I locked her up.

Q What did you lock it up with?

A Chain and padlock.

Q When did you do that?

A Before I left for the day.

(Tr. 515 at 96–104.)

Q Did you do anything to repair those brakes prior to OSHA coming to inspect the machine?

A No, I did not.

Q The indictment says that you caused brake fluid—whatever that means— you caused brake fluid to be added to the forklift. Did you cause brake fluid to be added to the forklift?

A No, I did not.

Q Did you add brake fluid to the—

A No, I did not.

Q Did you touch that machine in any way other than what you've described here in court today?

A No, I did not, until Saturday.

Q You heard testimony from Mr. Shepherd, I believe it was, that after the accident there was a meeting in your office. You recall that testimony?

A Yes.

Q Did that meeting occur?

A That was—I don't think it was Shepherd. I think that was Kevin Redcay.

Q I'm sorry. Whoever. There was testimony to that effect.

A Redcay.

Q Was there a meeting that occurred in your office?

A No, there was not.

Q What was the mood at the plant after Al's death?

A Very down, very—I don't know how to describe it. Down.

Q How long did you know Al Coxe before his death?

A I knew him since I started working there—

Q That would have been in—

A—at Atlantic States.

Q —'95?

A Yes.

(*Id.* at 114–115.)

Q There's another accusation [alleged overt act] that in March of 2000 you took steps to conceal facts regarding the forklift fatality earlier that day, from law enforcement and to an OSHA inspector, by causing the forklift brakes, which were known to leak brake fluid, to be repaired before the OSHA inspector inspected it. Do you recall that?

A Yes.

Q Did you take any steps to change the condition of that forklift from the time of the accident until OSHA inspected it?

A No, I did not.

Q Did you add brake fluid?

A No, I did not.

Q Did you repair the brakes?

A No, I did not.

Q Did you have anybody repair the brakes or add brake fluid?

A No, I did not.

Q Did you have any reason, based upon what you saw at the accident scene, to believe there was a problem with the brakes?

A No, I did not.

(*Id.* at 157.)

On cross examination concerning Count 9, MAURY testified:

Q And, when you get down to that area Al Coxe is underneath the forklift, correct?

A That's correct.

. . . .

Q And, you said other workers and yourself grabbed four by fours, correct?

A Yes, we did.

. . . .

Q And, you get the four by fours and you come back over to this area and you wedge the four by fours under so that you could lift this side of the forklift to get Mr. Coxe out, correct?

A That's correct. We just tilted it up.

Q And I believe you testified on direct other people dragged Mr. Coxe out from underneath the forklift, correct?

A Yeah, I don't remember who it was.

. . . .

Q After Al Coxe is out from underneath the forklift you go to find Scott Faubert in his office, correct?

A I ran over towards his office—

Q Right.

A—and wherever I found him over there is where I found him.

. . . .

Q You get back to the scene and Al Coxe is where when you get back?

A Same place he was when I left.

Q By then the police arrived at that point?

A At some point they did, yeah.

Q Do you remember if the police arrived first or the EMS or EMT arrived first?

A The police arrived first, then personnel from the ambulance came that the—they came in their personal cars, and in their photo right there, one of their personal cars, they—they came before the ambulance did. Some people did, I don't know how many, I didn't get their names. I don't know.

Q And then, when you got back to the scene you told everybody that they didn't need to be standing around and to go back inside the building, correct?

A That's correct.

Q And so, other workers went back inside the building after you said that, correct?

A Sure, they did.

Q Except for—you remember Brian Kresge stayed out on the scene, correct?

A Yes.

Q Do you remember anyone else staying out on the scene?

A I don't recall. I honestly can't tell you.

Q Then, at some point you said the police, they arrive, and they start taking measurements and taking photos, correct?

A They were measuring, chalking off, and taking photos.

Q And, is Al Coxe still there on the ground or is he in an ambulance now?

A I don't remember.

. . . .

Q And, regardless, you're saying—at some point do you remember the ambulance leaving?

A Sure, it left.

Q Do you remember the police leaving?

A The police left.

Q No, you said on direct some point before the police left you asked an officer if you could move the forklift out of the middle of the roadway, you said on direct, correct?

A That's correct.

Q And your response which you said on direct was the officer said yes, you could move it out of the middle of the road?

A Yes.

Q And,—

A He said his investigation was done, he said I could move it. That's correct.

Q And, do you remember which officer that was?

A No, I don't.

Q Well, you heard the testimony of Scott Faubert, correct?

A Yeah.

Q And, you heard him saying when he testified that Officer Schmeltzly told you, you could move the forklift out of the middle of the road, correct?

A That's what he said, I don't recall the policeman's name.

Q So, even though Scott Faubert said it was Officer Schmeltzly, you—

UNIDENTIFIED ATTORNEY: No, he didn't say that, Judge, he said he thought it was Schmeltzly.

COURT: Okay.

Q So, you don't know who the officer was?

A That's correct.

Q Now, the forklift, after the police leave, is when you first move the forklift, correct?

A George Shepherd drove down the road behind the—

. . . .

Q After the police left is when you first moved the forklift, correct?

A After they left where? They were still on the property when the forklift was being moved.

Q Okay. So, your testimony is the police are still there and the forklift is being moved, correct?

A They were still on the property.

Q Well,—

A They're not at the scene, they're driving down the road, and George Shepherd was driving the forklift behind the car. I don't know the distance behind him.

. . . .

Q Now, you also heard the testimony of George Shepherd, correct?

A Yes.

Q And, he testified on 1–18–06, pages 39–40 . . .

"Q After the police left what happened?

"A Well, we got everybody to go back to work, all maintenance and all that, we had to get everybody back to work, trying to get, you know,—resume production. The forklift was just sitting there and it was in the main—the roadway, so Jeff come up, and I says, "Yeah, I heard him"—

Q I'm sorry.

"A—and John told Jeff to tell me to take the forklift down to the garage and have the mechanic go over it. So, Jeff come up and I says, "Yeah, I heard him, I'll take it down to the

garage and I'll tell them to look at the forklift."

Q So, George Shepherd testifies that the forklift isn't moved until after the police leave and everybody's told to get back to work, do you disagree with that testimony?

A Yes, I do.

. . . .

Q So, after police leave everyone told to get back to work, and John Prisque tells Jeff Maury to have George Shepherd take the forklift down to the garage. You disagree with that?

A Yes, I disagree with that.

Q Well, isn't it a fact that John Prisque did tell you, regardless of timing, to tell George Shepherd to take the forklift down to the garage?

A No, that's not a fact.

Q So, was John Prisque on the scene?

A I don't recall.

Q You don't remember if John Prisque was there?

A I don't remember everybody that was there.

Q This is as the police were leaving, you're saying you don't remember if John Prisque was there, correct?

A I don't remember if he was or not.

Q So, your testimony is, you yourself made the decision as maintenance superintendent to move the forklift, correct?

A Yes.

Q And, when you made the decision to move the forklift by yourself you told George Shepherd to move the forklift, correct?

A After I asked the police officer, George Shepherd was standing behind me and I turned to George Shepherd and asked him to move—drive it down to the garage, that is correct.

Q And, as far as the police conversation that you had, you obviously—you never told the police, "We're moving the forklift down to the garage", correct?

A I don't remember what I said.

. . . .

A I know I asked him if I could move it.

Q You asked if you could move it out of the middle of the road, correct?

A Yeah.

. . . .

Q Now . . . the police, eventually they drive off the premises, correct?

A Yes.

Q And, George Shepherd is on the forklift driving, correct?

A That's correct.

Q And, George Shepherd worked for you, correct?

A That's correct.

Q He was under you in the chain of command, right?

A That's correct.

Q And, you're walking next to George Shepherd and the forklift, correct?

A I wouldn't say next to him, I would say I'm walking down with him. I wouldn't say next to him.

. . . .

Q And, how far is the garage from where the incident scene was? From this photo?

A I could show you on the photo.

Q Do you have—I mean, is it a 100 yards? Is it 200 yards?

A I don't know.

Q You don't know?

. . . .

Q So, as you were saying, you never specifically told the police, "We're tak-

ing the forklift down to the mainte-
nance garage", correct?

A I don't exactly know my exact
words, like I said before, but I know I
asked him if I could move the fork
truck.

. . . .

Q When you get to the maintenance
garage, your testimony is you don't
know if you get there first or George
Shepherd gets there first, is that fair
to say?

A No, the forklift was definitely first.

Q So, you do remember? You're say-
ing the forklift was first?

A You asked me if George Shepherd
was there when I got there. I said I
don't recall if he was there or not. He
may have left by the time I got there,
I don't recall. The forklift was there
before I got there, that is correct.

. . . .

Q And, again, how long before you get
there, between this walk down to the
maintenance garage, do you know,
how long is it that the forklift is there
before you get there?

A I don't know.

Q Well, let me ask you, was the forklift
in your line of vision the whole time?

A Probably it was, but I can't give you
an honest answer, I don't know.

Q Is your memory hazy on this date,
March 24th, 2000?

A What do you mean hazy?

Q It seems like, are you having trouble
remembering what happened that
day?

A About what?

Q About the incident?

A Which incident?

Q Well, let's talk about you and George
Shepherd going down to the mainte-
nance garage.

A Yeah.

Q Do you remember what happened as
you went down to the maintenance
garage that day?

A Yeah, I walked down to the mainte-
nance garage.

Q Okay. And, that's what I was asking
you, is the forklift in your line of sight
the entire time it's going to the main-
tenance garage?

A Did I watch it the entire time walk-
ing down to the garage?

Q Yes?

A I don't believe I did.

Q So, you did other things?

A I walked down—I walked down the
road.

. . . .

Q This stands out in your mind, this
day, right?

A The accident does, sure it does.

Q And, but bringing the forklift down
to the maintenance garage, that
doesn't stand out in your mind?

A No, it doesn't.

Q But, what you do remember is you
getting to the maintenance garage,
correct?

A Sure.

Q But, you don't know if you're even
there when George Shepherd gets off
the forklift and leaves the mainte-
nance garage, correct?

A I don't remember if he was or not.

Q So, if George Shepherd has a con-
versation with Jimmy Yukna, the me-
chanic, you weren't there, correct?

A I don't know.

Q You don't know? And, if there's
other people in the maintenance ga-
rage or at the maintenance garage
such as Bobby Fretz, do you remem-
ber that?

A No, I don't.

Q You don't. You're not saying he was or wasn't there, you don't remember?

A I just don't—I don't know who was there.

Q Okay. You don't know who was there?

A No.

Q You remember when you get to the maintenance garage, the thing you do remember is speaking to Jimmy Yukna?

A Yes. Yeah.

Q And, you remember speaking to Jimmy Yukna when you get to the maintenance garage because your testimony is you tell him not to touch the forklift, correct?

A That is correct.

Q Now, when you're driving—I'm sorry, when George Shepherd is driving the forklift and you're walking with him do you remember George Shepherd trying the brakes?

A No, I don't.

Q Again, going to George Shepherd's testimony on page 42, line 10

"Q Now, after Mr. Prisque gave his instruction to Mr. Maury did you have a conversation with Mr. Maury?

"A Yeah. He told me to take the forklift down to the garage, so I got on the forklift and turned around—

"Q Mr. Shepherd, you're going to have to keep your voice up just a little bit.

"A I got on the forklift and I had to turn it around because it was facing the other direction and I was driving it and Jeff was just walking next to me. While we were walking down he asked me to try the brakes and I tried them, and my foot went down to the ground, and I knew.

And, I had to pump them to slow down, to stop. I told him, "The brakes ain't working right. They're not working." So, we just took it down to the garage and Jeff, he just—I didn't see him, he just went on his way."

Q Why don't we just stop there. Then go to the next question. You heard that testimony of George Shepherd?

A Yes, I did.

Q Is that accurate?

A No, it's not.

Q You disagree with that testimony?

A Sure. The brakes were never a question in my mind. I seen the skid marks, the cops measured the skid marks, the cops chalk lined the skid marks, they photographed the skid marks. The brakes were never a question in my mind.

Q The question is,—I'm sorry.

A The brakes were never a question in my mind.

Q So, when George Shepherd says you told him to try the brakes, he tried the brakes, and his foot goes down to the ground, they don't work, and he tells you the brakes aren't working, that never happened?

A That never happened.

Q You never said anything to him about the brakes?

A Never.

Q He never said one word to you about the brakes?

A Never.

. . . .

Q Now, from the testimony in this case and what we went through yesterday as far as the maintenance of Number 24, you as the maintenance superintendent knew prior to March 24, 2000 that this forklift had problems, right?

A I wouldn't say—I wouldn't say that was on my mind on the day of this accident, no, I wouldn't say that.

Q Okay.

A That was probably furthest from my mind.

Q That was furthest from your mind? But, after the accident you're saying you never thought—well, December, January, February, March, Forklift Number 24 is having problems, that never entered your mind?

A No.

Q You never thought about the maintenance of the forklift, although you were in charge of the overall maintenance of all the forklifts in the plant? That never entered your mind on that day?

A No, it did not.

. . . .

Q Now, as far as the forklift getting down to the garage, I believe you testified yesterday about red tagging forklifts, correct?

A Yes.

Q And, the procedure of red tagging forklifts is to park it and put a red tag on it and take the key so nobody can use it, correct?

A That's correct.

Q Okay. But, in this instance when Al Coxe gets run over by a forklift and the police and the ambulance leave, instead of red tagging the forklift you make the sole decision to bring the forklift to the garage, correct?

A Say that again, please?

Q Instead of red tagging the forklift and parking it on the side of the road, this day, after Al Coxe gets run over by the forklift you make the sole decision to tell GS to take the forklift down to the maintenance garage?

A That's correct.

. . . .

Q Well, after you speak with Yukna where do you go?

A I went back into the plant.

Q Into which—the whole plant?

A Well, I headed back up the road, back into the plant.

Q And, you don't see the forklift for four or five hours, correct?

A I didn't see it until—until I was told to bring it back up for OSHA, whatever that time—whatever that time period was. I don't know what the time period was.

. . .

Q So, you drive the forklift from the maintenance area, down the road, up to the personnel area?

A That is correct.

Q And, when you get up to personnel, who's there?

A I don't remember everybody that was there.

Q Who do you remember being there?

A I know Scott was there. OSHA was there. I don't remember everybody that was there.

. . . .

Q So, you bring the forklift up to that area, correct?

A That is correct.

Q You get off the forklift, correct?

A That is correct.

Q You had no problem stopping the forklift, correct?

A That is correct.

Q That brakes worked fine at that point, correct?

A That is correct.

Q And, you turn the keys over to Scott, correct? Mr. Faubert, right?

A Yeah, I believe I did, yes.

Q And, after you give the keys to Scott Faubert what do you do?

A I leave.

Q And then, I believe you testified on direct you see Scott Faubert driving the forklift, but you didn't see what he was doing?

A That's correct.

Q So, you say Scott Faubert get on the forklift and start driving it?

A I don't remember if I seen him getting on it but I know he was—I know I seen him driving it.

. . . .

Q .... Now, when you originally spoke to Mr. Yukna and you said you went back into the plant, between that time and the time Scott Faubert calls you to tell you to bring the forklift up to the personnel area, did you speak to John Prisque?

A I don't believe I did, I don't recall. I don't believe I did.

Q Did you speak to Scott Faubert?

A Before OSHA got there?

Q Yes?

A I don't think I did. I'm not sure.

Q So, your testimony it was business as usual from 7:00 to 11:00, 12:00?

A No, no, I wouldn't say that.

Q Well,—

A I wouldn't say it was business as usual, somebody just got hurt.

Q Somebody got killed, Mr. Maury?

A He wasn't killed then.

Q Okay. When was he killed?

A Pardon me?

Q When did you find out he was killed?

A I don't know the time, but I think OSHA was there when I found out.

Q Did you find out before OSHA got there?

A I don't remember the exact time.

Q So, Al Coxe gets run over by a forklift 6:00 in the morning, correct?

A That's correct.

Q You bring the forklift up, as George Shepherd drives it to the garage, as the police were leaving, you're saying, correct?

A That's correct.

Q You speak with Mr. Yukna about 7:00 in the morning, correct?

A I can't put a time to that, I don't know.

Q For about four hours you go back inside after you speak with Mr. Yukna and you go about your business, correct?

A I couldn't put a time limit on that, but—

COURT: Several?

A Several hours . . . .

Q And, during that time period you're stating that you had no conversations with John Prisque the plant manager?

A I said I don't recall if I did.

Q Okay. Well, did you have any meetings between 7:00 and the time period where you brought the forklift up to the personnel or the dispensary?

A No. No, we didn't have no meetings.

Q There was no talk between yourself and John Prisque about the forklift incident, correct?

A I don't recall if there was or not.

Q You don't recall if there was any talk between yourself and Scott Faubert about the forklift incident, correct?

A No.

. . . .

Q Now, on the 24th, I know we spoke about bringing it down to the maintenance garage, my question is, out of all the places that we spoke about in Atlantic States you brought it to the

maintenance garage, correct? On the 24th?

A That is correct.

Q You didn't bring it to the dispensary and park it in one of the parking spaces, correct?

A No, I took it to the garage because I knew—I had trusted Jimmy Yukna to keep an eye on it, I did not want anybody to touch it.

Q Okay. Well, you could have accomplished the same goal if you parked it right there, correct? And, taken the key?

A No, I don't know if I could have or not.

(Tr. 520 at 5–53.)

On redirect examination concerning Count 9, MAURY testified:

Q You were asked questions about why did you take the forklift to the garage, rather than park it—you remember that question?

A Yes.

Q Would there be any reason to park the forklift outside?

A I took it to the garage because I trusted Jimmy Yukna to watch it. And make sure nobody touched it.

Q It was more secure there?

A Yes.

Q Than sitting out in the open?

A Yes.

Q Did you move that forklift—until you got permission from the police?

A No.

Q Was the forklift sitting in the middle of the road and blocking it?

A Yeah, it was right in the middle of the road.

Q Why did you tell—you started to answer this question, and [the government] said he would get back to

it. But it had to do with why did you tell Yukna not to touch the forklift?

A Because I didn't want nobody to touch it. The police did their investigation, you know, whatever they found they found. You know, I didn't know at that time if OSHA was coming or not, and they could do their investigation.

(*Id.* at 86–87.)

This Court makes the following findings as to the government's evidence on Count 9, and the specific contrary testimony of MAURY:

(1) The facts in the government's evidence concerning the actions of defendants including MAURY, to conceal from OSHA the defective condition of the forklift involved in the Coxe fatality, were the essential facts necessary to support the verdict on that count. Therefore, the falsity of the conflicting testimony by MAURY is necessarily implicit in the jury's verdict on Count 9. In addition, we find that the government's evidence on that count was sufficiently credible on the essential facts disclosed in that evidence, as corroborated by an array of various witnesses and documents, and that the conflicting testimony of MAURY on the same factual issues was false.

■ (2) The Court makes an independent finding that MAURY's testimony on Count 9 was willfully false. This finding is supported by evidence other than the jury's having disbelieved him. Given the nature and extent of the testimony of the government's witnesses who contradicted MAURY regarding the essential facts, on which MAURY could not have been mistaken (although he certainly did deny those facts), we find that MAURY's testimony on those facts under Count 9 was willfully false.

### c. Count 27

Count 27 alleged that between on or about December 4 to December 5, 1999, defendants ATLANTIC STATES, PRISQUE, MAURY, and DAVIDSON knowingly discharged and caused the discharge of a pollutant into navigable waters by causing petroleum-contaminated wastewater to be pumped from the cement pit through a hose into a storm drain leading to the Delaware River, resulting in an 8.5 mile oil sheen on the Delaware River, without a permit authorizing such discharge. (*See* dkt. 721 at 215.)

The jury found all three of the named individual defendants not guilty on the felony charge, but guilty on a lesser-included negligence violation under the CWA. (*Id.*) It also found each of those named defendants guilty of the conspiracy objective to intentionally violate the CWA, Objective A. (*Id.* at 112–113 n. 64.) The verdict found defendant ATLANTIC STATES guilty of the felony charge on Count 27, as well as the corresponding objective of the alleged conspiracy. (*Id.* at 3 n. 4 and 112–113 n. 64.) We have held, in ruling upon the post-trial motions, that the evidence was sufficient to establish each of the essential elements of the felony offense charged against each of the defendants named in Count 27, despite the fact that the jury found those individual defendants not guilty of the substantive felony and guilty of the corresponding felony conspiracy objective. (*Id.* at 230–231.)

▮▮ This Court recognizes that an enhancement under Section 3C1.1 can be applied not just when a defendant is convicted of a count, but when defendant is acquitted on a particular count and stands before the court for sentencing on other counts under which defendant was convicted. *See, e.g., Lipscomb,* 284 Fed. Appx. at 926–27 (defendant convicted on four bankruptcy fraud charges and acquitted of misuse of a social security number; Section 3C1.1 adjustment for perjury affirmed, the Court of Appeals commenting that "[t]he jury arguably believed his story, as [defendant] was acquitted of the misuse of a social security number charge.... Regardless of the actual effect [defendant's] statements had on the final verdict, they targeted at least one of the charges contested at trial.").

The government has not argued that a Section 3C1.1 enhancement is applicable to defendant PRISQUE for Count 27. (*See supra* n. 88.) The government has provided no rationale beyond the fact of conviction of the lesser included offense under Count 27 for applying it to defendant MAURY. (*See* Gov. I at 61.) We deal with defendant DAVIDSON on this topic when we address his potential enhancement under Section 3C1.1 *infra.*

This Court has undertaken to address every substantive felony conviction of each individual defendant within the framework of a potential enhancement for perjury under Section 3C1.1, where sought by the government. Recognizing that the Court can impose such an enhancement where the verdict on a particular count is not guilty (or, as here, guilty on a lesser included offense), *see Lipscomb,* we nevertheless decline to make any findings under Section 3C1.1 on Count 27 as to defendants PRISQUE and MAURY. The reason for this ruling is that in our view, the government has not provided the Court with argument that would address its burden of persuasion on that count, and the Court is not inclined to make an independent evaluation of whether their testimony on Count 27 was willfully false at trial, given that the verdict on that substantive count was a misdemeanor conviction only.

### d. Counts 28–33

Counts 28–33 alleged that during the months of May through October, 1999, de-

fendants ATLANTIC STATES and MAURY knowingly discharged and caused the discharge of a pollutant into navigable waters by causing petroleum-contaminated wastewater to be pumped at night from a pit under casting machine #4 into a storm sewer that led to the Delaware River, without a permit authorizing such discharge. (*See* dkt. 721 at 231.)

The jury found both named defendants guilty on Counts 28–33. This Court granted their post-trial motion for judgment of acquittal on Count 33, while denying their motion as to the verdicts on Counts 28–32. (*Id.* at 242–243.) This discussion therefore only applies to the counts of conviction, Counts 28–32. The government's evidence on those counts included foundation evidence concerning the wastewater disposal system permitted by NJDEP in that location, and the testimony of workers including Brad Schultz, Kevin Redcay, Robert Bobinis and Joseph Delker. (*Id.* at 242–243.) Here we give a brief overview of that evidence.

There was a large pit in the casting department underneath casting machine #4, which typically contained large amounts of petroleum-contaminated wastewater. It could be drained or lowered only by pumping, and it had to be kept below overflowing level to prevent explosions during production. The fluid in that pit could be pumped through trenches to outdoor holding tanks, sometimes called "clearwell tanks." There was a storm drain in that portion of the roadway. The same fluid could also be pumped out back of the plant, where other storm drains existed downhill. Workers testified that they would frequently see the outside holding tanks overflow during production, and they would see dark, hot, muddy water coming from those tanks and flowing into the storm drain in the roadway. Contents of this pit were also typically pumped during the night cleanup shift, to keep the level sufficiently contained for production. None of the workers were given the complete details about the water system (or systems) in the melting/casting area; they only knew their assigned tasks and what they observed. Schultz testified that he worked under foreman Bobinis during the relevant period, and on three occasions at night, he was directed by Bobinis to pump liquid from the #4 pit. On each occasion he pumped it through a hole in the back wall of the building, where he saw only a pile of dirt and knew nothing more about the area. Delker testified that he worked occasionally in a section called the water treatment plant in that department, but frequently it was not operational and the untreated water would just go back through the system. Bobinis provided the rest of the testimony. He said that he was directed in the procedure for pumping of the #4 pit by MAURY throughout the relevant period, which was at a frequency of approximately once or twice a week. Sometimes he would pump to the destination at the rear of the building, and sometimes he would pump into the outside holding tanks. The tanks, he said, would frequently overflow onto the roadway and into the storm drain, as would the trenches overflow into the roadway. Bobinis described a conversation he had with MAURY one night when they were taking a break and sitting near the storm drain across from the holding tanks, and both could see the tanks overflowing into the drain. Bobinis told MAURY that Bobinis did not want to go to jail for this, and MAURY just said "ssshhh," with a gesture to his lips. Bobinis testified that his employment was terminated shortly thereafter (records show it was Oct. 1, 1999), and no one would explain why. (*Id.* at 232–239.)

This Court found, in the post-trial opinion (applying the standard of Rule 29), that

the evidence could support a finding that some of the outside holding tank overflows, especially during production mode, were accidental or negligent, but that did not obviate the evidence of instances of intentional pumping into the same overfilled tanks during maintenance activities at night, with the inevitable result that the fluid would discharge into the nearby storm drain; and that the evidence of intentional pumping to the back of the plant would have the same effect. (*Id.* at 241.) We concluded:

> We do hold that the evidence was sufficient to establish each of the essential elements of the offenses charged against the named defendants in Counts 28 through 32, covering the months of May through September, 1999. The evidence for that period, as summarized above, was sufficient to support a reasonable finding that the named defendants did knowingly cause, and/or willfully aided and abetted, discharges at least monthly of petroleum-contaminated wastewater, by pumping at night from the #4 pit into one or more storm drains leading to the Delaware River.

(*Id.* at 243.)

Defendant MAURY testified extensively concerning Counts 28–33. (*See* tr. 515 at 25–69; tr. 517 at 88–146; tr. 520 at 93–97.) Here we quote a fair sampling of that testimony on direct, cross and redirect examination.

On direct examination concerning Counts 23–33, MAURY testified:

Q First of all, did you ever intentionally pump thousands of gallons of petroleum contaminated water from pit number 4 into the Delaware at any time you worked at Atlantic States Cast Iron?

A Never. Never did.

Q Would there be any reason—

A No.

. . . .

Q Now, do you recall the testimony of Robert Bobinis?

A Yes.

Q And you recall his testimony about pumping pit number 4—

A Yes.

Q —into the Delaware?

A When the system is in operation, in other words, when you're in pipe production what kind of water usage do you have? Let me put it this way, how important is water to the system to the process of making pipe?

A Very important.

Q Is water stagnant or is it in motion during pipe production?

A During pipe production it's in constant circulation.

Q At night when the production had to shut down—when I say the production end I mean the pipe making end. What happens to the water?

A It just sits there. It don't move.

Q Would you have any reason in the middle of the night to pump out pit number 4?

A No. the only time we would take water out of that pit is if we had to change a pump. We had to get down in the pit and change a pump. That's the only reason.

. . . .

Q There was some testimony about pumping out back. Do you recall that testimony?

A Yes.

. . . .

Q Would there ever be a time when you might pump number 4 out behind number 5 casting machine?

A Yes.

Q And if you did that where would the water go?

A The water trough from cupola scrubber quencher system runs through the wall behind number 5 casting machine, behind number 6 casting machine alongside number 6 casting machine all the way long to the front and it runs over to the waste water treatment plant.

Q Was it pumped into a drain?

A No, it was pumped into a trough.

. . . .

Q If you could come down again. You pumped out back behind number 5. Where are you pumping into? Where would you run the hose and where would it be pumped into?

A We'd run the hose right between this wall right here, this little cut out, right into this pit.

Q Now, that pit looks awful dirty. What's in that pit?

A That's the muddy water that comes from the cupola scrubber quencher. This pipe right here is a drain and this pipe right here is draining. Two drains. One from the scrubber and one from the quencher.

Q When you say drains, what do you mean drains?

A It's piping that comes down into the water after it cleans the air in the scrubber or the quencher it drains (indisc.) into this bit pit. It's probably about 12 foot deep. . . . And right in the corner of this wall is where the trench goes under the wall and the trench is underground. Well, in the ground with face covering.

Q . . . . If you could . . . show the jury with the pointer on this diagram how the water would flow and where it would go.

A This path is right here behind number 6, number 5, number 4 casting machines, it goes through the wall into the trench. This is the trench and it flows between number 6 and 7 right down (indisc.), it swings around behind the pullers and it goes into the sump that's (indisc.).

Q Now, let's go back to 1999 between May and October of 1999. Did you know Robert Bobinis?

A No, I did not.

Q How did you come to meet Robert Bobinis?

A He was selected to be maintenance foreman.

Q Prior to May 13th of 1999 what shift did you work?

A I worked first shift.

Q Did there come a point in time when you were moved to second shift?

A Yes.

Q Do you recall when that was?

A May 13, I believe.

Q And where were you working? What department were you working?

A I was taken out of maintenance department and I was second shift superintendent.

Q For what department?

A For the plant. Second shift for the plant.

Q How long were you on second shift?

A Until June 25th when Kenneth Fairchild, Jr. quit.

Q What was [he] at that point?

A He was maintenance manager.

Q And he quit in June of 1999?

A Yes.

Q How long a time was that maintenance manager spot vacant?

A Somewhere around 12 days.

Q When Fairchild quit were you moved—was your shift changed?

A Yes, I was moved back to first shift and put into maintenance.

Q Did there come a time when you moved back to second shift?

A I moved back to second shift when Mr. Bobinis failed his drug test and they didn't have a foreman for second shift so I went back to second shift and I had to run the second shift.

COURT: As a foreman?

WITNESS: As a foreman. I was maintenance superintendent filling for the foreman's slot.

Q How long were you working second shift after Bobinis—was he suspended?

A He was suspended.

Q For how long a period of time?

A I don't know exactly how long. Maybe three weeks somewhere around there. Three, four weeks.

Q When he was returned to work did you stay on second shift or move back to first?

A I went back to first shift.

Q And first shift maintenance?

A First shift maintenance.

Q Now, how well did you know Robert Bobinis?

A I didn't know him at all.

Q Do you recall Robert Bobinis testifying that you and he were sitting out by some pipe one night at the plant?

A Yes.

Q Do you recall him testifying that water was just freely running into the drain?

A Yes.

Q Do you recall him testifying I'm not going to jail for this?

A Right.

Q Did that conversation ever take place?

A No, it did not.

. . . .

Q What was your relationship with Robert Bobinis?

A I had a working relationship with him. I really didn't have no relationship. I didn't even know him.

Q Did you have a conversation with him about the water where he said I'm not going to go to jail for this and then went shh?

A No.

Q Did that ever take place?

A No. Never. Never took place.

(Tr. 515 at 25–50.)

Q Then [Bobinis] stated—he described it as follows. The troughs were like a catch basin for casting machines and the water went into it. Is that an accurate statement?

A Yes. The water from the casting machines went into the trough.

Q When the water was in the casting machines it cooled the casting machines. Is that accurate?

A No, that's not accurate.

Q What did it do?

A It didn't cool the casting machines, it cooled the molds in the casting machines. It didn't cool the casting machines.

Q And then he said it went down as the machines came back down the tracks to cool the machines it came out a drain into trough [sic] with the fluids pumped out of pit number 4. Is that accurate?

A The only trough that it pumped into was over by number 4. They all tied together, all the casting machine troughs tied together at the sump

and then the sump drained to the casting cooling tower.

Q Then he went on to say number 4 pit went into the same troughs which in turn went into the tanks outside which couldn't hold the capacity. Do you recall that?

A Yes.

Q Is that accurate?

A Yes.

Q Is that accurate?

A No, it's not.

Q Could number 4 do what he described here?

A The water in number 4 pit?

Q Yes.

A The water in number 4 could be pumped into the troughs that led to the casting and cooling tower. The water from the casting machines could not go to the clear well tanks.

Q So what Bobinis described, is that an accurate statement or an inaccurate statement?

A Inaccurate. The water from the casting machine could not go to the clear well tanks.

Q So we have the six casting machines here. And this system didn't have any relation to [t]his system in terms of the waste water treatment.

A The casting cooling system was a separate system from the waste water treatment plant system.

Q Then he went on to say they were built to hold the capacity for the machines themselves. Do you understand what it means by they? Does it mean the clear well tanks? It that your understanding?

A That's my understanding. Yes.

Q Is that an accurate statement?

A That is absolutely not true. That is false. The casting water did not go to the tanks.

(*Id.* at 25–54)

Q ... Remember Robert Bobinis talking about waste water treatment plant always being down?

A Yes.

Q If waste water treatment plant is down do you operate the plant?

A No, you can't.

Q Why not?

A You need the water in cupola scrubber quencher in order to run it. If you don't have water you have a dirty plume and you're polluting the air. You cannot run. Plus there are safeties on the cupola that are shut down if you don't have water.

Q I want to show you these pictures.... Do you recognize what they depict?

A Yes.

Q What do they show?

A They show the waste water treatment plant, the truck where the mud is conveyored up into the truck, and it shows the sump with the two pumps in the waste water treatment plant.

. . . .

Q What is a lamella?

A The lamella is where the water is pumped up from the sump, the dirty water gets pumped up from the sump, and the solids are separated from the water. The solids drop down. The water goes through veins, and the water ultimately goes into the clear well tanks. And the solids drop down into an agitator, and then ... it gets pumped on to the mud press where the water is pressed out of the mud. So, we save the water and discard the mud.

. . . .

Q What is that a picture of, Jeff?

A That is the two sump pumps and down-comers—the sump is underneath the ground. This is the sump that was being put in August of '99.

Q On this diagram, here, this story board diagram. . . . Is this what is shown there?

A Yes. . . .

Q Now where does that water get pumped to?

A This water—the water that's in the sump?

Q Right.

A It gets pumped up into the lamella.

Q And the lamella cleans it?

A Yes.

. . . .

Q Then it goes where?

A Once it comes through the lamella in through that system it goes out to the clearwell tanks.

Q Is it gravity fed or is it pumped?

A It's gravity fed.

Q And then from the clearwell tanks, how do you get it from the clearwell tanks back up to the cupola—

A It does to the clearwell pumps. The clearwell pumps pump it—

Q These two pumps here?

A Yeah, one's a spare, one—you alternate them. . . .

Q And then it goes where?

A It pumps it up into the cupola scrubber quencher system.

Q And is that—underneath that, is that dirty picture we saw a little while ago?

A That's the water that comes from the cupola scrubber system.

Q And it goes in this direction. Is it gravity fed or pumped?

A It's gravity fed.

Q And then it goes into where?

A Into the sump.

Q And then back around again?

A The sump—the two pumps in the sump pump it up into the wwtp, and it's just a continuous cycle.

(*Id.* at 59–65.)

Q Now, just so we're clear, this pump here shown in the front of the picture. . . .

 COURT: Are we talking about the water supply system for the cupola scrubber system?

 COUNSEL: No, we're talking about the casting.

 COURT: Okay, you're on the casting water supply system.

 COUNSEL: Right.

Q I want you to tell the jury where this pump pumps the water.

A This pump pumps it into the trough on the left of the casting machine, number 4 casting machine, into the water trough, over to the sump, and then . . . from the sump goes to the casting cooling tower.

Q Is that sump—when water travels from the sump to the casting cooling tower, is that gravity fed or pumped?

A It's all gravity fed from the casting machines—from the casting machines all the way to the cooling tower. It's all gravity fed.

Q Now, when it gets to the cooling towers, what do these two pumps do?

A These are the supply pumps for the cooling tower.

. . . .

Q And where [does] it pump to?

A It pumps—takes the water from the casting cooling tower, and it pumps it over to the casting floor where it's distributed to each of the machines.

Q Now, these two pumps here which are shown on the top of the floor, where do they pump?

A They are pumped to the trough, the wastewater treatment trough, which goes to the sump in wastewater treatment into the treatment plant.

(*Id.* at 66–67.)

On cross examination concerning Counts 23–33, MAURY testified:

Q Now, Mr. Bobinis testified on December 7th, 2005 (indisc.). You said you didn't know Robert Bobinis until after August, '99, when you said—you testified on direct—you worked for him because he was suspended?

A No, no. I don't think I said after August. I didn't know him before he started working at Atlantic States. Sometime in there is when I got to know him in a working relationship. That was it. I didn't know nothing really about him or anything. I don't think I said after August. I said he came back to work after August, after the August shutdown.

Q So—

A Because he failed his drug test.

Q So before that, I mean, you knew Robert Bobinis in June, July, 1999? You knew him?

A I can't put a month to it.... I cannot put a month to when I met him. I can't put a date.... Sometime, when he was working there, is when I met him.

. . . .

Q Now, he said—on 12–7–05—that you directed him to pump the liquid out of casting machine number four and it would be drained once or twice a week. Do you recall that testimony?

A I recall it.

Q Do you agree with that?

A That I told him to pump the water out of the pit?

Q The liquid out of casting machine number four, right.

A I don't recall telling him that, no.

Q So you don't recall? You don't remember? It's not that it never happened?

A If we had to change a pump, we had a pump to water [sic] out to get to the pump.

Q If we had to change a pump, we had to take the water out, is that fair to say?

A To get the pump, yeah. If, of course, there was water in it. There's not always water in the pit.

Q So that's—

A No, it wasn't drained once or twice a week. That didn't happen.

Q That part didn't happen?

A No, it didn't happen.

. . . .

Q [Looking at daily manning reports] And who is listed as the foreman on all of them?

A I'm listed so far.

Q: And you ... were the foreman for that month of June, 1999—

A I was the fill-in.

. . . .

Q What shift is that on those documents?

A The second shift.

. . . .

Q So Robert Bobinis was working for you on June 1st, 1999, correct?

A Yeah.

Q Okay. You testified five minutes ago that he didn't work for you.

A I was not sure. I stand corrected.

Q So he did work for you?

A I stand corrected.... I can't remember everybody's name that works for me.

Q You can't remember everybody's name during that period? How many men were working for you on that day? Let's back it up. How many men did you sign out that day?

A Well, you're only—you're mischaracterizing this, okay. You're pulling one day out or these dates out. I'm normally on first shift. They missed—they lost a foreman, as the first page you could see. So I got put on second shift to run the second shift. I mean, it's not uncommon for me to go from first shift to second shift to third shift.

. . . .

Q You were filling in because somebody quit, correct?

A Pardon me?

Q The foreman quit?

A I don't know what his—I don't recall what he—if he quit, if he was fired. I don't recall.

Q And that's why you filled in, correct?

A We lost a foreman and that's why I filled in.

Q So going to June 2nd, 1999, again, you're listed as foreman at the top. Was Robert Bobinis working for you again on that day?

A Yeah.

Q You signed him out, did you not?

A Yes.

. . . .

Q And we won't go through the whole month. There's 21 days that you have in front of you, correct?.... For June?

A I didn't count them. I don't know.

Q All right. Well, it goes from 1 to 21, correct? You can leaf through it.

Mr. Bobinis worked every one of those days on the second shift maintenance, correct?

A Do you want me to go through them all?

Q Sure.

A I'll go through them all.

Q I mean, if you want, look through them.

A Well, sure, I do.

Q To see if he signed out.

A My life's on the line. Sure, I do.

Q Take your time.

. . . .

Q Now that you've gone through them, ... you were listed as the foreman at the top of all those documents, correct?

A Yes.

Q And Robert Bobinis has that he worked and signed in—was signing in and out for those 21 days?

A Yeah. Those two aren't my handwriting.

Q Okay. So 19 out of those 21 days in June, you worked with Robert Bobinis, correct?

A As supervisor, sure.

Q And five minutes ago, you testified he never worked for you in 1999?

A I wasn't sure.

. . . .

Q So now you're sure that he did work for you in June of 1999, correct?

A Well, that's what the documents say.

Q That's what the documents say?

A Sure.

Q Do you have a reason to believe that the daily manning reports are inaccurate?

A No.

. . . .

Q So he worked with you 19 out of 21 days in June of 1999, correct?

A Yeah.

Q So when you said you didn't know Robert Bobinis in June of 1999, he never worked for you—

A I wasn't sure.

Q Now you're unsure?

A No. Now, I'm sure.... I was unsure.

Q [N]ow that we know he did work for you in June, 1999—Robert Bobinis also said one evening, around three or four a.m., you, Jeff Maury, and Robert Bobinis were sitting out on the pipes watching the overflow. And Robert Bobinis said to you, "I'm not going to jail for this." And you put your fingers to your lips and you said, "Shh." Are you sure about this?

A Positive.

Q Did it happen or not happen?

A Didn't happen.

Q Okay. Your testimony is it didn't happen?

A (No verbal response).

Q Mr. Bobinis and Jeff Maury—what I wrote—"Bobinis and Jeff Maury, at three or four a.m., sitting on the pipes watching the overflow. He said, "I'm not going to jail for this." Then Jeff Maury put his fingers to his lips and said, "shh"." This has never happened?

A Yeah. He said that happened in September, I believe.

Q My question is, did it happen or not?

A No, it didn't happen. That's my answer.

(Tr. 517 at 85–99.)

Q Mr. Schultz testified that while you were Robert Bobinis' supervisor, that Bobinis directed him to pump out casting machine number four pit. He testified on 12–13–05. Do you have any knowledge of that?

A No, I don't.

Q And now, we've been through daily manning reports for Mr. Bobinis. So do you recall Mr. Bobinis being a foreman at some point?

A Yeah, I recall him being a foreman. And then, he failed his drug test and he was suspended. And he came back after suspension.

Q He came back as a foreman?

A He left as a foreman, failed the drug test. He was suspended, and then he came back after suspension—after the shutdown.

Q He came back as a foreman?

A He left as a foreman, failed the drug test. He was suspended, and then he came back after suspension—after the shutdown.

. . . .

Q As a foreman?

A As a foreman. Yes .... We have— we should have manning reports with that on, too, if I'm not mistaken.

Q Yes. And I just wrote, "Bobinis' supervisor, Jeff Maury. And Schultz was directed to pump out casting machine number four pit." You have no knowledge, is that fair?

A Yeah, that's fair.

(*Id.* at 103.)

Q Mr. Redcay stated that clearwell tanks—we're on page 133—a good percentage of the time they would have overflowed and overflowing. Typically when you went by a time clock there was a pool of water consistent with productions had liquid, and it was black and mud, oil, residue, everything, and it went down in the facility by the drains and drain off into the drain.

A I disagree with that.

Q Do you disagree with that statement?

A Yes, I do.

Q When you were at Atlantic States would the clearwell tanks overflow?

A At what time?

Q From 1998 to 2003?

A Up until—towards the end of 2000, no, they did not.

Q Then afterward, then, in 2000?

A What's that?

Q You said up until 2000, the end of 2000.

A Yeah.

Q What happened then?

A There was a time—I think I can remember two times they did overflow.

Q Do you remember two—

COURT: What year:

WITNESS: Sometime after the end of 2000. . . . I did see them overflow once or twice. I think three times.

. . . .

Q You said "I saw them overflow two times"?

A I think it was two times. Don't hold me to that number. I think it was two times.

Q On the road. Just so we're clear we have a picture of where the clearwell tanks are.

A On the road. Never reached the drain, but it was on the road.

Q How do you know they never reached the drain?

A Pardon me?

Q How do you know they never reached the drain?

A I never seen—I personally never seen them reach the drain. That's how I know.

Q Mr. Redcay said it would drain off into the drain. You disagree with that.

A I disagree with that.

(*Id.* at 144–146.)

On redirect examination concerning Counts 23–33, MAURY testified:

Q [The government] was asking questions about tanks overflowing, you recall those questions?

A Yes.

Q Were there occasions when you saw the tanks overflowing?

. . . .

Q Clear well tanks?

A Yes.

Q And I think you said it happened a couple of times?

A Yes.

Q When would that occur?

A At start up.

Q And could you explain to the jury what would cause the tanks to overflow?

. . . .

A The procedure is that when the—cupola foreman starts up the system in the morning.

Q By the way, who is the—cupola foreman?

A—I think it was Craig Kolbe.

Q Go ahead.

A The procedure, the proper procedure is to turn the—these pumps on here, which are clear well pumps—you want to take water—if these tanks are full you want to take water out first, and send it to the cupola before you turn the pumps on in the sump.

. . . .

Q If the pumps in the sump by the waste water treatment plant are

turned on before the pumps to the clear well tanks, what happens?

A If you turn these on first, and the tanks are full, they will overflow. If you add water before you take water out, you're going to overflow.

Q Now, when that would occur, would—whose responsibility was that by the way, to see that the system was turned on properly?

A The third shift people cupola foreman who would start the system up.

Q And who was the white shirt or the superintendent of the—that would be casting, correct?

A Melting and casting.

Q Who was the white shirt?

A Tommy Dalrymple.

Q If when you ... said you saw it occur a couple of times, it was at start up?

A It was at start up.

Q What would you see? In terms of the water?

A The water would just flow—it wouldn't gush out, it would just flow down the sides, you go in you turn these pumps off, turn these pumps off, I'm sorry. Turn these pumps on, and then we'd clean up, whatever went on the ground.

Q And when you turn ... these pumps off, and put these pumps on, how quickly would the water start to overflow?

A It would stop—it would stop, because you stop adding. Once you stop adding, that's it.

Q Then what would be done to prevent the water from spreading out in the plant?

A We stop it.

Q How would you stop it?

A We had mats that go on the drain, we put speedy dry down, to stop the flow. If it was that much, it wouldn't be that much. We had oil stop, booms.

Q Who would take part in cleaning up after one of these tanks overflowed?

A Everybody. Everybody would.

Q Was it done intentionally?

A No.

Q What would you say caused it?

A It was just not following procedure. Not following the proper procedure.

(Tr. 520 at 93–97.)

This Court makes the following findings as to the government's evidence on Counts of conviction 28–32, and the specific contrary testimony of MAURY:

(1) The facts in the government's evidence concerning the actions of defendant MAURY, in knowingly causing workers to discharge petroleum-contaminated wastewater from a point source into navigable waters by pumping at night from the pit under casting machine number four into one or more storm sewers that led to the Delaware River, without a permit authorizing such discharge, during the stated period, were the essential facts necessary to support the verdicts on those counts. Therefore, the falsity of the conflicting testimony by MAURY is necessarily implicit in the jury's verdicts against MAURY that we have allowed to stand on Counts 28–32. In addition, we find that the government's evidence on those counts was sufficiently credible, despite the fact that it relied heavily on the testimony of one witness (Bobinis) for essential details.

▆ (2) The Court makes an independent finding that MAURY's testimony on Counts 28–32, denying all of the government's material evidence on those counts with specificity, was willfully false. This finding is supported by evidence other

than the jury's having disbelieved him. Given the nature of the testimony of the government's chief witness on that count (Bobinis), and the corroborating details provided by other witnesses, we find that MAURY's testimony on those essential facts was willfully false.

### e. Count 1

The government points out that the jury convicted MAURY of conspiring for all objectives of the conspiracy count except violation of the CAA, Objectives A, C, D, and E. It argues that all the evidence pertaining to his testimony as to Counts 3, 9, and 27–32 (discussed above) provides examples of his falsehoods that should produce a perjury enhancement under Section 3C1.1 for FAUBERT as to Count 1 as well. (Gov. I at 61.)

This Court declines to make further findings pertinent to Section 3C1.1 concerning Count 1 as to defendant MAURY, beyond those specifically addressed under Counts 3, 9, 27, and 28–32 above. We have stated our reasoning on this topic in discussing this enhancement as to defendant PRISQUE, and we incorporate that statement here by reference. *See supra.*

### 4. Craig Davidson

The jury found defendant DAVIDSON guilty on one false statement count (Count 4), on several lesser-included negligence counts under the CWA pertaining to discharges from the cement pit (Counts 12–27), and on two of the five alleged unlawful objectives of the conspiracy, pertaining to the CWA and false statements only, Objectives A and D. (*See* dkt. 721 at 3 n. 4 and 112–113 n. 64.) Defendant DAVIDSON testified for three trial days on direct and cross examination. He denied all criminal acts attributed to him, by asserting general denials of guilt and by his specific testimony in response to questioning. (Tr. 552

at 101–242; tr. 548 at 4–205; tr. 550 at 4–129.)

The government argues that each of his substantive counts of conviction and his conviction on Count 1 "demonstrates that the jury found that he had perjured himself." (Gov. I at 63.) It lists several specific alleged falsehoods that we discuss below. DAVIDSON objects to any enhancement under Section 3C1.1. (Davidson I at 45–47; Davidson II at 17–21.)

### a. Count 4

Count 4 alleged that on or about February 24, 2000, defendant DAVIDSON knowingly and willfully made a false statement to a federal and state investigator—that the discharge on December 4 and 5, 1999, occurred because the outlet hose leading from the sump pump had a hole in the middle of it—when DAVIDSON then knew and believed that the December 4 and 5 discharge occurred as a result of the end of the hose being used to direct liquid out of the cement pit. (*See* dkt. 721 at 142.)

The jury verdict found defendant DAVIDSON guilty on Count 4. (*See id.* at 3 n. 4.) The government's evidence on this count was based upon the entire body of evidence pertaining to Count 3 (alleged false statement by MAURY re: 12–4/5–99 discharge); Count 4 (alleged false statement by DAVIDSON as alleged), and Counts 12–27 (alleged discharges from the cement pit on various dates including 12–4/5–99, in violation of CWA). We will not attempt to summarize that evidence here, due to its sheer volume. (*Id.* at 136–146, 189–231.) The key issue under Count 4 at trial, however, was whether, when DAVIDSON was being interviewed by New Jersey Special Agent Jeffrey Hill, allegedly in the presence of NJDEP inspector Bruce Doyle, during the search warrant execution on February 24, 2000, he made the

false statement ascribed to him by the agents.

The findings of this Court on Count 4 in the post-trial opinion (applying the standard of Rule 29) were as follows:

This Court concludes that the government's evidence on Count 4 was sufficient to establish the essential elements of the offense charged in that count. In rendering these rulings as to Count 4, we expressly incorporate by reference the discussion of evidence under Counts 3, *supra*, and 12–33, *infra*. First, we find that the jurisdictional element is met, because the statement was made in the presence of NJDEP inspector Bruce Doyle, and that agency has delegated regulatory authority under the CWA. In this connection it is significant that the search warrant execution, while based on a state warrant, was part of the state investigation initiated to discover the cause of the 12–4/5–99 discharge that was within the Clean Water Act jurisdiction of the NJDEP. Next, we find that the evidence was sufficient to establish that Davidson made the statement alleged. As we instructed the jury, that element does not require a verbatim quote, but it does require that the defendant made a statement having the precise meaning described and could not reasonably mean anything different than the alleged meaning.

We hold that a reasonable jury could find that when the investigator asked Davidson what he knew about the cause of the 12–4/5–99 discharge and Davidson replied as he did, his statement had the precise meaning that "the discharge on December 4 and 5, 1999, occurred because the outlet hoses leading from the sump pump had a hole in the middle of it." Finally, we hold that the evidence was sufficient to support a finding that although Davidson may not have had direct personal knowledge of the cause of the discharge in the sense of having been on-site when it happened, nevertheless by the time of the interview on February 24, 2000, he did know and believe that the discharge did not occur because of a hole in a sump pump hose, but rather occurred "as a result of the end of the hose being used to direct liquid out of the cement pit," and therefore the statement he made to Hill about the cause of the discharge was knowingly false and made with intent to deceive the investigators.

(Dkt. 721 at 145–146 (citations omitted).)

Defendant DAVIDSON testified extensively about the circumstances surrounding the false statement alleged in Count 4. (*See* tr. 552 at 134–170, 227–242; tr. 548 at 5–100, 136–148, 154–158, 184–189; tr. 550 at 7–8, 57–61, 80–128.) Here we quote a fair sampling of that testimony, on direct and cross examination.

By way of background for the reader of this testimony, we note that DAVIDSON in his testimony described two spill events at the cement pit over the period December 4 and 5, 1999. He was present for the first of those events, which he said occurred on the afternoon of December 4. He described that event at length in his testimony. He said it was an inadvertent overflow of the cement pit that occurred when a worker (Randy Beck) left a pump operating that was pumping additional water from an interior pit called the bellwash pit into an already-full cement pit that was still in use for circulating water in the cement lining operation. DAVIDSON described how he and his foreman cleaned up that overflow before it reached any of the storm drains, and he described the configuration of the cement pit as normal when he left work that Saturday afternoon. He referred to that as the "December 4" event in his trial testimony. He stated that

when he next arrived at work on Tuesday, December 7 (Monday, December 6, having been a company holiday), the cement pit looked as it normally would at that point in the week. It had been drained, the solids had been cleaned out by Cathers operating the front end loader, and it had been re-filled with water in preparation for the new week's production. He said he learned on December 7, and not before, that PRISQUE and MAURY, and Cathers, had been called into the plant on an emergency over the weekend and had cleaned up a serious spill in the vicinity of the nearby storm drains. He testified that as of the date of the search warrant execution on February 24, 2000, he did not know the cause of that latter spill, which he referred to as the "December 5" spill, and was not aware that there were photos taken on December 5, or what the configuration of the cement pit was as observed by those present at that time. He said that when he was later shown those photos by his counsel, he surmised that someone must have intentionally pumped the contents of the cement pit onto the roadway, but he maintained that he had no such information—from any source—as of the date of the search warrant execution when he was interviewed by Special Agent Hill.[97]

On direct examination concerning Count 4, DAVIDSON testified:

Q Now, did you need water in the cement pit when you were running?

A Yes, you did.

Q If . . . the cement pit was dry, could you operate the cement line?

A You could run the cement liner and line pipe, but your trenches would all fill up with cement. . . .

Q Now these trenches or troughs, are they inside the plant?

A Yes.

Q And where do they ultimately run?

A Into the cement pond.

. . . .

COURT: The trenches come from where?

WITNESS: The trench is around the cement lining area. . . . They're by the cement liner itself and the bell-wash station that we've heard about.

. . . .

Q Are these trenches elevated in many cases?

A The ones at the bellwashes are elevated. The pit is underneath. Any water that's in the pit does not make it back up . . . through those trenches.

Q How does the water in the pit have to get out?

A It has to be pumped.

. . . .

**97.** The photos taken by inspector Doyle on December 5, 1999, showed the cement pit in a drained condition, with a sump pump partially submerged in the bottom of the cement pit and its outlet hose draped over the exterior wall of the pit and directed onto the roadway. The photos of the cement pit taken by officials on February 24, 2000, during normal cement line operation, showed the cement pit to be filled to the water line. The spill event on the afternoon of Saturday, December 4, 1999, as described by DAVIDSON at trial, was an overflow of a full cement pit during operations. The spill event depicted in the December 5, 1999, photos showed a drained cement pit, not an overflowing full cement pit. (*See* dkt. 721 at 218–220 & n. 128.) Therefore, some additional intentional activity, after cement line production ended on December 4, 1999, was definitely necessary to get the cement pit to the condition observed on December 5, 1999. DAVIDSON testified that he realized that much as soon as he saw the 12–5–99 photos, but he did not have that information until some time after he was interviewed by Special Agent Hill on February 24, 2000.

Q Whose responsibility was it to do that?

A I had my foreman.

Q Who was your foreman?

A I had a couple different foremen.

Q Do you remember who had that responsibility most of the time you were there?

A Willie Ledee.

Q And was he authorized to do something?

A Yes. He was authorized to pump it out.

Q How about on the night shift? Did you have anybody on the night shift that was authorized to pump the bell-wash?

A Scott Rodney. And then when he left, Rob Rush and Kenny Szoztak.

. . . .

Q [W]as there ever any reason that you know of to pump water down the street into the drain?

A No. None, whatsoever.

(Tr. 552 at 143–145.)

Q When Mr. Ledee or Mr. Rodney your second shift foreman had a need to pump the bell wash pit did you trust them with that authority?

A Yes, I did.

Q Did they know what was supposed to be done?

A Yes, they did.

Q Other than December 4th 1999 was there ever a problem with regard to pumping the bell wash pit into the cement pit and having it overflow?

A No.

. . . .

Q What would the millwrights or Mr. Ledee do to pump the bell wash pit when they had to lower it?

. . . .

A First they'd have to go out and look at the pond to make sure the pond wasn't too high.

Q How high did you let the water go before you thought there was a danger in the pond?

A Five inches. Four inches below the surface.

Q Did you check the pond everyday?

A Myself personally? . . . . Yes. A lot. . . . I walked by that pond at least 20 times a day.

Q Why were you so concerned about that pond?

A Because I didn't want it to run over.

Q You knew the consequences, didn't you?

A Yes. And plus I had people watching it for me.

(*Id.* at 169–170.)

Q Were you working on . . . December 4th, 1999?

A Yes, I was.

. . . .

Q Where were you working on that particular day?

A On that particular day, it was a Saturday, and I had the finishing department running with the annealing oven. The paint machine, cement liner, we were doing basically from the oven on down we were working. . . .

. . . .

Q . . . . Sometime during the day . . . did anything unusual occur . . . ?

A Yeah. Near the end of the day.

Q What occurred?

A All the men had gotten their breaks. . . .

. . . .

Q Was it unusual for Willie Ledee to come to you at any course of the day

and complain that the men weren't listening to him?

A No, that would happen, ... a couple times a week, if not more, that ... he would say I told so and so to do something and they didn't do it.

Q Now, on December 4th, did he come to you concerning something he told Randy Beck to do?

A Yes.

Q What did he say to you?

A He said I asked Randy to pump the pit and he didn't do it, ... pump the bell wash pit. He didn't do it for me. And I just said to him, Willie, ... I said, just go tell him to do it.

. . . .

Q Did Willie ever tell you that—what Beck had told him, that it was close to the top?

A No, he did not.

Q You heard Mr. Ledee testify ... if the pit is close to the top, and Willie asked the bell wash be pumped out, what is the millwright supposed to do?

A He is supposed to lower the outside pit, cement pit.

Q Is this a big deal?

A No.

Q How ... much work is entailed in lowering the cement pit?

A You've just got to turn a pump on and a valve.

COURT: Into the what?

WITNESS: Brown tank . . . .

Q How long would it take to lower the pit six inches?

A 15 to 20 minutes.

Q [W]hen Willie Ledee told you that he told Randy Beck to do something and he didn't do it, did that surprise you?

A No, not at all.

Q Later on that afternoon, did you run into Randy Beck?

A Yes, I did.

Q What did you tell Randy?

A I said, Randy, would you just go do what Willie told you to do?

Q What did Randy say to you?

A All right.

Q Did he tell you he never bothered lowering the [cement] pit?

A No.

Q Did he know he was supposed to do that?

A Yes.

Q Did he tell you that the cement pit was close to the top and he thought it may overflow?

A No, he did not.

. . . .

Q So, ... what happens after that?

. . . .

A That's when—like I said, all of the guys had gotten their breaks for the day . . . . and I was going to go back up to the finishing line, because I still had guys working up there and we were annealing pipe-

. . . .

Q Did anything unusual occur as you were going to the annealing oven?

A Yeah. I got there. I wasn't even there that long. I was just looking at the ... reports to see how we were running, and Scott Rodney came flying up towards me.

. . . .

Q [Y]ou said he flew up to you?

A He ran up to me.

. . . .

Q Describe his demeanor when he came up to you?

A Like—I don't know what's the word I'm looking for here. Not flustered,

but, like, panicky, kind of, like panicky.

Q And did he speak with you?

A Yeah. Like quickly, he said, . . . kind of grabbed me and said, we've got a problem down here, boss. The pit is overflowing.

Q And where did you go?

A We took off running. I knew—as soon as he said the pit is overflowing—I knew what pit he meant. I mean, any other pits inside the plant you can contain it. You know, this one we knew would go down the drain, so—

. . . .

Q By the time you got down—did you go outside right away?

A When we got down there I . . . went into the pump room and I switched that pump on, and turned the ball valve, pumped some water into the brown tank.

Q Did you do that before you even got outside?

A Yes, because Scott said . . . it stopped—because he had unplugged the sump pump that he found, he had unplugged it, so it was pretty much just kind of . . . like a bathtub at the brim, just . . . sitting there.

Q Where was the sump pump? . . . .

COURT: In the bell wash pit?

WITNESS: The sump pump was in the bell wash pit.

COURT: With a hose?

WITNESS: With a hose leading into the elevated trough.

Q By the time you saw it, it was already unplugged?

A Yes. Scott had already unplugged it. He unplugged it right away.

Q What did you do after you pumped the pit down a bit? Where did you go?

. . . .

A Right. Scott, in the meantime, while I was doing that, he went and got on the front end loader.

Q Who operates the front end loader normally?

A That's Billy Cathers.

. . .

Q What was he doing?

A Scooping up sand and he was putting it in front of the . . . cement pit.

Q Why was he doing that?

A So that way it wouldn't run over anymore. . . . Just as a safety precaution.

(*Id.* at 228–242.)

Q [A]pproximately what time of day this was when it overflowed?

A Probably around 2:30, in that area somewhere.

Q This is about the time you would be getting ready to go home?

A Yeah, it was getting close to quitting time.

. . . .

Q Was there anybody else with you at that time?

A No, it was just Scott and myself.

Q Was Rush with you?

A No, Rob Rush was not there.

Q Was he working that day?

A Rob Rush was not working that day.

Q What did . . . you and Rodney do?

A I started to sweep the water back up towards the hazmat pit. Scott, then with the front end loader started to—

. . .

A And Scott Rodney who was still on a front end loader got more sand and was throwing sand down on the

ground and I was spreading it to soak up the water.

Q Was this just water that was on the ground, or was there other-

A There was oil on it.

Q And the oil normally is where in the pit? If there's oil in the pit is it on the bottom or the top?

A When oil does get in the pit it's on the top.

Q Did that oil overflow?

A Unfortunately, yes.

Q Did any of it get to any of the drains?

A No, sir.

. . . .

Q When you left on the 4th to go home was there stain and puddles as depicted in those photographs which were taken on the 5th?

A All these here?

Q Yes.

A No, they were not there.

(Tr. 548 at 5–9.)

Q When you got home on the 4th did you ever sneak back to the plant and pump the pit you just cleaned up?

A No, sir.

Q Did you ever go back to tell somebody to pump the pit that you had just spent time cleaning up?

A No, sir.

Q In your entire career in Atlantic States, did you ever direct any employee to pump the pit down the drain or down the sewer?

A No, sir, I would never do that.

(*Id.* at 17–18.)

Q Tell the jury what happened when you walked in to work on Tuesday the 7th.

A My boss John Prisque wanted to know what happened over the week-

end, because he said he had been in there cleaning up a spill on Sunday. And I told him I did not know what happened because when I left everything was fine and I will investigate and find out what happened.

Q Was Mr. Prisque happy when you saw him?

A No, he wasn't very happy. He had to come in on his day off.

Q Now, the conditions that he described that he cleaned up on the 5th, were those the conditions at the plant that you left it in on the 4th?

A No, they were not.

Q Did you run into Mr. Maury sometime on Tuesday the 7th?

A Yes, I did.

Q And did you have a conversation with Mr. Maury?

A Yes.

Q What did Mr. Maury tell you?

A Jeff said the same thing, that there was a large mess or that him and John had to come in on Sunday and clean up. There was oil sheen on the Delaware River and they had to clean it up.

Q Did Mr. Maury offer you any idea how it happened when he talked to you on Tuesday the 7th?

A No, he didn't say anything about how anything could have possibly happened.

Q Describe to the jury the condition of the cement pond when you came in on Tuesday morning for start up.

A Tuesday morning when I came in the cement pond was already cleaned. When I say cleaned it was all ready. The cement was taken out of it.

Q And who does that?

A Billy Cathers.

Q How about water, did it have water in it?

A Water was back in. There was water in the pit ready to run.

Q Would that be the way you would normally find the pit?

A After it was cleaned out?

Q Yes.

A Yes.

Q Was there anything unusual about it?

A No.

. . . .

Q When the second shift came in on Tuesday the 7th who did you talk to, to try to find out what went on after you left on Saturday?

A First I talked to Scott Rodney, he was the supervisor on that shift. And I wanted to know if he knew what had happened.

Q Did he tell you what he did?

. . . . OBJECTION/SUSTAINED

Q Based on that conversation [with Rodney], what did you do next?

A I proceeded to talk to the other men that were on work that day.

. . . .

Q Did you proceed to speak with everybody else?

A I asked them all a question if they had any idea if they had seen any spilling or anything occurring.

Q Based on your conversations with Mr. Rodney the foreman and the men who were present that day, were you able to draw any conclusions as to what happened?

A No.

Q Did anybody admit to spilling it?

A Nobody admitted to anything.

Q Did you relay the results of your conversations to anybody in the plant?

A Yes, Mr. Prisque.

Q Thereafter did you have anything to do with any investigations that were going on as to who may have caused the overflow on the 5th?

A No, I did not.

(*Id.* at 26–30.)

Q Sometime thereafter did you have an opportunity to see certain photographs that have been exhibited in this trial?

A Yes.

Q Do you recall when you first saw those photographs?

A Sometime in March of 2000.

Q How did you come to see the photographs?

A That's when I found out that the spill was being investigated by the DEP and I met you [counsel].

. . . .

Q When was the first time you saw that [12–5–99 Doyle] photograph?

A When I met you [counsel].

Q Now, up until sometime in March of 2000 you had heard about the conditions that Mr. Prisque and Mr. Maury had described, right?

A Yes.

Q Is this the first time you ever saw what the conditions looked like?

A Yes.

. . . .

Q When you first saw that photograph what did you think?

A I couldn't understand why the hose was the way that it was.

Q What hose are you talking about?

A The small hose leaning over that wall.

. . . .

Q Have you ever seen a hose in that position before?

A No, I have not.

Q When a sump pump is used—tell the jury why they use a sump pump in the cement pit.

. . . .

A That hose is hooked up to a pump in the pump room and [there are] valves in there that you can either . . . go to the brown tank or . . . to the number 4 pit.

. . . .

Q [W]ould you point out . . . how high the water was when you left on the 4th. How high was the water level?

A After I pumped it down from the pump to the brown tank it was right about this area here, to the water line right here.

. . . .

Q That's not a line you guys drew or anything.

A No, that's just the water line.

. . . .

Q When you came in on Tuesday the 7th did you see that sump pump [shown in 12–5–99 Doyle photo]?

A No, I did not.

. . . .

Q Based on that photograph do you have any idea why the sump pump stopped?

. . . .

A Yeah. It ran out of water.

Q How many sump pumps would you see lying around your section of the plant? Just your section of the plant?

A Quite a few.

Q Directing your attention to [12–5–99 Doyle photo]. When you came in on Tuesday the 7th did you see the end of the hose there?

A No.

. . . .

Q On December 7th, before you saw the photograph and after you talked to

Mr. Prisque, did you have any idea what caused the discharge and the puddles that Mr. Prisque and Mr. Maury were cleaning up?

A No, I did not.

Q After you spoke to everybody who worked the second shift, including

Scott Rodney, did you have any idea how it happened?

A No, I did not.

. . . .

Q Had you ever come to the plant as you did—had you ever come to the plant and seen . . . the conditions as depicted in these photographs?

A Never.

Q After you saw the photographs sometime in March, did you come to some sort of conclusion about how the water got out of the cement pit? . . . . Did you come to a conclusion concerning what happened the evening of the 4th or early morning hours of the 5th?

A Yes.

Q Tell the jury . . . .

A Well, either someone deliberately put the hose out there or—and just deliberately did it. I have suspicions who it might have been at that point. Or someone tried to sabotage it by doing that.

Q [W]hen you spoke to Mr. Rodney did you have any reason to believe that he did anything? This is back on the 7th of January. Did you have any reason to believe that he did anything other than the normal procedure?

A No.

Q But when you saw these photographs was this the normal procedure?

A No, it was not.

. . . .

Q Based on these three photographs did you come to a conclusion when this may have occurred, this discharge?

A Yes, it was sometime during the second shift when men were still there working.

. . . .

Q [A]t the time you finally saw the photographs, was there a state investigation going on?

. . . .

A Yes, sir.

(*Id.* at 30–44.)

Q February 24th, 2000.

A Yes.

Q What were you doing when the agents arrived, if you recall?

A I was inside working.

Q Was your section running?

A Yes, it was.

Q About what time of day was it?

A It was morning. I don't know the exact time.

. . . .

Q When the individuals arrived did you know they were agents of some sort?

A Yes, I did.

Q How did you know?

A I'm not sure exactly who, but somebody had paged me and told me that there would be some investigators out around the cement pond and that they had asked me that I would please go out there and watch to make sure that no one would get injured, because we have a lot of trucks coming in and out of there. So I was to watch to kind of like police the trucks so it wasn't mass confusion.

Q Where were you directed to stand?

A Right around the corner of the building I stood. That way I could watch trucks coming back out to the plant and trucks coming into the plant.

. . . .

Q [T]ell the jury what you observed when you were stationed where you just showed the jury you are. Did you see anything unusual going on?

A Were, there were a lot of individuals walking around.

. . . .

Q Do you recall anything unusual about the roll off [dumpster] on the 24th of February?

A Yes. There was a lot of people walking around and I noticed somebody with a blue jacket climbed up inside the dumpster and pulled out a hose.

Q What did they do with the hose?

A They brought it over here to the cement pit.

Q What were they doing with the hose that you saw?

A They were taking pictures of it and they were measuring it and then they threw it inside the cement pond and then draped it over the side of the pit.

Q Did you know what the significance of what they were doing was at the time?

A No, I had no idea what they were doing.

Q Had you ever seen the hose in that position?

A No.

. . . .

Q On the 24th had you seen the photographs yet?

A No, I had not.

Q . . . . Do you remember watching individuals measure?

A Yes, there was people all over doing stuff.

Q Is that [referring to 2–24–00 photo] the trench you referred to earlier?

A Yes, that's it.

Q Is that where the sump pump is supposed to go?

A Right, it's supposed to go over that wall into that trench.

(*Id.* at 44–49.)

Q Tell the jurors ultimately what happens.

A After a while Mr. Hill, I don't know where he went, he just wasn't there anymore, and—I didn't know his name was Mr. Hill at the time, but one of the individuals left and he came back a little while later and he asked me if I knew where he—

COURT: Who is he now?

WITNESS: At the time I didn't know who he was.... It was Mr. Hill.

. . . .

A And he came back and asked if I knew where he could find Craig Davidson.

Q And what did you say to him?

A I said that would be me.

Q And what did he proceed to do?

A He said he wanted to ask a couple of questions about the cement pond.

Q Where were you having this discussion?

A Do you see where the brown building is there, just off to the side of that by those rails that are out there.

Q And you're outside at that time, right?

A Yes.

Q And you're supposed to be doing what when you're out there?

A Watching to make sure the trucks were coming in and out for safety purposes.

. . . .

Q After you identified yourself what— was he alone at that time when he was talking to you?

A Yes. I don't remember anybody being with him.

Q Is it possible somebody may have been with him?

A It could have been. There were so many people walking around. They were coming up to him, walking away and talking to him and leaving. So I mean right at that very moment I don't remember.

Q Tell the jury the tenor of the conversation? What did he want to know specifically?

A He wanted to know how the pond worked. So I showed him how the pond works and how it's recirculating water. I took him inside and showed him the pump rooms, showed him where the pumps are and then I proceeded to tell him how we pump the pit out to clean it out.

Q What did you tell him?

A I told him that it either goes into the—well, it'll go into the brown tank and then it'll go into the number 4 casting pit or the hazmat pit.

Q Was that the SOP at the time?

A Yes, it was.

Q Did you hear Mr. Hill testify?

A Yes.

Q You took him inside, correct?

A Yes, I did.

Q To the best of your knowledge was he taking notes when he was talking to you?

A No, he had no notepad with him. At that time we went inside there was another gentleman with him and he had a camera.

Q Did you show him the cement lining operation?

A We stood back. We didn't go right up by it, but we stood back by where the pump room is inside there and I pointed up and explained to them the process of cement lining pipe.

. . . .

Q Is Mr. Hill's diagram accurate?

A No.

Q But you took him inside, correct?

A Yes, I did.

Q He saw the cement line?

A Yes.

Q He saw the bell wash area?

A Yes, he saw all that.

. . . .

Q Did he draw it on his diagram?

A No, it's not drawn in the diagram.

. . . .

Q [W]hat did you tell Mr. Hill about how the cement pond operated?

A I told him it was a recirculating system. That water just keeps flowing around and that we use it to clean out the bells of the pipe and to keep the trenches clear.

Q Did you show how it worked?

A Yes. That's why I took him in the pump room.

Q Did you tell him about the paint room?

A No, I really didn't say much to him about the paint room other than it was on the other side of the building. I just told him we cement line pipe and then we painted them and I just pointed over to the paint room.

. . . .

Q [D]o you recall Mr. Hill testifying that on the 24th of February 2000 you told him that the paint room door exited to the cement pond?

A That's what he said. Yes. But I never told him that.

Q Could there be any circumstance why you would tell him the paint room door opened up to the cement pond?

A No, like I said, we were standing over at the cement line and I explained the system to him and then I pointed over to the paint line and told him that's where we paint them then. That was the extent of my conversation about paint lines.

Q Do you recall him indicating that his notes which he said he took on the 24th but transcribed in June of 2000, do you recall him saying that? That he transcribed those notes four months later?

A Yes.

Q Do you recall him saying that according to his notes you told him that they get painted in the paint room and the exit is by the cement pond?

A Yes, that's what he testified to, but that's not true.

. . . .

Q Was that a mistake that he put in his notes?

A Yes. He was misspoken when he said that.

Q Did you tell Mr. Hill about the brown tank?

A Yes, I did.

Q [D]id you hear Mr. Hill testify to this jury that you didn't know why they cement line the pipe?

A Yes.

Q Do you know why they cement line pipe?

A Yes, I do, that's my job.

Q Did you know back in 2000?

A Yes, I did.

Q Did you ever tell him you didn't know why you cement line the pipe?

A No, I had no reason to tell him that.

Q Did you hear him say that maybe you wanted to try to hide that information from him?

A Yes, I heard that.

Q When he asked you why they cement line the pipe, did you tell him?

A Yes, I did.

Q What did you tell him?

A I told him that's what customers want, it's for leaking purposes. After a while cement will wear out and then you will start working into the ductile iron and that starts to wear out after a year so you try to get it for longevity and the leaking process of pipe.

Q No question, you didn't tell him you didn't know why?

A No.

Q Now, do you recall Mr. Hill testifying that you told him on the 24th that ... the cement pit was dug out every two weeks?

A Yes, he said every two weeks.

Q What did you tell him?

A At that time it was done twice a week, not every two weeks. It was done twice a week.

Q Do you recall Mr. Hill asking you questions—did he ever show you the sump pump that they found on the 24th?

A Yeah, they did.

Q Do you recall him asking you any questions about the sump pump?

A Well, he asked me if that's the sump pump that was used on the day of the discharge.

COURT: Just a second, we're here now at February 24—

COUNSEL: 24th, 2000.

COURT: And you're asking Mr. Davidson whether on that day

Agent Hill showed Mr. Davidson the sump pump that was found-

COUNSEL: On that date.

Q Correct?

A Yes.

Q Did it look like all the other sump pumps?

A Yes, they all look alike. They're all teal pumps.

Q What did you tell him?

A I told him it was a possibility. I don't—I told him it was a possibility. There's so many of those pumps.

COURT: What was a possibility?

WITNESS: There was a possibility that that was the pump that was used o on the date of the discharge.

Q Now, as it turned out, you heard Mr. Hill's testimony, correct?

A Yes.

Q Were you wrong when you told him it was a good possibility according to Mr. Hill?

A Yes.

Q You remember Mr. Hill testifying on cross examination as it turns out that's not the sump pump that was found?

A No, that was a different pump.

Q You remember him acknowledging that because there was a different stem on it?

A Yeah, it had the other—yeah.

Q So, when you told him it was a good possibility, were you correct?

A No, I was wrong.

Q Now, do you recall Mr. Hill asking you who had the responsibility of pumping out the cement pit?

A Yes.

Q What did you tell him?

A I told him that a millwright or Scott Rodney would pump it out.

Q And what shift would the millwright work?

A Third shift.

Q Do you remember him testifying that you told him third shift Bill Wright?

A Yes, that's what he said.

Q Was there a Bill Wright?

A No, there's never been a Bill Wright working there.

. . . .

Q Did he get that wrong?

A Yes, he did.

Q Did he mis-hear you?

A Yes.

. . . .

Q You remember he said—he questioned you about what you saw when you came back to work?

A Yes.

Q You remember his note saying, "Craig came in on Monday"?

A Yes, that's what his note said.

Q Did you come in on Monday?

A No, I did not.

. . . .

Q Was there any reason you'd come in on Monday?

A No, I was deer hunting.

. . . .

Q Was the plant closed on Monday, December 6th?

A Yes, the plant was closed that day.

Q Did he get that wrong?

A Yes, he did.

Q Did . . . you ever tell him that on Monday when you came in you saw the hose and the sump, and it was still in the pit?

A I never told him that. I never came in on Monday.

Q Did he question you about that?

A Did he question me if I was there on Monday?

Q Yes.

A Yes, and I said I wasn't there on Monday. I told I wasn't there; I didn't come in until Tuesday.

Q Did he question you if you saw the sump and the hose in the pit on Monday?

A Yes.

Q What did you tell him?

A I said I wasn't there Monday. I didn't see anything, because when I came in everything was already back to normal. The water in the pit was cleaned out.

. . . .

Q Do you remember him questioning you about Jeff Maury and John Prisque?

A Yes.

. . . .

Q Do you remember telling him on the 24th, about two months after the episode, that Maury and the plant manager were working on the weekend around the pit?

A Yes.

Q Is that true?

A Yes.

Q Do you remember telling him that Maury told you about the incident?

A Yes.

Q He told you that there was oil. Maury didn't explain how it happened, just that there was oil all over the place?

A Yes.

Q Is that true?

A Yes.

Q There's a notation on Mr. Hill's report. You remember him telling the jury in that hose, saw hole in the

middle. Outlet hose, saw hole in the middle. You remember him testifying to that?

A Yes, I do.

Q Did you tell him you saw a hole in the outlet hose?

A No, I never told him about any hose.

Q Did he question you about the outlet hose?

A Yes, and that was when he said about being there Monday, and I said I wasn't even there.

Q Did you tell him that you saw a hole in the outlet hose?

A No, I never told him that.

Q Did you ever see a hole in the outlet hose?

A No.

Q The hose that was brought up here with the fancy blue gloves, was there any hole in that?

A No, there wasn't even a hole in that hose.

Q The hose that you saw in this courtroom, is that the hose that—where'd they find that hose?

A That's the hose they drug out of the green rolloff dumpster.

Q Do you remember Mr. Hill saying that you were beeped or summoned somehow?

A Yes.

Q Tell the jury how the conversation with Hill ended.

A He wanted to go outside the plant. He said let's go over to his truck which was parked out in the street. I said, "Well, I don't know if I can really leave the plant like that." And at that point my beeper went off, and I told him I'd be right back. I had to find out what the problem was.

Q What was the problem? Was it a production problem? Without telling specifically.

A Yes.

Q Was your section still running?

A Oh, yes. Yes. I had been down outside the whole time, and the finishing department's a pretty—you know, it's a pretty big area. So, I went, answered the page, and I came back and told Mr. Hill that I was—"I'm going to have to stop talking right now, 'cause I can't stop other operations that I have going on," because I was having a problem up on my finishing line which is a couple hundred—hundred yards away from where I was at.

Q Do you recall his notes? He testified his notes—was told to cease operation?

A Yeah.

Q That was his notes, right?

A Yes.

Q You remember him testifying on the witness stand that he—you told him you weren't allowed to talk to him anymore?

A Yes.

Q That's not what was in his notes, was it?

A No, that's—like I said, I told I had to—actually I told him if I got a chance

I'd come back, but I never got a chance. I never saw him after that.

Q Did anybody ever tell you that you couldn't speak with him anymore?

A No.

Q Did you ever tell him you couldn't speak with him?

A No.

. . . .

Q Hill, did he ever show you a copy of his handwritten notes?

A No.

Q Did he ever show you a copy of his typewritten notes that he prepared four months later?

A No.

Q Were there some mistakes that he put in his handwritten notes?

A Yes.

(*Id.* at 50–69.)

Q Were you in any way involved in the event that occurred after you left on the 4th or into the early morning hours of December 5th?

A No.

(*Id.* at 148.)

Q Did you ever lie to any Government agent?

A No.

Q Other than Mr. Hill, did anybody else talk to you?

A I can never remember talking to anyone else.

Q Did you conspire with any of these gentlemen sitting here at defense [table] to lie?

A No.

Q Do you have any reason to lie about anything?

A No.

Q What was the only thing you were ever questioned about by a Government agency?

A Oh. To the best that I ever remember anybody ever talking to me was Agent Hill, and that was about the February 24th, 2000 search warrant.

(*Id.* at 154–155.)

Q Overt act fourteen. This is the Mr. Hill charge, correct? You're charged with on or about February 24th, falsely told law enforcement official that the discharge on December 4th and

the 5th occurred because an outlet hose leading from the sump pump had a hole in the middle of it.

A I never told him that.

. . . .

Q Did you ever tell him that there was a hole in the outlet hose and that caused the discharge?

A No, I never told him that.

Q On the 4th and 5th?

A No, I never said that.

(*Id.* at 157.)

Q You are charged in Count 4, with basically saying that the discharge on the 4th and the 5th occurred because the outlet hose leading from the sump pump had a hole in the middle of it. Did you ever say that to anybody?

A No, I did not.

Q When in truth, and in fact, you knew and believed that the 4th and 5th discharge occurred as a result of the end of the hose being used to direct liquid out of the cement pit. When you spoke to Hill, did you know this fact?

A No, I didn't know what had happened.

Q When you saw the photographs, did you know what had happened?

A The photographs that I saw in March?

Q Of the hose coming out of the pit?

A Well then, once I saw that, yes.

Q You hadn't seen those photographs when you spoke to Hill on the 24th?

A When I had spoke to Mr. Hill, no, I had never seen those photographs.

Q Those were photographs taken by Mr. Doyle, correct?

A Yes.

(*Id.* at 186–187.)

On cross examination concerning Count 4, DAVIDSON testified:

Q [I]sn't it a fact that in addition to the three options we've been discussing, the tanks, be it the brown or the yellow tanks, the pit under cm 4 and the hazmat pit, there was a final option, the least desirable option, but an option nonetheless of pumping the liquid out of the cement pit down the road?

A Sir, I would never pump water down the road, and I never ordered anybody to pump water down the road.

. . . .

Q Weren't there circumstances where the sump pumps were used and they'd be put down into the liquid on the ground, as low down as possible, and the outlet from the sump pump went out into the roadway much as was seen in the photograph taken by Bruce Doyle on December 5th, 1999?

A Sir, I never saw that before, and no, I would never tell anybody to do that, and I never saw that before.

Q Wasn't this done at night at your direction so that no one would see it happening?

A No, sir.

Q Didn't you instruct your employees to do this when it rained out so that no one would see a wet slick on the roadway?

A Sir, I never ordered anybody to pump water down the road.

. . . .

Q [I]sn't the only thing that was different about what happened on December 4th, 1999 from the practice of pumping liquid out onto the roadway, was that what happened on December 4th and 5th, 1999 was particularly problematic because there was so much hydraulic oil in the cement pit?

. . . .

A Oh, first of all, that night was the biggest nightmare of my life, that happening, sir, when I found out that that happened. I never told anybody to ever do that. It was not practice, sir. We did not practice that. We did not pump water down the road.

(Tr. 550 at 94–98.)

Q And do you recall Mr. Beck testifying that the only reason that he went ahead and pumped the pit despite his concerns was because Craig Davidson ordered him to do that?

A Randy Beck testified to that?

Q Yes.

A Yes, he never told me that the pit was full, that it was getting full outside.

He never told me that.

Q That's not my question.

A Oh. Sorry.

Q Do you recall Mr. Beck indicating that the only reason he pumped the bell wash pit into the cement pit was because you ordered him to do so?

A Yes.

Q And do you recall him testifying that if you hadn't ordered him to do so, he would have left without doing that pumping?

A I'm not sure what he said. He may have.

Q Now, later at around 2:30 when you got to the annealing oven, your second shift foreman, Scott Rodney, came running up to you; is that right?

A Yes.

. . . .

Q You testified that based on your activities and those of Mr. Rodney, no

liquid got into the storm drain; is that right?

A Yes, we had stopped it before it got that far. Scott had unplugged it, and it never made it down to that drain.

Q And according to your testimony, thanks to your quick action, Mr. Rodney's quick action, the oily liquid got to within 25 to 30 yards of the drain, but none got into the drain.

A None made it to the drain, sir.

Q Now, you seem to recall the events of December 4th, 1999 quite clearly.

A Yeah, to the best of my ability. It was pretty much of an event.

Q Let's continue. . . . How much after . . . these activities did you leave?

A Hour.

. . . .

Q Mr. Davidson, isn't it a fact that later that night one of your men put a sump pump into the pit and pumped the liquid out onto the roadway?

A I don't know if that's a fact or not, sir.

Q Isn't that how Bruce Doyle discovered the pit with the sump pump, according to the photographs taken on December 5th, 1999?

A That how he found it, yes.

. . . .

Q Another photograph taken by Mr. Doyle on December 5th, 1999 showing the hoses leading out of the cement pit, and you said yesterday that there were two possibilities, one, someone deliberately put the hose out there, or two, that there were saboteurs. Is that your testimony?

A Yes, sir, 'cause that's not the standard procedure for that pump. It would have been over into the trench.

(*Id.* at 101–109.)

Q Let's talk about February 24th, 2000, the day of the search warrant?

A Yes.

. . . .

Q Now, you were interviewed at about 11:45 in the morning by that same gentleman, Jeff Hill. You testified about that yesterday, correct?

A I didn't know the time, but yeah, I talked to him, yes.

Q Now, do you recall telling Investigator Hill that you were the finishing line superintendent and you were in charge of the area that cut and ground pipes after they're cast?

A If he asked me that I would have answered him that, yes.

. . . .

Q Do you recall telling him that after cement lining was put in they're coated in the paint department?

A Yes, he asked the process, so I took him inside. I showed him the process.

Q Do you recall him asking you what . . . that pit was used for?

A Yeah, that's why I explained. That why we went inside to look into the pump room.

. . . .

Q Do you recall telling him that it's used to separate out the solids in your attempt to recycle the water?

A Recycle the water, yes.

. . . .

Q Mr. Hill asked you about that pit.

A Yes.

Q You told him that the pit does several things, right?

A Yes.

Q One, it's used to separate out the cement and other solids.

A Sand and cement.

. . . .

Q It's also used to recycle the water.

A Yes.

Q And that's what you told him.

A Correct.

. . . .

Q Now, there was some discussion with him about a sump pump that had been found. Remember that?

A Yes.

Q And do you recall him asking you what the sump pump is used for?

A Yes.

Q And do you recall explaining to him that the intake pipe from the recirculatory pumps doesn't go to the bottom of the cement pit?

A The in—yes.

Q And you have to use the sump pump, according to what you told Investigator Hill, to suck out the remaining liquid from the puddles from the cement pit to put it back into the pump room.

A Right. Yes.

. . . .

Q Now, Investigator Hill asked you to explain to him what you knew about the discharge that occurred the weekend of December 4th and 5th, 1999. Do you recall that?

A I don't remember that conversation to be honest with you.

Q Do you recall Investigator Hill asking you what you knew about the discharge that caused the big sheen in the river?

A He was asking questions, yes.

Q And you remember when that topic came up.

A Exactly when?

Q No, do you remember that that topic came up in the conversation you had with Investigator Hill?

A Yeah.

. . . .

Q And do you recall telling Investigator Hill that after that weekend the first day you came into work you approached Jeff Maury, and you asked him what happened over the weekend?

A No, that's not exactly what I told him. He says I said I came in, and on my way down I happened to see Jeff Maury. He was coming back up from the—I don't know where he was at. And he just said that there was an accident this weekend and water all over.

Q Do you recall telling Investigator Hill that Jeff Maury and the plant manager, meaning Mr. Prisque, were working on the pit over the weekend?

A Yes, I told him that. They were in cleaning it up, yes.

. . . .

Q Do you recall telling Investigator Hill that when you saw Jeff Maury, when you came to work after the weekend you asked Mr. Maury what happened over the weekend?

A That's what I just said to you, on my way down to the cement pit I ran into Jeff who was coming back up from wherever he was. And I asked him exactly what happened, "What happened here?" And he said he doesn't know, there was some kind of a big spill, and they were in cleaning it up.

Q Now, do you recall telling Investigator Hill that Mr. Maury didn't explain what happened, just that there was oil all over the place?

A Yes.

Q Now, you knew that Investigator Hill was trying to determine everything you knew about the discharge that led to the big sheen on the Delaware River, correct?

A Yes, and I was trying to help him, too.

Q You were being truthful with Investigator Hill, correct?

A Truthful with him?

Q Yes.

A Yes.

Q You were trying to be complete in your answers, correct?

A Correct.

Q You had nothing to hide, right?

A No, sir.

Q Did you ever tell Investigator Hill when he was interviewing you on the date of the search warrant that you had instructed Randy Beck to pump the bellwash pit into the troughs leading to the cement pit on December 4th, 1999?

A That did not happen. That's not what caused—that was not down at the Delaware River. That never made it to the drains.

. . . .

Q Do you recall telling Investigator Hill when he was interviewing you on February 24th, 2000 that when you went outside on December 4th, 1999 that there was hydraulic fluid on top of the pit that looked just like it looked on the date of the search warrant?

A Mr. Hill never asked me anything about December 4th. He [n]ever mentioned the word December 4th to me.

Q Did you ever mention the word December 4th to him?

A He was questioning me on December 5th, sir. That December 4th accident did not reach the drain so I didn't think that had anything to do with it. So, he was asking me December 5th, sir, so I was answering him on December

Q Did it occur to you to mention to him that the day before you had to go running out with Scott Rodney after the cement pit had overflowed sending hydraulic fluid out onto the blacktop?

A It was on the blacktop, sir. It never made it to the drain.

Q Did you tell Investigator Hill that on December 4, 1999 your foreman came running into you in a panic because the cement pit was overflowing?

A No.

Q Did you tell him that hydraulic fluid on December 4th got out of the cement pit and was heading downhill towards the drain?

A Sir, it wasn't that big of a spill. You're making out like it was thousands and thousands—it wasn't that big of a spill. It was cleaned up and it was put down, it was all cleaned up, and [t]here was nothing there.

Q You told him none of these things as far as what happened on December 4th, 1999, did you?

A No, sir, he was asking me on December 5th, and I was trying to help him out with his investigation of December 5th.

Q Now, rather than tell Investigator Hill anything about what had occurred on December 4th, 1999, you told him that when you came back to work after the weekend, you looked at the hose connected to the sump pump, and you discovered that there was a hole in the middle of it, correct?

A Sir, that's completely wrong. In that report it says I came back to work on Monday the 6th. As we all know, I was hunting that day. I wasn't even there. I never—when I came in on Tuesday the pit was already cleaned out. It was cleaned out of water. The cement was cleaned

out. There was no sump pump, no nothing. It was filled with water again, and we were ready to start running pipe in the production of lining pipe.

Q Didn't you—

A So, I never told him that, sir. I was never even there that day.

Q Didn't you tell Investigator Hill a story about a hole in the middle of the hose, because that's what you and Mr. Prisque and Mr. Yadzinski had all gotten together and agreed that's what you were going to tell the investigators if you were interviewed?

A No sir, that is not true, and I think that the reports show that that's not true, because I was not even there that day. I saw no hose with a hole in it. There was no hose around when I got there.

Q Didn't you and Mr. Yadzinski and Mr. Prisque get together on December 10, 1999, as reflected in Mr. Yadzinski's diary, and come up with this story about a hole in the hose?

A No, sir, I have never talked to Mr. Yadzinski or Mr. Prisque about any of this stuff with any of these reports. I never saw these reports 'til I was here.[98]

(*Id.* at 112–123.)

This Court makes the following findings as to the government's evidence on Count 4, and the specific contrary testimony of DAVIDSON:

(1) The facts in the government's evidence concerning the alleged false state-

ment of DAVIDSON to Special Agent Hill in the presence of inspector Doyle on February 24, 2000, were the essential facts necessary to support the verdict on Count 4. Therefore, the falsity of the conflicting testimony by DAVIDSON is necessarily implicit in the jury's verdict on Count 4. We make no credibility finding with respect to either party on this count, however, for the reasons set forth in paragraph (2) below.

■ (2) The Court does not find that DAVIDSON's trial testimony on Count 4 was willfully false. The subject matter of this false statement count concerns an oral exchange that took its meaning, for both parties, from the context of the events surrounding it. The alleged statement was not committed to writing or otherwise recorded, except as memorialized in notes that the interviewing officer may have used to make his later report and as described in Special Agent Hill's testimony at trial. The subject matter of this statement concerned events in the past, about which DAVIDSON was being questioned on February 24, 2000. Both sides to the conversation appeared and testified at trial to their conflicting versions of that conversation. We find that the version of that unrecorded conversation offered by DAVIDSON was at least plausible in the totality of the circumstances. While the jury rejected his version by its verdict, and this Court has upheld that verdict under the standards for both Rule 29 and Rule 33, we find that using the *Dunnigan* standard under Section 3C1.1, the circumstances do not support a finding by a

---

98. This last question and answer refers to Gov. Ex. 1–127, a letter dated 8–15–00 from Atlantic States to the EPA signed by Yadzinski, with a copy to PRISQUE, stating that on 12–4/5–99 the cement pit "experienced an overfill causing it to overflow and enter a nearby storm sewer." (*See* dkt. 721 at 221 n. 130.) DAVIDSON was questioned about that on cross examination and stated he had no knowledge of that letter prior to trial. (Tr. 550 at 109–111.) Yadzinski testified that he recalled speaking to PRISQUE to get information to do this letter, but not to DAVIDSON. (Tr. 530 at 48–62.)

preponderance of the evidence that DAVIDSON willfully testified falsely at trial on this topic.

### b. Counts 12–27

Counts 12–26 alleged that during the months of December, 1998 through February, 2000, defendants ATLANTIC STATES and DAVIDSON knowingly discharged and caused the discharge of a pollutant into navigable waters by causing petroleum-contaminated wastewater to be pumped from the cement pit into a storm sewer that led to the Delaware River, without a permit authorizing such discharge. (*See* dkt. 721 at 189.)

Count 27 separately alleged that between, on, or about December 4 to December 5, 1999, defendants ATLANTIC STATES, PRISQUE, MAURY, and DAVIDSON knowingly discharged and caused the discharge of a pollutant into navigable waters by causing petroleum-contaminated wastewater to be pumped from the cement pit through a hose into a storm drain leading to the Delaware River, resulting in an 8.5 mile oil sheen on the Delaware River, without a permit authorizing such discharge. (*Id.* at 215.)

The jury found all three of the named individual defendants not guilty on the respective felony charges, but guilty on a lesser-included negligence violation under the CWA. (*Id.* at 190, 215.) It also found each of those named defendants guilty of the conspiracy objective to intentionally violate the CWA, Objective A. (*Id.* at 112–113 n. 64.) The verdict found defendant ATLANTIC STATES guilty of the felony

charges on Counts 12–27, as well as the corresponding objective of the alleged conspiracy. (*Id.* at 3 n. 4 & 112–113 n. 64.) We have held, in ruling upon the post-trial motions, that the evidence was sufficient to establish each of the essential elements of the felony offense charged against ATLANTIC STATES and DAVIDSON on Counts 12–20 and 22–26, and against each of the defendants named in Count 27, including DAVIDSON, despite the fact that the jury found the individual defendants not guilty of the substantive felony and guilty of the corresponding felony conspiracy objective. (*Id.* at 214–215, 230–231.) [99]

This Court recognizes that an enhancement under Section 3C1.1 can be applied not only when a defendant is convicted of a count, but also when defendant is acquitted on a particular count and stands before the court for sentencing on other counts under which defendant was convicted. *See, e.g., Lipscomb,* 284 Fed.Appx. at 926–27, discussed *supra.*

The government has not argued that a Section 3C1.1 enhancement is applicable to defendant PRISQUE for Count 27. *See supra* n. 88. The government has provided no rationale beyond the fact of conviction of the lesser included offense under Count 27 for applying it to defendant MAURY. (*See* Gov. I at 61.) The government argues that DAVIDSON committed perjury as to Counts 12–27 when he testified that he did not instruct workers to dispose of petroleum-impacted wastewater in the cement pit by pumping it on the ground and through the storm sewer. (Gov. I at 63.) [100]

---

99. This Court granted 99 anted acquittal on Count 21 in post-trial motions. (*See* dkt. 721 at 208–209, 215.)

100. The government also argues, in connection with Count 27, that DAVIDSON testified "that he instructed Randy Beck to pump the cement pit on December 4, 1999, which is

what caused the 8 ½ mile oil slick on the Delaware River." (Gov. I at 64.) That was not what DAVIDSON testified, as shown in his testimony excerpted here.

This Court has undertaken to address every substantive felony conviction of each individual defendant within the framework of a potential enhancement for perjury under Section 3C1.1, where sought by the government. Recognizing that the Court can impose such an enhancement where the verdict on a particular count is not guilty (or, as here, guilty on a lesser included offense), *see Lipscomb*, we nevertheless decline to make any findings under Section 3C1.1 on Counts 12–20 and 22–27 as to defendant DAVIDSON. The reason for this ruling is that in our view, the government has not provided the Court with argument that would address its burden of persuasion on those counts, and the Court is not inclined to make an independent evaluation of whether his testimony on Counts 12–27 was willfully false at trial, given that the verdict on that substantive count was a misdemeanor conviction only.

### c. Count 1

The government points out that the jury convicted DAVIDSON of conspiring for two objectives of the conspiracy count: violation of the CWA and false statements, Objectives A and D. It argues that all the evidence pertaining to his testimony as to Counts 4 and 12–27 (discussed above) provides examples of his falsehoods that should produce a perjury enhancement under Section 3C1.1 for DAVIDSON as to Count 1 as well. (Gov. I at 63–64.) [101]

This Court declines to make further findings pertinent to Section 3C1.1 concerning Count 1 as to defendant DAVIDSON, beyond those specifically addressed under Counts 4 and 12–27 above. We have stated our reasoning on this topic in discussing this enhancement as to defendant PRISQUE, and we incorporate that statement here by reference. *See supra.*

### B. USSG § 3C1.1–Obstructing or Impeding the Administration of Justice—Unlawfully Influencing or Attempting to Influence a Witness

Section 3C1.1 is quoted, and the basic principles governing this adjustment are described, *supra* Sec. IV.A. The guidelines recognize that in determining whether an enhancement applies under Section 3C1.1, "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness." USSG § 3C1.1, cmt. n. 3.

One type of conduct to which this adjustment does apply is: "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id.*, cmt. n 4(a). [102] As stated in this application note, the obstructive conduct aimed at a witness or co-defendant may be direct or indirect; it may be an attempt rather than a successful effort; and it may be a threat or other conduct designed to

---

**101.** We need not tarry on the government's argument that DAVIDSON falsely denied that that machinery leaking hydraulic oil was treated by tying rags in futile attempts to stop the leaks. (Gov. I at 64; Davidson II at 20–21.) The testimony could reasonably be understood to indicate that DAVIDSON was confused by the questions, and that his answers meant that workers used rags to mark leaking components to show where the millwrights should make repairs.

**102.** The cited application note, paragraph 4(a), was numbered paragraph 3(a) prior to a guidelines revision effective Nov. 1, 1998. *See* USSG, App. C, Amendment 581 (1998). Therefore, it is cited as paragraph 3(a) in case law discussing the earlier editions. *See, e.g., United States v. Collins*, 90 F.3d 1420, 1430–31 (9th Cir.1996).

intimidate or influence the other person or persons.

The government contends that the trial evidence establishes that defendant DAVIDSON communicated a threat to Atlantic States employee Randall Lieberman, who was a grand jury witness and trial witness in this case, in oral communications DAVIDSON made to Lieberman when DAVIDSON became aware of the federal criminal investigation. (Gov. I at 48–50.) DAVIDSON contends that he did not intend to, and did not in fact, convey any message of threat or attempt to influence any witnesses. (Davidson I at 36–40, 43–45, 47–48; Davidson II at 17, 35.) The relevant portions of the record are described below.

■ This context is no exception to the rule that where the government seeks an upward sentencing adjustment, it bears the burden of proving that the predicate facts exist. *See United States v. Bush,* 94 Fed.Appx. 101, 103 (3d Cir.2004), citing *Belletiere,* 971 F.2d at 965.[103] The government must prove, by a preponderance of the evidence, that "the defendant willfully obstructed or impeded, or willfully attempted to obstruct or impede, the administration of justice." *Id.* (quoting Section 3C1.1). *See United States v. Jenkins,* 275 F.3d 283, 287 (3d Cir.2001) (interpreting "willfully" as used generally in Section 3C1.1, as " 'deliberately or intentionally'; in other words, not 'negligently, inadvertently, or accidentally' ") (internal quotes original). As with other grounds for obstruction under Section 3C1.1, this ground requires a finding that the defendant had the specific intent to obstruct justice. "In other words, there must be a finding that the defendant 'consciously act[ed] with the

*purpose* of obstructing justice.' " *United States v. Hernandez,* 83 F.3d 582, 585 (2d Cir.1996), quoting *United States v. Rivera,* 971 F.2d 876, 894 (2d Cir.1992).

■ The decision whether to apply an enhancement on this ground is inherently fact-sensitive. The "sentencing court's findings as to what acts were performed, what was said, what the speaker meant by his words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous." *United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990). "[T]he commentary does not preclude a finding of a threat any time the defendant can conjure up some conceivable alternative explanation for his words. The sentencing court ... may draw all reasonable inferences from the words used and from the pertinent circumstances." *Id.* at 885; *see Bush,* 94 Fed. Appx. at 103 ("Although [defendant] did testify that he meant only to show ... how confident he was that he would prevail upon appeal, the District Court was not required to accept his explanation"). The Court is required to make factual findings if an issue arises on this ground, and to apply the enhancement if the facts support it. *See, e.g., Hall v. United States,* 46 F.3d 855, 858–59 (8th Cir.1995) (remanding for fact finding whether defendant threatened witness, and if so to apply the enhancement).

The conduct giving rise to this enhancement has included threats of violence and lesser kinds of obstructive acts towards the targets. *See, e.g., United States v. Rinick,* 219 Fed.Appx. 238 (3d Cir.2007) (searching out and threatening to kill cooperating witnesses; court recognized that

---

**103.** We are not aware of any 104 published Third Circuit decisions discussing this particular ground for enhancement under Section 3C1.1. This memorandum therefore cites recent unpublished Third Circuit opinions on this topic, and well-established case law in other circuits.

less egregious behavior will also support the enhancement); *United States v. Drapeau,* 121 F.3d 344, 350–51 (8th Cir.1997) (threat of assault to prospective witnesses); *United States v. Pippen,* 115 F.3d 422, 425 (7th Cir.1997) (attempts to pressure co-defendants to withdraw affidavits and guilty pleas); *United States v. Collins,* 90 F.3d 1420, 1423–24, 1429–30 (9th Cir. 1996) (persuading others to participate in cover-up story); *United States v. Grady,* 997 F.2d 421, 425 (8th Cir.1993) (threat to kill cooperating witness); *United States v. Campbell,* 985 F.2d 341, 347 (7th Cir.1993) (threat to cooperating witness while both in custody); *Rivera,* 971 F.2d at 893–94 (assaulting cooperating co-defendant while threatening with additional injury); *United States v. Davila,* 964 F.2d 778, 784 (8th Cir.1992) (threatening co-conspirator to keep from contacting authorities); *United States v. Hershberger,* 956 F.2d 954, 957 (10th Cir.1992) (threatening to harm several prospective trial witnesses or cooperators).

■ An attempt without more is sufficient to warrant the enhancement when the defendant attempts to influence a person for the purpose of obstruction. *See, e.g., United States v. Phillips,* 367 F.3d 846, 859 (9th Cir.2004) (remanding for findings on whether defendant's conduct was an attempt to influence the prospective witness/co-defendant; "the guidelines do not require materiality when a defendant attempts to influence a witness."); *United States v. Sayetsitty,* 107 F.3d 1405, 1410 (9th Cir.1997) ("Such signalling [to a witness who was testifying], we conclude, qualifies as an obstruction of justice.... The prosecution was not required to prove that [defendant] actually obstructed justice; a showing of attempt is sufficient."); *United States v. Powell,* 973 F.2d 885, 894 (10th Cir.1992) ("A defendant need not actually threaten the witness; he need

only attempt to influence them."). The Second Circuit has adopted a common definition of attempt in this context: "[A] person is guilty of an attempt to commit a crime if he had the intent to commit the crime and engaged in conduct amounting to a substantial step towards its commission." *Shoulberg,* 895 F.2d at 885.

■ The obstructive message need not be communicated directly to the target or targets, or communicated to them at all. Courts have imposed this enhancement where the communication route is indirect and the obstructive message would not necessarily even reach the intended target. In each of the following cases, a Section 3C1.1 adjustment for an indirect act or attempt to influence a witness was affirmed in such circumstances. *See, e.g., Bush,* 94 Fed.Appx. at 102–03 (while defendant was in custody awaiting sentencing, he sent letter to his wife indicating intent to "get" the prosecutor and the case agent witness; letter was reviewed by prison officials who interpreted it as threatening); *Drapeau,* 121 F.3d at 350–51 (defendant's threats communicated to one co-defendant frightened him and frightened the other co-defendant who was the stated target and learned of the threat indirectly); *Powell,* 973 F.2d at 893–94 (defendant communicated threat against witness to witness's sister; also threatened witness directly); *United States v. Capps,* 952 F.2d 1026, 1028–29 (8th Cir.1991) (defendant communicated a threat against informant in a manner that frightened the bartender who heard it; bartender reported it to authorities); *Shoulberg,* 895 F.2d at 886 (defendant sent note to co-defendant indicating intent to threaten a witness; the fact that the content of the note might have been relayed to the target by the intermediary, but was not in fact relayed to target, was sufficient to support the enhancement).

Considering these guideline provisions and case law precedent, we make the following findings.

### *What acts were performed and what was said*

The relevant time period is August through early December, 2003. DAVIDSON and Lieberman were best friends, having developed their friendship gradually over the years since they each began working at Atlantic States in 1994. They were both in non-union, salaried "company" positions, but DAVIDSON was in a superintendent position and Lieberman was a clerk. (Tr. 359 at 125–129; tr. 362 at 46–52.)

As of mid–2003, Lieberman had, since 1998, been the "inventory clerk," a non-union salaried position in which he manned the "scale house" at the entrance to the plant. Lieberman's primary duties were to operate a scale that weighed trucks entering the plant loaded with scrap metal, decide whether the scrap was acceptable for purchase as foundry raw material, and keep records of those tasks. The scale house was a small building located near the end of the finishing line, and it was quiet in comparison to the noise inside the main foundry building. (Tr. 359 at 127–135, 158; tr. 362 at 49, 56.)

Lieberman's job was at the lowest position in "chain of command" at the plant, a fact that had been emphasized to him repeatedly by PRISQUE himself. Lieberman was a "private" in relation to PRISQUE as "general," with those at levels below PRISQUE being described as "sergeants" and "lieutenants." (Tr. 359 at 155–159.) Lieberman testified that at that time in 2003, the "white shirt clique," who reported directly to PRISQUE in the chain of command, included DAVIDSON, MAURY, and Dalrymple. (*Id.* at 161–163; tr. 362 at 99–100.) Lieberman knew that George Shepherd, who had been a member of the "white shirt clique," had left his employment recently under bad circumstances, but he did not know any specifics about the reasons for Shepherd's departure. (Tr. 362 at 93, 99–100.)

The close relationship between DAVIDSON and Lieberman had existed since at least 1998, when DAVIDSON resumed his position as finishing line superintendent after having quit and returned, and Lieberman became inventory clerk. They would get together almost every day, typically for coffee in the scale house and over lunch. (*Id.* at 46–52.) They would have frequent "one-on-one" conversations, and would confide things to one another. (Tr. 359 at 161–162.)

DAVIDSON and Lieberman were not in a direct reporting relationship. However, DAVIDSON did tell Lieberman to do certain tasks on a regular basis, and Lieberman complied. Those tasks included having Lieberman keep on the lookout (from his vantage point in the scale house) for any overflows from the cement pit during operations and notify DAVIDSON so he could send someone to deal with that, and directing Lieberman to run the street sweeper to rid the roadway of oily residues. (Tr. 362 at 48–55.)[104] In an earlier period before Lieberman became inventory clerk, DAVIDSON had issued a written warning to Lieberman for poor workmanship, even though they were best friends

---

**104.** Lieberman worked during the daytime only. He testified at trial that usually when returning to work after the weekly cement pit pumping, which occurred on later shifts, he would notice in the roadway near the storm drains the greenish oily residue that was indicative of cement pit water. (Tr. 362 at 100–103.) This information did not come out in August, 2003, in any of his statements to the EPA investigators or in his testimony to the grand jury. (*Id.* at 119–123.)

then too, and Lieberman did not take it personally. (Tr. 359 at 213–14; tr. 362 at 57–58.) Lieberman testified: "Q: And if you did something wrong, whether you were his best friend or not, [Davidson] was going to write you up; is that correct? A: Yes." (Tr. 362 at 57–58.)

Lieberman was approached by EPA investigators on August 19, 2003, and asked questions about his employment at Atlantic States. That initial contact was made off-site, when he was not accompanied by any fellow Atlantic States employees. (Tr. 359 at 159–161.) [105] The next day, August 20, 2003, Lieberman contacted the EPA agents and sat for a lengthy interview at his home, after signing *Miranda* waivers. (*Id.*; tr. 362 at 72–74.) Later in August, 2003, he testified under oath before the grand jury investigating this case. (Tr. 359 at 161.) As far as he could tell, Lieberman did not have information to contribute in those sessions that incriminated DAVIDSON, and he told the truth about the matters he was asked about. (Tr. 362 at 98–99.) However, he did not inform his best friend DAVIDSON (or anyone else at Atlantic States) that the government had involved him as a witness in its investigation. (*Id.* at 96.)

Lieberman testified at trial to two conversations in which DAVIDSON brought up the subject of the federal criminal investigation. The first of those was in September, 2003, just after DAVIDSON received notification from the government that he was a target of the investigation. Here we quote Lieberman's direct testimony describing what DAVIDSON said then:

Q [I]n early September of 2003, did you have a conversation with Mr. Davidson concerning the federal investigation?

A Yes, I did.

Q Please tell the members of the jury about that.

A Craig came in and—came in for a cup of coffee, as usual. He was very upset. He's got letters in the mail saying what the allegations were—charges. He was confused about how they knew as much information as they did. George Shepherd was mentioned as—there was only four or five white shirts that were there that really knew exactly what went on. George Shepherd got the blame for most of the—much of the investigation.

Q Is this what Mr. Davidson was saying to you?

A Yes.

Q And when Mr. Davidson referred to white shirts—only a few white shirts knew what was going on—did you know what he meant?

A Yes, I did.

Q What did you understand him to mean?

A George Shepherd quit at that time. And he was the one getting blamed for a lot of information.

Q Was Mr. Davidson a white shirt?

A Yes, he was.

**105.** Lieberman testified at trial that when he was first approached by 106 government investigators on August 19, 2003, he was surprised to learn that there was an investigation, having been assured by PRISQUE that there was no investigation; and he did not want to get involved in talking to the government out of fear for his job. (Tr. 359 at 159–161; tr. 362 at 32, 75–76.) He stated that on that first day, when contacted by the government and asked to answer questions, "I was very scared for my job." (Tr. 359 at 160.) At trial he testified that for those reasons, he falsely denied knowledge of certain information about which the agents inquired in that first interview. (*Id.*; tr. 362 at 76–78.)

Q Who were the other people who you understood to be white shirts?

A Tommy Dalrymple, John Prisque, Craig Davidson, and Jeff Maury.

Q And was Mr. Shepherd a white shirt?

A Yes, he was.

(Tr. 359 at 162–163.)

Here we also excerpt a fair portion of the cross-examination of Lieberman describing that same September, 2003 conversation with DAVIDSON:

Q [On direct examination] you told the jury that ... Craig Davidson was very upset when he found out he was the target of an investigation. Do you remember that?

A Yes, I do.

. . . .

Q He became very upset and angry when he got—allegedly got a letter from the government saying he's being targeted. You remember saying that yesterday?

A He was upset.

Q Would you say he was not happy that he was the target of an investigation?

A No, he wasn't.

Q When he came in to talk to you, he came to you because you were his friend, to share his frustration. Would that be an accurate statement?

A Yes, I would say that.

. . . .

Q The question is was he upset that he was being charged?

A Yes, he was.

Q And he expressed that to you; did he not?

A Yes, he did.

Q Did he tell you they were charging him with dumping water into the De-laware River, conspiring to dump water into the Delaware River?

. . . .

A I don't particularly remember that one, but he had told me conspiracy. He told me a few of them. He rattled them off.

Q And one of the conspiracies was that he was being charged by the government, or targeted by the government, with unlawfully dumping water down the drains. Didn't he tell you that?

A He made a few statements of what he was charged for. ... I don't remember exactly what the statements were.

. . . .

Q I'm talking about he was being charged specifically with either dumping water down the drain or telling people. Did he seem angry about that he was being charged with that?

. . . .

A Yes, he was very angry.

(Tr. 362 at 88–92.)

[COURT] [D]id you say that to Tara Donn [EPA investigator], that you heard Mr. Davidson indicate that he thought Mr. Shepherd was bringing these charges?

A Yes.

Q As a matter of fact, you told Tara Donn that Craig said he thought it was Shepherd because he had left the plant under bad circumstances and that Craig thought he had been mistreated. You remember Craig telling you that and you telling that to Tara Donn?

A Yes, I do.

. . . .

Q [W]hen Craig came to you on this day after he got this letter, he thought it was Shepherd that was saying these things about him because Shepherd

left the company, and he told you, he, Craig Davidson, thought Shepherd got a bad deal. You remember telling that to Tara Donn?

A Yes, he mentioned his name.

. . . .

Q He mentioned George Shepherd's name as somebody he suspected was saying bad things about him, correct?

A I wouldn't say bad things about him. I would say he thought George Shepherd was giving information. I don't ... think it was targeted towards Craig. I don't really remember that.

. . . .

Q I'm asking you on this day when Craig came in and he's mad because he finds out he's the target of investigation, he thinks it's possibly a fellow named George Shepherd. And do you recall him saying, and you saying to Tara Donn, that Davidson told you that he thinks George Shepherd talked, because Shepherd quit under bad circumstances and was treated badly? ... Do you remember telling that to Tara Donn?

A Yes, I did.

. . . .

Q Do you remember telling Tara Donn that Davidson wanted to cross examine—you used the word cross examine—the people who were saying things against him? You remember that?

A Yes.

Q You didn't say he wanted to hurt them. He wanted the opportunity to cross examine those people who were

saying things against him. You remember him saying that to you?

A Yeah, he used those words. He'd like to-

Q Cross examine.

A—cross examine, yes.

Q Right. So, he wanted the opportunity to confront the people who were saying these things about him. He used the word cross examine.

A Yes, I remember that.

(*Id.* at 93–96.)

The second of the conversations Lieberman described in which DAVIDSON brought up the subject of the federal criminal investigation was in or about December, 2003.[106] Here we quote Lieberman's direct testimony describing DAVIDSON's statements at that time:

Q Now, directing your attention to November—to December of 2003, about two months later. Did you have another conversation with Mr. Davidson about the federal investigation?

A Yes, I did.

Q Please tell the members of the jury about that conversation.

COURT: And when is this?

GOV.: November, into December of 2003 . . . .

A Craig Davidson came in and he told me that they were going to find out who testified, and they'll deal with them.

Q What did you understand him to mean?

A A direct threat. They were going to fire anybody that tried to testify.

---

**106.** The date of this conversation would have been before DAVIDSON was arrested on December 15, 2003. We will refer to it as the December, 2003 conversation, although it could have been in November or December according to the framework of the question.

This point in time was, however, approximately two months into the period when DAVIDSON and others at Atlantic States had received formal target letters in the federal criminal investigation.

Q And when you said Mr. Davidson came in, what do you mean by that?

A Walked in the door, had his normal coffee and he talked.

Q Walked into the door where?

A The scale house.

Q The conversation that you testified about a couple of minutes ago that took place in early September, 2003, wherein Mr. Davidson shared with you his beliefs about Mr. Shepherd, where did that conversation take place?

A At the scale house, also.

(Tr. 359 at 163–164.)

Here we also excerpt a fair portion of the cross-examination of Lieberman describing that same December, 2003 period and conversation with DAVIDSON:

Q Now, you remained friends with Craig up until the point of his arrest in December of 2003, correct?

A I wouldn't say I—it wasn't that the friendship ended. It was I didn't want to get confused in statements. I didn't want to talk to him and get statements confused. I didn't want to—

Q You didn't want to tell him [objection to portion of question sustained], did you?

A I was sought out by the government. They called me around. I didn't want anything to do with this.

. . . .

Q When Craig came to you sometime in . . . December, you testified that he made the statement that as far as he was concerned, when this investigation blew over that some people were going to be fired. He had something to do with it, correct?

A Yeah [balance of answer stricken based on objection sustained].

Q As far as Craig was concerned, if this blew over he wanted, in your interpretation, the people who said these things, what he considered lies against him, he wanted them gone, didn't he?

A Yes, I would say so. I would say . . . even though we were good friends he would have had me fired.

Q Well, you never said anything bad about Craig.

A I don't have a per—it's nothing personal. . . . It's just telling the truth. I don't have—there's not many instances where I seen Craig do things first-hand. I didn't—you know, all these things are not personal.

Q You never told anyone that Craig did anything. You never told Tara Donn that Craig ordered the pits to be pumped, did you?

A I never heard him say that. I never was there for him to say that.

Q Your . . . testimony was people were doing it the way they were supposed to do it. They were taking it from the cement pit every week and pumping it into the hazmat. That's what you told everybody. Isn't that what you said under oath?

A Yes.

(Tr. 362 at 96–99.)

We find that there is no material dispute as to what was said and the context in which the words were communicated by DAVIDSON in those two conversations with Lieberman, as set forth in the above-quoted portions of the trial record. In that sense, the record speaks for itself. The dispute, rather, centers on the next two questions, which we address in the following order.

### How a listener would reasonably interpret those words

Lieberman testified that DAVIDSON again brought up the topic of the federal criminal investigation in December, 2003, at a time when DAVIDSON had been aware for approximately two months that he personally and Atlantic States were targets of that investigation. Lieberman said DAVIDSON "told me that they were going to find out who testified, and they'll deal with them." Lieberman understood that to mean: "A direct threat. They were going to fire anybody that tried to testify." (Tr. 359 at 163–164.)

We find it entirely reasonable that Lieberman took that to mean that even though he and DAVIDSON were good friends, DAVIDSON would have had Lieberman fired if Lieberman testified as a witness in the federal criminal case at all, even if truthfully and without revealing damaging information about DAVIDSON. As Lieberman said, "I would say . . . even though we were good friends he would have had me fired." (Tr. 362 at 98.) Lieberman was aware that DAVIDSON was a member of the "white shirt clique," headed by plant manager PRISQUE and operating under the established "chain of command." (Tr. 359 at 156–163; tr. 362 at 99–100.) Lieberman himself had been threatened with being fired by PRISQUE at an earlier time when Lieberman consulted an attorney about possibly initiating litigation regarding his serious injuries sustained while working in the cupola. "You can get a settlement and get money, but you won't have a job," is what PRISQUE had told him, stating that his comment was "off the record." (Tr. 359 at 152.) Lieberman had accurately understood PRISQUE's warning to be "a direct threat," and it caused Lieberman to drop the matter. (Id.) Likewise, he was "very scared for [his] job" when the government agents first approached him in this case in August, 2003. (Id. at 160.) That was even before DAVIDSON made his comment to Lieberman in December, 2003. Indeed, at trial, when Lieberman was testifying as a current employee of Atlantic States and perhaps former best friend of DAVIDSON, he repeatedly tried to emphasize that he participated in the investigation most reluctantly: "I was sought out by the government. They called me around. I didn't want anything to do with this." (Tr. 362 at 96.)

It is clear that Lieberman was subjectively frightened for his own livelihood when he heard DAVIDSON say that "they were going to find out who testified, and . . . deal with them." (Tr. 359 at 163.) We find that his fear was reasonable in the circumstances.

### What the speaker meant by his words

Defendant DAVIDSON argues that for the following reasons, his own intent in making those comments should not be interpreted as an actual or attempted threat or effort to influence Lieberman as a potential witness. DAVIDSON contends that what he meant by his statements did not constitute any willful act or attempt with the purpose of threatening or intimidating any witness.

DAVIDSON argues that the Court should interpret his statements, in context, to mean that he believed that George Shepherd was the only individual cooperating with the government, and he was merely speaking his opinion to his friend Lieberman that Shepherd was cooperating because he was treated badly by Atlantic States and had left under bad circumstances. DAVIDSON would speak to Lieberman about the pending investigation because they were good friends and he treated Lieberman as a confidante. DAVIDSON vented about how he wanted to confront the individuals who were mak-

ing up lies about him, as any rational person would. No one else was present during those discussions, and DAVIDSON did not ask Lieberman to relay any threats to anyone. DAVIDSON adds that he had no reason to think that Lieberman had anything negative to say about DAVIDSON. (Davidson I at 36–40, 43–47, 47–48; Davidson II at 16–17, 35.) [107]

This argument emphasizes the fact that there is no evidence that DAVIDSON had any knowledge that Lieberman was cooperating with the government at the times when DAVIDSON made his statements to Lieberman. It also highlights certain points brought out in cross-examination of Lieberman, which defendant summarizes as follows:

- Lieberman testified that when DAVIDSON got the target letter from the government, he was upset and came to Lieberman as a friend to share his frustration, and that DAVIDSON was very angry that he was being charged with dumping water down the drain or telling people to do so.
- Lieberman testified that one of the statements DAVIDSON made to Lieberman was that he wanted to "cross-examine" the people who were saying things against him, that is, he wanted the opportunity to confront them.
- Lieberman testified that DAVIDSON wanted the people telling lies about him "gone" from Atlantic States.

(Davidson I at 39–40.)

We have carefully considered the arguments of both parties as to how the Court should interpret what DAVIDSON meant by his statements to Lieberman. Having made our own independent review of the record, we make the following findings:

(1) The record is undisputed as to what DAVIDSON said in those two conversations with Lieberman, and the context in which his comments were made.

(2) Lieberman reasonably interpreted DAVIDSON's words to connote that if Lieberman provided information to the government investigation he could lose his job at Atlantic States.

(3) DAVIDSON himself did not subjectively intend his words as a threat or an effort to influence Lieberman, or others indirectly, not to respond to inquiries for information from the government.

■ The Court finds that DAVIDSON's comments to his friend Lieberman, at a time when DAVIDSON was under investigation but was not aware that Lieberman was an actual or potential government witness, and when DAVIDSON did not know of any damaging information that Lieberman could contribute to such investigation, did not constitute a deliberate and intentional attempt to obstruct or impede the administration of justice. Based on these findings, the 2–level adjustment under Section 3C1.1, cmt. n. 4(a) does not apply.

## V. CHAPTER THREE, PART D (MULTIPLE COUNTS)

### A. USSG § 3D1.1–Procedure for Determining Offense Level on Multiple Counts

The guidelines require the sentencing court to follow these steps where, as here,

---

**107.** Our ruling on this issue is based primarily upon the trial testimony of witness Lieberman, but we have also taken into account his prior statements to government investigators as well as his grand jury testimony, as summarized in defendant's briefs. (Davidson I at 36–40; Davidson II at 16–17.) We have assessed all of this evidence based upon the parties' arguments in their briefs.

a defendant has been convicted of more than one count:

 (1) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in § 3D1.2.

 (2) Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3.

 (3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4.

USSG § 3D1.1(a).

### B. USSG § 3D1.2–Groups of Closely Related Counts

Section 3D1.2 provides rules for determining whether multiple counts of conviction should be grouped. "The rules in this Part seek to provide incremental punishment for significant additional criminal conduct.... In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines." USSG Ch.3, Pt. D., intro. cmt. "Some offenses, *e.g.*, racketeering and conspiracy, may be 'composite' in that they involve a pattern of conduct or scheme involving multiple underlying offenses. The[se] rules ... are to be used to determine the offense level for such composite offenses from the offense level for the underlying offenses." *Id.*

Section 3D1.2 provides in general that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." USSG § 3D1.2. The four subsections of Section 3D1.2, with accompanying application notes, provide rules that specify situations in which counts are to be grouped together.

"A single case may result in application of several of the [grouping] rules." USSG § 3D1.2, cmt. n. 7. The most frequently-applied rule of Section 3D1.2, subsection

(d), requires grouping "when the offense level is determined largely on the basis of the total amount of harm or loss, ... or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." USSG § 3D1.2(d). A conspiracy to commit an offense is covered under subsection (d) if the offense that is the object of the conspiracy is covered under subsection (d). *Id.*, cmt. n. 6. The commentary gives as one example: "The defendant is convicted of three counts of discharging toxic substances from a single facility." *Id.*, example (7). However, subsection (d) itself says that for multiple counts that are not itemized in subsection (d) as either required to be grouped or excluded from being grouped under that subsection, grouping "may or may not be appropriate; a case-by-case determination must be made". USSG § 3D1.2(d). Environmental offenses calculated under Section 2Q1.3, such as those in this case, are not listed as required for, or excluded from, grouping under subsection (d). The Introductory Commentary adds that "many environmental offenses" qualify for grouping under this rule. USSG Ch.3, Pt. D, intro. cmt.

We find, and the parties do not dispute, that the CWA offenses and the corresponding Count 1 conspiracy objective, Objective A, clearly qualify for grouping under Section 3D1.2(d). (*See, e.g.,* Davidson I at 50.) The parties also do not dispute that the false statement offenses committed in connection with the search warrant execution involving the suspected CWA offenses should be grouped with the underlying CWA offenses. We agree that this is an appropriate application of subsection (b), which provides for grouping:

 When counts involve the same victim and two or more acts or transactions

connected by a common criminal objective or constituting part of a common scheme or plan.

USSG § 3D1.2(b). Also, this subsection, like subsection (d), requires grouping "[w]hen one count charges a conspiracy ... and the other charges a substantive offense that was the sole object of the conspiracy." *Id.*, cmt. n. 4.[108]

Applying these two subsections, (b) and (d), we find that all convictions of defendant DAVIDSON (Counts 4, 12–20, 22–27, and Count 1, Objectives A and D) form one Group. We also find, for the same reasons, that the CWA-related convictions of defendant MAURY (Counts 3, 27–32, and Count 1, Objectives A, C, and D) should be grouped. Likewise, we find that the CWA-related convictions of defendant PRISQUE (Counts 27 and Count 1, Objective A) should be grouped. We address the further arguments of defendants MAURY and PRISQUE *infra.*

Subsection (b), quoted above, uses the term "victim." The same term is used in subsection (a), quoted in the margin.[109] The commentary provides this explanation:

> The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (*e.g.,* drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is

harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. Where one count, for example, involves unlawfully entering the United States and the other involves possession of fraudulent evidence of citizenship, the counts are grouped together because the societal interests harmed (the interests protected by laws governing immigration) are closely related. In contrast, where one count involves the sale of controlled substances and the other involves an immigration law violation, the counts are not grouped together because different societal interests are harmed. Ambiguities should be resolved in accordance with the purpose of this section ... to identify and group "counts involving substantially the same harm."

USSG § 3D1.2, cmt. n. 2.

Grouping under subsection (b) requires that the multiple counts not only involve the same "victim," but also that they constitute "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." § 3D1.2(b). The commentary states:

> Subsection (b) provides that counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times. This provision does not authorize

---

**108.** The commentary directs that where, as here, a defendant is convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses, we "treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses.... Then apply the ordinary grouping rules...." USSG § 3D1.2, cmt. n. 8.

**109.** Grouping is required under subsection (a) "[w]hen counts involve the same victim and the same act or transaction." USSG § 3D1.2(a). The parties do not argue that this applies here.

the grouping of offenses that cannot be considered to represent essentially one composite harm (*e.g.*, robbery of the same victim on different occasions involves multiple, separate instances of fear and risk of harm, not one composite harm).

. . . .

*Examples:* . . . . (2) The defendant is convicted of two counts of mail fraud and one count of wire fraud, each in furtherance of a single fraudulent scheme. The counts are to be grouped together, even if the mailings and telephone call occurred on different days. . . . *But:* (5) The defendant is convicted of two counts of rape for raping the same person on different days. The counts *are not* to be grouped together.

*Id.*, cmt. n. 4.

 "[W]hen crimes involve 'indirect or secondary victims'," or where society at large is the victim, the crime is treated as a "victimless crime" for purposes of the grouping rules. *United States v. Bush,* 56 F.3d 536, 538–42 (3d Cir.1995) (affirming separate grouping of firearms offenses based on differences including place, time, nature of guns, and purposes of acts). For such "victimless crimes", "the grouping decision must be based primarily upon the nature of the interest invaded by each offense." *Id.* at 538 (quotation and citation omitted); *United States v. Riviere,* 924 F.2d 1289, 1304 (3d Cir.1991); *see Boggi,* 74 F.3d at 473–74, 478–79 (district court separated racketeering and substantive counts of unlawful receipt of payments by union official into three groups based on different payors; ruling not challenged on appeal; circuit court approved of abuse of trust enhancements in all three groups but remanded for resentencing on other grounds); *United States v. Beard,* 960 F.2d 965, 967–69 (11th Cir.1992) (finding district court properly did not group two

obstruction convictions for acts that arose out of same scheme but occurred two years apart and involved different harms— one involved interfering with proper sentencing of another defendant, and the other involved attempt to suborn perjury before grand jury).

All of the convictions of defendant FAUBERT arose out of the OSHA investigation of the Coxe forklift fatality. Although two of those convictions pertained to his obstruction and false statements regarding the earlier forklift injury to worker Marchan, there is no dispute that Marchan's injury was investigated only as part of the larger OSHA investigation of the circumstances surrounding the forklift fatality of Coxe on March 24, 2000. For this reason, and the parties do not dispute, we find that all convictions of defendant FAUBERT (Counts 7, 9, 10 and Count 1, Objectives C, D, and E) form one Group pursuant to Section 3D1.2(b).

Defendants MAURY and PRISQUE each have convictions for both OSHA-related offenses and CWA-related offenses. In addition, PRISQUE has convictions for CAA-related offenses. They each argue that the OSHA-related offenses should be grouped with the environmental offenses so they would have but one group under Section 3D1.2. PRISQUE alternatively argues that at most, his offenses should be separated into two groups and that his CAA-related offenses should be grouped with the CWA-related offenses. The government disagrees, arguing that the CWA and CAA offenses should be separated, and also the three OSHA investigations concerning the workplace injuries to Coxe, Owens, and Velarde should be separately grouped. (Gov. I at 16–24, 48; Prisque I at 97–104, 130, 132–137; Prisque II at 27–29; Maury I at 55–57; Maury II at 27.)

 It is true that the overarching objective of the conspiracy, as alleged in the

indictment, was to maximize pipe production at the expense of the environment and worker safety. However, in our view the societal interests involved were distinct in each of the five categories, and the respective offenses cannot be considered to represent essentially one composite harm. Defendant PRISQUE argues that in the case of the three OSHA investigations, the injured workers were indirect or secondary victims, so their status cannot support separate grouping. We do agree with that point. However, we find that the entirely separate OSHA investigations launched as a consequence of each of the casualties sustained represented separate "societal interests" in having the causes determined and necessary corrective action taken to avoid future similar events. We further find that those three separate OSHA investigations were separated by initiating incident, time and duration, expenditure of OSHA time and attention, and relevant persons, witnesses, and industrial machinery. Therefore, the separate conduct of the named individuals at ATLANTIC STATES to obstruct those three OSHA investigations did not represent essentially one composite harm.

As for the distinction between the CWA and CAA counts of conviction, the evidence established that the CAA and CWA substantive offenses in this case were committed under entirely separate statutory and regulatory schemes, under which ATLANTIC STATES was required to and did maintain permits for discharge into the air and the water that were each individually tailored to the facility. Each set of permits had entirely separate standards and record-keeping and enforcement requirements. The lengthy history of the issuance and enforcement of those separate air and water permits is part of the record underlying those offenses in this case. (*See* dkt. 721 at 189–192, 243–250.)

We cannot conclude that the "societal interest" being advanced by the government in this prosecution was identical for the air and water violations. We also find that the nature of the violative conduct under the CWA and CAA offenses did not represent essentially one composite harm. Those two types of conduct were distinct at the plant, involving clearly separate activities and operating systems. As the commentary to subsection (b) states, "[a]mbiguities should be resolved in accordance with the purpose of this section . . . to identify and group 'counts involving substantially the same harm.'" USSG § 3D1.2, cmt. n. 2. In our view, particularly in light of the significant amount of separate evidence the government had to present in order to establish the proofs under the CWA and CAA counts, it is not appropriate here to treat those counts as "constituting a single offense for purposes of the guidelines." USSG Ch.3, Pt. D., intro. cmt.

For the reasons stated, we find as follows. The convictions of defendant DAVIDSON form one Group. The convictions of defendant FAUBERT form one Group. The convictions of defendant MAURY will be separated into two groups. The CWA-related convictions of defendant MAURY (Counts 3, 27–32, and Count 1, Objectives A, C, and D) form Group I, and the convictions of defendant MAURY pertaining to obstruction of the OSHA investigation of the Coxe incident (Count 9 and Count 1, Objectives C and E) form Group II. The convictions of defendant PRISQUE will be separated into five groups: Group I (Count 8–obstruction of OSHA investigation of Owens incident, and Count 1, Objectives C and E); Group II (Count 9–obstruction of OSHA investigation of Coxe incident, and Count I, Objectives C and E); Group III (Count 11–obstruction of OSHA investigation of Ve-

larde incident, and Count 1, Objectives C and E); Group IV (Count 27–violation of CWA, and Count 1, Objective A); and Group V (Count 34–violation of CAA, and Count 1, Objective B).

### C. USSG § 3D1.4–Determining the Combined Offense Level

Part D of the guidelines "provides rules for determining a single offense level that encompasses all the counts of which the defendant is convicted." USSG Ch.3, Pt. D., intro. cmt. Section 3D1.3 provides the method when multiple counts are combined into one Group. Section 3D1.4 provides the method of calculating a single offense level when there is more than one Group. It states in pertinent part:

> The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1½ | add 1 level |
| 2 | add 2 levels |
| 2½—3 | add 3 levels |
| 3½—5 | add 4 levels |
| More than 5 | add 5 levels. |

> In determining the number of Units for purposes of this section:
>
> (a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

USSG § 3D1.4.

The following subsections set forth the offense level calculations at Step 1 for each of the individual defendants, based upon the findings and rulings contained in this memorandum.

### 1. John Prisque

*GROUP I*

*Count 1*—Conspiracy, Objectives C and E (OSHA)
*Count 8*—Obstruction of OSHA Investigation of Owens Incident

| | | |
|---|---|---|
| Base offense level | § 2J1.2(a) | 12 |
| Substantial interference | § 2J1.2(b)(2) | 3 |
| Aggravating role | § 3B1.1(a) | 4 |
| Abuse of position of private trust | § 3B1.3 | 2 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level (Subtotal) | | <u>23</u> |

*GROUP II*

*Count 1*—Conspiracy, Objectives C and E (OSHA)
*Count 9*—Obstruction of OSHA Investigation of Coxe Incident

| | | |
|---|---|---|
| Base offense level | § 2J1.2(a) | 12 |
| Substantial interference | § 2J1.2(b)(2) | 3 |
| Aggravating role | § 3B1.1(a) | 4 |

| | | |
|---|---|---|
| Abuse of position of private trust | § 3B1.3 | 2 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level (Subtotal) | | <u>23</u> |

*GROUP III*

*Count 1*—Conspiracy, Objectives C and E (OSHA)
*Count 11*–0Obstruction of OSHA Investigation of Velarde Incident

| | | |
|---|---|---|
| Base offense level | § 2J1.2(a) | 12 |
| Substantial interference | § 2J1.2(b)(2) | 3 |
| Aggravating role | § 3B1.1(a) | 4 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level (Subtotal) | | <u>21</u> |

*GROUP IV*

*Count 1*—Conspiracy, Objective A(CWA)
*Count 27*—Violation of CWA

| | | |
|---|---|---|
| Base offense level | § 2Q1.3(a) | 6 |
| Discharge of pollutant | § 2Q1.3(b)(1)(A) | 6 |
| Discharge in violation of permit | § 2Q1.3(b)(4) | 4 |
| Aggravating role | § 3B1.1(a) | 4 |
| Adjusted Offense Level (Subtotal) | | <u>20</u> |

*GROUP V*

*Count 1*—Conspiracy, Objective B(CAA)
*Count 34*—Violation of CAA

| | | |
|---|---|---|
| Base offense level | § 2Q1.3(a) | 6 |
| Discharge of pollutant | § 2Q1.3(b)(1)(A) | 6 |
| Discharge in violation of permit | § 2Q1.3(b)(4) | 4 |
| Aggravating role | § 3B1.1(a) | 4 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level (Subtotal) | | <u>22</u> |

Multiple–Count Adjustment (See § 3D1.4)

| | # | Units |
|---|---|---|
| Adjusted Offense Level for Group I | 23 | 1 |
| Adjusted Offense Level for Group II | 23 | 1 |
| Adjusted Offense Level for Group III | 21 | 1 |

| | | |
|---|---|---|
| Adjusted Offense Level for Group IV | 20 | 1 |
| Adjusted Offense Level for Group V | 22 | 1 |
| Total Number of Units | | <u>5</u> |
| Greater Adjusted Offense Level | 23 | |
| Increase in Offense Level | <u>4</u> | |
| Combined Adjusted Offense Level | | <u>27</u> |

### 2. Scott Faubert

*Count 1*—Conspiracy, Objectives C, D, and E (OSHA, False statements)
*Count 7*—False statement re: Marchan injury during OSHA Coxe Investigation
*Count 9*—Obstruction of OSHA Investigation of Coxe Incident
*Count 10*—Obstruction of Coxe Investigation re: Marchan injury

| | | |
|---|---|---|
| Base offense level | § 2J1.2(a) | 12 |
| Substantial interference | § 2J1.2(b)(2) | 3 |
| Aggravating role | § 3B1.1(b) | 3 |
| Abuse of position of private trust | § 3B1.3 | 2 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level | | <u>22</u> |

### 3. Jeffrey Maury

*GROUP I*

*Count 1*—Conspiracy, Objectives A, C, and D (CWA, Defraud EPA, False statements)
*Count 3*—False statement to federal officials
*Count 27*—Violation of CWA (cement pit)
*Counts 28–32*—Violation of CWA (# 4 pit)

| | | |
|---|---|---|
| Base offense level | § 2Q1.3(a) | 6 |
| Discharge of pollutant | § 2Q1.3(b)(1)(A) | 6 |
| Discharge in violation of permit | § 2Q1.3(b)(4) | 4 |
| Aggravating role | § 3B1.1(b) | 3 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level (Subtotal) | | <u>21</u> |

*GROUP II*

*Count 1*—Conspiracy, Objectives C and E (OSHA)
*Count 9*—Obstruction of OSHA Investigation of Coxe Incident

| | | |
|---|---|---|
| Base offense level | § 2J1.2(a) | 12 |
| Substantial interference | § 2J1.2(b)(2) | 3 |

| | | |
|---|---|---|
| Aggravating role | § 3B1.1(b) | 3 |
| Obstruction (perjury) | § 3C1.1 | 2 |
| Adjusted Offense Level (Subtotal) | | <u>20</u> |

Multiple–Count Adjustment (See § 3D1.4)

| | # | Units | |
|---|---|---|---|
| Adjusted Offense Level for Group I | 21 | 1 | |
| Adjusted Offense Level for Group II | 20 | 1 | |
| Total Number of Units | | <u>2</u> | |
| Greater Adjusted Offense Level | <u>21</u> | | |
| Increase in Offense Level | <u>2</u> | | |
| Combined Adjusted Offense Level | | | <u>23</u> |

### 4. Craig Davidson

*Count 1*—Conspiracy, Objectives A and D (CWA, False statements)
*Count 4*—False statement to federal officials
*Counts 12–20 and 22–27*—Violation of CWA (cement pit)

| | | |
|---|---|---|
| Base offense level | § 2Q1.3(a) | 6 |
| Discharge of pollutant | § 2Q1.3(b)(1)(A) | 6 |
| Discharge in violation of permit | § 2Q1.3(b)(4) | 4 |
| Aggravating role | § 3B1.1(b) | 3 |
| Adjusted Offense Level | | <u>19</u> |

### SUMMARY

This memorandum states the findings of the Court at Step 1 of the sentencing process for the individual defendants in this case. It was circulated to the parties in substantially similar form on December 31, 2008. Further proceedings led to the completion of the sentencing hearings on April 20–24, 2009. In that process, we did consider the further objections of each individual defendant, as well as the corporate defendant, but we made findings consistent with this memorandum at their sentencing hearings. Therefore, we are filing this document as a memorandum opinion at this time.

The findings and conclusions forming the basis of the calculations set forth here are contained in the numbered sections of this memorandum that correspond to the respective guideline sections.